**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| GIFFORDS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:21-cv-02887 |
| | ) | |
| v. | ) | Hon. Emmet G. Sullivan |
| | ) | |
| NATIONAL RIFLE ASSOCIATION OF AMERICA POLITICAL VICTORY FUND, NATIONAL RIFLE ASSOCIATION OF AMERICA INSTITUTE FOR LEGISLATIVE ACTION, MATT ROSENDALE FOR MONTANA, and JOSH HAWLEY FOR SENATE, | ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

_____/

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE NATIONAL RIFLE ASSOCIATION OF AMERICA POLITICAL VICTORY FUND AND NATIONAL RIFLE ASSOCIATION OF AMERICA'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION .......................................................................................................... 1

BACKGROUND ............................................................................................................ 2

    I.     The NRA Affiliates................................................................................. 2

    II.    Plaintiff's FEC Complaints ..................................................................... 2

    III.   The Commission ................................................................................... 10

    IV.   The Weintraub Scheme......................................................................... 10

    V.    The Delay Suit and the Commission's Acts ........................................ 14

ARGUMENT ............................................................................................................... 17

    I.     This Court Lacks Subject Matter Jurisdiction Over Plaintiff's Claims. .............. 17

         A.   It is Plaintiff's burden to demonstrate that this Court has subject matter jurisdiction, and it must do so by a preponderance of the evidence. ....................................................................................... 17

         B.   Plaintiff cannot show that the FEC failed to act under Section 30109(a)(8) because the FEC clearly acted on the FEC Complaints....... 18

    II.    Plaintiff Lacks Article III Standing........................................................ 22

         A.   Standing is fundamental to Article III's case-or-controversy requirement, and Plaintiff cannot satisfy its burden with speculative allegations ......................................................................... 22

         B.   Plaintiff fails to demonstrate the requisite injury for Article III standing .............................................................................................. 24

         C.   Plaintiff fails to satisfy the causation requirement for Article III standing .............................................................................................. 28

         D.   Plaintiff fails to satisfy the redressability requirement for Article III standing ....................................................................................... 32

         E.   Plaintiff may not end-run Article III standing requirements by claiming competitor-standing ................................................................ 33

    III.   The Five-Year Statute of Limitations Bars Plaintiff's Pre-November-2016 Claims ................................................................................................... 36

         A.   Legal Standard .................................................................................... 36

         B.   28 U.S.C. § 2462 applies to the Earlier Claims. .................................. 37

         C.   The Earlier Claims are time-barred by 28 U.S.C. § 2462....................... 39

CONCLUSION............................................................................................................. 44

i

# TABLE OF AUTHORITIES

## Cases

*21st Century Telesis Joint Venture v. FCC*, 318 F.3d 192  (D.C. Cir. 2003) .............................. 23

*3M Co. (Minnesota Min. & Mfg.) v. Browner*, 17 F.3d 1453 (D.C. Cir. 1994).............. 39, 42, 43

*Already, LLC v. Nike, Inc.*, 568 U.S. 85 (2013)................................................................... 33, 34

*ASARCO Inc. v. Kadish,* 490 U.S. 605 (1989)............................................................................ 31

*Biton v. Palestinian Interim Self-Gov't Auth.*, 310 F. Supp. 2d 172 (D.D.C. 2004)................... 23

*Browning v. Clinton*, 292 F.3d 235 (D.C. Cir. 2002) ................................................................. 37

*Canadian Lumber Trade All. v. United States*, 517 F.3d 1319 (Fed. Cir. 2008)........................ 33

*Citizens for Resp. & Ethics in Washington v FEC*, 892 F.3d 434 (D.C. Cir. 2018)................... 14

*Citizens for Resp. & Ethics in Washington v. Am. Action Network*, 410 F. Supp. 3d 1 (D.D.C. 2019) ........................................................................................................................ 41

*Citizens for Resp. & Ethics in Washington v. Fed. Election Comm'n*, 236 F. Supp. 3d 378 (D.D.C. 2017) ................................................................................................................ 37, 43

\* *Citizens for Responsibility & Ethics in Washington v. FEC*, 993 F.3d 880 (D.C. Cir. 2021) ................................................................................................................................................ 20

*Citizens United v. FEC*, 558 U.S. 310 (2010)............................................................................. 36

*Clapper v. Amnesty Intern. USA*, 568 U.S. 398 (2013) .............................................................. 24

*Common Cause v. FEC*, 108 F.3d 413 (D.C. Cir. 1997) ....................................................... 22, 25

*Common Cause v. FEC,* 489 F. Supp. 738 (D.D.C. 1980) .......................................................... 13

*Consumer Fed'n of Am.* v. *Upjohn Co.*, 346 A.2d 725 (D.C. Cir. 1975).................................... 25

*Cope v. Anderson*, 331 U.S. 461 (1947) .................................................................................... 38

*Earle v. D.C.*, 707 F.3d 299 (D.C. Cir. 2012)............................................................................. 43

*Epps v. US. Capitol Police Bd*, 719 F. Supp. 2d 7 (D.D.C. 2010)............................................. 17

*FEC v. Akins*, 524 U.S. 11 (1998)............................................................................................... 25

*FEC v. Christian Coal.*, 965 F. Supp. 66 (D.D.C. 1997)............................................................ 39

*FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27 (1981)...................................... 14

*FEC v. Nat'l Republican Senatorial Comm.*, 877 F. Supp. 15 (D.D.C. 1995) ..................... 40, 41

\**FEC v. Nat'l Republican Senatorial Comm.*, 966 F.2d 1471 (D.C. Cir. 1992) ......................... 22

*FEC v. Nat'l Right to Work Comm., Inc.*, 916 F. Supp. 10 (D.D.C. 1996) .......................... 38, 40

*FEC v. Toledano*, 317 F.3d 939 (9th Cir. 2002), *as amended on denial of reh'g* (Jan. 30, 2003) ............................................................................................................................... 38

*Flores ex rel. J.F. v. District of Columbia*, 437 F. Supp. 2d 22 (D.D.C. 2006) ........................ 24

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000)............... 23

*FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990)................................................................. 23

*Gabelli v. SEC*, 568 U.S. 442 (2013) ......................................................................................... 39

*Garelick v. Sullivan*, 987 F.2d 913 (2d Cir. 1993)..................................................................... 31

*Giffords v FEC*, No. 1:19-cv-1192-EGS (D.D.C. Nov. 1, 2021)........................................ passim

\* *Gottlieb v. FEC*, 143 F.3d 618 (D.C. Cir. 1998)............................................................ 24, 31, 35

*Grand Lodge of Fraternal Ord. of Police v. Ashcroft*, 185 F. Supp. 2d 9 (D.D.C. 2001)........... 18

*In re U.S. Catholic Conference (USCC)*, 885 F.2d 1020 (2d Cir. 1989).................................... 33

*Kokesh v. S.E.C.*, 137 S. Ct. 1635 (2017) .................................................................................. 38

*Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375 (1994) .............................................. 18

*Laroque v. Holder*, 650 F.3d 777 (D.C. Cir. 2011) .................................................................... 35

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ............................................................ 23, 31

*McConnell v. FEC*, 540 U.S. 93 (2003)...................................................................................... 36

*McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178 (1936)..................................... 23

*Nader v. FEC*, 725 F.3d 226 (D.C. Cir. 2013)............................................................................ 35

*New World Radio, Inc. v. F.C.C.*, 294 F.3d 164 (2002) .............................................................. 34

\**Pub. Citizen, Inc. v. FERC*, 839 F.3d 1165 (D.C. Cir. 2016) ..................................................... 21

*Raines v. Byrd*, 521 U.S. 811 (1997) ......................................................................................... 34

*Renal Physicians Ass'n* v. *U.S. Dep't of Health & Human Servs.*, 489 F.3d 1267 (D.C. Cir. 2007) .......................................................................................................................... 32

*Schmidt v. U.S. Capitol Police Bd.*, 826 F. Supp. 2d 59 (D.D.C. 2011) ..................................... 23

*\*Shays v. FEC*, 414 F.3d 76 (D.C. Cir. 2005) ............................................................................. 35

*Shekoyan v. Sibley Int'l Corp.*, 217 F. Supp. 2d 59 (D.D.C. 2002) ............................................ 18

*Sherley v. Sebelius*, 610 F.3d 69 (D.C. Cir. 2010) ..................................................................... 33

*Sierra Club v. Okla. Gas & Elec. Co.*, 816 F.3d 666 (10th Cir. 2016) ........................... 37, 38, 44

*Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26 (1976) ................... 28, 30

*Smith–Haynie v. District of Columbia*, 155 F.3d 575 (D.C.Cir.1998) ....................................... 37

*State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48 (D.C. Cir. 2015) ........................................ 34

*Strumsky v. Wash. Post Co.*, 842 F. Supp. 2d 215 (D.D.C. 2012) ............................................. 37

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ......................................................... 25

*Trawinski v. United Techs.*, 313 F.3d 1295 (11th Cir. 2002) .................................................... 37

*United States v. Meyer*, 808 F.2d 912 (1st Cir. 1987) ............................................................... 41

*Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464 (1982) ........................................................................................................ 34

*Williams v. Purdue Pharma Co.*, 297 F. Supp. 2d 171 (D.D.C. 2003) ....................................... 24

## Statutes & Regulations

11 C.F.R. § 109.20 ......................................................................................................................... 3

11 C.F.R. § 109.21 .................................................................................................................. passim

11 C.F.R. § 111.24 ....................................................................................................................... 37

28 U.S.C. § 2462 ......................................................................................................... 1, 37, 39, 44

52 U.S.C. § 30101 .......................................................................................................................... 3

52 U.S.C. § 30104 ...................................................................................................................... 5, 6

52 U.S.C. § 30106 ........................................................................................................................ 11

52 U.S.C. § 30109 .................................................................................................................. passim

52 U.S.C. § 30116 ............................................................................................... 5, 6

52 U.S.C. § 30118 ............................................................................................... 5, 6

**Rules**

Fed. R. Civ. P. 12(b)(1) .................................................................................. 1, 17, 18

Fed. R. Civ. P. 12(b)(6) ............................................................................. 1, 17, 36, 37

**Other Authorities**

13 Fed. Prac. & Proc. Juris. § 3522 (3d ed.) ............................................................ 18

## INTRODUCTION

Defendants the National Rifle Association of America Political Victory Fund ("NRA-PVF") and the National Rifle Association of America ("NRA") (collectively, "the NRA Affiliates") seek dismissal of Plaintiff's complaint under Rule 12(b)(1) and (6) of the Federal Rules of Civil Procedure. First, Plaintiff's complaint should be dismissed under Rule 12(b)(1) because Plaintiff's basis for subject matter jurisdiction—the idea that the Federal Election Commission (the "Commission" or the "FEC") "failed to act" on Plaintiff's administrative complaints under 52 U.S.C. § 30109(a)(8)—is factually inaccurate because the FEC *did* act on those matters. Therefore, this Court lacks jurisdiction over Plaintiff's claims, and its complaint should be dismissed.

Plaintiff's complaint should also be dismissed under Rule 12(b)(1) for lack of standing. Given Plaintiff's own claims of success in the American political arena, Plaintiff simply cannot demonstrate an Article III injury in this case. Plaintiff also fails to show the requisite traceability and redressability because the "harm" alleged by Plaintiff results from independent decisions of voters and elected officials—essentially, the political process at work. For those reasons, Plaintiff failed to demonstrate standing by a preponderance of the evidence.

Plaintiff's complaint likewise fails to state a claim upon which relief can be granted for the reasons stated in Defendant Josh Hawley for Senate's motion to dismiss and brief in support. ECF Nos. 31; 31-1. The NRA Affiliates therefore join those aspects of Josh Hawley for Senate's motion to dismiss and brief in support seeking dismissal under Rule 12(b)(6), and hereby incorporate its reasoning herein.

Finally, Plaintiff's pre-November-2016 claims should be dismissed under Rule 12(b)(6) because those claims are time-barred by the five-year statute of limitations under 28 U.S.C. § 2462.

For these reasons, and as further explained below, the NRA Affiliates respectfully request that this Court grant the instant motion and dismiss Plaintiff's complaint with prejudice.

## BACKGROUND

### I.    The NRA Affiliates

This case arises from the alleged failure of the FEC to act on a series of administrative complaints that Plaintiff filed with the FEC beginning in 2018 (hereinafter "the FEC Complaints"). The NRA-PVF and the NRA-ILA (short form for the National Rifle Association of America Institute for Legislative Action) were named as respondents in those FEC Complaints. The NRA-PVF, which is registered with the FEC as a separate segregated fund,[1] is the political action committee of the NRA.[2]  Although named as a respondent in the FEC Complaints, the NRA-ILA is not a separate entity, but is the principal lobbying arm of the NRA,[3] which is a tax-exempt organization under Section 501(c)(4) of the Internal Revenue Code. The NRA-ILA focuses on preserving the right of law-abiding individuals to purchase, possess, and use firearms for legitimate purposes as guaranteed by the Second Amendment to the U.S. Constitution, as well as educating the public on firearm ownership in America.[4]

### II.    Plaintiff's FEC Complaints

Beginning in 2018, Plaintiff filed with the Commission several administrative complaints—the FEC Complaints—designated by the FEC as Matter Under Review ("MUR") Nos. 7427, 7497, 7524, 7553 and 7621. In its FEC Complaints, Plaintiff alleged that the NRA Affiliates, among others, violated prohibitions against coordinated communications and corporate contributions to candidates, as well as reporting requirements under the Federal Election Campaign

---

[1] *See* Financial Summary, National Rifle Association of American Political Victory Fund, https://www.fec.gov/data/committee/C00053553/?tab=summary (last visited Jan. 28, 2022).

[2] Mission Statement, National Rifle Association of America Political Victory Fund, https://www.nrapvf.org/about-pvf/ (last visited Jan. 28, 2022).

[3] About the NRA Institute for Legislative Action, National Rifle Association of America Institute for Legislative Action, https://www.nraila.org/about/ (last visited Jan. 28, 2022).

[4] *Id.*

Act of 1971, 52 U.S.C. §§ 30101–30126, 30141–30146 ("FECA").

The common theme of the FEC Complaints is an alleged scheme to violate FECA through common vendors. Plaintiff primarily speculates that because the NRA Affiliates and certain candidates shared vendors that have multiple entities, there was coordination in violation of FECA. But coordination requires more than just a business relationship with mutual vendors, or conversation between representatives from each side; it is an expressly defined legal term.

A communication is "coordinated" when made in cooperation, consultation, or concert with, or at the request or suggestion of, a candidate, a candidate's authorized committee, or their agent. 11 C.F.R. § 109.20. When certain communications are "coordinated," they constitute "contributions" for purposes of contribution limits and reporting. 52 U.S.C. § 30101(71)(B), 11 C.F.R. § 109.21(b). The FEC uses a three-pronged test to determine if a communication is coordinated. *Id.* That test considers: 1) the source of the payment (payment); 2) the subject matter of the communication (content); and 3) the interaction between the payor and the candidate (conduct). If all three prongs are satisfied, a communication is coordinated and counts against applicable contribution limits. *Id.*

The conduct prong is at issue in the FEC Complaints. Here, Plaintiff claims the NRA Affiliates and other respondents satisfied the conduct prong by use of a common vendor. But the conduct prong is subject to a three-prong test of its own, and is satisfied by use of a common vendor only where all three elements are present: 1) the payor contracts with or employs a "commercial vendor" to create, produce, or distribute the communication; 2) within the previous 120 days, the commercial vendor had or has relationship with the candidate or party committee which put the vendor in a position to acquire information about the campaign plans, projects, activities, or needs of the candidate; and 3) the vendor uses or conveys non-public information

about the campaign plans, projects, activities, or needs of the candidate, or information previously used by the vendor in serving the candidate, to the payor, *and* that information is material to the creation, production, or distribution of the communication. *Id.*

Plaintiff's FEC Complaints failed to meet their evidentiary burden to show there was reason to believe the NRA Affiliates or their vendors coordinated any communications. First, all vendors referenced in the FEC Complaints advised that they established and implemented internal firewall policies, which are designed to prevent the flow of non-public information in violation of FECA. A firewall policy provides safe harbor for common vendors and their clients under the Commission's coordination regulations, *see* 11 C.F.R. § 109.21 (h), so that vendors serving both candidates and outside spenders may do so without undue fear of baseless allegations of coordination. Second, even if the common vendor did not have internal firewall policies in place, Plaintiff provided no evidence beyond mere speculation that the "common vendors" used non-public information to create or disseminate advertising for the NRA Affiliates. After considering Plaintiff's FEC Complaints, as well as the NRA Affiliates' responses and those of the other respondents, the Commission voted on whether Plaintiff's allegations merited reason to believe FECA violations occurred. The controlling Commissioners concluded they did not. *See infra*, Background Section V. And just days before this Court authorized this suit, the controlling Commissioners issued a statement of reasons explaining the basis for their decision. *See id*.

As the NRA Affiliates explained when responding before the Commission, and as further summarized below, each of the FEC Complaints is baseless.

**MUR No. 7427 (Tillis, Cotton, Johnson & Gardner)**

In July 2018, Plaintiff filed an administrative complaint with the Commission alleging that, beginning in the 2014 election cycle, the NRA Affiliates made coordinated communications (in-

kind contributions under 11 C.F.R. § 109.21) to the candidate committees of Senators Thom Tillis, Tom Cotton, Ron Johnson, and Cory Gardner, which the NRA Affiliates reported as independent expenditures.[5] Consequentially, Plaintiff also claimed that the NRA Affiliates violated FECA's prohibition on corporate contributions to candidates (52 U.S.C. § 30118(a), (b)(2)), candidate contribution limits (52 U.S.C. § 30116(a)(1)), and reporting requirements (52 U.S.C. § 30104). Stripped of minutiae, the crux of Plaintiff's claims is that the NRA Affiliates' media vendor, Starboard Strategic, Inc. ("Starboard"), is functionally the same entity as the candidates' media vendor, OnMessage, Inc. ("OnMessage"); that this can only be evidence of an attempt to "hide" the existence of a common vendor; and, thus, that the NRA affiliates *must* have coordinated with the candidates through Starboard and OnMessage. (The complaint did not address why the NRA Affiliates would need to hide the use of a common vendor—a common, lawful practice explicitly contemplated by FEC regulations.)

In their response dated September 18, 2018, the NRA Affiliates pointed out that the Plaintiff failed to meet the evidentiary standard in use by the FEC for over a decade at that point. A copy of the NRA Affiliates' Response for MUR 7427 is attached as **Exhibit A**. Specifically, the Commission has used two different standards when approaching "common vendor" coordination complaints. In this matter, Plaintiff urged the Commission to apply an old standard with a lower evidentiary burden (*i.e.*, to find reason to believe unlawful coordination occurred where "the first two parts of the common vendor test are satisfied," rather than all three elements). *Id.* at 9-14. Since 2005, however, the Commission has consistently required *evidence* of the third element—

---

[5] *See* Tillis, et al., Am. Complaint (Aug. 9, 2018), https://campaignlegal.org/sites/default/files/2021-10/8-9-18%20CLC-Giffords%20NRA%20Complaint%20%28final%20with%20exhibits%29.pdf.

*i.e.*, actual conduct—to find "reason to believe" coordination had occurred.[6] *Id.* at 11-14. For example, Plaintiff failed to provide any evidence that nonpublic, material campaign information was shared through OnMessage and Starboard, or that such information was improperly used by the entities to create or disseminate advertising for the NRA Affiliates. *Id.* at 14-16. The complaint also failed to identify a specific advertisement that was allegedly coordinated. *Id.* The NRA Affiliates also informed the Commission that OnMessage and Starboard maintained firewall policies while they worked for the candidates and NRA Affiliates. *Id.* at 14, 16. Firewall policies, again, are designed to prevent non-public information about vendors' clients from being "used or conveyed" as described in 11 C.F.R. § 109.21(d)(4)(iii). Firewall policies are industry standard, and are a safe harbor for common vendors under Commission regulations, *see* 11 C.F.R. § 109.21(h). Plaintiff assumed, with no reasonable basis, that OnMessage and Starboard did not have a firewall policy in place.  Based on these firewall policies and the general lack of evidence, the NRA Affiliates argued that the complaint should be dismissed.

**MUR No. 7497 (Rosendale)**

Plaintiff filed another administrative complaint in September 2018, designated by the FEC as MUR 7497.[7] Plaintiff again alleged that the NRA Affiliates made unreported and excessive in-kind contributions to a senatorial candidate committee, Matt Rosendale for Montana, during the 2018 election cycle in violation of 11 C.F.R. § 109.21, 52 U.S.C. § 30118(a), (b)(2), 52 U.S.C. § 30116(a)(1) and 52 U.S.C. § 30104. The Plaintiff's allegation in MUR 7497 was twofold; it alleged

---

[6] This standard was first applied by the Commission in August of 2005 in MUR 5609. There, the FEC voted *unanimously* to find *no* reason to believe a violation had occurred after the General Counsel noted "the available information provides no support for an inquiry into whether the *third* element of the coordinated communications regulation was satisfied – the conduct standard." MUR5609, First General Counsel's Report at 6. (Emphasis added).

[7] *See* Rosendale Complaint (Sep. 17, 2018), https://campaignlegal.org/sites/default/files/2018-09/CLC%20Complaint%20to%20FEC%20Against%20Rosendale%20%2B%20NRA.pdf.

direct coordination between Rosendale and an NRA officer, and, separately, "common vendor" coordination as in MUR 7427. Plaintiff alleged that the communications paid for by the NRA Affiliates were coordinated because, as Plaintiff would have it, Matt Rosendale "assented" to the NRA's Affiliates' planned spending. According to the complaint, "Rosendale stated at a fundraising event that the NRA-ILA's political director [...] told him the group would be making expenditures supporting Rosendale, and Rosendale accurately described both the content of the NRA-ILA's communications and their timing...." *See* Rosendale Complaint at 1-2.  Plaintiff also alleged that the NRA Affiliates again used Starboard to produce and distribute the ads, while Rosendale simultaneously employed OnMessage as a campaign vendor.

As the NRA Affiliates explained in their response dated November 12, 2018, the comments Plaintiff relied upon clearly did *not* evidence "suggestion" or "assent" as Plaintiff claimed. A copy of the NRA Affiliates' Response for MUR 7497 is attached as **Exhibit B**. The NRA Affiliates otherwise incorporated their previous response to MUR 7427 as to the alleged common vendor coordination. *Id.* at 2.

### MUR 7621 (Rosendale)

On February 8, 2019, Plaintiff filed a statement it claimed was relevant to MUR 7497, designated by the Commission as MUR 7621,[8] alleging that the NRA Affiliates and Matt Rosendale for Montana coordinated pro-Rosendale communications through a second set of affiliated "common vendors": National Media Research, Planning and Placement, LLC ("National Media"), Red Eagle Media Group ("Red Eagle") (a registered trade name of National Media) and American Media & Advocacy Group ("AMAG") (an affiliate of National Media).

---

[8] *See* Rosendale Supplement (Feb. 7, 2019), https://campaignlegal.org/sites/default/files/2019-02/Additional%20Facts%20NRA%20and%20Rosendale.pdf.

The NRA Affiliates responded to this administrative complaint on July 30, 2019. A copy of their Response for MUR 7621 is attached as **Exhibit C**. There, the NRA Affiliates requested that the matter be dismissed because all involved entities had a firewall policy in place at the time of the alleged violation such that they qualified for safe harbor under 11 C.F.R. § 109.21(h). *Id*. While MUR 7621 is referenced in Plaintiff's complaint, *see* ECF 1 at n 1; ¶122, it is the NRA Affiliates' position that MUR 7621 is not properly before this Court because, among other reasons, it is not included in this Court's Memorandum Opinion in the predecessor litigation. *See Giffords v FEC*, No. 1:19-cv-1192 (D.D.C.) ("*Giffords*"), ECF 88.

**MUR 7524 (Hawley)**

In October 2018, Plaintiff filed another complaint, designated by the Commission as MUR 7524, which again alleged common vendor coordination, excessive contributions, and reporting violations through OnMessage and National Media, with respect to the NRA Affiliates' support for the Josh Hawley for Senate candidate committee during the 2018 election cycle.[9] Once again, the NRA Affiliates responded that Plaintiff lacks evidence sufficient to support its claims, and that Plaintiff continued to misstate the legal standard for common vendor coordination. A copy of the NRA Affiliates' Response for MUR 7524 is attached as **Exhibit D**.

**MUR 7553 (Trump)**

In December 2018, Plaintiff filed yet another complaint, designated by the Commission as MUR 7553, again alleging common vendor coordination, excessive contributions, and reporting violations through Red Eagle and AMAG, this time with the Donald J. Trump for President

---

[9] *See* Hawley Complaint (Oct. 22, 2018), https://campaignlegal.org/sites/default/files/2018-10/10-22-18%20NRA%20Hawley%20Complaint%20%28final%29.pdf.

campaign in September and October of 2016.[10] The NRA Affiliates responded, requesting dismissal of the complaint because, again, Plaintiff's complaint lacks evidence sufficient to satisfy the three-pronged test for common vendor coordination. A copy of the NRA Affiliates' Response for MUR 7553 is attached as **Exhibit E**. The NRA Affiliates disputed Plaintiff's claim that similarities in ad buys by the Trump campaign and the NRA affiliates were evidence of coordination. Information related to broadcast advertising purchases, for example, by a candidate, is *required by statute* to be publicly disclosed, which provides any interested party—such as an ad buyer for a supportive independent spender—the necessary information to "coordinate" entirely lawfully. *Id.* at 3-5.[11] The NRA Affiliates also clarified that AMAG and Red Eagle appropriately firewalled their employees. (Ex. E at 2, 6).

In sum, each of Plaintiff's FEC Complaints was devoid of evidence sufficient to show the NRA Affiliates violated FECA's coordination prohibitions. Plaintiff offered no evidence that any common vendor improperly used or conveyed non-public information about campaign plans, projects, activities, or needs of a candidate, or that any such information was material to the creation, production, or distribution of a communication. Moreover, all "common vendors" established and implemented legally compliant firewall policies, statutorily providing the NRA Affiliates with safe harbor for any accusations of wrongdoing under the common vendor coordination regulations.  The FEC Complaints were meritless, and as explained below, the FEC

---

[10] *See* Trump Complaint (Dec. 7, 2018), https://campaignlegal.org/sites/default/files/2018-12/12-07-18%20Trump%20NRA%20complaint%20%28final%29.pdf.

[11] The use of public information defeats the third prong of the test for common vendor coordination. 11 C.F.R. 109.21(d)(4)(iii) (" This paragraph…is not satisfied if the information material to the creation, production, or distribution of the communication used or conveyed by the commercial vendor was obtained from a publicly available source."); FEC, Coordinated Communications – Safe harbor for publicly available information, https://www.fec.gov/help-candidates-and-committees/candidate-taking-receipts/coordinated-communications/ (last visited Jan. 28, 2022).

ultimately voted and did not find reason to believe that FECA had been violated.

## III.   The Commission

*The NRA Affiliates adopt by reference Section (C) of the Memorandum in Support of Defendant Josh Hawley for Senate's Motion to Dismiss, titled "The FEC's Structure and Voting Requirements," ECF No. 31 at ECF page no. 13-19.*

## IV.   The Weintraub Scheme

The FEC's ordinary course in event of deadlock is for the controlling Commissioners to issue a statement of reasons reflecting the rationale for their decision and for the Commission to close the file. That, of course, leaves the complainant with the option of challenging as "contrary to law" the statement of reasons serving as the Commission's decision for judicial review purposes. But a troubling practice has been revealed in recent months. Certain Commissioners on the losing end of reason to believe votes are refusing to close matters, which under the FEC's internal practices leaves the administrative record—including the statement of reasons reflecting the rationale and result disfavored by these particular Commissioners—shielded both from public view, *and from judicial review*. These matters become what some Commissioners call "zombie matters"—they remain on the FEC's enforcement docket indefinitely, despite having been decided, with the complainant, respondent, and the public deprived of the vote certifications and Commissioners' reasoning.[12]

Referenced here as the "Weintraub Scheme," the ruse works as follows. Because the Commissioners who lose the reason to believe vote otherwise refuse to close the file, the statement of reasons setting forth the Commission's decision never becomes public. As a result, everyone

---

[12] Commissioner Sean J. Cooksey, Motion to Amend Directive 68 to Include Additional Information in Quarterly Status Reports to Commission at 2 (June 3, 2021), https://www.fec.gov/documents/3174/mtgdoc-21-27-A.pdf.

outside the FEC is left completely unaware that a reason to believe vote has in fact occurred, and complainants are deprived of access to the statement of reasons that would be essential for a "contrary to law" challenge by aggrieved parties. Activist groups such as Campaign Legal Center—which represents Plaintiff in this case—then sue the FEC for "failure to act" on the administrative complaint under section 30109(a)(8), in what is known as a "delay suit." Then, the same Commissioners who refused to close the file in the first instance refuse to provide the four affirmatives votes necessary to authorize the FEC's General Counsel to defend the FEC in court. 52 U.S.C. § 30106(c). Because the FEC does not mount a defense, courts are left with no choice but to enter default judgment against the FEC and to order the FEC to make a decision on the enforcement matter within thirty days of the default judgment.  Then, the same Commissioners serve a final blow: they dishonestly let the Court believe they defied the Court order to comply within 30 days by not taking further action—because at that point, the Commissioner has already *acted*, but those facts are shielded from public view by the Commissioners' refusal to close the matter. Meanwhile, defying the court order to comply within 30 days provides Plaintiff with authorization to bring a private suit "to remedy the violation involved in the original complaint." 52 U.S.C § 30109 (a)(8)(C).[13]

Despite the confidentiality provisions under FECA, the scheme is well-documented. For example, several Commissioners confirmed during an open FEC meeting that dissenting Commissioners are strategically declining to close cases at the reason to believe stage even though

---

[13] *See also* Shane Goldmacher, *Democrats' Improbable New F.E.C. Strategy: More Deadlock Than Ever*, The New York Times (Jun. 8, 2021), https://www.nytimes.com/2021/06/08/us/politics/fec-democrats-republicans.html ("It is not like I think the courts are automatically going to come to the same decision I would come to," said Commissioner Ellen Weintraub, "[b]ut I think it's got a better shot.").

the Commission deadlocked on whether to find reason to believe FECA had been violated.[14] Indeed, multiple Commissioners voiced concern that the scheme "keep[s] federal courts in the dark" in delay cases—just like in *Giffords v. FEC*, the delay suit that preceded this matter—by creating the false appearance of a failure to act despite the fact that the FEC had indeed acted on the matter, but failed to obtain four votes to close the file.[15] Likewise, another Commissioner lamented that the scheme leaves administrative complaints in "limbo" and "intentionally prevent[s] meaningful judicial review" of the controlling Commissioners' reasons for not proceeding with an investigation or enforcement.[16] Former FEC Commissioner Caroline Hunter likewise condemned the scheme, attacking "the unprecedented step of refusing to allow the [Commission] to defend itself in court" when one Commissioner disagrees with the legal outcome resulting from the Commission's process.[17]

The architect of the scheme—Commissioner Ellen Weintraub—has admitted that she is proud of her scheme and the resulting dysfunction. In her own words, "[i]f [the Commissioners] are not going to vote to enforce the law, I'm not going to pull any punches and I'm not going to be shy about calling them out . . . [a]nd if we get sued, that requires four votes to defend those kinds of lawsuits . . . I'm not going to authorize the use of agency resources to defend that litigation."[18] Even worse, Commissioner Weintraub is deceiving the public as to her intentions,

---

[14] FEC, Discussion of Draft Statement of Policy Re: Closing the File at Initial Stage in Enforcement Process, (Apr. 22, 2021), available at https://www.youtube.com/watch?v=qMozMP5sPIE (hereinafter, "FEC Discussion"), at 39:10-41:22.

[15] FEC Discussion, at 24:42.

[16] *See* Statement of FEC Chair James E. "Trey" Trainor III on the Dangers of Procedural Dysfunction, § II.B., (Aug. 28, 2020), https://www.fec.gov/resources/cms-content/documents/Trainor_Statement_on_FEC_Procedural_Disfunction_REDACTED.pdf

[17] Commissioner Caroline Hunter, *How My FEC Colleague is Damaging the Agency and Misleading the Public*, POLITICO MAGAZINE (Oct. 22, 2019), https://politi.co/2zRfIJY.

[18] Nihal Krishan, *Elections Commission Chief Uses the "Nuclear Option" to Rescue the Agency From Gridlock,* Mother Jones (Feb. 20, 2019),

claiming the scheme is a chance to "go back to the drawing table,"[19] even though other Commissioners note there has been no attempt by Commissioner Weintraub to do so.[20]

Commissioner Weintraub's rationale is upside-down. What she perceives to be other Commissioners' refusal to "enforce the law" is part and parcel of the bipartisan enforcement of FECA that Congress baked into the FEC's processes.[21] While FECA "favors the resolution of complaints through informal methods with resort to the courts as a last resort," *Common Cause v. FEC,* 489 F. Supp. 738, 743 (D.D.C. 1980), Commissioner Weintraub is intentionally steering certain matters directly to district court.

Not only is this scheme contrary to the Congressional intent for a bipartisan investigation and enforcement process, it also unlawfully resets the level of judicial review that would otherwise be available to the administrative complainant. By refusing to close matters in which the Commission *has* made a decision, or to fully defend the Commission's record, Weintraub and her colleagues leave the courts in the dark, resulting in "failure to act" suits against the FEC under section 30109(a)(8), followed by private suits directly against the respondents under the same provision. The administrative complainant in such a case then becomes a plaintiff in a federal lawsuit against the respondent, proceeding with a clean slate rather than challenging the Commission's substantive decision, which is subject to a far more deferential legal standard, *if*

---

https://www.motherjones.com/politics/2019/02/elections-commission-chief-uses-the-nuclear-option-to-rescue-the-agency-from-gridlock/.

[19] Shane Goldmacher, *Democrats' Improbable New F.E.C. Strategy: More Deadlock Than Ever,* The New York Times (Jun. 8, 2021), https://www.nytimes.com/2021/06/08/us/politics/fec-democrats-republicans.html.

[20] FEC Discussion at 39:20-39:57.

[21] *See* FED. ELECTION COMM'N, LEGISLATIVE HISTORY OF THE FEDERAL ELECTION CAMPAIGN ACT AMENDMENTS OF 1976 89 (1977), https://transition.fec.gov/pdf/legislative_hist/legislative_history_1976.pdf (bipartisan membership prevents the FEC from "becom[ing] a tool for harassment by future imperial Presidents who may seek to repeat the abuses of Watergate." (statement of Sen. Alan Cranston)).

*even reviewable at all.* *FEC v. Democratic Senatorial Campaign Comm.,* 454 U.S. 27, 39 (1981)(reviewing whether an FEC action was "contrary to law" is a "narrower inquiry" of "whether the [FEC's statutory] construction was sufficiently reasonable") (cleaned up); *Citizens for Resp. & Ethics in Washington v FEC*, 892 F.3d 434, 441 (D.C. Cir. 2018) (FEC action declining enforcement may not be held contrary to law when based on the Commission's prosecutorial discretion).

The Weintraub Scheme clearly runs afoul of due process and other constitutional protections afforded to its targets. But as shown below—and despite the Weintraub Scheme—this Court lacks subject matter jurisdiction over this case because the Commission has indeed acted on the FEC Complaints.

## V.   The Delay Suit and the Commission's Acts

Months after filing the FEC Complaints, Plaintiff commenced a "delay suit" against the FEC for allegedly failing to act on the FEC Complaints under 52 U.S.C. § 30109 (a)(8)(A). *Giffords*, ECF No. 1. While four Commissioners affirmatively voted to authorize defense of the suit—they did *not* authorize a *full* defense. *See* FEC Certifications reflecting a failed vote to authorize the Office of General Counsel to defend the FEC in *Giffords*, and subsequent votes apparently authorizing a *limited* defense in same, attached as **Exhibit F**. For example, while the FEC defended the speed and reasonableness of its actions in its summary judgment papers, *Giffords*, ECF No. 41, it never challenged subject matter jurisdiction or standing as the NRA Affiliates do here. Indeed, the FEC's counsel balked when the Court inquired as to whether the conditions precedent to file *this* suit had been met. Hr'g Tr., *Giffords v. FEC*, No. 1:19-cv-1192-EGS (D.D.C. Nov. 1, 2021), ECF No. 78 at 8:16 – 9:6 ("Hr'g Tr.").

The parties filed cross-motions for summary judgment. While those motions were pending, the FEC submitted a Notice of Subsequent Developments on February 19, 2021, informing the

Court that the FEC had held a vote to "find that there was no reason to believe that a violation had occurred in MURs 7427 and 7497," and the "vote failed 2-3 with one recusal." *Giffords*, ECF No. 84, at 2. A short time later, the FEC submitted a Second Notice of Subsequent Developments, outlining several actions the Commission had taken on the FEC Complaints on February 23, 2021:

> A motion was made to find reason to believe that some violations of law had occurred in all four of the MURs at issue here. **That vote failed by a vote of 3-2 with one recusal, short of the four affirmative votes required for the motion to pass. 52 U.S.C. § 30109(a)(2).** Another motion was then made that the Commission find there was no reason to believe a violation had occurred with respect to MURs 7524, 7553, and another MUR not at issue in this case**. That motion also failed, by a vote of 2-3 with one recusal.** Finally, a motion was made to close the file on the matters and send letters to the respondents notifying them of the disposition of the MURs. **That motion similarly failed by a vote of 2-3 with one recusal.**

*Giffords*, ECF No. 85, at 1-2.

The FEC's Notices of Subsequent Developments clearly illustrate the Weintraub Scheme: the FEC voted on whether to find reason to believe that violations of law had occurred in each FEC Complaint, and was short of the four votes required to proceed with an investigation. A vote was held on whether to close the files, but it also failed, meaning that in the Commission's view, the FEC Complaints were officially in limbo, despite having been fully adjudicated. But the reason to believe vote was a self-actuating dismissal, and the vote to "close the file" was a legal nullity, not required by statute or regulation.[22] Simply put, the FEC is being coy, if not outright dishonest, in pretending that the underlying MURs are still "open."

As a result, the *Giffords* delay suit continued. On September 30, 2021, the Court issued its Memorandum Opinion granting Plaintiff's motion for summary judgment and denying the FEC's

---

[22] *See* Defendant Josh Hawley for Senate's brief in support of motion to dismiss, ECF No. 31-1, at 13-24 (explaining that the matters did not remain open after the February 2021 reason to believe determinations because the February 23, 2021, vote to close the files was a ministerial act with no substantive legal effect).

motion. *Giffords*, ECF 88. The Court ordered the FEC "to conform to the Court's Order within 30 days of the entry of the Order by making the reason-to-believe determination set forth in 52 U.S.C. § 30109 (a)(2)." *Id*. at 31; *see also Giffords*, ECF No 71.

The Court held a sealed status conference on November 1, 2021, at which Plaintiff claimed "there is no indication on the record that the FEC has taken any action in response to the Court's [September 30, 2021] order," and requested that the Court authorize a private suit against the respondents. Hr'g Tr. at 2:24 – 3:9. The Court responded by inviting the FEC's counsel to provide a status report. *Id.* at 4:8 – 12. The FEC's counsel reported that, after the Court issued its order directing the FEC to conform within 30 days, the FEC "took the matters up in the next executive session on October 26th." *Id*. at 5:19-24. During that executive session, it was confirmed that the Commissioners had not changed their positions from their February 2021 vote as to whether to find reason to believe that some violation had occurred in the matters. *Id*. at 5:25 – 6:10. FEC counsel also disclosed that, the same day—October 26, 2021—"the two commissioners who had voted to find no reason to believe violations were committed and to close the file . . . submitted to the administrative record their statement of reasons; that statement will be released publicly when the files in the matters are closed." *Id*. at 6:11 – 16.

In other words, the FEC had taken literally every possible *action* that the law required, a posture that is completely consistent with Weintraub Scheme. And while the Court then asked the FEC's counsel whether it is "the government's position that closure is the condition preceding to the filing of a private action," the Court noted it would let the FEC's counsel "off the hot seat," as the issue of meeting the conditions precedent to file a private action under section 30109(a)(8) is "a legitimate issue to be raised by defense counsel." *Id*. at 8:15 – 9:10.

The same day, the Court entered an Order authorizing Plaintiff to bring a private suit

against the NRA Affiliates and the other respondents under section 30109(a)(8)(C). *Giffords*, ECF No. 75. Plaintiff commenced this suit the very next day. ECF No. 1. Meanwhile, the NRA Affiliates intervened in *Giffords* for the limited purpose of unsealing the record, most of which had been sealed in accordance with FECA. *Giffords*, ECF No. 77; 82; 83. The Court granted that motion on December 13, 2022, *see id.*, 12/13/2021 Minute Order, and the Clerk of the Court unsealed the record two weeks later. *See id.*, Docket Entry dated 12/28/2021.

Plaintiff's instant suit loosely tracks the theories in its FEC Complaints, which lacked merit as explained *supra*, Background Section II. And while the NRA Affiliates maintain that Plaintiff's claims fail in this case, too, those claims are not properly before this Court and should be dismissed for the reasons discussed below.

**ARGUMENT**

**I.    This Court Lacks Subject Matter Jurisdiction Over Plaintiff's Claims.**

    **A.    It is Plaintiff's burden to demonstrate that this Court has subject matter jurisdiction, and it must do so by a preponderance of the evidence.**

The NRA Affiliates challenge subject matter jurisdiction because the conditions precedent under 52 U.S.C § 30109 (a)(8)—the sole claimed basis for subject matter jurisdiction here—have not been satisfied. Because the NRA Affiliates seek dismissal under both Rules l2(b)(1) and 12(b)(6), the Court should first address subject matter jurisdiction because "the accompanying defenses and objections become moot and do not need to be determined" if the Court lacks jurisdiction. *Epps v. US. Capitol Police Bd*, 719 F. Supp. 2d 7, 12 (D.D.C. 2010) (cleaned up).

Motions to dismiss for lack of subject matter jurisdiction fall into two categories: (1) facial challenges, where the movant challenges the complaint's jurisdictional allegations as insufficient on their face, and (2) factual challenges, where "the party opposing jurisdiction challenges the accuracy of the factual allegations and demonstrates facts showing a lack of jurisdiction." Courts

17

of Limited Jurisdiction, 13 Fed. Prac. & Proc. Juris. § 3522 (3d ed.). Here, the NRA Affiliates

challenge subject matter jurisdiction on factual grounds. Despite Plaintiff's allegations, the FEC

has *not* failed to act on Plaintiff's FEC Complaints, which means that section 30109(a)(8) does not

give this Court jurisdiction, and Plaintiff's complaint must be dismissed with prejudice.

To survive this challenge, Plaintiff "bear[s] the burden of establishing by a preponderance

of the evidence that the court has jurisdiction to entertain [its] claims. *Shekoyan v. Sibley Int'l

Corp.*, 217 F. Supp. 2d 59, 63 (D.D.C. 2002) (cleaned up). And "because subject-matter

jurisdiction focuses on the court's power to hear the plaintiff's claim, a Rule 12(b)(1) motion

imposes on the court an affirmative obligation to ensure that it is acting within the scope of its

jurisdictional authority.*" Grand Lodge of Fraternal Ord. of Police v. Ashcroft*, 185 F. Supp. 2d 9,

13 (D.D.C. 2001) (cleaned up). To that end, this Court "need not limit itself to the allegations of

the complaint," and "may consider such materials outside the pleadings as it deems appropriate to

resolve the question whether it has jurisdiction in the case." *Id*. at 14 (citations omitted).

**B.      Plaintiff cannot show that the FEC failed to act under Section 30109(a)(8) because the FEC clearly acted on the FEC Complaints.**

Plaintiff's claimed basis for subject matter jurisdiction, 52 U.S.C. § 30109(a)(8), provides

the framework for judicial review of the Commission's treatment of the FEC Complaints. *See*

Compl., ECF No. 1, at ¶¶ 10, 37-38, 129-131. But "[f]ederal courts are courts of limited

jurisdiction," *Kokkonen v. Guardian Life Ins. Co. of Am*., 511 U.S. 375, 377 (1994), meaning that

federal courts "possess only that power authorized by Constitution and statute[.]" *Id*. (cleaned up).

The presumption is "that a cause lies outside this limited jurisdiction," and therefore Plaintiff must

show by a preponderance of the evidence that all preconditions for subject matter jurisdiction

under section 30109(a)(8) have been satisfied. *Id*. (cleaned up).

There are two conditions precedent that must be satisfied before the Court can exercise

jurisdiction under section 30109(a)(8). First, Plaintiff must be "aggrieved by an order of the Commission dismissing a complaint filed by such party under [section 30109(a)(1)], or *by a failure of the Commission to act on such complaint* during the 120-day period beginning on the date the complaint is filed[.]" 52 U.S.C. § 30109(a)(8)(A) (emphasis added). Second, in a proceeding under that first precondition, "the court may declare that the dismissal of the complaint or *the failure to act* is contrary to law, and may direct the Commission to conform with such declaration within 30 days[.]" Id. § 30109(a)(8)(C) (emphasis added). Then, if the FEC fails to conform with that declaration within 30 days, and only then, a complainant such as Plaintiff may bring a suit like this one. *Id*. Plaintiff proceeds under the "failure to act" prong of section 30109(a)(8), alleging it was "aggrieved" by the FEC's alleged "failure to act" on the FEC Complaints, and that the FEC failed to comply with the Court's September 30, 2021 order to make a reason to believe determination on the FEC Complaints. But neither of those conditions precedent exist here, and this Court therefore lacks jurisdiction over this case.

Despite Plaintiff's claim otherwise, the FEC *did* act on the FEC Complaints. During an executive session held on February 9, 2021, the FEC held a vote to "find that there was no reason to believe that a violation had occurred in MURs 7427 and 7497." *Giffords*, ECF No. 84, at 2. That "vote failed 2-3 with one recusal." *Id*. The Commission acted further on February 23, 2021, when it voted whether "to find reason to believe that some violations of law had occurred in all four of the MURs at issue here," a motion that "failed by a vote of 3-2 with one recusal." ECF No. 85, at 1. During the same session, the FEC also voted whether to "find there was no reason to believe a violation had occurred with respect to MURs 7524, 7553," and that motion also failed "by a vote of 2-3 with one recusal." *Id*. at 2. At that same session, the FEC also voted whether "to close the file on the matters and send letters to the respondents notifying them of the disposition of the

MURs," and that vote likewise failed "2-3 with one recusal." *Id*.

The FEC's determinations made on February 9 and 23, 2021, were clearly "acts" in the context of section 30109(a)(8). *See Citizens for Responsibility & Ethics in Washington v. FEC*, 993 F.3d 880, 891 (D.C. Cir. 2021)("A *decision* to initiate enforcement, *but not to decline enforcement*, requires the votes of four commissioners."). In fact, Plaintiff and the FEC *both* took this same position in the *Giffords* delay suit. There, in its summary judgment papers, which were filed with the Court *before* the FEC notified the Court of the reason to believe determinations held in February 2021, Plaintiff took the position that the FEC's failure to take reason to believe votes was a "failure to act" under section 30109(a)(8). *E.g.*, *Giffords*, Pl's Summary Judgment Brief, ECF No. 48, at 14 ("The Commission has *failed to act expeditiously to determine whether there is reason to believe* the National Rifle Association, its affiliates, the Trump campaign, and the respondent Senate campaigns violated FECA and should therefore be investigated.") (emphasis added); *id*. at 19 ("The Commission's *failure to vote on whether there is reason to believe a violation has occurred—i.e.*, its failure to even decide whether to commence an investigation of the allegations is not excused by resource constraints, competing priorities, or lack of available information.") (emphasis added). The FEC took the same position, rebutting Plaintiff's argument that the FEC could have completed the "act" in the months already passed, stating "the *act of voting on whether there is reason to believe a violation has occurred* in complex matters like these is far from a ministerial one." *Id*., FEC's Reply Br., ECF No. 56 (emphasis added). Thus, the FEC clearly acted on the FEC Complaints when it held reason to believe votes in February 2021, and for that reason alone, this Court lacks jurisdiction under section 30109(a)(8).

Likewise, and as stated in Defendant Josh Hawley for Senate's brief in support of its own motion to dismiss, "[a]s of February 23, 2021, the FEC had voted to dismiss [the FEC Complaints"

because "dismissal was self-executing [under FECA] when the Commissioners failed to find there was reason to believe a violation occurred by the statutorily required four votes." ECF 31-1 at 20. To that end, the NRA Affiliates hereby incorporate—and join—the argument set forth by Defendant Josh Hawley for Senate that the matters did not remain open after the February 2021 reason to believe determinations because the February 23, 2021, vote to close the file was a ministerial act with no substantive legal effect. *See id.* at 13-24.

*Even if*, however, the February 2021 reason to believe determinations were somehow not "acts" under section 30109(a)(8), the second condition precedent for subject matter jurisdiction remains unsatisfied. After this Court ordered the FEC "mak[e] the reason-to-believe determination set forth in 52 U.S.C. § 30109(a)(2)" within 30 days of September 30, 2021, *Id.*, ECF No 71, the FEC held an executive session on October 26, 2021. *See* Hr'g Tr. at 5:19-24. There, the FEC "confirmed that the Commissioners had not changed their positions from their February 2021 vote as to whether to find reason to believe that some violation had occurred in the matters." *Id.* at 5:25 – 6:10. That confirmation that Commissioners had not changed their votes clearly indicates that the FEC had simply deadlocked on the FEC Complaints when it voted on reason to believe back in February 2021. This is entirely consistent with how the FEC is supposed to work under FECA. *Pub. Citizen, Inc. v. FERC*, 839 F.3d 1165, 1171 (D.C. Cir. 2016) ("The voting and membership requirements mean that, unlike other agencies—where deadlocks are rather atypical—FEC will regularly deadlock as part of its *modus operandi*."). And that is precisely why, also on October 26, 2019, the controlling Commissioners—"the two commissioners who had voted to find no reason to believe violations were committed and to close the file"—submitted their written statement of reasons to the administrative record. Hr'g Tr. at 6:11 – 16. Further, because "those Commissioners constitute a controlling group for purposes of the decision, their rationale necessarily states the

21

agency's reasons *for acting* as it did." *FEC v. Nat'l Republican Senatorial Comm.*, 966 F.2d 1471, 1476 (D.C. Cir. 1992) (emphasis added).

Simply put, as of no later than October 26, 2021, the FEC had not only acted on the FEC Complaints; *it had fully adjudicated the FEC Complaints*. Likewise, the FEC did not fail to comply with the Court's September 30, 2021 Order; rather, the FEC met within the timeframe ordered by the Court and, despite having already acted on the FEC Complaints many months prior in February 2021, it cemented its prior votes for the reason to believe determinations *and* issued a written decision in the form of a statement of reasons. And while that statement of reasons remains shielded from public view as a direct and intentional result of the Weintraub Scheme, that dynamic does not undo the Commission's actions because the FEC's tradition of voting to close a file is a ministerial act with no substantive legal effect.[23] Thus, Plaintiff cannot demonstrate by a preponderance of the evidence that the conditions precedent under Section 30109(a)(8) have been met here. This Court should therefore grant the NRA Affiliates' motion and dismiss Plaintiff's complaint for lack of subject matter jurisdiction.

## II.    Plaintiff Lacks Article III Standing.

### A.    Standing is fundamental to Article III's case-or-controversy requirement, and Plaintiff cannot satisfy its burden with speculative allegations

While Plaintiff proceeds under 52 U.S.C. §30109(a)(8) – the citizen-complainant provision of FECA – it is well-settled that section 30109(a)(8) does not confer Article III standing. Rather, section 30109(a)(8) confers a right to sue only upon those parties who also meet the requirements of Article III standing, separate and apart from fulfilling the conditions precedent set forth in section 30109(a)(8). *See Common Cause v. FEC*, 108 F.3d 413, 419 (D.C. Cir. 1997) (citing *Lujan*

---

[23] *See* Defendant Josh Hawley for Senate's brief in support of motion to dismiss, ECF No. 31-1, at 13-24.

*v. Defenders of Wildlife*, 504 U.S. 555, 573 (1992)). This is, of course, consistent with the principle that federal courts may only decide "actual ongoing controversies." *21st Century Telesis Joint Venture v. FCC*, 318 F.3d 192, 198 (D.C. Cir. 2003) (cleaned up).  And where a plaintiff lacks standing, there is no such controversy.

To demonstrate Article III standing, Plaintiff must establish that: "(1) [it] suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (citing *Lujan*, 504 U.S. at 560–61). Plaintiff bears the burden of establishing these Article III standing requirements, and it must do so by preponderance of the evidence. *Schmidt v. U.S. Capitol Police Bd.*, 826 F. Supp. 2d 59, 69 (D.D.C. 2011) (citing *Lujan*, 504 U.S. at 561); *Biton v. Palestinian Interim Self-Gov't Auth.*, 310 F. Supp. 2d 172, 176 (D.D.C. 2004) (plaintiffs must show "by a preponderance of the evidence that the Court has subject matter jurisdiction to hear [the] case.") (internal citations omitted). Failure to satisfy each of the elements above by a preponderance of the evidence must result in dismissal of a plaintiff's complaint.

To survive a motion to dismiss challenging standing, Plaintiff "must allege in [its] pleading the facts essential to show jurisdiction," *McNutt v. Gen. Motors Acceptance Corp. of Ind*., 298 U.S. 178, 189 (1936), although "the necessary factual predicate may *not* be gleaned from the briefs and arguments," *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 235 (1990) (emphasis added) (cleaned up). Further, this Court "may look beyond the allegations contained in the complaint" to "materials outside the pleadings" when determining whether Plaintiff met its burden to prove

standing. *Flores ex rel. J.F. v. District of Columbia*, 437 F. Supp. 2d 22, 28-29 (D.D.C. 2006) (cleaned up).

As explained below, Plaintiff cannot show the necessary elements for Article III standing by a preponderance of the evidence, and its Complaint should be dismissed in its entirety.

### B.     Plaintiff fails to demonstrate the requisite injury for Article III standing

First and foremost, Plaintiff has entirely failed to allege a concrete, imminent, and non-speculative loss arising out of the asserted FECA violations. This alone warrants dismissal for lack of standing. *See, e.g., Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 409 (2013). Indeed, Plaintiff's alleged "injury" is set forth in the following paragraph:

> Plaintiff Giffords has been, and continues to be, injured by the NRA Affiliates' illegal campaign contributions. Giffords is a gun safety organization that exists in part to compete with the NRA and the candidates and policies it supports. Giffords directly opposed the campaigns of several of the candidates who participated in the NRA scheme and who benefited from the NRA Affiliates' illegal contributions. Giffords also continues to engage in legislative advocacy for positions each of the NRA's beneficiaries has opposed while in office. Giffords is injured by the competitive advantages the NRA has obtained by flouting campaign finance laws.

(ECF No. 1 ¶ 6). These conclusory allegations, coupled with the lack of a "concrete" injury alleged elsewhere in the Complaint, are clearly insufficient to show Article III injury by a preponderance of the evidence. A simple assertion that Plaintiff suffered a supposed injury to its ability to influence the political process necessarily "rests on gross speculation and is far too fanciful to merit treatment as an 'injury in fact.'" *Gottlieb v. FEC*, 143 F.3d 618, 621 (D.C. Cir. 1998).

Indeed, Plaintiff fails entirely to assert any concrete "loss" or "injury." For instance, Plaintiff failed to allege any specific legislative action or policy adverse to its own cause but that arose from the alleged violations. *See Williams v. Purdue Pharma Co.*, 297 F. Supp. 2d 171, 177 (D.D.C. 2003) ("Standing requires 'individualized proof' of both the fact and the extent of the

injury") (citing *Consumer Fed'n of Am.* v. *Upjohn Co.*, 346 A.2d 725, 728 (D.C. Cir. 1975)).

Likewise, Plaintiff fails to identify whether the candidates referenced in the Complaint *actually*

received an unfair advantage over Plaintiff's preferred candidates as a result of the alleged

violations, although, even if Plaintiff could do so, this is not an *individualized* injury specific to

Plaintiff—a requirement for Article III standing. *Id*. Rather, that injury would be specific to the

candidate running against the individual benefiting from the allegedly improper expenditures.

As a result, Plaintiff has failed to allege any individualized injury arising out of the asserted

conduct because the alleged injury would be shared equally by any individual or party opposing

the NRA-supported candidates.  Plaintiff's suit "involves only a generalized grievance," and its

injury, if at all substantiated, is "shared in substantially equal measure by all or a large class of

citizens." *FEC v. Akins*, 524 U.S. 11, 23 (1998) (cleaned up).

Rather than allege a concrete and particularized injury, Plaintiff insists only that it "is

injured by the competitive advantages the NRA has obtained by flouting campaign finance laws"

((ECF No. 1 ¶ 6). But such a bare, conclusory assertion is wholly inadequate to establish an injury

by a preponderance of the evidence. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)

(injury must be "concrete" and "particularized," not a product of conjecture or hypothetical). This,

of course, is even more problematic for Plaintiff because, in cases like this where Plaintiff's

"asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation)

of *someone else*, it is substantially more difficult to establish injury in fact." *Common Cause*, 108

F.3d at 417 (cleaned up).

Plaintiff's failure to allege a sufficient injury is not the only reason it cannot show Article

III injury; another obstacle is Plaintiff's own success in the political arena during the election

cycles at issue. While Plaintiff attempts to characterize itself as David to the NRA's Goliath,

Giffords is anything but a diminutive or inconsequential organization. Rather, Plaintiff is a sophisticated and well-funded political machine consisting of a 501(c)(4) lobbying arm, a 501(c)(3) research arm, and even a super PAC.[24] Plaintiff's 501(c)(4) 2019 Form 990 indicates receipt of over $10 million in receipts  (through contributions and/or grants) for the year 2019—up by roughly $7 million from 2018. *See* Giffords Form 990 for tax year 2019, attached hereto as **Exhibit G**, at 1, 9, 26. Meanwhile, Plaintiff's PAC ended the 2020 election cycle with over $11 million in total contributions,[25] and Plaintiff's 501(c)(3) with just under $5 million in total receipts (through contributions and/or grants). *See* Giffords Law Center to Prevent Gun Violence Form 990 for tax year 2019, attached hereto as **Exhibit H**, at 1, 9. As a whole, the Giffords entities received at least $26 million in contributions for the 2019-2020 election cycle.

While Plaintiff's complaint downplays its political influence to pass Article III muster, Plaintiff has elsewhere memorialized its political impact for all to see. For example, on November 8, 2018, just two days after the 2018 general election in which Plaintiff claims to have been competitively disadvantaged, Plaintiff issued a press release bearing the headline "Giffords Took on the NRA and Won."[26]  Cutting even deeper against its case for standing, Plaintiff's press release claims that on Election Day in 2018, "voters from across the country took to the polls and made one thing crystal clear: *the politics of guns has shifted dramatically*."[27] Plaintiff went on to assert that in 2018, "gun safety move[d] from third rail to top issue in some of the most contentious

---

[24] *See About Giffords*, Giffords, https://giffords.org/about/ (last visited Jan. 28, 2022) (referencing Giffords, Giffords Law Center to Prevent Gun Violence, and Giffords PAC).

[25] *See* Giffords PAC, Receipts (2019-2020), Federal Election Commission, *available at* https://www.fec.gov/data/committee/C00540443/?tab=raising&cycle=2020 (last visited Jan. 28, 2022)

[26] Press Release, *Giffords Took on the NRA and Won*, Giffords (Nov. 8, 2018), https://giffords.org/press-release/2018/11/post-election-memo/.

[27] *Id.* (Emphasis in original).

campaigns. Millions of voters—young and old, Democrat and Republican, urban and suburban—rallied for stronger gun laws and the candidates who support them." *Id.*

Pertinent to its burden to show a sufficient injury here, Plaintiff proclaimed that "*[c]ampaign ads touting gun safety <u>far outnumbered</u> ones focused on gun rights. And gun safety groups like <u>Giffords outspent the NRA by tens of millions of dollars</u>*, even in the deepest of red states, like Texas." *Id.* Plaintiff further announced that, for the 2018 election cycle, "Giffords endorsed 307 candidates. Of those endorsements 249 candidates were victorious. We are still awaiting results from 10 additional outstanding races."[28] Plaintiff went on to claim that "95 Giffords endorsed gun safety champions were elected to the US House of Representatives last night, helping flip the House to a new 'Gun Safety Majority.'"[29]

Plaintiff's proclamations are not limited to the 2018 Election Cycle. Plaintiff also proclaims that it "beat the NRA in its home state in 2019, and elected gun safety champions to the White House and Senate in 2020."[30] While such claims of political victory are often hyperbolic, Plaintiff cannot seriously claim to have been harmed while simultaneously announcing, "WE'RE WINNING," and that "[i]n red, blue, and purple states, voters are rejecting the gun lobby and electing gun safety champions."[31]

Plaintiff should not be allowed to talk out of both side of its mouth; its claims of competitive harm, while touting its political success, are but a thinly veiled effort to skirt the Article III standing requirements. Plaintiff simply has not suffered a legally cognizable injury, and

---

[28] *Id.* One of the elections in which Plaintiff's preferred candidate prevailed in 2018 was the Montana U.S. Senate race, in which the candidate supported by Plaintiff, Sen. Jon Tester, defeated Matt Rosendale. ECF No. 1, ¶ 20. That victory further undercuts Plaintiff's claim to have been harmed by any of the NRA Affiliates conduct in relation to that election.

[29] Press Release, *Giffords Took on the NRA and Won*, Giffords (Nov. 8, 2018).

[30] Elections, Giffords, https://giffords.org/elections/ (last visited Jan. 28, 2022).

[31] *Id.*

its Complaint should be dismissed for lack of standing.

### C.     Plaintiff fails to satisfy the causation requirement for Article III standing

The Supreme Court insists that the federal courts act only "to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 41-42 (1976). Here, Plaintiff fails to show that the injury alleged in the Complaint—which, again, is not even sufficient to show standing in the first instance—is attributable to the FECA allegations outlined in the Complaint. For example, Plaintiff fails to show that the NRA Affiliates influenced a candidate's position on policy issues as a result of the alleged FECA violations. And that's because Plaintiff cannot make such a showing; the candidates at issue here had firearm policy preferences that are in line with those of the NRA long before the alleged FECA violations set forth in Plaintiff's Complaint.

For example, the NRA rates candidates—including those implicated in the FEC Complaints—"based solely on [each] candidate's support of our Right to Keep and Bear Arms…." *See* "Here's What the Ratings Mean," Compilation of NRA-PVF Candidate Endorsements, attached as **<u>Exhibit I</u>**. On one end of the spectrum, "[a] legislator with not only an excellent voting record on all critical NRA issues, but who has also made a vigorous effort to promote and defend the Second Amendment," may be awarded an "A+" rating. *Id*. On the other end of the spectrum, a legislator with "anti-gun" policy preferences that votes wrong on "key issues" will receive a lower rating, such as a "D" or an "F," while those who "[r]efused to answer the NRA-PVF candidate questionnaire, often an indication of indifference, if not outright hostility, to gun owners' and sportsmen's rights," receive a rating of "?" *Id*.

This demonstrates that the candidates' position on firearm policies is a *precursor* to whether the NRA Affiliates support their candidacies, not a consequence of that support. In other

words, while Plaintiff's standing claim rests in part on the proposition that it "continues to engage in legislative advocacy for positions each of the NRA's beneficiaries has opposed while in office," the reality is that the firearm policy positions of those candidates existed *before* the NRA Affiliates' conduct alleged in the Complaint—not as a result of it—and therefore Plaintiff cannot demonstrate the requisite causation between those policy positions and its claimed injury to show Article III standing.

For example, in the 2018 election cycle, NRA-PVF gave Josh Hawley an "A" rating based in part on his support of pro-gun policies, including Concealed Carry Reciprocity legislation and his prior work of "protecting the Second Amendment rights of law abiding gun owners" as Missouri's Attorney General. *See* Ex. I-1, NRA-PVF, *Candidate Endorsements 2018, Missouri* at 1 (Sept. 15, 2018).   Meanwhile, NRA-PVF gave Matt Rosendale an "A" rating based in part on his opposition to the United Nations Gun Ban Treaty and also to the semi-automatic firearms ban proposed by California Senator Dianne Feinstein. *See* Ex. I-2, NRA-PVF, *Candidate Endorsements 2018, Montana* at 1 (Aug. 15, 2018); *See* Ex. I-3, NRA-PVF, *Candidate Endorsements 2018, Montana* at 1 (Sept. 15, 2018).

Indeed, NRA-PVF's candidate ratings are consistently based on the candidate's prior positions or actions regarding firearm policies. *See* Ex. I-4, NRA-PVF, *Candidate Endorsements 2014, Arkansas* at 1 (Sept. 15, 2014) ("A" rating for Tom Cotton in part for cosponsoring "The National Right to Carry Reciprocity Act"); Ex. I-5, NRA-PVF, *Candidate Endorsements 2014, Colorado* at 1, 2 (Sept. 15, 2014) ("A" rating for Cory Gardner in part for cosponsoring a resolution opposing the United Nations Gun Ban Treaty); Ex. I-6, NRA-PVF, *Candidate Endorsements 2014, North Carolina* at 1 (Sept. 15, 2014) ("A+" rating for Thom Tillis in part for voting to improve North Carolina's Concealed Handgun Permit law);  Ex. I-7, NRA-PVF, *Candidate Endorsements*

*2016, Wisconsin* at 1, 2 (Sept. 15, 2016) ("A" rating for Ron Johnson in part for voting against government blacklists that would deny those on secret government lists the right to purchase or own firearms without due process); *id.* at 1 (advocating for Donald Trump's election as President due to his opposition to gun and ammunition bans).

Nor has Plaintiff shown that any given candidate *actually* received an unfair advantage (*i.e.*, more votes) as a result of the alleged violations. Thus, Plaintiff's assertion that the "NRA's beneficiaries [have] opposed" Plaintiff's "legislative advocacy" for certain positions cannot be traced back to the alleged violations themselves. In fact, Plaintiff cannot show that the alleged harm bears any relation to the alleged violations because the "harm" alleged by Plaintiff is the result of independent decisions made by voters and elected officials.

The *Simon* case is instructive in this regard. 426 U.S. 26 (1976). There, the Supreme Court considered whether certain low-income individuals had Article III standing to challenge the government's favorable tax treatment of nonprofit hospitals. *Id.* at 37. Specifically, the plaintiffs in *Simon* challenged an IRS revenue ruling that they claimed incentivized healthcare providers to deny the plaintiffs hospital services. *Id.* at 32-33. While the Supreme Court acknowledged that some indigent members of the plaintiff-organization may have been denied hospital services, it concluded that the alleged injury was insufficient to establish a case or controversy because it was entirely speculative as to whether the hospital's decision to deny services to plaintiff's members stemmed from the hospital's favorable tax treatment under the challenged IRS ruling. *Id.* at 42-43.

The same dynamic forecloses Plaintiff's traceability argument in this case. Indeed, with respect to claims like Plaintiff's where the "asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else,*" standing is difficult to establish because "one or more of the essential elements of standing 'depends on the unfettered choices

made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict.'" *Lujan*, 504 U.S. at 562 (quoting *ASARCO Inc. v. Kadish,* 490 U.S. 605, 615 (1989)). Plaintiff essentially alleges that its own support for certain candidates and policies was rendered less effective because the NRA Affiliates were, through purportedly coordinated expenditures, better able influence voters and candidates. But "[t]hat conclusion rests on a series of hypothetical occurrences, none of which [Plaintiff] can demonstrate came to pass." *Gottlieb*, 143 F.3d at 621..

Likewise, in *Gottlieb*, the D.C. Circuit Court affirmed dismissal for lack of standing where the plaintiffs could not show how allegedly improper campaign financing actually influenced public opinion. *Id.* There, the panel reasoned that while one campaign *may* have received extra funds, it did not prevent the plaintiffs from "engaging in any of the numerous activities open to all politically active citizens." *Id.*at 622. In other words, like Plaintiff here, the plaintiffs in *Gottlieb* were "free to raise funds to support their own candidates, volunteer their time to work on those campaigns, and vote for the candidate of their choice." *Id.*

The alleged injury is simply too attenuated here. For example, the results of any election, and the political leanings and policies ultimately pursued by any elected official, are the product of "independent choices…from a range of [options]." *Garelick v. Sullivan*, 987 F.2d 913, 919-20 (2d Cir. 1993). Plaintiff has not pled that the alleged FECA violations in its Complaint somehow caused the various candidates and politicians named as respondents in the underlying MURs to take policy positions adverse to Plaintiff, and even if it had, Plaintiff cannot prove that connection by a preponderance of the evidence. This is so because the alleged injury suffered by Plaintiff is not attributable to the alleged violations or "competitive advantage" held by the NRA Affiliates. Rather, any candidate or voter is free to make their own independent policy decisions, whether

favorable or unfavorable to Plaintiff's policy preferences, despite the NRA Affiliates' political activities. Those decisions, like the election results, are not "traceable" to the acts of the NRA Affiliates, and Plaintiff lacks standing for that reason.

### D.   Plaintiff fails to satisfy the redressability requirement for Article III standing

Likewise, Plaintiff fails to satisfy the third element of standing because redressability cannot be founded on mere speculation as to what third parties *might* do in response to a favorable ruling. *Renal Physicians Ass'n* v. *U.S. Dep't of Health & Human Servs.*, 489 F.3d 1267, 1274 (D.C. Cir. 2007). Simply put, even if Plaintiff obtains a favorable ruling in this case, it will not redress Plaintiff's alleged grievance because Plaintiff's claimed harm results from the independent actions of third parties not before the Court. *Id.* In other words, it is impossible for Plaintiff's alleged "injury" (*i.e.,* the election of certain candidates in past elections and those candidates' continued opposition to Plaintiff's policy preferences) to be redressed by the relief Plaintiff seeks (such as declarations that Defendants made or accepted illegal campaign contributions) where the "harm" is the product of voters' choices and the policy preferences of those who win elected office. Those results flow from the independent actions of voters, making redressability beyond the scope of relief available in this case. A ruling in Plaintiff's favor would not suddenly reverse the reasons for which voters in one region or another select elected officials; nor would it reverse a legislator's pro-Second Amendment view on laws and regulations.

Likewise, there is no redressability for the named and un-named candidates' continued support for firearm policy opposite to that sought through Plaintiff's "legislative advocacy" (ECF No. 1 at ¶6). First, those candidates are already in office, and none of the requested relief will alter those officeholders' votes on public policy issues—nor should it under this country's constitutional framework. Elected officials are free to support or oppose any given legislative policy. Plaintiff cannot "enjoin" elected officials from supporting their own policy preferences, and any such relief

is beyond the authority of this Court. There is simply no way for Plaintiff to illustrate redressability for the injuries alleged in its Complaint. Plaintiff therefore lacks standing.

### E.   Plaintiff may not end-run Article III standing requirements by claiming competitor-standing

While Plaintiff is unable to show any concrete, specific, or individualized injury, Plaintiff also makes an unsupported assertion of "competitor-standing" apparently by virtue of the respective positions of Plaintiff and the NRA Affiliates in regards to firearm policy preferences. For instance, Plaintiff asserts it "is injured by the competitive advantages the NRA has obtained by flouting campaign finance laws" because "Giffords is a gun safety organization that exists in part to compete with the NRA and the candidates and policies it supports." (ECF No. 1 ¶6).

The competitor-standing doctrine is born from a line of cases in which claimants asserted the federal government erroneously allowed banks to begin competing in entirely new fields of business. *See In re U.S. Catholic Conference (USCC)*, 885 F.2d 1020, 1029 (2d Cir. 1989). This Circuit in particular, however, has emphasized that "the basic requirement common to all [such] cases" is that the allegedly unlawful competitive benefit must "*almost certainly cause an injury in fact.*" *Sherley v. Sebelius*, 610 F.3d 69, 73 (D.C. Cir. 2010) (emphasis added); *see also Canadian Lumber Trade All. v. United States*, 517 F.3d 1319, 1332 (Fed. Cir. 2008) ("competitor standing . . . relies on economic logic to conclude that a plaintiff will likely suffer an injury-in-fact") (cleaned up).

The Supreme Court, however, has refused to impose "a boundless theory of standing" in which "a market participant is injured for Article III purposes whenever a competitor benefits from something allegedly unlawful." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 99 (2013). Indeed, the Supreme Court held that competitor-standing must be "based on an injury more particularized and more concrete than the *mere assertion that something unlawful benefited the plaintiff's*

*competitor*." *Id.* (emphasis added). Courts predictably reject application of competitor-standing where the alleged unlawful benefit does not presumptively dictate competitive injury as a matter of economic certainty and no "concrete, economic interest…has been perceptibly damaged." *New World Radio, Inc. v. F.C.C.*, 294 F.3d 164, 172 (2002); *State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 55 (D.C. Cir. 2015) (identifying increased difficulty in proving standing where plaintiff's asserted injury arises from government's unlawful regulation of another party and rejecting application of competitor-standing where harm to plaintiff was too attenuated from actual harm to plaintiff).

In this case, the application of a competitive injury where Plaintiff has otherwise failed to establish the elements of standing would be entirely misplaced. This is not a commercial dispute between two parties competing for the same customer base. Rather, this is a dispute regarding the enforcement of nuanced FECA provisions that happens to implicate alleged inaction by an independent agency of the government—a jurisdictional point challenged elsewhere in this brief. *See Raines v. Byrd*, 521 U.S. 811, 819 (1997) (insisting on strict compliance with injury-in-fact standing requirement in cases involving separation-of-powers concerns). Application of the competitor-standing doctrine here would grant Plaintiff "a special license to roam the country in search of wrongdoing" and allow the federal courts to be used as "ombudsmen of the general welfare." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 487 (1982); *Already, LLC*, 568 U.S. at 732 (cautioning against accepting a theory of standing whereby competitors meet the requirements of Article III "injury" simply because they operate in the same market).

Plaintiff will likely assert that application of the competitor-standing doctrine in the context of federal election disputes would not be a unique proposition in this Court. To be sure, this Court

has applied the doctrine to such claims in the past, but in each instance those claims were brought by parties actually *participating* in the election itself. *See Laroque v. Holder*, 650 F.3d 777, 788-89 (D.C. Cir. 2011) (voter with concrete plan to run for political office in upcoming election had Article III standing because there was "substantial probability" he would be personally injured by ballot access measure); *Shays v. FEC*, 414 F.3d 76, 82, 85–87 (D.C. Cir. 2005) (incumbent candidates for reelection had competitor-standing to challenge FEC regulation because they too were regulated in election environment and stood to suffer harm to their interest in election as a result of regulation); *But see Gottlieb*, 143 F.3d at 621 (rejecting PAC's assertion of competitor-standing to challenge use of public matching funds by a candidate it opposed because "it was never in a position to receive matching funds itself" and "*[o]nly another competitor could make such a claim*") (emphasis added). In other words, those instances gave rise to competitive injury as a matter of certainty—which is not the case here because Plaintiff is not an actual candidate but, rather, a public-interest group not actually "competing" in the same forum. Just like the plaintiff in *Gottlieb*, Plaintiff lacks standing to challenge the receipt of funds (in the form of allegedly non-independent expenditures that would be treated as in-kind contributions under FECA) by candidates it opposes because "it was never in a position to receive…funds itself." *Id.* And those decisions reinforce another important distinction; competitor-standing may only arise from a certain injury related to participation in a *future election*, not from harm allegedly suffered as a result of past infractions. *Nader v. FEC*, 725 F.3d 226, 228-229 (D.C. Cir. 2013).

The Court of Appeals for the D.C. Circuit dealt with a similar redressability issue in *Nader*, where the plaintiff asserted he was "forced to compete in an illegally structured campaign environment." (*Id.* at 228) (compare with Plaintiff's Complaint, ECF No. 1 at ¶6: "Giffords is injured by the competitive advantages the NRA has obtained by flouting campaign finance laws").

There, the Court made abundantly clear that "the problem with [plaintiff's] argument" was that "a favorable decision…will not redress the injuries [claimed]." 725 F.3d at 228. The Court in *Nader* reasoned that the plaintiff "*might* have been able to establish standing as a competitor had he shown that the FEC's determination injured *his* ability to fight the next election" (*Id.*) (emphasis added), however, no such allegations are made in this case. Furthermore, it is impossible to prove such an allegation by a preponderance of the evidence because it would be entirely speculative. See *McConnell v. FEC*, 540 U.S. 93, 226 (2003) (denying standing to plaintiff because claim that he might encounter unfavorable treatment under newly-enacted statute was "too remote temporally") *overruled on other grounds by Citizens United v. FEC*, 558 U.S. 310 (2010). Here, it is not a matter of "certainty" that the alleged violations will lead to a competitive injury in the future because the extent of the parties' competition is not even made clear on the face of Plaintiff's Complaint, nor is Plaintiff's participation in any future election.

Practically speaking, it is simply untenable for an entity with a presence and political influence as wide as that claimed by Plaintiff to use the competitor-standing doctrine to slip past the stringent Article III standing requirements that apply to everyone else. Plaintiff cannot show Article III standing by a preponderance of the evidence, and it cannot shortcut that requirement via competitor-standing. Accordingly, Plaintiff's Complaint should be dismissed.

## III. The Five-Year Statute of Limitations Bars Plaintiff's Pre-November-2016 Claims

### A. Legal Standard

As an independent basis for dismissal, Plaintiff's claims for alleged violations that purportedly occurred prior to November 2, 2016 (the "Earlier Claims") should be dismissed as time-barred under Rule 12(b)(6) of the Federal Rules of Civil Procedure. A defendant may raise the affirmative defense of statute of limitations in a Rule 12(b)(6) motion when the facts giving rise to the defense are clear from the face of the complaint. *Smith–Haynie v. District of Columbia*,

155 F.3d 575, 578 (D.C.Cir.1998).

A motion to dismiss under Rule 12(b)(6) "tests the legal sufficiency of a complaint" and asks whether the plaintiff has properly stated a claim. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). Dismissal of a claim is appropriate "when a complaint fails 'to state a claim upon which relief can be granted.'" *Strumsky v. Wash. Post Co.*, 842 F. Supp. 2d 215, 217 (D.D.C. 2012) (quoting Fed. R. Civ. P. 12(b)(6)).

### B.   28 U.S.C. § 2462 applies to the Earlier Claims.

Several of the counts pled against the NRA Affiliates allege violations in the year 2014. ECF 1 (Counts 1-4). "The statute of limitations for FECA actions," however, "is five years," *Citizens for Resp. & Ethics in Washington v. Fed. Election Comm'n*, 236 F. Supp. 3d 378, 392 (D.D.C. 2017), *aff'd*, 892 F.3d 434 (D.C. Cir. 2018), and the applicable statute, 28 U.S.C. § 2462, provides that "an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued . . . ." Courts have routinely applied Section 2462 to time-bar lawsuits initiated by private parties. *Cf., e.g.*, *Sierra Club v. Okla. Gas & Elec. Co.*, 816 F.3d 666, 675 (10th Cir. 2016) (holding that "§ 2462 bars Sierra Club's suit for civil penalties," and also characterizing Sierra Club as a "[p]rivate plaintiff[]"); *Trawinski v. United Techs.*, 313 F.3d 1295, 1298 (11th Cir. 2002) ("Section 2462 by its text is generally applicable . . . and the Trawinski's citizen suit . . . is precisely this sort of action."). Thus, Section 2462 applies to this action, in which Plaintiff requests that this Court "assess an appropriate civil penalty against each Defendant in accordance with 11 C.F.R. § 111.24, to be paid to the United States, for each violation Defendants are found to have committed," (Compl. at Requested Relief ¶ 8), including for alleged violations occurring prior to November of 2016.

And, while Plaintiff purports to also seek declaratory and injunctive relief, in substance,

this requested relief also seeks to enforce a penalty. *See Kokesh v. S.E.C.*, 137 S. Ct. 1635, 1642 (2017) (A "penalty" to which Section 2462 applies (1) redresses a wrong to the public, rather than a wrong to an individual; and (2) is sought for the purpose of punishment, and to deter others from offending in like manner, rather than to compensate a victim for his or her loss); *FEC v. Toledano*, 317 F.3d 939, 953 (9th Cir. 2002), *as amended on denial of reh'g* (Jan. 30, 2003) (stating that "[p]ublic harm can be presumed from the magnitude or seriousness of the violation of the FECA," and that "the public was harmed by the infusion of illegal campaign funds" (quotations omitted)).

Alternatively, even if the claimed equitable relief sought by Plaintiff is not a penalty, Section 2462 would still apply to bar this relief under the concurrent-remedies doctrine. This doctrine holds that "equity will withhold its relief in such cases where the applicable statute of limitations would bar the concurrent legal remedy." *Cope v. Anderson*, 331 U.S. 461, 464 (1947). Courts have explained that "the concurrent remedy doctrine provides that a statute barring a legal claim will also bar an equitable claim when the jurisdiction of the federal court is concurrent with that at law, or the suit is brought in aid of a legal right." *Sierra Club*, 816 F.3d at 675 (quotations omitted). In other words, "[t]his rule applies whenever an action at law or equity could be brought on the same facts," and when "the only difference between [the equitable claim] and a time-barred legal claim is the relief sought." *Id*. (quotations omitted); and *see generally FEC v. Nat'l Right to Work Comm., Inc.*, 916 F. Supp. 10, 15 (D.D.C. 1996) ("Notions of welcome repose for ancient grievances aside, the practical concerns alone for problems of missing documents, faded memories, and absent witnesses that inevitably occur with the passage of time are no less problematic in adjudicating actions for declaratory and injunctive relief than in determining liability for monetary civil penalties."). Here, the relief sought by Plaintiff is concurrent with the legal remedies established by FECA. *See generally* (Compl.); 52 U.S.C. § 30109 (d).   Thus,

because legal remedies are available on the facts that Plaintiff alleges, Section 2462 applies to Plaintiff's claims for purported equitable relief for alleged violations predating November 2, 2016.

### C. The Earlier Claims are time-barred by 28 U.S.C. § 2462.

Not only does Section 2462 apply to this case, it also necessitates dismissal of the Earlier Claims. As noted, pursuant to Section 2462, an action must be "commenced within five years from the date when the claim *first accrued* . . . ." (Emphasis added).

A claim "first accrue[s]" at the time that the alleged violation occurs. *3M Co. (Minnesota Min. & Mfg.) v. Browner*, 17 F.3d 1453, 1462 (D.C. Cir. 1994) (holding "an action, suit or proceeding to assess or impose a civil penalty must be commenced within five years of the date of the violation giving rise to the penalty," and rejecting application of discovery of violation rule); *see Gabelli v. SEC*, 568 U.S. 442, 454 (2013) (Section 2462 does not contain a discovery rule).

Further, the claim accrues at that time regardless of any procedural hurdles which must be cleared prior to the filing of the claim in this court. "[N]othing in the language of Section 2462 even arguably makes the running of the limitations period turn on the degree of difficulty an agency experiences in detecting violations," *3M Co.*, 17 F.3d at 1461, and the same should be true of any FECA process that a complainant must undergo prior to initiating a private suit in this court. For example, in *FEC v. Christian Coal.*, 965 F. Supp. 66 (D.D.C. 1997), a court in this circuit dismissed claims brought by the FEC seeking legal remedies for violations which occurred more than six years prior to the FEC's filing of the complaint. The court explained that "the FEC's cause of action accrued when the events at issue occurred, and 28 U.S.C. § 2462 operates according to its terms to bar the enforcement of any civil fine, penalty or forfeiture for events that occurred more than five years before the Complaint was filed," even though the FEC underwent FECA's administrative process prior to filing the complaint. *Id*. at 68, 70.

Another court in this circuit similarly concluded that Section 2462 barred the FEC's claims

for civil penalties for alleged violations that had occurred more than five years prior to the complaint being filed. *FEC v. Nat'l Republican Senatorial Comm.*, 877 F. Supp. 15 (D.D.C. 1995) ("*NRSC (1995)*"). There, the court rejected the FEC's argument that the claim should not accrue until the FEC had completed its investigation and satisfied FECA's statutory requirements, reasoning that such a result would "encourage the FEC to drag out its own investigations," and would obstruct "the general prohibition against open-ended penalties" and "FECA's goal of expeditious conflict resolution." *Id*. at 20. It further held that "the minimal time periods statutorily imposed for review and conciliation do not transform the decision-making process of the Commission from a prosecutorial decision into a mandatory administrative adjudication." *Id*. Rather, FECA "essentially formalizes the usual steps involved in preparing a civil suit: gathering evidence, determining whether sufficient evidence exists, and attempting to work with the potential defendant to obviate the need for litigation." *Id*.; *see also Nat'l Right to Work Comm.*, 916 F. Supp. at 14.

While the foregoing cases applied to lawsuits initiated by the FEC, they should apply with equal weight to a citizen suit. In both scenarios, a complainant can initiate the FECA process by filing a complaint with the FEC. 52 U.S.C. § 30109(a). And if the complainant believes that the FEC administrative process is too slow, FECA provides a remedy, providing that 120 days after an administrative complaint is filed, a complainant may sue to challenge the delay. 52 U.S.C. § 30109(a)(8)(A), (C). Permitting a private complainant additional time to commence a lawsuit, beyond the time limitation imposed upon the FEC would create a bizarre result in which the FEC would be able to cure an expired statute of limitations by setting the procedural stage for a private party to pursue the matter in a citizen suit—as has been done here through the Weintraub Scheme.

By contrast, a court in this circuit has reached the opposite conclusion, holding that a

plaintiff's FECA-based claims in federal court were not time-barred by Section 2462, even for alleged violations which had occurred more than five years prior to the filing of the complaint. *Citizens for Resp. & Ethics in Washington v. Am. Action Network*, 410 F. Supp. 3d 1, 23 (D.D.C. 2019) ("*AAN*"). In so holding, the court reasoned that "[t]he question is not when the alleged violation occurred, but when the claim first could have been brought: that is, when [the plaintiff] had a complete and present cause of action." *Id*. at 24 (quotations omitted). The NRA Affiliates respectfully submit that this result is erroneous for at least two reasons.

First, rather than imposing mandatory administrative adjudication as a prerequisite to a suit, the FECA procedures are more akin to a prosecutorial determination. *NRSC (1995)*, 877 F. Supp. at 20. Indeed, "the FECA statutory framework essentially formalizes the usual steps involved in preparing a civil suit: gather evidence, determining whether sufficient evidence exists, and attempting to work with the potential defendant to obviate the need for litigation." *Id*. Thus, where the FECA procedures only amount to a prosecutorial determination as to whether a lawsuit should be brought, the reasons for applying extensions where adjudicatory administrative proceedings are a mandatory prerequisite to bringing suit are simply absent here. As one court explained in the context of a government-initiated lawsuit, "if statutes of limitations did not begin running until a party resolved to bring suit or otherwise take affirmative action to vindicate its rights, no statute of limitations would ever lapse; the promise of repose would be as empty as a beggar's purse. To liken prosecutorial administrative decision-making to mandatory administrative adjudication is to compare plums to pomegranates." *United States v. Meyer*, 808 F.2d 912, 920–21 (1st Cir. 1987). And as discussed herein, the same analysis should govern a citizen-initiated lawsuit.

Second, and despite the holding in *AAN*, the particularities of FECA's prosecutorial

decision-making process do not alter the time at which a claim first accrues. Contrary to the *AAN* Court's statement that "[t]he question is not when the alleged violation occurred," the D.C. Circuit held that a claim first accrues at the time of the alleged violation, and that "nothing in the language of Section 2462 even arguably makes the running of the limitations period turn on the degree of difficulty an agency experiences in detecting violations." *3M Co.*, 17 F.3d at 1461-1463. Logically, then, nothing in the language of section 2462 should even arguably make the running of the limitations period turn on the degree of difficulty that a litigant must undergo to file a complaint in this court. Indeed, the *3M* Court rejected the notion of interpreting Section 2462, an omnibus statute of limitations, in such a way that the interpretation would "be influenced by EPA's particular difficulties in enforcing TSCA." *Id*. It further opined that "[a]n agency's failure to detect violations, for whatever reasons, does not avoid the problems of faded memories, lost witnesses and discarded documents in penalty actions brought decades after alleged violations are finally discovered." *Id*. It would be inconsistent with the rulings in *3M* to conclude that unlike in other instances, where the claim "first accrues" at the time of the violation, a FECA claim somehow is tolled by any procedural hurdles that a plaintiff must overcome prior to filing suit in this Court.

Sound policy reasons also support the conclusion that an action to impose a civil penalty must be commenced within five years of the date of the alleged violation giving rise to the penalty. In addition to the evidentiary problems noted elsewhere, courts have recognized that "[s]tatutes of limitations also reflect the judgment that there comes a time when the potential defendant ought to be secure in his reasonable expectation that the slate has been wiped clean of ancient obligations." *Id*. at 1457 (quotations omitted). In fact, as the FEC itself has explained, "[s]tatutes of limitations are especially important for campaign-finance law." *In The Matter of Independent Women's Voice*, MUR 7181, March 18, 2021 ("IWV"). Indeed, "[p]olitical campaigns and committees are, by their

nature, often temporary enterprises without permanent structures or personnel, and reconstituting their activities from far in the past often poses significant investigatory obstacles." *Id*. Thus, "[i]ndividuals and organizations cannot operate with confidence in the political system when, ten years hence, they may be subject to a years-long open investigation for an undetermined charge. This has a deleterious chilling effect on constitutionally protected activity." *Id*. at 4.

Indeed, if the date upon which the claim "first accrued" was measured by Plaintiff's ability to file a private suit in *this* court, a plaintiff could more than double the statute of limitations set forth in Section 2462, receiving an additional five years *after* resolution with the FEC. This case demonstrates the concern: no administrative complaint regarding the 2014 alleged violations was filed until 2018, *four years* after the alleged violations occurred. (Compl. ¶ 118). If Section 2462 was measured from the date upon which Plaintiff could file a complaint in this court, November 1, 2021, *id*. ¶ 130, Plaintiff could wait until November 1, *2026* to file suit regarding alleged violations from *2014*. Such a reading of the statute of limitations would directly contravene the reasons that statutes of limitations exist. Just as "nothing in the language of Section 2462 even arguably makes the running of the limitations period turn on the degree of difficulty an agency experiences in detecting violations," *3M Co.*, 17 F.3d at 1461, Section 2462 also does not concern itself with any FECA procedures a citizen-complainant must undergo prior to filing a complaint.

Finally, Plaintiff attempts to circumvent the plain bar of the statute of limitations by trying to invoke a continuing violation exception. *See* (Comp. ¶¶ 2, 114, 133, 137). But that exception plainly does not apply here. Indeed, "the text of FECA does not clearly establish that entities have a continuous obligation to report information." *Citizens for Resp. & Ethics in Washington v. Fed. Election Comm'n*, 236 F. Supp. 3d 378, 393 (D.D.C. 2017), *aff'd*, 892 F.3d 434 (D.C. Cir. 2018); *see also Earle v. D.C.*, 707 F.3d 299, 306 n.9 (D.C. Cir. 2012) (noting that "[c]ourts do not lightly

create exceptions to the general rule of claim accrual," such as the continuing violation exception, so "absent a clear…directive from the Congress, the general rule applies." (Cleaned up)). Further, courts have rejected the argument that "where a continuing violation exists, the limitations period under Section 2462 does not begin to run until the final day of the violation . . . ." *Sierra Club*, 816 F.3d at 672 (10th Cir. 2016). In *Sierra Club*, the Tenth Circuit held that because the statute of limitations begins to run when a claim "first" accrues, and "a continuing violation is actionable even before the last act of the violation where the conduct that has already occurred is sufficient to support a claim," Sierra Club's action was time-barred, "even if the violation continued until some later date." *Id*. So too here.

Accordingly, as Plaintiff commenced this action on November 2, 2021, any claims that accrued prior to November 2, 2016, are time-barred under 28 U.S.C. § 2462 and must be dismissed.

## CONCLUSION

For these reasons, the NRA Affiliates respectfully request that the Court grant their motion and dismiss Plaintiff's complaint in its entirety with prejudice.

Dated: January 28, 2022                      Respectfully Submitted,

/s/ Charles R. Spies                         Robert L. Avers, Bar ID: MI0083
Charles R. Spies, Bar ID: 989020             350 S. Main Street, Ste 300
DICKINSON WRIGHT PLLC                         Ann Arbor, MI 48104
1825 Eye Street, N.W., Suite 900             (734) 623-1672
Washington, D.C. 20006                       ravers@dickinsonwright.com
Telephone: (202) 466-5964
Facsimile: (844) 670-6009                     *Attorneys for Defendants the National Rifle*
cspies@dickinsonwright.com                    *Association of America & the National Rifle*
                                             *Association of America Political Victory Fund*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 28, 2022, I caused a true and correct copy of the foregoing document to be served upon all counsel of record registered with the Court's ECF system, by electronic service via the Court's ECF transmission facilities.

<u>/s/ Robert L. Avers</u>
Robert L. Avers (Bar ID: MI0083)