**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| GIFFORDS<br>P.O. Box 51196<br>Washington, DC 20091,<br>　　　　　　Plaintiff,<br><br>　　　　　v.<br><br>NATIONAL RIFLE ASSOCIATION OF<br>AMERICA POLITICAL VICTORY FUND,<br>11250 Waples Mill Road Fairfax, VA 22030,<br><br>NATIONAL RIFLE ASSOCIATION OF<br>AMERICA INSTITUTE FOR<br>LEGISLATIVE ACTION, 11250 Waples<br>Mill Road Fairfax, VA 22030,<br><br>MATT ROSENDALE FOR MONTANA,<br>P.O. Box 4907, Helena Montana, 59604, and<br><br>JOSH HAWLEY FOR SENATE, P.O. Box<br>31476, St. Louis, MO 63131,<br><br>　　　　　　Defendants. | Civil Action No. 1:21-cv-02887 (LLA) |

## <u>AMENDED COMPLAINT</u>

Starting as early as during the 2014 election cycle, the National Rifle Association ("the NRA") has engaged in an ongoing scheme to evade campaign finance regulations by using a series of shell corporations to illegally but surreptitiously coordinate advertising with at least seven candidates for federal office. Through this scheme, two NRA affiliates made up to $35 million in illegal, excessive, and unreported campaign contributions across the 2014, 2016, and 2018 elections, including up to $25 million to the Trump Campaign in 2016. These coordinated contributions violate the Federal Election Campaign Act's ("FECA") contribution limits, corporate contribution ban, and disclosure requirements.

1

1.      Plaintiff Giffords brings this action under 52 U.S.C. § 30109(a)(8)(C) to remedy violations of FECA's contribution limits, corporate contribution ban, and disclosure requirements.

2.      Two NRA affiliates, National Rifle Association of America Political Victory Fund ("NRA-PVF") and National Rifle Association of America Institute for Legislative Action ("NRA-ILA") (collectively, the "NRA Affiliates"), have maintained a long-running and continuous scheme to make illegal, excessive, and unreported in-kind campaign contributions to candidates for federal office since at least the 2014 election cycle.

3.      During this time, NRA-PVF and NRA-ILA have made as much as $35 million in illegal campaign contributions to seven federal candidates, including to the Senate campaigns of Thom Tillis, Tom Cotton, Cory Gardner, Ron Johnson, Matt Rosendale, and Josh Hawley, and to the presidential campaign of Donald J. Trump.

4.      NRA-PVF and NRA-ILA coordinated with the above-mentioned candidates by contracting with a common vendor. Both the NRA Affiliates and the candidates purchased advertisements through the political consultancy OnMessage/Starboard, which operates as "OnMessage" when it acts on behalf of candidates and as "Starboard" when it acts on behalf of the NRA. Likewise, the NRA Affiliates and the candidates place campaign ads through a vendor named National Media, which purports to operate as "American Media and Advertising Group" ("AMAG") when it acts on behalf of candidates and "Red Eagle" when it acts on behalf of the NRA Affiliates.

5.      OnMessage/Starboard and National Media/Red Eagle/AMAG are functionally indistinguishable. They are led by the same people, located at the same address, and have no internal separation or firewall between the staff who work for each entity. Indeed, the same staff

performed work for both the NRA Affiliates and the candidates' campaigns during the same election cycles.

6.      Plaintiff Giffords has been, and continues to be, injured by the NRA Affiliates' illegal campaign contributions. Giffords is a gun safety organization that exists in part to compete with the NRA and the candidates and policies it supports. Giffords directly opposed the campaigns of several of the candidates who participated in the NRA scheme and who benefited from the NRA Affiliates' illegal contributions. Giffords also continues to engage in legislative advocacy for positions each of the NRA's beneficiaries has opposed while in office. Giffords is injured by the competitive advantages the NRA has obtained by flouting campaign finance laws and by the resulting lack of information necessary to fulfill its mission and programmatic goals.  Giffords is also injured by the inaccurate, incomplete, and untimely reporting of campaign-finance information that has resulted from Defendants' scheme.

7.      To remedy its injuries, Plaintiff filed four administrative complaints with the Federal Election Commission ("FEC" or "Commission"), which demonstrated that NRA-PVF and NRA-ILA made illegal, unreported, and excessive in-kind contributions, in the form of coordinated communications, to the campaigns of Thom Tillis, Tom Cotton, and Cory Gardner in 2014, Donald J. Trump and Ron Johnson in 2016, and Matt Rosendale and Josh Hawley in 2018.[1]

---

[1]   *See*   Tillis   et   al.,   Am.   Complaint   (Aug.   9,   2018), https://campaignlegal.org/sites/default/files/2021-10/8-9-18%20CLC-Giffords%20NRA%20Complaint%20%28final%20with%20exhibits%29.pdf;   Rosendale Complaint   (Sept.   17,   2018),   https://campaignlegal.org/sites/default/files/2018-09/CLC%20Complaint%20to%20FEC%20Against%20Rosendale%20%2B%20NRA.pdf.; Rosendale   Supplement   (Feb.   7,   2019),   https://campaignlegal.org/sites/default/files/2019-02/Additional%20Facts%20NRA%20and%20Rosendale.pdf; Hawley Complaint (Oct. 22, 2018), https://campaignlegal.org/sites/default/files/2018-10/10-22-18%20NRA%20Hawley%20Complaint%20%28final%29.pdf; Trump Complaint (Dec. 7, 2018), https://campaignlegal.org/sites/default/files/2018-12/12-07-

8.      On April 24, 2019, after the FEC failed to act on any of the complaints for more than 120 days, Giffords filed suit against the Commission under 52 U.S.C. § 30109(a)(8)(A). The U.S. District Court for the District of Columbia denied the FEC's motion for summary judgment and granted Giffords's cross-motion for summary judgment on September 30, 2021, finding that the FEC's failure to act on the complaints was contrary to law, and ordering the FEC to act on Giffords's complaints within 30 days by making a reason-to-believe determination under 52 U.S.C. § 30109(a)(2). Order, *Giffords v. FEC*, No. 1:19-cv-1192 (D.D.C. Sept. 30, 2021).

9.      The FEC's 30-day period to conform with the Court's order expired without action by the FEC. On November 1, 2021, the Court issued an Order declaring that the FEC had "failed to conform" to the September 30 Order and ordering that, "pursuant to 52 U.S.C. § 30109(a)(8)(C), Plaintiff Giffords "may bring 'a civil action to remedy the violations involved in the original complaints'" against the NRA. Order, ECF 75, *Giffords v. FEC*, 1:19-cv-1192 (D.D.C. Nov. 1, 2021). Plaintiff Giffords now brings this civil action against the NRA to "remedy the violations involved in the original complaints." 52 U.S.C. § 30109(a)(8)(C).

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action under 52 U.S.C. § 30109(a)(8)(A) and 28 U.S.C. § 1331.

11.     This Court has personal jurisdiction over Defendants NRA-PVF, NRA-ILA, Matt Rosendale for Montana, and Josh Hawley for Senate pursuant to D.C. Official Code § 13-423, because all four entities transact business within the District of Columbia, including the regular filing of campaign finance reports with the FEC. *See also* Fed. R. Civ. P. 4(k).

---

18%20Trump%20NRA%20complaint%20%28final%29.pdf. Collectively, the Tillis, Rosendale, Hawley, and Trump Complaints are referred to herein as the "Administrative Complaints," or the "Complaints."

12.    Venue lies in this district under 28 U.S.C. § 1391(b)(2), because a substantial part of the events and omissions giving rise to the claims alleged herein took place in the District of Columbia, including the filing of unlawful campaign finance reports with the FEC.

13.    This Court has authority to issue declaratory and injunctive relief under 28 U.S.C. §§ 2201(a) and 2202, and 52 U.S.C. § 30109(a).

## THE PARTIES

14.    Plaintiff Giffords is a nonpartisan, nonprofit 501(c)(4) organization headquartered in Washington, D.C., that is dedicated to saving lives from gun violence.

15.    Founded and led by former Congresswoman Gabrielle Giffords, the organization researches, writes, and proposes policies designed to reduce gun violence and mobilizes voters and lawmakers in support of safer gun laws. Giffords educates political candidates about issues and policies related to gun violence, and supports candidates for local, state, and federal office who favor strong gun-violence-prevention laws. Many candidates supported by Giffords are opposed by the NRA.

16.    Giffords was founded in 2013 under the name Americans for Responsible Solutions ("ARS"), and was renamed Giffords in October 2017.  It works in concert with two sister entities to end gun violence in America. In addition to the 501(c)(4) entity headquartered in Washington, D.C., Giffords has a sister organization, Giffords Law Center to Prevent Gun Violence, a nonprofit, nonpartisan 501(c)(3) based in San Francisco that works to research, write, enact, and defend laws, policies, and programs proven to reduce gun violence and save lives. Giffords's political action committee, Giffords PAC, supports and endorses candidates and elected officials who promote policies to reduce gun violence and oppose the influence of the gun industry and the NRA, including by making political contributions and independent expenditures.

17.     Congresswoman Giffords founded Giffords for the express purpose of competing with the NRA. On the day they launched the organization that would become Giffords, Congresswoman Giffords co-wrote an op-ed with her husband and co-founder, Mark Kelly, in which they defined their organizational mission in opposition to "the NRA leadership's defiant and unsympathetic response to the Newtown, Conn., massacre."[2] In a book they co-wrote the following year, they elaborated that Giffords's mission is to "balance the debate, shelter politicians bombarded by NRA attacks, and advocate for stronger gun-violence laws."[3]

18.     On Election Night 2020—a night on which Trump, Tillis, Cotton, Gardner, and Rosendale each competed again for election to federal office after benefitting from the NRA Affiliates' illegal, unreported, and excessive in-kind contributions during previous runs—the Congresswoman returned to these themes and reflected on the role of the NRA in Giffords's origin story: "When we launched our organization in 2013," she recalled, "our goal was to challenge the gun lobby. To make sure public safety was always prioritized over gun industry profits. To fight for a future where our children wouldn't grow up fearing the sound of gunfire. Six years ago, the problem wasn't that the NRA couldn't lose—the problem was that not enough people were challenging them."[4] Giffords's ability to pursue that challenge is unlawfully obstructed when the NRA flouts campaign finance laws in support of candidates Giffords exists, in part, to oppose.

19.     Giffords has a demonstrated mission of "electing gun safety champions" and has devoted substantial resources to this goal since its founding in 2013.[5] Indeed, Giffords has spent

---

[2]     Gabrielle Giffords & Mark Kelly, *Giffords and Kelly: Fighting Gun Violence*, USA TODAY (Jan. 8, 2013), https://www.usatoday.com/story/opinion/2013/01/07/gabby-giffords-mark-kelly-tucson-shooting-gun-control/1816383/.
[3]     Gabrielle Giffords & Mark Kelly, *Enough* 236 (2014).
[4]     Press Release, *Giffords Took on the NRA and Won*, GIFFORDS (Nov. 8, 2018), https://giffords.org/press-release/2018/11/post-election-memo/.
[5]     Elections, GIFFORDS, https://giffords.org/elections/ (last visited Jan. 6, 2025).

significant sums supporting gun safety candidates since at least 2016, and Giffords PAC has spent over $90 million in total supporting gun safety candidates in every federal election cycle since 2014.[6]

20.    Giffords PAC is a political action committee that registered with the FEC on January 7, 2013, under its previous name ARS PAC. Giffords PAC is a "hybrid PAC," meaning that it maintains one account to make contributions to federal candidates in which it only accepts contributions that comply with FECA's amount and source limitations, and a separate segregated account through which it accepts contributions that can be used to finance independent expenditures.

21.    Giffords works in concert with Giffords PAC to end gun violence in America. The two entities are legally distinct, but have common board members and leadership, and share many employees. Giffords PAC's endorsements, contributions, and expenditures reflect Giffords's policy and political priorities.

22.    Giffords routinely opposes candidates supported by the NRA and supports rival candidates who support gun safety and ending gun violence in America.

23.    In 2014, Giffords PAC, operating under its previous name, ARS PAC, spent $1.3 million in support of Thom Tillis's opponent Kay Hagan, and over $272,000 in support of Cory Gardner's opponent Mark Udall. Giffords opposed candidate Trump in his 2016 campaign, and Congresswoman Giffords endorsed his general election opponent, Hillary Clinton. In addition, Giffords PAC made $510 in in-kind contributions to Hillary for America. Giffords also supported

---

[6] *Americans for Responsible Solutions PAC – 2014 cycle*, PROPUBLICA, https://projects.propublica.org/itemizer/committee/C00540443/2014 (last visited Jan. 6, 2025).

Ron Johnson's 2016 opponent, Russ Feingold, and Giffords PAC made a $5,000 contribution to Feingold's campaign.

24.    In 2018, Giffords opposed both Josh Hawley and Matt Rosendale, and Giffords PAC made a $5,000 contribution to Hawley's opponent Claire McCaskill, and a $2,500 contribution to Rosendale's opponent Jon Tester.

25.    This spending was in direct political opposition to the NRA and Defendant Matt Rosendale for Montana ("Rosendale Campaign") and Defendant Josh Hawley for Senate ("Hawley Campaign"). Giffords and Giffords PAC both opposed Rosendale and Hawley's campaigns and supported the campaigns of their opponents.

26.    In 2020, Giffords opposed President Trump's reelection campaign, and again, Congresswoman Giffords endorsed his general election opponent. Giffords PAC also contributed $10,000 to the Biden Victory Fund in 2020. In 2020, Giffords also opposed the candidacies of Thom Tillis and Cory Gardner, and Giffords PAC contributed $5,000 each to Tillis opponent Cal Cunningham and Gardner opponent John Hickenlooper. Giffords PAC also made a total of $10,000 in contributions to the Hickenlooper Victory Fund.

27.    In addition to campaign spending, in 2020 Giffords PAC endorsed 252 candidates for a variety of offices, held over 40 events to support gun safety candidates, reached over 1.5 million viewers through digital campaign events, and earned over 16 million views of its #GunSafetyPresident campaign video.[7]

---

[7] *Giffords Efforts in the 2020 Election*, GIFFORDS (Nov. 2, 2020), https://giffords.org/memo/giffords-efforts-in-the-2020-election/.

28.    Giffords PAC continued its mission of "electing gun safety champions" in the 2022 election cycle[8]—in which it sought to expand its influence at the state level and made a concerted effort to reach out to Hispanic voters, who public opinion polling proved to be moved by gun-safety messaging.[9] That cycle, Giffords PAC endorsed 288 candidates for state and federal office and invested $10 million dollars in races up and down the ballot—with top ad spends coming in the Colorado and Pennsylvania U.S. Senate races in support of endorsed candidates Senator Michael Bennet and then-Lieutenant Governor John Fetterman. In the leadup to the midterms, Giffords PAC hosted 67 events virtually and in-person across the United States and launched its first ever state-based political program, Giffords Florida. Giffords intends to continue competing with the NRA in the political arena, including by opposing candidates supported by the NRA, and supporting rival candidates that support gun safety and ending gun violence in America, and mobilizing voters and elected officials to support gun safety and advance sensible gun policy.

29.    Buoyed by its successes in the midterms, Giffords PAC launched an expansive off-year endorsement program in 2023, when it supported 70 candidates for the Virginia House of Delegates and Senate—56 of whom won their races on Election Day. That fall, Giffords PAC urged Virginians to elect leaders who were focused on building on the significant gun safety laws passed in the Commonwealth's legislature in 2020 and 2021 and protecting them from potential repeal efforts under Republican Governor Glenn Youngkin.[10]

---

[8]    *Giffords Efforts in the 2022 Election*, GIFFORDS (Nov. 17, 2022), https://giffords.org/memo/giffords-efforts-in-the-2022-election/.

[9] *Latino Americans worried about gun violence and crime, optimistic about America*, IPSOS (Jun. 30, 2022), https://www.ipsos.com/en-us/news-polls/latino-americans-worried-about-gun-violence-and-crime-optimistic-about-america.

[10] Gabby Giffords, *Gun laws are saving lives. We can't let extremists overturn our progress*, RICHMOND TIMES-DISPATCH (Aug. 29, 2023), https://richmond.com/opinion/column/gabby-giffords-gun-laws-are-saving-lives-we-cant-let-extremists-overturn-our-progress/article_99dd4de0-42be-11ee-a496-d7ca6069d578.html.

30.    After passage of the first federal gun safety legislation in nearly thirty years during the Biden-Harris administration, Giffords PAC turned its attention to control of the White House, maintaining a gun safety majority in the U.S. Senate and flipping control of the U.S. House of Representatives in 2024. In the 2024 election cycle, Giffords PAC committed $15 million to elect Vice President Kamala Harris and other candidates running on gun safety platforms in key battleground districts and states.[11] In total, the organization supported 341 candidates for office—294 of whom won their races, resulting in an 86% win ratio. Additionally, Giffords PAC rallied gun owners in support of the presidential ticket in forty-five states and its principal surrogates, Gabby Giffords and Executive Director Emma Brown, headlined over seventy in-person and virtual events with and on behalf of its endorsed candidates in eighteen states.

31.    Giffords intends to continue competing with the NRA, and Giffords and Giffords PAC plan to continue to support candidates opposed by the NRA, in future elections.

32.    For example, Giffords is competing with the NRA in 2026, and Giffords and Giffords PAC plan to support candidates who run on gun safety platforms likely opposed by the NRA, potentially including direct contributions and independent activity in federal and state races across the country.

33.    Giffords also has engaged and continues to engage in legislative advocacy for positions each of the beneficiaries of the NRA, including Matt Rosendale and Josh Hawley, have opposed while in office..

34.    For example, in 2021, Giffords supported H.R. 8, the Bipartisan Universal Background Checks Act of 2021 and H.R. 1446, the Enhanced Background Checks Act. Matt

---

[11] Sahil Kupar, *Giffords group commits $15 million to boost Kamala Harris and gun safety candidates*, NBC NEWS (Jul. 26, 2024), https://www.nbcnews.com/politics/2024-election/giffords-gun-safety-group-commits-15-million-help-harris-beat-trump-rcna163424.

Rosendale voted against each of these bills, and Josh Hawley indicated that he opposes them. In 2022, Giffords supported S. 2938, the Bipartisan Safer Communities Act. Both Josh Hawley and Matt Rosendale voted against this bill. That same year, Matt Rosendale also voted against H.R. 7910, the Protect Our Kids Act; H.R. 4118, the Break the Cycle of Violence Act; H.R. 2377, the Federal Extreme Risk Protection Order Act of 2021; and H.R. 1808, the Assault Weapons Ban of 2022; all of which Giffords supported and which Josh Hawley has also indicated he opposed.

35.    The NRA Affiliates' illegal, unreported, and excessive contributions to candidates give the NRA a competitive advantage over Giffords. The NRA Affiliates' unlawful conduct impairs Giffords's ability to compete with the NRA to elect candidates and enact policies that align with Giffords's mission to reduce gun violence.

36.    Defendants are NRA Affiliates the National Rifle Association of America Institute for Legislative Action ("NRA-ILA") and the National Rifle Association of America Political Victory Fund ("NRA-PVF"). The NRA describes itself as "America's foremost defender of Second Amendment rights" and as a "major political force" in American politics.[12]

37.    NRA-ILA is a corporation holding tax-exempt status under Section 501(c)(4) of the Internal Revenue Code that describes itself as "the 'lobbying' arm of the NRA."[13] NRA-PVF is the NRA's primary political committee ("PAC"). Both entities report federal campaign finance expenditures to the FEC in Washington, D.C. Together, NRA-PVF and NRA-ILA reported $110.8 million in expenditures to the FEC between 2014 and 2018, up to $35 million of which was spent in coordination with the seven candidates named in this complaint.

---

[12]    *A Brief History of the NRA*, NATIONAL RIFLE ASSOCIATION, https://home.nra.org/about-the-nra/, (last visited Jan. 6, 2025).
[13]    NATIONAL RIFLE ASSOCIATION INSTITUTE FOR LEGISLATIVE ACTION, https://www.nraila.org/ (last visited Jan. 6, 2025).

38.     Matt Rosendale was a candidate for the United States Senate in Montana in 2018. Matt Rosendale for Montana is his authorized campaign committee. Rosendale lost his 2018 campaign, but was elected to the U.S. House in 2020 and 2022. Matt Rosendale for Montana was Rosendale's dedicated campaign committee for 2022.

39.     Giffords opposed Matt Rosendale's re-election to the U.S. House in 2022. Giffords made expenditures against Matt Rosendale and made contributions to his opponent.

40.     Josh Hawley was elected to the U.S. Senate in 2018 and 2024. Josh Hawley for Senate is his authorized campaign committee.

41.     Giffords intends to oppose future campaigns of candidates across the country, like Rosendale and Hawley, who oppose Giffords's gun safety platform.

42.     The competitive fundraising advantage that the Rosendale Campaign and Hawley Campaign enjoy over the candidates supported by Giffords as a result of the illegal contributions from the NRA forces Giffords to spend additional resources countering its opponents' illegally raised funds.

43.     Giffords has been, and continues to be, injured by the competitive advantages the NRA and the Hawley Campaign and Rosendale Campaign obtained by flouting campaign finance laws.

44.     In 2018, after Giffords became aware of the NRA's illegal contributions, Giffords PAC increased its expenditures on federal elections to its highest-ever level, and together with the gun safety group Everytown outspent the NRA for the first time.

45.     Giffords also relies on accurate, complete, and timely FEC filings in a number of ways.

46.    Giffords reviews and tracks NRA spending as reported in FEC filings in order to make strategic decisions as it competes with the NRA. Giffords relies on the accuracy of these filings to gain information about how the NRA is spending in federal races and which candidates it is supporting. This information allows Giffords to make strategic decisions, including determinations about where to spend its own resources and how to compete most effectively in the electoral arena.

47.    Giffords also uses this information to develop messaging, engage with the press, and educate the public and the electorate about the NRA's activities and support for candidates. Information about NRA support and spending, and candidates' acceptance of support and contributions, is particularly important to Giffords's messaging about candidates. Giffords relies on FEC filings to perform this work, and it is essential that these filings are accurate, complete, and timely in order for Giffords's products to be current, correct, and informative.

48.    FEC reports also inform decisions about how Giffords and Giffords PAC will allocate their resources. Using the information contained in these filings, Giffords and Giffords PAC make strategic decisions, including about which candidates to support and oppose, and the quantity, amount, and placement of independent expenditures. Giffords and Giffords PAC evaluate the NRA's contributions and independent expenditures, and this information will inform Giffords's and Giffords PAC's strategic decisions, such as the level of contributions or independent expenditures that will be most effective in furthering their electoral goals. In making these decisions, Giffords relies in real time on the accuracy and completeness of FEC filings by the NRA and candidates for office.

49.    Giffords also reviews FEC filings to determine whether the NRA and candidates for office that Giffords opposes are complying with campaign finance law. When it has detected

violations, Giffords has filed administrative complaints with the FEC to inform the Commission of these violations. These efforts to monitor compliance with campaign finance law require accurate, complete, and timely FEC filings.

50.    Giffords uses information from FEC filing in content for its website, reports, blog posts, and social media. For example, Giffords and Giffords PAC uses information about NRA spending in opposition to a candidate, by highlighting NRA contributions.

51.    The failure of the NRA, the Hawley Campaign, and the Rosendale Campaign to timely file required forms and disclosure reports deprives Giffords of information necessary to fulfill its mission and programmatic goals.

## LEGAL FRAMEWORK

### I.    Contribution Limits

52.    FECA limits the dollar amounts of contributions to federal candidates and their campaign committees and prohibits contributions from certain sources, including from a corporation's treasury funds.[14] 52 U.S.C §§ 30116(a)(1), 30118(a).

53.    In the 2014 cycle, the limit on contributions to candidates from most persons was $2,600 per election; in the 2016 and 2018 cycles, that limit was $2,700. The limit on contributions to a candidate from a multicandidate political committee in each of these cycles was $5,000 per election. 52 U.S.C. § 30116(a)(2)(A).

54.    A "contribution" includes "any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office." 52 U.S.C. § 30101(8)(A)(i); *see also* 11 C.F.R. §§ 100.52(a), 114.1(a)(1).

---

[14]    Contributions to candidates from a separate segregated fund established by a corporation (an "SSF," also commonly known as a corporate PAC) are permissible, but subject to amount limits.

"Anything of value" includes all in-kind contributions. 11 C.F.R. § 100.52(d)(1). An in-kind contribution includes the provision without charge (or at less than the usual and normal charge) of any goods or services, including, but not limited to, "facilities, equipment, supplies, personnel, advertising services, membership lists, and mailing lists." *Id.*

55.    In contrast to contributions, expenditures are generally not subject to limits. A corporation like NRA-ILA, or a political committee like NRA-PVF, may make unlimited expenditures on advertising that expressly advocates the election or defeat of a candidate, provided that those expenditures are made independently of any candidate. Any expenditure made in coordination with a candidate, however, including for a "coordinated communication," is an in-kind contribution to the candidate, subject to contribution limits and the corporate contribution ban, 52 U.S.C. § 30116(a)(7)(B)(i); 11 C.F.R. § 109.20, and must be reported as a contribution to that candidate by the person that made the payment, 11 C.F.R. § 109.21(b).

56.    Under FEC regulations, a "coordinated communication" is a communication that (1) is paid for, in whole or in part, by a person other than the candidate or committee; (2) "expressly advocates . . . the election or defeat of a clearly identified candidate for Federal office;" and (3) satisfies at least one of the "conduct standards" in the regulation, such as the use of a "common vendor." 11 C.F.R. § 109.21(a), (d).

57.    The second prong, the "content standard," is met if the communication "expressly advocates . . . the election or defeat of a clearly identified candidate for Federal office." *Id.* § 109.21(c)(3).

58.    The third prong, the common vendor "conduct" standard, is satisfied when (a) the person paying for the communication contracts with a commercial vendor that (b) during the previous 120 days also provided services to the candidate, such as media strategy, advertising

content and placement, or other political or media related advice; and (c) the vendor uses or conveys information about the candidates' strategies, plans, activities and needs, and that information is material to the "creation, production, or distribution" of the communications in support of that candidate. 11 C.F.R. § 109.21.

59.    An outside group that makes coordinated expenditures must report them as a contribution to the candidate, subject to the contribution limits and source restrictions discussed above. Corporations are prohibited from making such in-kind contributions, while in-kind contributions from political committees are subject to the $5,000 contribution limit. 52 U.S.C §§ 30116(a)(2), 30118(a).

60.    Candidates must report a coordinated expenditure as a contribution received only when they engage in conduct that demonstrates that they suggested or assented to the coordinated communication; are materially involved in decisions regarding the content, audience, means or mode, media outlet used, timing or frequency, or size, prominence, duration of the communication; or where "information about the candidate's or political party committee's campaign plans, projects, activities, or needs is conveyed to a person paying for the communication, and that information is material to the creation, production, or distribution of the communication." 11 C.F.R. § 109.21(b)(3), (d)(1)-(3).

## II.    Private Right of Action Under FECA

61.    Any person who believes there has been a violation of FECA may file a sworn complaint with the FEC under 52 U.S.C. § 30109(a)(1). If the FEC fails to act on the complaint within 120 days, FECA provides that the administrative complainant may file a civil action against the FEC, and "the court may declare that . . . the failure to act is contrary to law, and may direct the Commission to conform with such declaration." 52 U.S.C. § 30109(a)(8)(C).

16

62.     If the FEC fails to conform to an order declaring that its failure to act is contrary to law, FECA provides that "the complainant may bring, in the name of such complainant, a civil action to remedy the violation involved in the original complaint." 52 U.S.C. § 30109(a)(8)(C).

## FACTUAL BACKGROUND

### I.     The Common Vendor Schemes

63.     Since at least 2014, NRA-PVF and NRA-ILA have funneled millions of dollars to candidates for federal office in the form or illegal, excessive, and unreported contributions, including to Thom Tillis, Tom Cotton, and Cory Gardner in 2014, Ron Johnson and Donald Trump in 2016, and Matt Rosendale and Josh Hawley in 2018.

64.     In contravention of the FEC's common vendor coordination rules, the NRA employs two interconnected and ongoing schemes, both of which use a network of shell corporations to coordinate political ad spending and placement with candidate campaigns. These schemes allow the NRA to evade federal contribution limits and shield millions of dollars of political spending from public scrutiny in violation of FECA.

65.     At the center of the first scheme is political consulting firm OnMessage. OnMessage has performed contracting work for dozens of campaigns and political committees.

66.     OnMessage operates as one with its corporate alter ego, Starboard Strategic, Inc. ("Starboard"), which is linked to OnMessage through shared addresses, shared board members and staff, and public statements and reporting.

67.     At the center of the second scheme is National Media Research, Planning & Placement, LLC ("National Media"), a media and political strategy firm. National Media is linked to two additional corporate entities: Red Eagle Media ("Red Eagle") and American Media & Advocacy Group ("AMAG").

68.     As of 2018, the Virginia State Corporation Commission listed the principal office for OnMessage as 815 Slaters Lane in Alexandria, Virginia. At the same time, the OnMessage website listed its Virginia address as 817 Slaters Lane in Alexandria. 815 and 817 Slaters Lane consist of a pair of adjacent brick buildings that share a parking lot. OnMessage has an additional office in Annapolis, Maryland, located at 705 Melvin Avenue #105.

69.     According to FEC records, NRA-PVF and NRA-ILA paid Starboard at both OnMessage's Alexandria and Annapolis addresses.

70.     National Media also has a principal office at 815 Slaters Lane. As of 2018, a business entity search on the Virginia State Corporation Commission website for either Red Eagle or AMAG redirected to the National Media Page listing the 815 Slaters Lane address. At that time, the National Media website, like the OnMessage website, listed an office address of 817 Slaters Lane.

71.     Within these entities, the same individuals develop advertising content and place ads for both the NRA and the candidates. For example, OnMessage Founding Partner and Starboard Director Bradley Todd has been described in news reports as a media strategist for Thom Tillis, and as an ad or media consultant for Cory Gardner, Tom Cotton, Ron Johnson, and Josh Hawley. NRA employees reported seeing Todd around their office and described him as a consultant on whom former NRA-ILA Executive Director Chris Cox[15] relied for issues deemed "controversial."

---

[15]   Cox was also chairman of the NRA-PVF. *See, e.g.*, Mike Spies, *The Mystery Firm That Became the NRA's Top Election Consultant*, POLITICO (July 13, 2018), https://www.politico.com/magazine/story/2018/07/13/mystery-firm-nra-consultant-219004.

72.    Similarly, at least four National Media employees who placed ads for NRA-ILA and NRA-PVF as Red Eagle also placed ads as AMAG for the candidates supported by NRA-ILA and NRA-PVF.

73.    OnMessage, together with Starboard, acts as a single common vendor for advertising content development and media strategy. Similarly, National Media, together with Red Eagle and AMAG, acts as a single common vendor for advertising placement and strategy. Using the OnMessage/Starboard and the National Media/Red Eagle/AMAG common vendor schemes, the NRA has engaged in an ongoing effort to conceal up to $35 million in contributions to at least seven candidates for federal office since 2014.

74.    The following graphic illustrates how the NRA's ongoing coordination scheme operates:



### A.    The Starboard Scheme

75.    Under the first scheme, NRA-PVF and NRA-ILA pay Starboard for advertising expenditures in support of a candidate for federal office, while the candidate pays OnMessage for its own advertising expenditures.

76.    OnMessage and Starboard are functionally indistinguishable—they are led by the same people and located at the same address, and no internal separation or firewall exists between the staff who work for each entity. As of 2018, the websites for OnMessage and Starboard used

the same or highly similar language to describe their services. OnMessage has been nominated for, and has accepted, industry awards for NRA-PVF and NRA-ILA ads contracted through Starboard.

77.    Prior to Starboard's incorporation, NRA-PVF paid OnMessage millions of dollars for expenditures related to television and radio advertising during the 2010 and 2012 election cycles. NRA-ILA paid OnMessage over $3.5 million for expenditures described as advertising expenses during the 2012 election cycle.

78.    Once Starboard was incorporated, NRA-PVF and NRA-ILA stopped making payments to OnMessage and began making payments to Starboard.

79.    In the 2014 cycle, NRA-PVF and NRA-ILA reported payments to Starboard of approximately $20.5 million combined for expenditures and other disbursements related to television, radio, and digital advertising.

80.    In the 2016 cycle, NRA-PVF and NRA-ILA together reported payments to Starboard of approximately $40.7 million in expenditures and other disbursements related to television, radio, and digital advertising.

81.    In the 2018 cycle, NRA-PVF and NRA-ILA reported payments to Starboard of approximately $10.6 million for expenditures and disbursements related to advertising. During these election cycles, the candidates in support of whom NRA-PVF and NRA-ILA paid Starboard millions of dollars all made significant payments to OnMessage for their own advertising.

82.    Aside from less than $20,000 in business with the National Republican Congressional Committee, the NRA is Starboard's only federal election client, according to FEC records.

B.    *The National Media Scheme*

83.    Under the second scheme, NRA-PVF and NRA-ILA coordinate ad placements with candidates through National Media, a group that describes itself as "a nationally recognized leader in media research, planning, and placement for issue advocacy, corporate, and political campaigns."[16]

84.    NRA-PVF and NRA-ILA use National Media, doing business as Red Eagle, to place their advertisements in support of candidates. At the same time, the candidates use National Media affiliate AMAG to place their own advertisements.

85.    According to corporate records, National Media does business under the name Red Eagle. AMAG is an affiliate of National Media, and the two entities share a registered agent. According to Virginia state records, all three entities share an address at 815 Slaters Lane in Alexandria. National Media also lists 817 Slaters Lane as its office address—the same Virginia address as OnMessage/Starboard. National Media employees have signed Federal Communications Commission ("FCC") filings on behalf of both Red Eagle and AMAG.

## II.    The NRA's Coordinated Contributions to Candidates

86.    Taken together, the Starboard and National Media schemes represent a continuous and ongoing pattern and practice by the NRA, through NRA-PVF and NRA-ILA, to illegally coordinate advertising spending with candidates for federal office through a common vendor, and to shield their illegal acts from federal regulators through the use of shell corporations.

87.    Since at least the 2014 election cycle, NRA-PVF and NRA-ILA have coordinated with candidate campaigns to develop advertisements through a common vendor, using a shell

---

[16] NATIONAL MEDIA, https://natmedia.com/ (last visited Jan. 6, 2025); *National Media Research, Planning and Placement LLC*, LEGISTORM, https://perma.cc/UN7G-V3H9 (last visited Jan. 7, 2025).

company associated with political consulting firm OnMessage. Since at least the 2016 election cycle, NRA-PVF and NRA-ILA have additionally coordinated with candidate campaigns to place advertisements in complementary fashion, including on the same stations and programs, using shell companies associated with media strategy firm National Media.

88.     By coordinating their advertising strategy in this manner, NRA-PVF and NRA-ILA have made up to $35 million in contributions to candidate campaigns since the 2014 election, in excess of the contribution limits, in violation of the source restrictions, and without the disclosure required under federal law. This includes up to $25 million in coordinated, illegal contributions to the Trump campaign in 2016.

89.     The NRA has continued its illegal coordination scheme at least through the 2020 election cycle, employing yet another National Media related shell corporation, Harris Sikes Media LLC, to place television and radio ads in coordination with the Donald J. Trump 2020 presidential campaign.[17]

A.     *Pre-2014 Election Cycle*

90.     OnMessage was registered in Virginia on April 13, 2005 and was incorporated in Maryland on April 20, 2006. Its website provides detailed information about its staff, past clients, and portfolio of work.[18]

91.     In the 2010 election cycle, NRA-PVF reported paying OnMessage over $4.5 million, primarily for television and radio ad production, including approximately $3.2 million for federal independent expenditures, according to reports filed with the FEC in Washington, D.C.

---

[17]    *See* Notice of Supplemental Evidence, *Giffords v. FEC*, 1:19-cv-1192 (Oct. 8, 2020).
[18]    ONMESSAGE, INC., https://onmessageinc.com/ (last visited Jan. 6, 2025).

NRA-ILA did not disclose any payments to OnMessage for the 2010 election cycle on its reports filed with the FEC.

92.     In the 2012 election cycle, NRA-PVF reported paying OnMessage $7.7 million for independent expenditures and $42,866 in other disbursements. All of the independent expenditure payments were for advertising expenses, and the disbursements were also for television and radio advertising expenses.

93.     In the 2012 election cycle, NRA-ILA reported paying OnMessage over $3.5 million for independent expenditures described as advertising expenses.

94.     On March 22, 2013, Starboard was incorporated in Virginia by OnMessage officials. The incorporation certificate lists five directors: Curtis Anderson, Wesley Anderson, Bradley Todd, Graham Shafer, and Timothy Teepell. At the time, three of those directors— Curtis Anderson, Wesley Anderson, and Todd—were also directors at OnMessage. By the following year, 2014, Shafer and Teepell had been added to OnMessage's board, as was Orrin "Guy" Harrison; Harrison, in turn, was added to Starboard's board the year after, in 2015. As of 2018, both Starboard's and OnMessage's boards still consisted of these same six directors (Anderson, Anderson, Todd, Shafer, Teepell, and Harrison). As of 2018, Starboard's registered agent, Craig M. Palik, was also the registered agent for OnMessage Holdings, Inc.

95.     According to a *Politico* report, "[i]nternal emails indicate executives toggled between roles" at both Starboard and OnMessage, and that "none of Starboard's partners has publicly affiliated himself with the company; four of them have LinkedIn pages, for instance, and their profiles only mention OnMessage."[19]

---

[19]    Spies, *supra* note 11.

### B. 2014 Election Cycle

96.    NRA-PVF and NRA-ILA reported paying approximately $20.5 million to Starboard for "independent" expenditures and other disbursements related to advertising for the 2014 cycle.

97.    The NRA's 2014 "focus" included "three major Senate races," and was aimed at "boosting Republican Senate challengers in Arkansas, Colorado and North Carolina," according to published reports.[20] Reports filed with the FEC show that NRA-PVF supported candidates in these three U.S. Senate races—Tom Cotton, Cory Gardner, and Thom Tillis—with expenditures contracted through Starboard. NRA-ILA also supported two of these candidates—Gardner and Tillis—with expenditures contracted through Starboard. At or around the same time, these same three candidates were contracting with OnMessage for advertising and media consulting. During this time, OnMessage founder and Starboard Director Brad Todd served as a "media strategist" or "consultant" for Tillis, Cotton, and Gardner.

98.    In the North Carolina race, NRA-PVF paid $2.3 million and NRA-ILA paid $812,658 to Starboard for "independent" expenditures supporting Tillis or opposing his opponent during the 2014 cycle. Tillis's authorized campaign committee, the Thom Tillis Committee, reported paying OnMessage $6.6 million during the same cycle for advertising and media consulting. The Thom Tillis Committee reported disbursements to OnMessage at the 705 Melvin Ave. #105 address in Annapolis, Maryland. NRA-PVF reported disbursements to Starboard at this

---

[20] *NRA focuses on three major Senate Races*, CNN (Sept. 17, 2014), https://www.cnn.com/2014/09/17/politics/nra-senate-races/index.html.

same address. OnMessage Founding Partner and Starboard Director Bradley Todd was described in news reports as a Tillis campaign "media strategist."[21]

99.    In the Arkansas race, NRA-PVF paid $1.6 million to Starboard for "independent" expenditures supporting Cotton or opposing his opponent during the 2014 cycle. Cotton's authorized campaign committee, Cotton for Senate, reported paying OnMessage $5.3 million during the same cycle for media and polling services. Cotton for Senate reported disbursements to OnMessage at its Annapolis, Maryland address. NRA-PVF reported its disbursements to Starboard at that same address. OnMessage's/Starboard's Todd was described in news reports as an "ad consultant" for Cotton's campaign.[22]

100.    In the Colorado race, NRA-PVF paid $2.6 million and NRA-ILA paid $529,186 to Starboard for "independent" expenditures supporting Gardner or opposing his opponent during the 2014 cycle. Gardner's authorized campaign committee, Cory Gardner for Senate, reported paying OnMessage $8 million during the same cycle for media and web-related services. Cory Gardner for Senate reported disbursements to OnMessage at its Alexandria, Virginia offices. NRA-ILA reported its disbursements to Starboard at that same address. OnMessage's/Starboard's Todd was described in news reports as a "consultant" for the Gardner campaign for OnMessage.[23]

---

[21]    David Catanese, *It's Tillis v. Hagan in North Carolina*, U.S. NEWS & WORLD REPORT (May 6, 2014), https://www.usnews.com/news/articles/2014/05/06/thom-tillis-advances-faces-kay-hagan-in-north-carolina-senate-race.

[22]    Andrea Drusch, *Inside Ad-Makers' Outrageous Arkansas Senate Strategy*, THE ATLANTIC (Sept. 23, 2014), https://www.theatlantic.com/politics/archive/2014/09/inside-ad-makers-outrageous-arkansas-senatestrategy/435168/.

[23]    Alexis Levinson, *Democrats Try to Turn Cory Gardner into Todd Akin (Video)*, ROLL CALL (July 15, 2014), https://rollcall.com/2014/07/15/democrats-try-to-turn-cory-gardner-into-todd-akin-video-2/; Emily Schultheis, *Republicans Will Need to Sweep to Hold Onto Senate Majority in 2016*, THE ATLANTIC (Sept. 16, 2014), https://www.theatlantic.com/politics/archive/2014/09/republicans-will-need-to-sweep-to-hold-onto-senate-majorityin-2016/457608/.

C.    *2016 Election Cycle*

101.    The Starboard scheme continued in the 2016 Election Cycle with NRA-PVF and NRA-ILA using Starboard/OnMessage to coordinate payments with presidential candidate Donald J. Trump and Wisconsin Senate candidate Ron Johnson. NRA-PVF and NRA-ILA reported paying Starboard approximately $40.7 million for "independent" expenditures and other disbursements related to advertising for the 2016 cycle, with over $25 million of those payments spent in support of Trump and Johnson (or against their opponents).

102.    In the 2016 Wisconsin Senate race, NRA-PVF paid $315,066 and NRA-ILA paid $48,537 to Starboard for "independent" expenditures supporting Johnson or opposing his opponent. Johnson's authorized campaign committee, Ron Johnson for Senate, Inc., reported paying OnMessage $3.8 million during the same cycle for media, strategy, and advertising expenses. Ron Johnson for Senate reported disbursements to OnMessage at its Annapolis, Maryland address. NRA-PVF reported its disbursements to Starboard at that same address. Bradley Todd was a consultant for Johnson's campaign through August 2016.[24]

103.    In the 2016 presidential race, NRA-PVF and NRA-ILA used Starboard/OnMessage and National Media to coordinate ad placement with the Trump campaign. NRA-PVF and NRA-ILA paid Starboard for campaign ads, while Starboard subcontracted ad placement to National Media affiliate Red Eagle. At the same time, the Trump campaign placed ads with National Media affiliate AMAG. Like Starboard/OnMessage, National Media, Red Eagle, and AMAG are functionally indistinguishable.

---

[24]    *See, e.g.*, Bill Glauber, *Strategic Change Pays Off for Johnson*, Milwaukee Journal Sentinel    (Nov.    9,    2016), https://www.jsonline.com/story/news/politics/elections/2016/11/09/johnson-lays-out-100-day-goals-gop/93538466/.

104.     During the 2016 Election Cycle, NRA-PVF and NRA-ILA reported paying over $25 million to Starboard for "independent" expenditures supporting Donald J. Trump, or opposing his opponent. NRA-PVF paid Starboard at OnMessage's Alexandria address, 817 Slaters Lane, while NRA-ILA paid Starboard at OnMessages's Annapolis address. Records on file with the FCC indicate that National Media, doing business as Red Eagle, placed NRA-PVF and NRA-ILA ads supporting Trump or attacking his opponent, Hillary Clinton, using the 815 Slaters Lane address in Alexandria.

105.     President Trump's authorized campaign committee, Donald J. Trump for President, Inc., paid $74.2 million to National Media affiliate AMAG for ad placement during the 2016 cycle, and records filed with the FCC show that AMAG placed the Trump campaign's 2016 ads.

106.     The pattern of ad placement by National Media for both the NRA entities and the Trump campaign indicates a high level of coordination. Red Eagle placed NRA-PVF's first 2016 presidential ad campaign at the end of June and continued to place pro-Trump and anti-Clinton ads for NRA-PVF throughout July and August. These ads were of significant strategic value to the Trump Campaign, which did not make its first ad placement until late August.[25]

107.     According to reports filed with the FCC during the 2016 cycle, at least four National Media employees placed both pro-Trump ads for NRA-PVF and NRA-ILA as employees of "Red Eagle," and also Donald J. Trump for President Inc.'s ads as employees of "AMAG." Between

---

[25] Contemporaneous reporting described the June 2016 NRA-PVF ad-buy as "coming to the rescue" because it would "provide air cover for Mr. Trump's campaign in early June and July" as well as a "desperately needed television presence on behalf of the Trump campaign, which spent nothing in June battleground states." *See,* Donovan Slack, *Exclusive: NRA to run $2 million Benghazi-themed ad campaign for Trump*, USA TODAY (June 29, 2016), https://www.usatoday.com/story/news/politics/elections/2016/06/29/nra-2-million-ad-campaign-trump-benghazi/86484306/; Nick Corasaniti, *NRA Comes to Rescue of Donald Trump With Ad*, N.Y. TIMES (July 3, 2016), https://www.nytimes.com/2016/07/03/us/politics/nra-comes-to-rescue-of-donald-trump-with-ad.html.

mid-September and Election Day, the same four National Media employees regularly alternated between placing pro-Trump/anti-Clinton ads for NRA-PVF and NRA-ILA as "Red Eagle," and placing ads for Donald J. Trump for President, Inc. as "AMAG." Those employees were:

a) Ben Angle, who was previously described on National Media's website as a "senior media buyer" who "strategically place[s] efficient and effective media buys," and "has helped national media develop strategies to combat the challenges of the online public file by identifying new ways to negotiate with stations on placement and location."[26] In the 2018 book *Inside Campaigns: Elections through the Eyes of Political Professionals*, Angle is described as an architect of the Trump campaign's television advertising strategy. "In mid-September," the book says, "Angle and his boss were summoned to Trump Tower and told their firm would be placing all of the Trump campaign's television advertising during the last seven weeks of the campaign."[27]

b) Kristy Kovatch, who was previously described on National Media's website as a "senior media buyer" who "specializes in television media buying for political candidates, issue/advocacy groups and public affairs clients."[28]

c) Jon Ferrell, who was previously described on National Media's website as National Media's "director of accounting," in a profile emphasizing that Ferrell "ensures that

---

[26] *See, e.g.*, Trump Compl. at 8, https://campaignlegal.org/sites/default/files/2018-12/12-07-18%20Trump%20NRA%20complaint%20%28final%29.pdf.

[27] William J Feltus, Kenneth M. Goldstein & Matthew Dallek, *Inside Campaigns: Elections Through the Eyes of Political Professionals* 115 (2d ed. 2018); *see also* Spies, *supra* note 11.

[28] *See, e.g.*, Trump Compl. at 8-9, https://campaignlegal.org/sites/default/files/2018-12/12-07-18%20Trump%20NRA%20complaint%20%28final%29.pdf

every penny allocated for media is spent according to election laws."[29] He has also

been described in news reports as "National Media chief financial officer."[30]

    d)    Caroline Kowalski, who identified herself on LinkedIn as a former "media

specialist" at National Media from March 2016 until May 2017, and emphasized

that in that role she "[a]cted as liaison between media buyers and TV, radio, and

cable networks" and "[r]esearched voter demographic data to help create national,

statewide and local advertising campaigns for Presidential, senatorial, and

congressional candidates, issue-advocacy groups, and PACs," among other

duties.[31]

108.    On May 24, 2016, Kovatch appeared as Red Eagle's contact person on a Station

Issue Advertising Request Sheet for a flight of NRA-PVF ads mentioning "Hillary Clinton" and

pertaining to the "Presidential General Election 11/8/16."

109.    On June 28, 2016, Angle was listed as a Red Eagle representative on a Political

Inquiry Form for NRA-PVF ads labeled "Anti-Clinton (D)" and "Pro-Trump (R)."

110.    On July 11, 2016, Ferrell signed an agreement form on behalf of NRA-PVF and

Red Eagle for ads pertaining to the "2016 Presidential Election, 11/8/2016 Hillary Clinton &

Donald Trump."

---

[29]  *See, e.g.*, *id.* at 9.

[30]  Brody Mullins & Devlin Barrett, *FBI Searches for Possible Accomplices in Probe of Fallen K Street Lobbyist*, WALL ST. J. (Feb. 16, 2017), https://www.wsj.com/articles/fbi-searches-for-possible-accomplices-in-probe-of-fallen-k-street-lobbyist-1487285904.

[31]  *See* Trump Compl. at 9, https://campaignlegal.org/sites/default/files/2018-12/12-07-18%20Trump%20NRA%20complaint%20%28final%29.pdf.

111.    On August 5, 2016, Ferrell signed another agreement form on behalf of NRA-PVF and Red Eagle related to "Hillary Clinton for U.S. President, Nov. 8, 2016 General Election, Gun Control" and slated to run August 8 through August 14, 2016.

112.    On an August 11, 2016 "traffic instructions" document for an NRA-PVF ad purchase on a Florida station, Kowalski is the Red Eagle contact, with a @redeagleteam.com email address. Ferrell signed a check paid to the station, and signed an agreement form. The instructions do not state whether they relate to a Trump/Clinton ad, but searching for one of the ID numbers listed on the traffic instructions shows that the same ID number is associated with NRA-PVF's "Hillary Will Leave You Defenseless" ad, also called "Jet."

113.    On a September 16, 2016 NBC/Telemundo Political Inquiry Record, Kovatch appeared as AMAG's contact person purchasing the ads on behalf of "Donald Trump, RNC/Trump for President."

114.    On a Station Issue Advertising Request Sheet dated three days later, September 19, 2016, Kovatch also appeared as Red Eagle's contact person for a flight of NRA-ILA ads mentioning Clinton and Trump and pertaining to the 2016 presidential election.

115.    On September 15, 2016, Red Eagle placed $101,200 in NRA-ILA campaign ads on the Raycom Sports Network, a syndicator of sports programming, for seven college football games in September, October, and November 2016. Ferrell signed the accompanying agreement form. Five days later, on September 20, 2016, AMAG placed $30,000 in Donald J. Trump for President, Inc. ads on Raycom Sports Network, with the ads slated to run during six football games, with Angle listed as AMAG's contact on the accompanying invoice.

116.    Five AMAG-placed Trump campaign ads and five Red Eagle-placed NRA-ILA ads were slated to appear the same afternoons, on the same stations, and during the same five games. As *Mother Jones/The Trace* reported:

> The purchases were mirror images of each other. In five of the games, both the NRA and Trump bought ads. When the NRA ran two spots either attacking Clinton or promoting Trump, the Trump campaign ran just one. And when the Trump campaign ran two spots, the NRA ran one. The pattern even persisted when there was no direct overlap: In the two games the Trump campaign sat out, the NRA ran two ads. And in the one game where the NRA didn't buy time, Trump bought two slots. Side by side, the spots aired across the country, on as many as 120 stations, according to data provided by Raycom.
>
> After reviewing the Raycom records, [Republican media strategist Rick] Wilson said the pattern suggests that the purchases were part of a unified strategy by the NRA and the Trump campaign. "Sometimes you want to maximize the lowest unit rate on the campaign side," Wilson said. "But you still need more fire on the target. This is why the FEC says coordination is illegal."[32]

117.    On a document dated September 28, 2016, Kowalski was listed as the AMAG contact for advertisements purchased on behalf of Donald J. Trump for President, Inc., where she was listed with an "@americanmediaag.com" email address. The "traffic instructions" document for this ad buy is printed on AMAG letterhead, and very closely resembles the Red Eagle "traffic instructions" document dated August 11, 2016 and also listing Kowalski. While ostensibly coming from different entities, both are formatted identically, both list Kowalski, and both list the same mailing address, phone number, and fax number in the header.

118.    On October 4, 2016, Ferrell signed a Trump campaign/AMAG agreement form as an "agent for Donald J. Trump for President, Inc."

---

[32]    Spies, *supra* note 11.

119.    On an October 14, 2016 Station Issue Advertising Request Sheet for NRA-ILA ads mentioning Clinton, Trump, and the 2016 General Election, Angle is listed as Red Eagle's contact person.

120.    On October 19, 2016, Ferrell signed on behalf of Red Eagle and NRA-PVF for a "pro-Trump anti-Clinton" ad buy on the Norfolk, VA ABC affiliate, WVEC. The ads were scheduled to run from October 25 to October 31, 2016.

121.    Five days later, on October 24, 2016, Ferrell signed on behalf of AMAG and Donald J. Trump for President, Inc. for "pro-Trump anti-Clinton" ads on the same Norfolk, VA station." The ads were scheduled to run from October 25 to October 31, 2016.

122.    On a Station Issue Advertising Request Sheet dated October 28, 2016, for an ad flight described as "anti-Clinton anti-Murphy," Kowalski was listed as Red Eagle's contact person.

123.    On a November 3, 2016 contract for a Donald J. Trump for President, Inc. ad flight scheduled the first week of November, Kovatch was listed as the "buyer" for AMAG.

124.    On a "traffic instructions" form, dated November 3, 2016, Kowalski appeared as AMAG's contact for Donald J. Trump for President, Inc. ads. The same filing also showed Kovatch as an AMAG contact and Ferrell as the signatory.

125.    On a November 4, 2016 CBS Political Inquiry Form for ads purchased by Donald J. Trump for President, Inc. and the Republican National Committee ("RNC"), Kovatch again appeared as AMAG's agency contact. On another CBS Political Inquiry Form dated November 4, 2016 for RNC/Donald J. Trump for President, Inc. ads, Kowalski appeared as the agency contact for AMAG. Also on November 4, 2016, Ferrell signed an agreement form for presidential election ads placed by AMAG as an "agent of RNC/Trump for President."

126.    The following chart demonstrates how individual National Media staffers toggled back and forth between their roles at Red Eagle and AMAG while simultaneously working on ad placement for the Trump Campaign and the purportedly "independent" NRA Affiliates:

| National Media / AMAG / Red Eagle Employee | NRA Affiliate Ad Placement Activity | Donald J. Trump Ad Placement Activity |
|---|---|---|
| Ben Angle, Senior Media Buyer for National Media | June 28, 2016, Red Eagle | |
| | | September 15, 2016, AMAG |
| | October 14, 2016, Red Eagle | |
| | | |
| Kristy Kovatch, Senior Media Buyer, National Media | May 24, 2016, Red Eagle | |
| | | September 16, 2016, AMAG |
| | September 19, 2016 Red Eagle | |
| | | November 3, 2016, AMAG |
| | | November 4, 2016, AMAG |
| | | |
| Jon Ferrell, Director of Accounting, National Media | July 11, 2016, Red Eagle | |
| | August 5, 2016, Red Eagle | |
| | August 11, 2016, Red Eagle | |
| | September 15, 2016, Red Eagle | |
| | | October 4, 2016, AMAG |
| | October 19, 2016, Red Eagle | |
| | | October 24, 2016 AMAG |
| | | November 3, 2016, AMAG |
| | | November 4, 2016, AMAG |
| | | |
| Caroline Kowalski, Media Specialist, National Media | August 11, 2016, Red Eagle | |
| | | September 28, 2016, AMAG |
| | October 28, 2016, Red Eagle | |
| | | November 3, 2016, AMAG |
| | | November 4, 2016, AMAG |

127.    Following the 2016 election, OnMessage won several industry awards for presidential campaign ads paid for by NRA-PVF and NRA-ILA on behalf of the "National Rifle Association's efforts to elect President Trump."[33] The NRA, however, did not report a single

---

[33] *OnMessage Wins Five Pollie Awards for TV and Digital Work*, ONMESSAGE, INC. (Mar. 20, 2017), https://onmessageinc.com/onmessage-wins-five-pollie-awards-for-tv-and-digital-work/ (last visited Jan. 6, 2025).

disbursement to OnMessage during the 2016 election cycle. Every one of its payments, instead, was made to Starboard.

### D.    2018 Election Cycle

128.    NRA-PVF and NRA-ILA continued to operate the illegal coordination scheme throughout the 2018 election cycle, this time with Montana Senate candidate Matt Rosendale and Missouri Senate candidate Josh Hawley.

129.    In the Montana race, candidate Rosendale himself publicly indicated his campaign was coordinating advertising with the NRA. At a July 18, 2018 fundraiser in Washington, D.C., Rosendale stated that NRA-ILA's political director, Chris Cox, had told him that the group would be making expenditures supporting Rosendale.[34] Rosendale then accurately described both the content and timing of NRA-ILA's purportedly "independent" pro-Rosendale advertisements, even though the ads were not disseminated until weeks later.

130.    NRA-ILA paid Starboard $383,196 for "independent" expenditures related to advertising attacking Rosendale's opponent. At the same time, Rosendale's authorized campaign committee, Matt Rosendale for Montana, reported payments to OnMessage of $445,367 for media and strategy consulting.

131.    The NRA-ILA advertisements opposing Rosendale's opponent were placed by Red Eagle. Matt Rosendale for Montana placed its own communications using National Media and its affiliate, AMAG. In at least one instance, the same National Media employee placed

---

[34] *Matt Rosendale on NRA support,* SoundCloud (uploaded Sept. 13, 2018), https://soundcloud.com/user-379527848/matt-rosendale-on-nra-support; *see also* Lachlan Markay, *Exclusive: Audio Reveals Potentially Illegal Coordination Between NRA and Montana Senate Hopeful Matt Rosendale,* DAILYBEAST (Sept. 13, 2018), https://www.thedailybeast.com/exclusive-audio-reveals-potentially-illegal-coordination-between-nra-and-montana-senate-hopeful-matt-rosendale.

advertisements for *both* NRA-ILA and Matt Rosendale for Montana with the same Montana TV station. NRA-PVF also contracted with Starboard for independent expenditures in the Montana Senate race, which were placed by National Media doing business as "Red Eagle," at the same time that Matt Rosendale for Senate continued to pay OnMessage and place advertisements using National Media and AMAG.

132.    In the Missouri race, NRA-PVF endorsed Hawley, a candidate who already had close ties to OnMessage/Starboard. Brad Todd, a founding member of OnMessage and Starboard Director, served as a consultant for Hawley's Senate campaign.[35] Todd previously served as a consultant for Hawley's Attorney General campaign in 2016. Todd's role included speaking on behalf of the Hawley campaign throughout the 2018 general election.[36]

133.    During October 2018, NRA-PVF reported almost $1 million in payments to Starboard for "independent" expenditures either supporting Hawley or opposing his opponent. That same month, NRA-ILA issued a press release about NRA-PVF's "seven-figure ad campaign."

134.    Also in October 2018, Josh Hawley's authorized campaign committee, Josh Hawley for Senate, reported paying $2.2 million to OnMessage for media, advertising, and strategy consulting.

135.    Additionally, as of September 30, 2018, Josh Hawley for Senate reported paying $98,967 to an entity called "First Tuesday" for "Communications Consulting," "Communications

---

[35]    *See* Tarini Parti & Henry Gomez, *Expanding Front in the Republicans' Culture Wars: The NFL*, Buzzfeed News (Sept. 5, 2018), https://www.buzzfeednews.com/article/tariniparti/nfl-protests-football-republicans-midterm-elections; *see also* Lindsay Wise & Ben Wieder, *Hawley signals a Senate run and Democrats quickly cry foul*, McClatchy (Aug. 3, 2017), https://www.mcclatchydc.com/news/politics-government/article165290077.html.
[36]    *Expanding Front in the Republicans' Culture Wars: The NFL*, *supra* note 30.

Consulting/Travel," or "Travel," at the same address as OnMessage, 705 Melvin Ave., #105, Annapolis, Maryland, 21404. Maryland corporate records do not show any results for registered corporations under the name "First Tuesday," but Virginia State Corporation Commission records show that an entity called "First Tuesday: The Ballot Initiative Group" is located at 817 Slaters Lane, Alexandria Virginia, the same address as OnMessage's Virginia office. Its articles of incorporation, dated August 2, 2016, listed the following individuals as directors: Bradley A Todd, Gail Gitcho, Wesley Anderson, Curtis Anderson, and Graham Shafer. Its 2017 annual report, dated May 8, 2018, continued to list Todd, Gitcho, and Shafer, as directors, but replaced Wesley and Curtis Anderson with Orrin Harrison and Timothy Teepell. Todd, Shafer, Teepell, Harrison, and Wesley and Curtis Anderson all serve on Starboard's and OnMessage's boards, and First Tuesday's agent, Craig Palik, is also the registered agent for Starboard and OnMessage.

136.    NRA-PVF and Josh Hawley for Senate also coordinated their ad placements through National Media. FCC records indicate that NRA-PVF placed its Missouri advertisements supporting Hawley using National Media affiliate Red Eagle Media. The FCC database does not show NRA-PVF broadcast advertisements placed with any agency other than Red Eagle Media in Missouri in 2018. Meanwhile, Josh Hawley for Senate contracted with National Media affiliate AMAG to make its ad placements. As of September 30, 2018, Josh Hawley for Senate had reported $45,000 in payments to "National Media Digital" for "digital consulting" at the address 815 Slaters Lane, Alexandria, VA, 22314.

137.    FCC documents filed on behalf of NRA-PVF are signed by National Media employees in their "Red Eagle" capacity.[37] FCC documents filed on behalf of Josh Hawley for Senate are signed by National Media employees in their "AMAG" capacity. For example:

a)    An undated document uploaded to the FCC database on July 5, 2018 shows Jon Ferrell, the same National Media employee who placed ads on behalf of both the NRA and the Trump Campaign in the 2016 election, submitting an agreement form on behalf of Josh Hawley for Senate in his capacity as an "AMAG" employee. The form is signed by "Jon Ferrell, agent for Josh Hawley for Senate." As noted *supra* ¶ 83, Ferrell is National Media's "Director of Accounting," and has described himself as "CFO at National Media Inc."

b)    On September 6, 2018, Ferrell signed an "agreement form" between Red Eagle and the Missouri station KYTV for NRA-PVF ads pertaining to the "Missouri General Election U.S. Senate," this time in his capacity as a "Red Eagle" employee.

c)    Also on September 6, 2018, Ferrell signed an agreement form filed by AMAG for a "coordinated buy" on behalf of "Josh Hawley for Senate/NRSC," as well as the attached "federal candidate certification," where he signed as "Jon Ferrell, agent for Josh Hawley for Senate."

d)    A September 19, 2018 "political file disclosure form" filed by Red Eagle with the Missouri station KSHB, for NRA-PVF ads referencing Hawley and his opponent,

---

[37]  FCC filings filed on behalf of other political committees or entities also show NMRPP employees listed as Red Eagle contacts. For example, an America First Action political file disclosure form dated October 3, 2018 lists Michael Eyerman as Red Eagle's contact person, and a With Honor Fund political file disclosure form dated April 19, 2018 lists Melissa Sharp as Red Eagle's contact. Both Eyerman and Sharp previously appeared as employees on NMRPP's website.

lists Kristy Kovatch, who also placed NRA and Trump Campaign ads in the 2016 election, as the "contact person" for Red Eagle and AMAG respectively.

e)   An October 2018 contract shows AMAG placing $50,175 in Josh Hawley for Senate ads with KMOV, and lists John Jay as AMAG's contact person. According to a previous version of National Media's website, at the time John Jay had been National Media's "Client Media Planner" since 2015.

E.   *The NRA's Coordination Scheme*

138.   Taken together, these facts reveal a continuous scheme by the NRA to unlawfully coordinate with candidates it supports for federal office, including Donald J. Trump, Thom Tillis, Cory Gardner, Tom Cotton, Ron Johnson, Matt Rosendale, and Josh Hawley, while evading detection of its violations of federal law concerning the coordination of advertising communications through common vendors.

139.   These facts, and this ongoing pattern of activity, demonstrate that Starboard/OnMessage and National Media used or conveyed to NRA-PVF and NRA-ILA information about these candidates' advertising plans and needs, which informed the creation and placement of communications made by the NRA-affiliated entities in support of the candidates.

140.   As part of this scheme, NRA-PVF and NRA-ILA falsely reported coordinated advertisement spending as independent expenditures to the FEC in Washington, D.C., failed to report the coordinated advertisement spending as contributions, and failed to disclose their donors, in violation of FECA. Similarly, Matt Rosendale for Montana and Josh Hawley for Senate failed to report the coordinated communications as contributions to the FEC in Washington, D.C.

141.   Accordingly, NRA-PVF and NRA-ILA's coordinated communication with Donald J. Trump, Thom Tillis, Tom Cotton, Cory Gardner, Ron Johnson, Matt Rosendale, and Josh

Hawley through a common vendor amounts to millions of dollars of in-kind contributions to these candidates in excess of FECA's contribution limits, and in violation of FECA's source prohibitions and reporting requirements.

**PROCEDURAL HISTORY**

142.    On July 16, 2018, CLC and an individual, Sandhya Bathija, filed a complaint with the FEC against NRA-PVF and NRA-ILA seeking enforcement against illegal, unreported, and excessive in-kind contributions to the Thom Tillis Committee, Cotton for Senate, Cory Gardner for Senate, and Ron Johnson for Senate in the form of coordinated communications. On August 16, 2018, an Amended Complaint was filed adding Plaintiff Giffords as a complainant.

143.    On July 20, 2018, the FEC sent CLC and Bathija a letter acknowledging receipt of the Tillis Complaint, and designating it Matter Under Review ("MUR") 7427.

144.    On September 14, 2018, CLC and Giffords jointly filed with the FEC an administrative complaint showing reason to believe that NRA-ILA made illegal, unreported, and excessive in-kind contributions to Matt Rosendale for Montana in the form of coordinated communications, 11 C.F.R. § 109.21.

145.    On September 21, 2018, the FEC sent CLC and Giffords a letter acknowledging receipt of the Rosendale Complaint, and designating it MUR 7497.

146.    On February 8, 2019, CLC and Giffords supplemented the Rosendale Complaint by providing additional evidence of illegal contributions and further information as to the nature of the second layer of the coordination scheme, namely that NRA-ILA's pro-Rosendale communications were distributed and placed by National Media employees under the trade name Red Eagle, while Matt Rosendale for Montana placed its own communications using National Media or its affiliate AMAG.

147.    On October 22, 2018, CLC and Giffords jointly filed with the FEC an administrative complaint showing that NRA-PVF made illegal, unreported, and excessive in-kind contributions to Josh Hawley for Senate in the form of coordinated communications.

148.    On October 29, 2018, the FEC sent CLC and Giffords a letter acknowledging receipt of the Hawley Complaint, and designating it MUR 7524.

149.    On December 7, 2018, CLC and Giffords jointly filed with the FEC an administrative complaint showing that NRA-PVF made illegal, unreported, and excessive in-kind contributions to Donald J. Trump for President, Inc. in the form of coordinated communications.

150.    On December 13, 2018, the FEC sent CLC and Giffords a letter acknowledging receipt of the Trump Complaint, and designating it MUR 7553.

151.    Despite the ample evidence in each of Giffords's four detailed complaints, the FEC failed to take action on the matters.

152.    On April 24, 2019, more than 120 days after the filing of the last of Plaintiff's four administrative complaints, Giffords filed a civil action in the U.S. District Court for the District of Columbia under 52 U.S.C. § 30109(a)(8)(A), which provides Plaintiff a cause of action for "a failure of the Commission to act on such complaint during the 120-day period beginning on the date the complaint is filed."

153.    The parties subsequently filed cross-motions for summary judgment and, on September 30, 2021, the Court issued an order denying the Commission's motion for summary judgment and granting Giffords's cross-motion for summary judgment. Order, *Giffords v. FEC*, No. 1:19-cv-1192 (D.D.C. Sept. 30, 2021). The Court found that the FEC's failure to act on the administrative complaints was contrary to law, and ordered the FEC to act on Giffords's

complaints within 30 days by making a reason-to-believe determination under 52 U.S.C. § 30109(a)(2). *Id.*

154.    The Commission failed to conform with the Court's order to act within 30 days. *See* Order, ECF 75, *Giffords v. FEC*, No. 1:19-cv-1192 (D.D.C. Nov. 1, 2021). On November 1, 2021, the Court issued an Order declaring that the FEC had "failed to conform" to the September 30 Order and authorizing Plaintiff Giffords to "bring 'a civil action to remedy the violations involved in the original complaints'" against the NRA "[p]ursuant to 52 U.S.C. § 30109(a)(8)(C)." *Id*.

155.    Plaintiff Giffords hereby brings this civil action against the NRA to "remedy the violations involved in the original complaints." 52 U.S.C. § 30109(a)(8)(C).

## CAUSES OF ACTION

### COUNT 1:  NRA-PVF and NRA-ILA Engaged in an Ongoing Scheme to Make Excessive In-Kind Contributions to Federal Candidates in Violation of 52 U.S.C § 30116(a).

156.    Plaintiff repeats and realleges paragraphs 1-155.

157.    Since 2014, NRA-PVF and NRA-ILA have engaged in a continuous and ongoing scheme to violate FECA by making millions of dollars in excessive contributions, in the form of coordinated communications, to campaigns for federal office.

158.    Federal law limits the dollar amount of contributions a candidate for federal office may receive in an election from a political committee or individual donor. 52 U.S.C § 30116(a)(1). In the 2014 cycle, the contribution limit for all persons other than multicandidate political committees was $2,600 per election; in the 2016 and 2018 cycles it was $2,700 per election. The limit on contributions from multicandidate political committees to candidates is $5,000 per election. 52 U.S.C. § 30116(a)(2)(A).

159.    NRA-PVF and NRA-ILA violated 52 U.S.C. § 30116(a)(2)(A) by making contributions in excess of the limits to the Tillis, Cotton, and Gardner campaigns in 2014, the Johnson and Trump campaigns in 2016, and the Rosendale and Hawley campaigns in 2018.

### COUNT 2:  NRA-ILA Engaged in an Ongoing Scheme to Make Corporate Contributions to Federal Candidates in Violation of 52 U.S.C § 30118(a).

160.    Plaintiff repeats and realleges paragraphs 1-159.

161.    Since 2014, NRA-ILA has engaged in a continuous and ongoing scheme to violate FECA by making millions of dollars in illegal corporate contributions, in the form of coordinated communications, to candidates for federal office.

162.    Federal law prohibits corporations from making contributions to candidates. 52 U.S.C. § 30118(a).

163.    NRA-ILA violated 52 U.S.C. § 30118(a) by making in-kind contributions with corporate funds to the Tillis and Gardner campaigns in 2014, the Johnson and Trump campaigns in 2016, and the Rosendale campaign in 2018.

### COUNT 3:  NRA-PVF Failed to Report Contributions to Federal Candidates in Violation of 52 U.S.C § 30104(b)(4) and 11 C.F.R. § 109.21(b).

164.    Plaintiff repeats and realleges paragraphs 1-163.

165.    Since 2014, NRA-PVF has made millions of dollars in in-kind contributions to candidates for federal office, in the form of coordinated contributions, but failed to report those disbursements to the FEC as contributions, and instead misstated those disbursements as independent expenditures in violation of 52 U.S.C. § 30104(b)(4) and 11 C.F.R. § 109.21(b).

### COUNT 4:  NRA-ILA Misstated Reportable Financial Activity to the Federal Election Commission in Violation of 52 U.S.C § 30104(b)(4) and 11 C.F.R. § 109.21(b).

166.    Plaintiff repeats and realleges paragraphs 1-165.

167.    Since 2014, NRA-ILA has filed false reports with the FEC describing millions of dollars in illegal corporate contributions to candidates for federal office, in the form of coordinated communications, as independent expenditures, in violation of 52 U.S.C. § 30104(b)(4) and 11 C.F.R. § 109.21(b).

### COUNT 5: Josh Hawley for Senate Accepted Excessive In-Kind Contributions in 2018 in Violation of 52 U.S.C § 30116(a)(2)(A).

168.    Plaintiff repeats and realleges paragraphs 1-167.

169.    Federal law limits the amount of a contribution a candidate for federal office may receive in an election from any person, including a political committee or individual donor. 52 U.S.C § 30116(a)(1), (2). The limit on contributions to candidates from a multicandidate political committee is $5,000 per election. 52 U.S.C. § 30116(a)(2)(A).

170.    In 2018, Josh Hawley for Senate accepted contributions of up to $973,411 from NRA-PVF, in the form of coordinated expenditures, in violation of 52 U.S.C. § 30116(a)(2)(A).

### COUNT 6: Matt Rosendale for Montana Accepted Illegal Corporate Contributions in 2018 in Violation of 52 U.S.C § 30118(a).

171.    Plaintiff repeats and realleges paragraphs 1-170.

172.    Federal law prohibits candidates for federal office from accepting contributions from corporations. 52 U.S.C § 30118(a).

173.    In 2018, Matt Rosendale for Montana accepted contributions of up to $383,196 from NRA-ILA, in the form of coordinated expenditures, in violation of 52 U.S.C. § 30116(a)(2)(A).

### COUNT 7: Matt Rosendale for Montana Accepted Excessive In-Kind Contributions in 2018 in Violation of 52 U.S.C § 30116(a)(1).

174.    Plaintiff repeats and realleges paragraphs 1-173.

175.    Federal law limits the dollar amount of a contribution a candidate for federal office may receive in an election from any person. 52 U.S.C § 30116(a)(1). In the 2018 cycle, the contribution limit for all persons other than multicandidate political committees was $2,700 per election. The limit on contributions from multicandidate political committees is $5,000 per election. 52 U.S.C. § 30116(a)(2)(A).

176.    In 2018, Matt Rosendale for Montana accepted contributions of up to $383,196 from NRA-ILA, in the form of coordinated expenditures, in violation of 52 U.S.C. § 30116(a)(1).

**COUNT 8: Josh Hawley for Senate Failed to Report Contributions in 2018 in Violation of 52 U.S.C § 30104(b)(4), 11 C.F.R. § 109.21(b).**

177.    Plaintiff repeats and realleges paragraphs 1-176.

178.    In 2018, Josh Hawley for Senate accepted contributions of up to $973,411 from NRA-PVF, in the form of coordinated expenditures, but failed to report those expenditures to the FEC in violation of 52 U.S.C § 30104(b)(4) and 11 C.F.R. § 109.21(b).

**COUNT 9: Matt Rosendale for Montana Failed to Report Contributions in 2018 in Violation of 52 U.S.C § 30104(b)(4), 11 C.F.R. § 109.21(b).**

179.    Plaintiff repeats and realleges paragraphs 1-178.

180.    In 2018, Matt Rosendale for Montana accepted contributions of up to $383,196 from NRA-ILA, in the form of coordinated expenditures, but failed to report those expenditures to the FEC in violation of 52 U.S.C § 30104(b)(4) and 11 C.F.R. § 109.21(b).

**REQUESTED RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

1.    Declare that Defendants NRA-PVF and NRA-ILA made excessive and unreported in-kind contributions to the Thom Tillis Committee, Cotton for Senate, Cory Gardner for Senate, Ron Johnson for Senate, Matt Rosendale for Montana, Josh

Hawley for Senate, and Donald J. Trump for President, Inc. in violation of 52 U.S.C. § 30116(a); 52 U.S.C. § 30104(b); and 11 C.F.R 109.21(b);

2.    Declare that Defendant NRA-ILA made illegal corporate contributions, in the form of coordinated communications, to candidates for federal office, in violation of 52 U.S.C. § 30118(a);

3.    Declare that Defendant Josh Hawley for Senate accepted excessive in-kind contributions in the form of coordinated communications from NRA-PVF in violation of 52 U.S.C §§ 30116(a)(1);

4.    Declare that Defendant Matt Rosendale for Montana accepted excessive and illegal in-kind contributions in the form of coordinated communications from NRA-ILA in violation of 52 U.S.C § 30116(a)(1) and 30118(a);

5.    Order Defendants to file corrective reports with the FEC for each periodic report that a Defendant was required, but failed, to report in-kind contributions made in the form of coordinated communications, or misstated in-kind contributions as independent expenditures;

6.    Enjoin NRA-PVF and NRA-ILA from continuing to engage in their ongoing scheme to violate FECA by making excessive, illegal, and unreported contributions to federal candidates through the use of common vendors;

7.    Enjoin Defendants Matt Rosendale for Montana and Josh Hawley for Senate from accepting any future excessive or illegal in-kind contributions in the form or coordinated communications with the NRA-PVF or NRA-ILA;

8.    Assess an appropriate civil penalty against each Defendant in accordance with 11 C.F.R. § 111.24, to be paid to the United States, for each violation Defendants are found to have committed;

9.    Award Plaintiff its costs and reasonable attorneys' fees incurred in this action; and

10.    Grant such other relief as the Court may deem just and proper.

January 15, 2025                                Respectfully submitted,


                                                /s/Kevin P. Hancock
DAVID PUCINO*                                   ADAV NOTI (DC Bar No. 490714)
Giffords Law Center to                          KEVIN P. HANCOCK (DC Bar No.
Prevent Gun Violence                            90000011)
244 Madison Ave., Ste. 147                      Campaign Legal Center Action
New York, NY 10016                              1101 14th Street NW, Suite 400
(917) 680-3473                                  Washington, DC 20005
                                                (202) 736-2200
dpucino@giffords.org                            anoti@campaignlegal.org
                                                khancock@campaignlegal.org


*Admitted pro hac vice                          Counsel for Plaintiff