## FIN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| GIFFORDS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:21-cv-02887 |
| | ) | |
| v. | ) | Hon. Loren L. AliKhan |
| | ) | |
| NATIONAL RIFLE ASSOCIATION OF AMERICA POLITICAL VICTORY FUND, NATIONAL RIFLE ASSOCIATION OF AMERICA INSTITUTE FOR LEGISLATIVE ACTION, MATT ROSENDALE FOR MONTANA, and JOSH HAWLEY FOR SENATE, | ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

_____/

### DEFENDANTS THE NATIONAL RIFLE ASSOCIATION OF AMERICA POLITICAL VICTORY FUND AND NATIONAL RIFLE ASSOCIATION OF AMERICA'S MOTION TO DISMISS GIFFORDS'S FIRST AMENDED COMPLAINT AND MEMORANDUM IN SUPPORT

Defendants the National Rifle Association of America Political Victory Fund and the National Rifle Association of America (collectively, "the NRA"), respectfully move this Court to dismiss Giffords's complaint under Rule 12(b)(1) for lack of standing and also for failure to state a claim upon which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure. A supporting memorandum of points and authorities and a proposed order accompany this motion.

Dated: March 7, 2025

Respectfully Submitted,

DICKINSON WRIGHT PLLC

/s/ *Charles R. Spies*
Charles R. Spies, Bar ID: 989020
1825 Eye Street, N.W., Suite 900
Washington, D.C. 20006
Telephone: (202) 466-5964

Facsimile: (844) 670-6009
cspies@dickinsonwright.com

Robert L. Avers, Bar ID: MI0083
350 S. Main Street, Ste 300
Ann Arbor, MI 48104
(734) 623-1672
ravers@dickinsonwright.com

*Attorneys for Defendants the National Rifle Association of America & the National Rifle Association of America Political Victory Fund*

## REQUEST FOR HEARING

The NRA respectfully requests a hearing on their Motion to Dismiss.

/s/ *Charles R. Spies*
Charles R. Spies, Bar ID: 989020

## CERTIFICATE OF SERVICE

I hereby certify that on March 7, 2025, I caused a true and correct copy of the foregoing document to be served upon all counsel of record registered with the Court's ECF system, by electronic service via the Court's ECF transmission facilities.

/s/ *Robert L. Avers*
Robert L. Avers (Bar ID: MI0083)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| GIFFORDS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:21-cv-02887 |
| | ) | |
| v. | ) | Hon. Loren L. AliKhan |
| | ) | |
| NATIONAL RIFLE ASSOCIATION OF AMERICA POLITICAL VICTORY FUND, NATIONAL RIFLE ASSOCIATION OF AMERICA INSTITUTE FOR LEGISLATIVE ACTION, MATT ROSENDALE FOR MONTANA, and JOSH HAWLEY FOR SENATE, | ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

_____/

## **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE NATIONAL RIFLE ASSOCIATION OF AMERICA POLITICAL VICTORY FUND AND NATIONAL RIFLE ASSOCIATION OF AMERICA'S MOTION TO DISMISS GIFFORDS'S FIRST AMENDED COMPLAINT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 2

    I.    The FEC's enforcement authority and procedural framework ............................. 2

        A.    Public Enforcement of FECA ..................................................... 2

        B.    Private Enforcement of FECA .................................................... 3

        C.    The Sudden Proliferation of Citizen Suits ................................ 4

    II.    Giffords's FEC Complaints ................................................................. 7

    III.    Giffords obtains a judgment against the FEC, but things are not what they seem. ............................................................................................................ 9

        A.    Giffords sues the FEC for allegedly "failing to act." ............... 9

        B.    The FEC deadlocks on reason-to-believe, which means it "acted" under FECA. ..................................................................... 10

        C.    The Delay-Suit Court, without knowledge of the FEC's "acts" under FECA, still finds the FEC acted unreasonably. ............. 11

        D.    The Delay-Suit Court authorizes Giffords to file this Citizen Suit— again, without knowledge of the FEC's "acts." ...................... 12

    IV.    It turns out that the FEC had "acted" under FECA long before the Delay Suit Court authorized Giffords to file this suit ................................... 14

ARGUMENT ...................................................................................................................... 17

    I.    Giffords failed to satisfy the pre-suit conditions under FECA. ........................ 17

        A.    FECA citizen suit preconditions intentionally limit such private actions to certain conditions, and those conditions are subject to new review here. ........................................................................ 17

        B.    Giffords has failed to satisfy the FECA citizen suit preconditions.......... 21

        C.    The Delay Suit Court's determinations lack preclusive effect here. ....... 25

    II.    Giffords's FECA claim fails as a matter of law because the FEC's impasse at the reason-to-believe stage constituted the functional conclusion of the MURs.............................................................................................................. 26

    III.    Giffords lacks Article III standing. .................................................... 29

        A.    Giffords fails to demonstrate the requisite injury for Article III standing. ..................................................................................... 30

        B.    Giffords fails to satisfy the causation requirement for Article III standing. ..................................................................................... 35

**TABLE OF CONTENTS**
(continued)

**Page**

C.    Giffords fails to satisfy the redressability requirement for Article III standing. ........................................................................................ 38

D.    Giffords may not end-run Article III standing by claiming competitor-standing. .............................................................................. 39

IV.    The five-year statute of limitations bars Gifford's pre-November-2016 claims. ................................................................................................. 42

CONCLUSION ......................................................................................................... 45

## TABLE OF AUTHORITIES

**Cases**

*21st Century Telesis Joint Venture v. FCC*, 318 F.3d 192 (D.C. Cir. 2003) .............................. 29

*3M Co. (Minnesota Min. & Mfg.) v. Browner*, 17 F.3d 1453 (D.C. Cir. 1994).................... 43, 45

*Already, LLC v. Nike, Inc.*, 568 U.S. 85 (2013)..................................................................... 40

*Canadian Lumber Trade All. v. United States*, 517 F.3d 1319 (Fed. Cir. 2008)........................ 39

*Christian v. McHugh*, 847 F. Supp. 2d 68 (D.D.C. 2012) .......................................... 25

*Clapper v. Amnesty Intern. USA*, 568 U.S. 398 (2013) ........................................ 30, 34

*CLC & Democracy 21 v. FEC*, 952 F.3d 352 (D.C. Cir. 2020).......................................... 3

\* *CLC v. 45Committee, Inc.*, 118 F.4th 378 (D.C. Cir. 2024) ............................................ passim

*CLC v. FEC*, 312 F. Supp. 3d 153 (D.D.C. 2018) .......................................................... 3

\* *CLC v. Heritage Action for Am.*, No. 23-7107, 2025 WL 222305 (D.C. Cir. Jan. 15, 2025)
    4, 24

*CLC v. Iowa Values*, 691 F. Supp. 3d 94 (D.D.C. 2023)........................................ 5, 24

*CLC. v. 45Committee, Inc.*, 666 F. Supp. 3d 1 (D.D.C. 2023) ............................... 19, 24

*Combat Veterans for Cong. PAC v. FEC*, 795 F.3d 151 (D.C. Cir. 2015)................................ 2, 3

*Common Cause v. FEC*, 108 F.3d 413 (D.C. Cir. 1997) ...................................... 29, 31

*Common Cause v. FEC*, 842 F.2d 436 (D.C. Cir. 1988) ........................................ 3

*Cope v. Anderson*, 331 U.S. 461 (1947) .................................................... 43

*CREW v. Am. Action Network*, 410 F. Supp. 3d 1 (D.D.C. 2019)........................... 35

*CREW v. FEC*, 236 F. Supp. 3d 378 (D.D.C. 2017)........................................ 42, 45

*CREW v. FEC*, 799 F. Supp. 2d 78 (D.D.C. 2011)........................................ 34

*CREW v. FEC*, 892 F.3d 434 (D.C. Cir. 2018)....................................... 6, 42

*CREW v. FEC*, 993 F.3d 880 (D.C. Cir. 2021)........................................ 27, 28

*Earle v. D.C.*, 707 F.3d 299 (D.C. Cir. 2012) ............................................ 45

\* *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024) ..................................... 33, 34

*FEC v. Akins*, 524 U.S. 11 (1998) ................................................................................ 31, 35

*FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27 (1981) ................................ 2, 26

*FEC v. Nat'l Republican Senatorial Comm.*, 877 F. Supp. 15 (D.D.C. 1995) ........................... 44

*FEC v. Nat'l Right to Work Comm., Inc.*, 916 F. Supp. 10 (D.D.C. 1996) ............................... 43

*FEC v. Rose*, 806 F.2d 1081 (D.C. Cir. 1986) ................................................................. 18

*Flores ex rel. J.F. v. District of Columbia*, 437 F. Supp. 2d 22 (D.D.C. 2006) ........................ 29

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000) .............. 29

*FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990) ...................................................... 29

*Gabelli v. SEC*, 568 U.S. 442 (2013) ........................................................................... 43

*Garelick v. Sullivan*, 987 F.2d 913 (2d Cir. 1993) .......................................................... 38

*Gottlieb v. FEC*, 143 F.3d 618 (D.C. Cir. 1998) ................................................... 30, 37, 41

*Heckler v. Chaney*, 470 U.S. 821 (1985) ...................................................................... 17

*Heritage Action for Am. v. FEC*, 682 F. Supp. 3d 62 (D.D.C. 2023) ................................. 5, 6, 24

*In re U.S. Catholic Conference (USCC)*, 885 F.2d 1020 (2d Cir. 1989) ................................. 39

*Kokesh v. S.E.C.*, 581 U.S. 455 (2017) ......................................................................... 43

*Laroque v. Holder*, 650 F.3d 777 (D.C. Cir. 2011) .......................................................... 40

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .................................................... 29, 38

*McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178 (1936) ............................... 29

*Nader v. FEC*, 725 F.3d 226 (D.C. Cir. 2013) ................................................................. 41

*New World Radio, Inc. v. F.C.C.*, 294 F.3d 164 (D.C. Cir. 2002) ......................................... 40

*NRA v. FEC*, 22-cv-01017 (D.D.C) ............................................................................... 14

*Perot v. FEC*, 97 F.3d 553 (D.C. Cir. 1996) ..................................................................... 4

*Raines v. Byrd*, 521 U.S. 811 (1997) ........................................................................... 40

*Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs.*, 489 F.3d 1267 (D.C. Cir. 2007) ............................................................................................................. 38

*Schmidt v. U.S. Capitol Police Bd.*, 826 F. Supp. 2d 59 (D.D.C. 2011) ................................. 29

*Shays v. FEC*, 414 F.3d 76 (D.C. Cir. 2005) ........................................................... 41

*Sherley v. Sebelius*, 610 F.3d 69 (D.C. Cir. 2010) ................................................... 39

*Sierra Club v. Okla. Gas & Elec. Co.*, 816 F.3d 666 (10th Cir. 2016) ................. 42, 45

*Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26 (1976) ......... 36

*Smith–Haynie v. District of Columbia*, 155 F.3d 575 (D.C. Cir. 1998) ..................... 42

*State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48 (D.C. Cir. 2015) ........................ 40

*Strumsky v. Wash. Post Co.*, 842 F. Supp. 2d 215 (D.D.C. 2012) .............................. 42

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ......................................... 31

*Taylor v. Sturgell*, 553 U.S. 880 (2008) ................................................................... 26

*Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70 (D.C. Cir. 1984) .................... 10

*Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464 (1982) .................................................................... 40

*Van Hollen, Jr. v. FEC*, 811 F.3d 486 (D.C. Cir. 2016) ............................................ 2

*Vroom v. FEC*, 951 F. Supp. 2d 175 (D.D.C. 2013) ................................................. 34

* *Wertheimer v. FEC*, 268 F.3d 1070 (D.C. Cir. 2001) .............................. 30, 34, 35

*Williams v. Purdue Pharma Co.*, 297 F. Supp. 2d 171 (D.D.C. 2003) ...................... 30

**Statutes**

28 U.S.C. § 2462 ................................................................................. 1, 42, 43, 45

52 U.S.C. § 30101(9)(B) ............................................................................................ 8

52 U.S.C. § 30106(a)(1) ............................................................................................. 2

52 U.S.C. § 30106(c) ............................................................................................ 6, 10

52 U.S.C. § 30107(a)(6) ........................................................................................ 6, 10

52 U.S.C. § 30109(a)(12) ........................................................................................... 3

52 U.S.C. § 30109(a)(2) ................................................................................... 2, 3, 29

52 U.S.C. § 30109(a)(4)(A)(i) .................................................................................... 2

52 U.S.C. § 30109(a)(4)(B)(i) .................................................................................... 3

52 U.S.C. § 30109(a)(4)(B)(ii) ............................................................................ 3

52 U.S.C. § 30109(a)(6)(A) ................................................................................ 2

52 U.S.C. § 30109(a)(8) ............................................................................. passim

52 U.S.C. § 30109(d) ....................................................................................... 43

**Rules**

Fed. R. Civ. P. 12(b)(1) ....................................................................................... 1

Fed. R. Civ. P. 12(b)(6) ................................................................................. 1, 42

**Regulations**

11 C.F.R. § 109.20 .............................................................................................. 8

11 C.F.R. § 109.21(b) .......................................................................................... 8

11 C.F.R. § 109.21(h) .......................................................................................... 9

11 C.F.R. § 111.20(a) .......................................................................................... 3

11 C.F.R. § 111.21 ............................................................................................... 3

11 C.F.R. § 111.24 ............................................................................................. 43

11 C.F.R. § 111.9(b) ............................................................................................ 3

11 C.F.R. § 5.4(a)(4) ............................................................................................ 3

## INTRODUCTION

Defendants the National Rifle Association of America Political Victory Fund ("NRA-PVF") and the National Rifle Association of America (collectively, the "NRA") seek dismissal of Giffords's complaint under Rule 12(b)(1) and (6) of the Federal Rules of Civil Procedure. First, Giffords's complaint should be dismissed under Rule 12(b)(6) because Giffords failed to satisfy the preconditions for a citizen suit under FECA. Indeed, in a case for which this matter was stayed for nearly a year, *CLC v. 45Committee, Inc*., 118 F.4th 378 (D.C. Cir. 2024), the D.C. Circuit recently held that a delay suit court's finding as to those preconditions is not binding on this Court, and that a failed reason-to-believe vote constitutes an "act" under FECA that renders the citizen suit preconditions unsatisfied. And because we now know—*without a shred of doubt*—that the FEC committed an "act" when it deadlocked at the reason-to-believe stage of Giffords's administrative complaints back in February 2021, the FEC *did* act on those matters and the FECA suit preconditions here are unsatisfied.

Giffords's complaint should also be dismissed under Rule 12(b)(1) for lack of standing. Given Giffords's own claims of success in the American political arena, Giffords simply cannot demonstrate an Article III injury in this case. Giffords also fails to show the requisite traceability and redressability because the "harm" alleged by Giffords results not from the NRA but from independent decisions of voters and elected officials—essentially, the political process at work. For those reasons, Giffords failed to demonstrate standing by a preponderance of the evidence.

Finally, Giffords's pre-November-2016 claims should be dismissed under Rule 12(b)(6) because those claims are time-barred by the five-year statute of limitations under 28 U.S.C. § 2462.

For these reasons, and as further explained below, the NRA respectfully requests that this Court grant the instant motion and dismiss Giffords's complaint with prejudice.

## BACKGROUND

### I.    The FEC's enforcement authority and procedural framework

#### A.    Public Enforcement of FECA

The FEC is an independent federal agency with which Congress vested the primary responsibility for administering and enforcing FECA. Uniquely tasked with regulating core constitutionally-protected activity such as when individuals and groups "act, speak and associate for political purposes," the FEC "implicates fundamental rights" with each action it takes. *Van Hollen, Jr. v. FEC*, 811 F.3d 486, 499 (D.C. Cir. 2016). To prevent the FEC from abusing its enforcement powers for political gain, Congress structured the FEC in an "inherently bipartisan" fashion so that "no more than three of its six voting members may be of the same political party." *FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 37 (1981) (*DSCC*) (cleaned up); *see also* 52 U.S.C. § 30106(a)(1). Those bipartisan safeguards—which prohibit the FEC from enforcing FECA without bipartisan agreement to do so—temper the FEC's enforcement powers. *Combat Veterans for Cong. v. FEC*, 795 F.3d 151, 153–54 (D.C. Cir. 2015) (citations omitted).

The FEC's enforcement process commences upon the filing of a complaint alleging FECA violations. *See* § 30109(a)(1) (permitting anyone that believes FECA has been violated to file a complaint with the FEC). An imperative legal principle here, the FEC may *not* begin an investigation until at least four commissioners find "reason to believe" a violation has occurred. *Id*. § 30109(a)(2). If at least four commissioners vote to find reason to believe a violation occurred, then upon completion of that investigation, the FEC votes as to whether there is "probable cause to believe" a violation occurred. *Id.* § 30109(a)(1)–(4). If four commissioners agree there is probable cause, then FECA requires the FEC to attempt to rectify the violation through conciliation with the respondent. *Id.* § 30109(a)(4)(A)(i). If conciliation is unsuccessful, then the FEC *may*, upon approval of four members, commence a civil suit to enforce the FECA. *Id.* § 30109(a)(6)(A).

To be clear, each of those procedural stages—(1) a reason to believe determination, (2) a probable cause determination, and (3) the filing of a civil suit—"requires an affirmative vote of 4 of the FEC's members before the Commission may proceed." *Combat Veterans*, 795 F.3d at 154 (cleaned up). Consequently, where—like in this case—the FEC musters three or fewer reason-to-believe votes, the FEC is *not* authorized to conduct an investigation. § 30109(a)(2).

Pertinent here, the FEC frequently splits at this threshold reason-to-believe stage, thereby failing to garner the four votes necessary to proceed with FECA's complaint enforcement process. These splits, commonly known as "deadlocks," are part of the FECA framework. *See CLC v. FEC*, 312 F. Supp. 3d 153, 164 n.6 (D.D.C. 2018) ("The fact that these deadlocks occur is evidence of the Congressional scheme working."), *aff'd sub nom.*, *CLC & Democracy 21 v. FEC*, 952 F.3d 352 (D.C. Cir. 2020). When, as here, the FEC deadlocks at reason-to-believe, the position of the commissioners who vote against reason to believe becomes the "controlling" position of the FEC, and those Commissioners must then issue a "statement of reasons" for judicial review purposes. *CLC*, 31 F.4th at 787 (citing *Common Cause v. FEC*, 842 F.2d 436, 449 (D.C. Cir. 1988)).

With limited exceptions, FEC proceedings on complaints remain confidential until the FEC "terminates its proceedings." 11 C.F.R. §§ 111.20–21; *see also* §§ 30109(a)(4)(B)(i); 30109(a)(12). The FEC terminates enforcement proceedings by "vot[ing] to close [the] enforcement file," 11 C.F.R. § 5.4(a)(4), at which time the FEC must notify the complainant and respondent of the terminated action, *id*. § 111.9(b), and release the statements of reasons, which, as described above, serve as the basis for judicial review of the FEC's enforcement determinations.

## B.    Private Enforcement of FECA

In limited circumstances, FECA permits a party that was "aggrieved by an order of the Commission dismissing [their] complaint . . . or by a failure of the Commission to act on [their] complaint" to sue the FEC. § 30109(a)(8)(A). In either case, the district court's role is limited to

correcting legal errors—meaning, the court "may declare that the [FEC's] dismissal of the complaint or [its] failure to act is contrary to law." *Id.* § 30109(a)(8)(C). Upon issuing one of those declarations, the court "may direct the Commission to conform with such declaration within 30 days." *Id.* But the court's powers are otherwise limited. If, for example, a delay suit court declared the FEC had failed to act, FECA merely permits the court to enter an order requiring FEC action; it does <u>*not*</u> permit the court to compel the FEC to enforce FECA. *Perot v. FEC*, 97 F.3d 553, 559 (D.C. Cir. 1996).

With that in mind, only when the FEC fails to conform with such an order may a court authorize the complainant to file a civil suit to "remedy the violation" alleged in their original administrative complaint. § 30109(a)(8)(C). Put another way, these "citizen suits" may only be filed upon the satisfaction of two preconditions under FECA: (1) a court must have declared that the FEC's dismissal of or failure to act on a complaint was contrary to law; and (2) assuming the court ordered the FEC to conform with that prior declaration, the FEC failed to conform within 30 days. *See id.* § 30109(a)(8). Once *both* preconditions are satisfied, the initial district court may authorize the complainant to file a citizen suit against the respondent to remedy the violation alleged before the FEC.

### C.    The Sudden Proliferation of Citizen Suits

While FECA's private enforcement scheme is nearly 50 years old, citizen suits were extremely rare until just a few years ago. Indeed, a blitz of citizen suits have been filed since 2019—including the present citizen suit—although nearly all of them have now been dismissed on grounds similar to those explained below. *See, e.g.*, *45Committee, Inc.*, 118 F.4th 378; *CLC v. Heritage Action for Am.*, No. 23-7107, 2025 WL 222305 (D.C. Cir. Jan. 15, 2025). This recent surge of citizen suits is directly attributed to a bloc of commissioners that had weaponized a strategy of "deliberately voting against administratively closing files, appearing in court, or

4

making records public, in order to artificially trigger FECA's citizen-suit provision." *CLC v. Iowa Values*, 691 F. Supp. 3d 94, 99 (D.D.C. 2023) (citation omitted). <u>*This*</u> case is one of those cases.

Here's how the scheme works. First, after a deadlocked reason-to-believe vote, a bloc of commissioners refuse to provide the votes necessary to close the file, which precludes the FEC's General Counsel from notifying the parties that their matter concluded. Goldmacher, *Democrats' Improbable New F.E.C. Strategy: More Deadlock Than Ever*, N.Y. Times (June 8, 2021), attached as **<u>Exhibit A</u>**. This is a departure from decades of practice where the FEC had consistently closed files when deadlocked at the reason-to-believe stage. This part of the scheme weaponizes the FEC's internal practices to dishonestly leave the agency record shielded both from public view *and from judicial review*, despite the fact that the FEC has already reached a full and final disposition of the matter. Another court in this District recently held that this exact anti-disclosure practice violates both FECA and the APA, and did so in a ruling that the FEC did <u>*not*</u> challenge on appeal. *Heritage Action for Am. v. FEC*, 682 F. Supp. 3d 62, 75–76 (D.D.C. 2023).

Second, when the FEC is sued in a delay suit for allegedly "failing to act" under FECA § 30109(a)(8), those same commissioners that shielded the FEC's final disposition from public view then hamstring the FEC's ability to defend itself in court, as FEC counsel may only defend the agency in a delay suit if at least four commissioners vote to authorize a defense. *See* §§ 30106(c), 30107(a)(6); *see also* Ex. A. As Commissioner Trey Trainor explained, this leaves the FEC in a position where it "can't even tell the court under seal that we've handled a particular case" such that FECA suit judges "are getting a one-sided story." Ex. A at 3.

Third, steps one and two of the scheme combine to "open the door" for private advocacy groups—*like Giffords here*—to directly sue private parties—*like the NRA here*—in FECA citizen suits *just like this case*. *Id*. at 1. So, despite a respondent having prevailed at the agency level as a

result of the FEC's deadlock at the reason-to-believe stage—which is an "act" under FECA—that respondent suddenly becomes a defendant in a federal suit brought not by the FEC, but by a private litigant, and on the false pretense that the FEC had failed to act on the administrative complaint.

Apparently, the scheme was some Commissioners' idea of a revolt against the D.C. Circuit's decision in *CREW v. FEC*, 892 F.3d 434 (D.C. Cir. 2018)—known as *Commission on Hope*—which held that when the FEC declined to initiate enforcement proceedings on the basis of "prosecutorial discretion," such dismissal is not subject to judicial review. So, the bloc's scheme evades *Commission on Hope* by preventing the disclosure of the controlling commissioners' statement of reasons until *after* the respondent is sued directly by another private litigant in a citizen suit, which in turn brings that otherwise unreviewable decision before a court.

Agree or disagree with those commissioners' revolt against *Commission on Hope*, the anti-disclosure practice upon which their scheme operates is illegal. *Heritage Action*, 682 F. Supp. 3d at 75–76. More troubling, however, is that this unlawful scheme has also led to citizen suits *like this case* that, as explained below, result from a delay suit that not only rests on complaints that were subject to timely agency action in the form of deadlocked reason-to-believe votes, but were also rejected by the FEC for *substantive reasons* rather than prosecutorial discretion.

To that end, there is no doubt that a coordinated scheme within the FEC artificially triggered *this* citizen suit against the NRA. **One of the Commissioners admitted it**, and publicly announced—unapologetically—that her "efforts" involved "activating a previously unused, alternative enforcement path" that "allows those who file complaints to sue those they allege have violated the law." FEC Comm'r Ellen L. Weintraub Verified Tweets (Sept. 30, 2022), attached as **Exhibit B**, at 2 (specifically, slide #5, referencing MURs 7427, 7497, 7524, 7553—which are the MURs referenced in Giffords's Amended Complaint, and the Delay Suit Court's Memorandum

Opinion). Indeed, that same Commissioner admitted that she "quite consciously and intentionally cast votes" that put ***this case***, among others, "on their current paths," and that she makes "zero apologies" for her actions in pursuit of that outcome. *Statement of Comm'r Weintraub On the Voting Decisions of FEC Comm'rs* (Oct. 4, 2022) attached as **Exhibit C**, at 2-4 (directly referencing *Giffords v. NRA Political Victory Fund*, No. 21-2887 (D.D.C.)—which is ***this*** case).

## II.     Giffords's FEC Complaints

Giffords filed four complaints against the NRA and other respondents alleging violations of FECA. Filed in 2018, those complaints were designated by the FEC as Matter Under Review ("MUR") Nos. 7427, 7497, 7524, 7553.[1] As the NRA explained in its responses before the FEC, each of those complaints lacked evidence of FECA violations. *See* ECF No. 35-1, at 8–16 (summarizing Giffords's failure to show reason to believe that FECA violations occurred).[2]

The common theme of Giffords's complaints was alleged coordination through common vendors. Giffords speculated that because the NRA and certain candidates shared vendors that have multiple entities, there was coordination in violation of FECA. But "coordination" is an expressly defined legal term that requires more than just a business relationship with mutual vendors or conversation between representatives from each side. Rather, a communication is "coordinated" when made in cooperation, consultation, or concert with, or at the request or suggestion of, a candidate, a candidate's authorized committee, or their agent. 11 C.F.R. § 109.20. If truly "coordinated," communications constitute "contributions" for purposes of contribution limits. § 30101(9)(B), 11 C.F.R. § 109.21(b). The FEC uses a three-pronged test to determine if a

---

[1] Giffords filed a supplement to MUR No. 7497 that was designated as MUR No. 7621 by the FEC. A separate administrative complainant filed two complaints in 2019 that raised identical issues as Giffords's complaints and were designated as MUR Nos. 7558 and 7560.

[2] When citing electronic filings throughout this Brief, the NRA cites to the ECF page number, rather than the page number of the filed document.

communication is coordinated, which considers: 1) the source of the payment (payment); 2) the subject matter of the communication (content); and 3) the interaction between the payor and the candidate (conduct). If all three prongs are satisfied, a communication is coordinated and counts against applicable contribution limits. *Id.*

The conduct prong is the key here. As Giffords would have it, the respondents satisfy the conduct prong by use of a common vendor. But the conduct prong is subject to a three-prong test of its own, which is only satisfied by use of a common vendor if all three elements are present: 1) the payor contracts with or employs a "commercial vendor" to create, produce, or distribute the communication; 2) within the previous 120 days, the commercial vendor had a relationship with the candidate or party committee that put the vendor in a position to acquire information about the campaign plans, projects, activities, or needs of the candidate; and 3) the vendor uses or conveys non-public information about the campaign plans, projects, activities, or needs of the candidate, or information previously used by the vendor in serving the candidate, to the payor, *and* that information is material to the creation, production, or distribution of the communication. *Id.*

Giffords's complaints failed to meet their evidentiary burden to show there was reason to believe the NRA or its vendors coordinated any communications. First, all vendors referenced in the complaints advised that they established and implemented firewall policies to prevent the flow of non-public information. Those firewall policies provide safe harbor for common vendors and their clients under the FEC's coordination regulations, *see* 11 C.F.R. § 109.21(h), so that companies with employees serving as vendors to both candidates and outside spenders may do so without fear of baseless allegations of coordination. Second, even if the common vendor did not have internal firewall policies in place, Giffords had no evidence that the "common vendors" actually used non-public information to create or disseminate advertising for the NRA.

So after the FEC considered Giffords's complaints, which lacked evidence that any common vendor improperly used or conveyed non-public information about campaign plans, projects, activities, or needs of a candidate, or that any such information was material to the creation, production, or distribution of a communication, as well as the NRA's responses, which showed that all "common vendors" established and implemented legally compliant firewall policies thereby providing the NRA with statutory safe harbor for any accusations of wrongdoing under the common vendor coordination regulations, the FEC voted on whether Giffords's allegations merited reason to believe FECA had been violated. The controlling Commissioners concluded they did not, and issued a statement of reasons explaining the basis for their decision. As further explained below, that happened *before* the Delay Suit Court unwittingly authorized this suit without knowing the legal significance of those administrative proceedings. *See infra*, Background Sections III.D; IV.

### III.    Giffords obtains a judgment against the FEC, but things are not what they seem.

### A.    Giffords sues the FEC for allegedly "failing to act."

On April 24, 2019, Giffords filed a Delay Suit against the FEC for allegedly failing to act on the complaints under § 30109(a)(8)(A). *See Giffords v. FEC*, No. 19-1192 (D.D.C. April 24, 2019), ECF No. 1. ("*Giffords v. FEC*").

On May 9, 2019, the FEC voted on whether to authorize its General Counsel to defend that suit. *See* FEC Certification re: Vote to Authorize Defense of Giffords's Delay Suit, attached as **Exhibit D**. As explained above, the FEC may only authorize its General Counsel to defend a Delay Suit "by a majority vote of the members of the Commission." § 30106(c); *see also id.* at § 30107(a)(6). Importantly, that vote to authorize a defense in the Delay Suit *failed* by a vote of 3-1, *see* Ex. D. During that same executive session, however, the FEC again voted on whether to authorize a defense, but, apparently, with a catch, as most of the substance of this second vote to

authorize a defense is ***redacted***. Aside from indicating that the FEC decided by a vote of 4-0 to authorize the FEC's OGC to defend the Delay Suit, the remainder of the vote description of this vote is redacted under FOIA Exemption 5. *Id.* (Item No. 2.)

The relationship between Items No. 1 and 2 on the May 9, 2019, vote certification leads to the simple logical implication that the FEC was unable to muster the votes to authorize a full defense of the Delay Suit, so it authorized something *less* than a full defense, the conditions of which remain undisclosed to this day. *See id*.

Meanwhile, the parties filed cross-motions for summary judgment. For its part, the FEC sought summary judgment on the grounds it had handled Giffords's complaints in reasonable fashion under the factors courts consider when assessing claims of agency delay. *See, e.g., TRAC. v. FCC*, 750 F.2d 70 (D.C. Cir. 1984); *Common Cause v. FEC*, 108 F.3d 413, 419 (D.C. Cir. 1997). *Giffords v. FEC*, ECF No. 41-1 (arguing that the timeline of its work on the complaints was reasonable in light of heavy workload, the FECA-mandated administrative process, a partial government shutdown, and the substance of the complaints).

Giffords, on the other hand, sought summary judgment on the grounds that the FEC had failed to act on its administrative complaints. *E.g.*, *Giffords v. FEC*, Pl.'s Mem. Supp. Cross-Mot. Sum. J. & Opp'n, ECF No. 48, at 14. As Giffords put it, "[t]he Commission's *failure to vote* on whether there is reason to believe a violation has occurred—i.e., its failure to even decide whether to commence an investigation of the allegations—is not excused by resource constraints, competing priorities, or lack of available information." *Id*. at 19 (emphasis added).

### B.    The FEC deadlocks on reason-to-believe, which means it "acted" under FECA.

While those dispositive motions were pending, the FEC did exactly what Giffords claimed the FEC had not done. Indeed, on February 19, 2021, the FEC informed the Court that it had held a vote to "find that there was no reason to believe that a violation had occurred in MURs 7427 and

7497," and the "vote failed 2-3 with one recusal." *Id.*, ECF No. 84, at 2. Shortly thereafter, the FEC notified the court of several *more* actions the FEC had taken on all of Giffords's complaints during an executive session on February 23, 2021, which the FEC described as follows:

> A **motion was made to find <u>reason to believe</u>** that some violations of law had occurred in all four of the MURs at issue here. **That vote failed by a vote of 3-2 with one recusal, short of the four affirmative votes required for the motion to pass.** Another motion was then made that the Commission find there was no <u>reason to believe</u> a violation had occurred with respect to MURs 7524, 7553, and another MUR not at issue in this case. **That motion also failed, by a vote of 2-3 with one recusal.**

*Giffords v. FEC*, ECF No. 85, at 1–2. (Internal citation omitted. Emphasis added).

While the main premise of Giffords's motion for summary judgment was the idea that the FEC had failed to act under FECA because it had not yet voted on whether there was reason to believe a violation had occurred, *id.*, ECF No. 48, at 14; *id.* at 19, the FEC did not ask the Court to deny Giffords's motion on the grounds that the FEC had subsequently done just the thing that Giffords claimed it had failed to do. The inexplicable absence of that counter-argument from the FEC rings loud in retrospect, and logic suggests that the reason for the FEC's failure to make that obviously dispositive argument must be related to—if not entirely explained by—the redacted vote certification authorizing only a limited defense of the Delay Suit. *See* Ex. D. Simply put, it appears that the FEC had barred its counsel from raising that dispositive argument.

## C.    The Delay-Suit Court, without knowledge of the FEC's "acts" under FECA, still finds the FEC acted unreasonably.

Seven months later, the Delay Suit Court issued its Opinion denying the FEC's motion for summary judgment but granting summary judgment for Giffords. *Giffords v. FEC*, ECF No. 88. While the Court weighed a host of factors, from the complexity of the complaints to the time constraints under FECA, the Court's decision finding that the FEC failed to act hinged on what happened *after* the FEC's February 23, 2021 deadlocked reason-to-believe votes. Importantly, up

until that time the FEC had largely been without a quorum, meaning the FEC could not have acted during most of the pendency of this suit even if it unanimously wanted to do so. *Id.* at 29.

Thus, the Delay Suit Court concluded the FEC had acted reasonably through the time it deadlocked on reason-to-believe on February 23, 2021. *See id.* at 29–30 (recounting the FEC's actions from the time it regained quorum in December 2020 to the time it deadlocked on reason-to-believe and holding that "the Commission's actions up until February 23, 2021, appear to be substantially justified."). From there, however, the Court focused on the time *after* the February 23, 2021 deadlocked reason-to-believe votes, and ruled as follows:

> On the other hand, however, ***there is <u>no evidence</u> before the Court indicating that the FEC has taken <u>any actions</u> to discuss or to vote on the matters again during any subsequent executive session since February 23, 2021.*** *Id.* (noting that the Commission had met in executive session on March 9 and 11, 2021, and that the administrative complaints were not on the agenda). ***<u>Neither has the FEC assured the Court "that it is moving expeditiously" to address the claims</u>***. *TRAC*, 750 F.2d at 80. Particularly in view of the fact that the Commissioners have already conducted one vote on all MURs at issue and two votes on two of the MURs— thereby demonstrating that the Commissioners have carefully considered and understand the facts, legal issues, and interests at stake—***the Court cannot find that the FEC's failure to take <u>any action</u> on the matters <u>during the past 7 months</u> is reasonable***.

*Id.*, ECF No. 88, at 30–31. As a result of this apparent inaction—and without knowing that the failed February 23, 2021, reason-to-believe votes were indeed "acts" under FECA—the Court granted judgment for Giffords and ordered the FEC to conform with the Court's order by acting on the complaints within 30 days. *Id.* at 31; *see also id.*, ECF No 71 (order granting same).

**D.    The Delay-Suit Court authorizes Giffords to file this Citizen Suit—again, without knowledge of the FEC's "acts."**

The Court held a status conference on November 1, 2021—just as the 30 day period by which it had ordered the FEC to act on the complaints had expired. At that point, Giffords claimed there was "no indication on the record that the FEC has taken any action in response to the Court's order," and asked the Court authorize a private suit against the NRA. *Id.*, Hearing Transcript, ECF

Nos. 78 & 89 at 2:24 – 3:9 ("Hr'g Tr."). A copy of the Transcript is attached as **Exhibit E.**

The Court then invited the FEC's counsel to provide a status report. *Id.* at 4:8 – 12. The FEC's counsel reported that after the Court had directed it to conform within 30 days, the FEC "took the matters up in the next executive session on October 26th." *Id.* at 5:19 – 24. During that executive session, which was held within the 30 day conformance period, the Commissioners confirmed they had not changed their positions since the February 23, 2021 deadlock on reason-to-believe. *Id.* at 5:25 – 6:10. It turns out that the February 23, 2021 failed reason-to-believe votes truly represented an impasse, as no further reason-to-believe votes would be taken. FEC Counsel also reported that "the two commissioners who had voted [in February 2021] to find no reason to believe violations were committed [had] submitted to the administrative record their statement of reasons; that statement will be released publicly when the files . . . are closed." *Id.* at 6:11 – 16.

Clearly, the Delay Suit Court thought the notion that Giffords had satisfied the citizen suit preconditions was at least questionable, and in fact proceeded under the caution that the defendants in the citizen suit could challenge the satisfaction of those preconditions here, in *this* suit. And we know this because the Court had the following exchange with the FEC's counsel:

> THE COURT: When do you anticipate closure? And the second part of that question is, is it the government's position that closure is the condition preceding to the filing of a private action?
>
> FEC COUNSEL: I don't have any information, Your Honor, on when the file may be closed. Exactly what constitutes the –
>
> THE COURT: Let me get you off the hot seat. Maybe that should be an issue to be litigated on the public record.
>
> In other words, based on what the Court's heard, if the Court hypothetically today were to say to the plaintiff, proceed with your private action, then that would be a legitimate issue to be raised by defense counsel [in the citizen suit], that [authorizing the citizen suit] was premature at that point. I don't want to put you in an awkward position and I don't want to rule on any substantive affidavits.

*Id.* at 8:15 – 9:6. Despite that uncertainty as to whether Giffords had satisfied the preconditions to

file a citizen suit, and with the Court having expressly stated that the soon-to-be citizen suit defendants could challenge the satisfaction of those preconditions in the then-forthcoming citizen suit, the Court entered an order authorizing Giffords to file this suit against the respondents—including the NRA—under § 30109(a)(8)(C). *Id.*, ECF No. 75, at 1–2 (Order dated Nov. 1, 2021).

## IV. It turns out that the FEC had "acted" under FECA long before the Delay Suit Court authorized Giffords to file this suit.

Giffords filed this citizen suit against the NRA the very next day. Limited in scope by virtue of FECA § 30109(a)(8), the instant suit mirrors the theories set out in the complaints Giffords had filed with the FEC, which lacked merit as explained *supra*, Background Section II.

While Giffords was authorized to bring this suit based on the *appearance* that the complaints sat idle with the FEC in the months that followed the February 23, 2021 deadlocked reason-to-believe votes, the NRA has maintained from the outset that things were not as they then appeared. As it turns out, from the time the FEC deadlocked on reason-to-believe in February 2021 to the time the Delay Suit Court issued its Opinion in September 2021—*i.e.*, the 7 month period upon which the Delay Suit Court based its "failure to act" decision—the FEC was <u>not</u> inactive. And, as the D.C. Circuit would clarify in the months to come, those February 23, 2021 failed reason-to-believe votes were acts under FECA such that the FEC *did not* fail to act here.

To gain access to the FEC's concealed administrative file, the NRA sought records from the FEC through a FOIA request. The FEC denied that request, so the NRA sued the FEC for violating FOIA. *See NRA v. FEC*, 22-cv-01017 (D.D.C.) (the "*FOIA Suit*"). Meanwhile, on September 7, 2022—presumably due to an onslaught of FOIA litigation and the FEC's increasingly indefensible position that it could hold administrative matters hostage despite having "acted" when it deadlocked at the reason-to-believe stage—the FEC informed the NRA that it had closed the files in the FEC MURs giving rise to this citizen suit. *See* FEC File Closure Letter, dated

Sept. 7, 2022, attached as **<u>Exhibit F</u>**. Shortly thereafter, the administrative files for the underlying MURs in this case—including commissioner statements of reasons—were made public. *See generally* FEC Public Record re: MUR 7427, *available at* https://www.fec.gov/data/legal/matter-under-review/7427/; FEC Public Record re: MUR 7497, *available at* https://www.fec.gov/data/legal/matter-under-review/7497/; FEC Public Record re: MUR 7524, *available at* https://www.fec.gov/data/legal/matter-under-review/7524/; FEC Public Record re: MUR, *available at* 7553: https://www.fec.gov/data/legal/matter-under-review/7553/.

The two commissioners who voted against enforcement when the FEC deadlocked at the reason-to-believe stage—Commissioners Dickerson and Trainor—wrote a "controlling" statement of reasons explaining their reason-to-believe votes from February 2021. *See Statement of Reasons of Vice Chair Dickerson and Commissioner Trainor, III* ("Statement of Reasons") (Dec. 23, 2021), attached as **<u>Exhibit G</u>**. "After a thorough review of the record," they explained, "including responses from counsel for the respondents and sworn statements by individuals implicated in the complaints, we could not support OGC's [reason-to-believe] recommendations because purely speculative charges . . . accompanied by . . . direct refutations cannot form an adequate basis to find a reason to believe." *Id*. at 10–11 (cleaned up).

Remarkably, Giffords never brought a legal challenge as to the controlling commissioners' statement of reasons. To be sure, Giffords could have attempted to challenge the statement of reasons by alleging their complaints were dismissed in a manner "contrary to law"—which would have resulted in a substantive review of the statement of reasons by a court in this District, maybe even by this Court—but Giffords elected not to do so.

While the FEC released the statement of reasons and vote certifications when it closed the administrative files, it continued to withhold thousands of documents in the *FOIA Suit*. After much

litigation, the FEC disclosed a sample index of the 3,681 responsive items that it withheld under alleged exemptions to FOIA. *See* FEC's Index of a Sample of Withheld Items – Feb. 24, 2023, *NRA v. FEC*, No. 22-cv-1017 (D.D.C.)," attached hereto as **Exhibit H** ("FEC Sample Index"). The Sample Index—which represents a mere fraction of the withheld documents—shows the FEC was anything but inert as to Giffords's complaints during the period after the FEC's February 23, 2021, deadlocked reason-to-believe votes but before the issuance of the Delay Suit Court's Orders and Judgment giving rise to this suit. In fact, the FEC Sample Index shows the controlling commissioners began drafting their statement of reasons no later than March 15, 2021—less than a month after they cast their final deadlocked reason-to-believe votes on February 23, 2021, *see* FEC Sample Index at 15 (RS Number 3102 (3103)), and that the controlling commissioners continued working on their statement of reasons through April and May 2021, *see id.* at 16 (RS Numbers 752 (751); 1202 (1201)). And that makes sense, given that FEC Counsel told the Delay Suit Court during the November 1, 2021 status conference that the controlling commissioners had placed their statement of reasons in the administrative record on well within the 30 day conformance period under FECA § 30109(a)(8)(C). *See* Ex. E at 6:11 – 16.

In light of these developments, the NRA has moved for relief from the Delay Suit Court's Orders and Judgment on the grounds that the court lacked jurisdiction over the case at the time it authorized Giffords to file this suit. The Orders and Judgment are based on the false premise that the FEC had "failed to act" on Giffords's administrative complaints, which we now know is untrue. In the time since the NRA filed that motion last year, the D.C. Circuit has confirmed that a failed reason-to-believe vote like the vote held by the FEC here on February 23, 2021, constitutes an "act" in the context of a "failure to act" suit, which means, *inter alia*, that the Delay Suit became moot when those votes were taken and the Court then lacked subject matter jurisdiction to issue

the Orders and Judgment that ultimately led to this suit. *See generally 45Committee, Inc*., 118 F.4th 378. The NRA also seeks relief there under Rule 60 because there was no controversy before that court because, *inter alia*, Plaintiff Giffords and Defendant FEC were aligned as to the dispositive legal question before that court. That motion is fully-briefed and awaiting decision. *See generally Giffords v. FEC*, ECF No. 90, 90-1; 94; 102; 103; 104; 106; 107; 110.

While the relief sought by the NRA in the Delay Suit would vacate the Orders and Judgment that gave rise to Giffords's suit here, Giffords's claims here should be dismissed, too.

## ARGUMENT

I. **Giffords failed to satisfy the pre-suit conditions under FECA.**

A. **FECA citizen suit preconditions intentionally limit such private actions to certain conditions, and those conditions are subject to new review here.**

"[A]n executive agency's decision not to pursue enforcement is presumptively unreviewable." *45Committee, Inc*., 118 F.4th at 383 citing *Heckler v. Chaney*, 470 U.S. 821, 831–33 (1985). "FECA, however, contains an unusual provision that *sometimes* allows for judicial review of Commission nonenforcement decisions, and that also authorizes citizen suits against the alleged violator," but *only* in "certain conditions." *Id.*

To that end, FECA provides that "any party aggrieved by the Commission's 'dismissal' of a complaint or by its 'failure . . . to act on such complaint during the 120-day period' after receiving it may sue the Commission, seeking a court 'declaration' that the dismissal or failure to act is 'contrary to law.'" *Id*. quoting § 30109(a)(8). To be clear, the "Commission's failure to act within that 120-day period or any other timeframe is not per se contrary to law." *Id*. Rather, "FECA provides a 'failure to act' cause of action to the complainant that ripens after that 120-day period, and courts analyze the lawfulness of the Commission's challenged inaction under a set of factors laid out in *[Common Cause]* and *[TRAC]*." *Id*. citing *FEC v. Rose*, 806 F.2d 1081, 1084 & n.6,

1091–92 & n.17 (D.C. Cir. 1986) (citation omitted). That is precisely what happened here when the Delay Suit Court held the FEC had acted reasonably under *TRAC* and *Common Cause* up until it held the failed reason-to-believe votes on February 23, 2021, but also held the FEC's apparent inaction for the period after February 23, 2021 was unreasonable and contrary to law. *Giffords v. FEC*, No. 19-cv-01192, ECF 88 at 30 (D.D.C. Oct. 14, 2021) ("there is no evidence before the Court indicating that the FEC has taken any actions . . . since February 23, 2021 . . . [s]uch conduct is not explained and cannot be condoned.") (quotation omitted).

Two preconditions must be satisfied before a citizen suit plaintiff can proceed under FECA: "(i) a court must declare that the Commission's failure to act on a complaint is contrary to law and must order the Commission to conform with that declaration; and (ii) the Commission must fail to timely conform with that declaration." *45Committee, Inc*., 118 F.4th at 383. If both preconditions are met, then the complainant can file a citizen suit in their name against the subject of the original complaint. And while a Delay Suit Court—*i.e.*, *Giffords v. FEC* for the instant matter—is the first to analyze those preconditions, it is well-settled that a subsequent citizen suit court—*i.e.*, this Court—should consider afresh whether those preconditions were indeed satisfied if so challenged. The D.C. Circuit's recent decision in *45Committee* is controlling on those points of law.

In *45Committee*, plaintiff CLC—the same organization that represents Giffords as plaintiff's counsel in this case—filed an administrative complaint alleging that 45Committee, Inc. "had violated FECA by raising and expending funds in connection with the 2016 presidential election without registering as a political committee." *Id.* at 383. CLC filed suit against the FEC roughly two years later, alleging a failure by the FEC to act on its administrative complaint under § 30109(a)(8)(A). *Id.* That is, of course, precisely the same species of claim that Giffords brought in the Delay Suit that led to this case.

18

Under similar circumstances to the Delay Suit giving rise to this case, the plaintiff in *45Committee* obtained a declaration that the FEC had failed to act on its administrative complaint. *45Committee, Inc.*, 118 F.4th at 384. Then—further similar to what transpired here in Giffords's Delay Suit against the FEC—the district court ordered the FEC "to act on the complaint within thirty days pursuant to 52 U.S.C. § 30109(a)(8)(C)." *Id.* at 384 (quoting *CLC*, 2021 WL 5178968 at *9). The FEC did not notify the plaintiff or the court of any action taken during that 30-day conformance period. *Id.* And so—like here—as soon as that 30-day conformance period expired, the plaintiff in *45Committee* asked the district court for an order "finding that the Commission had failed to conform with the contrary-to-law determination," which of course—again, like here— "would pave the way for a citizen suit" under § 30109(a)(8)(C). *Id.*

Plaintiff filed a citizen suit against respondent 45Committee, which ultimately moved to dismiss that citizen suit for lack of jurisdiction, among other grounds. *See 45Committee, Inc.*, 666 F. Supp. 3d at 1-2. The premise of 45Committee's jurisdictional argument was that because the FEC had held a deadlocked reason-to-believe vote during the 30-day conformance period and *before* the delay suit court entered its judgment, the citizen suit court lacked jurisdiction because the FEC had acted under FECA by conducting those failed reason-to-believe votes. *Id.* at *3–4.

Plaintiff disagreed, arguing that a failed reason-to-believe vote does not constitute "action" under FECA. *Id.* at *4. But the *45Committee* district court sided with 45Committee and dismissed the citizen suit on the grounds that the FEC's failed reason-to-believe vote was an "action" under FECA, which meant the FEC had conformed with the Court's order because it "acted" under FECA within 30 days. *Id.* at *4-5. And because the FEC's "act" had brought it into conformance with the delay suit court's order to act, the plaintiff had not satisfied the citizen suit preconditions. *Id.* at *5.

Unwilling to accept the proposition that a failed reason-to-believe vote is an "action" under FECA, the *45Committee* plaintiff appealed to the D.C. Circuit. On appeal, the plaintiff argued that the citizen suit court should not have second-guessed the delay suit court's previous determination that the plaintiff had satisfied the second precondition to a citizen suit, *i.e.*, that the FEC had failed to conform with the contrary-to-law determination. The plaintiff further argued that, regardless, the FEC's failed vote at the reason-to-believe stage was not an "act" under FECA such that the failed vote could not have conformed with the delay suit court's order to make a reason to believe determination within 30 days. *See 45Committee, Inc.*, 118 F.4th at 381.

The D.C. Circuit disagreed and affirmed the dismissal of the citizen suit for the same two reasons that this Court should dismiss Giffords's suit. Specifically, the D.C. Circuit held (1) the district court was free to consider afresh whether the FECA suit preconditions had been satisfied despite the delay suit court having already considered the issue, and (2) while the FECA citizen-suit preconditions are non-jurisdictional—recall that the district court had dismissed the citizen suit for lack of jurisdiction after determining the suit preconditions had not been satisfied—the FEC's holding of the failed reason-to-believe vote was still an "act" under FECA so the plaintiff had failed to state a claim for a FECA citizen suit. *See generally, 45Committee*, 118 F.4th 378.

*45Committee* is binding precedent, which means this case should be dismissed for the same reasons. First, there is no doubt that the failed reason-to-believe votes taken by the FEC on February 23, 2021, were "acts" under FECA such that the first precondition to a citizen suit, *i.e.*, the notion that the FEC had "failed to act," was not satisfied when the Delay Suit Court unwittingly held otherwise. And second, the NRA is not bound by the Delay Suit Court's judgment. In fact, the Delay Suit Court was so doubtful as to whether the citizen suit preconditions were satisfied that it said—*on the record* and *in the absence of the Defendants here*—that the defense here would

20

be free to challenge whether the preconditions to suit had actually been met there. Thus, Plaintiff has failed to state a claim upon which relief can be granted and its First Amended Complaint should be dismissed as further explained below.

      **B.    Giffords has failed to satisfy the FECA citizen suit preconditions.**

Giffords cannot satisfy the FECA citizen suit preconditions because the failed reason-to-believe votes taken by the FEC on February 23, 2021, were "acts" under FECA. Those votes were held _before_ the Delay Suit Court entered its order authorizing Giffords to file this citizen suit against the NRA, and _before_ that court entered its Judgment against the FEC. Indeed, every court that has considered the question in this context has held that a deadlocked reason-to-believe vote is a significant "action" in the context of an alleged "failure to act" under § 30109(a)(8).

Recall that there are "two preconditions to a citizen suit: (i) a [delay suit] court must declare that the Commission's failure to act on a complaint (or its dismissal of a complaint) is contrary to law and must order the Commission to conform with that declaration; and (ii) the Commission must fail to timely conform with that declaration." *45Committee, Inc.*, 118 F.4th at 383. In *45Committee*, "the Commission's failure to act on CLC's complaint against 45Committee was deemed contrary to law, but within thirty days of that decision, the Commission held a reason-to-believe vote." *Id*. at 389-390. "That vote failed to garner the four votes necessary to either find reason to believe (and thus initiate an investigation) or find no reason to believe (and thus dismiss the complaint)." *Id*. at 390. "And while the Commission voted later that same day on dismissing the complaint, that vote, too, failed to gain a majority, so the complaint remained pending at the end of the thirty-day period." *Id.*

Thus, the issue before the D.C. Circuit in *45Committee* was "whether the Commission's holding the failed reason-to-believe vote constituted conformance with the contrary-to-law determination." *Id*. That question turned on the issue that is dispositive here, too: *i.e.*, whether that

failed reason-to-believe vote was an "act" under FECA. While the parties in *45Commitee* agreed that in order "to conform with a declaration that its <u>failure to act</u> on an administrative complaint was contrary to law, the Commission must *act* on the complaint," the parties disagreed "about what counts as action, much less about what constitutes *conforming* action." *Id.* (first emphasis added).

On one hand, the plaintiff argued that "only a majority-supported decision can count as conforming action because, under FECA, the Commission can act only through majority vote." *Id.* Thus, in the plaintiff's view, because the FEC's reason-to-believe vote "failed" such that the "Commission did not dismiss the complaint within the thirty-day window," the FEC had failed to conform within 30 days and plaintiff could bring a citizen suit. *45Committee, Inc.*, 118 F.4th at 390. The D.C. Circuit, however, rejected that argument, concluding that "[w]hen a contrary-to-law decision arises from the Commission's failure to act on a complaint at all, the Commission conforms by holding a reason-to-believe vote, regardless of the vote's outcome." *Id.* In other words, all that was required of the FEC during the conformance period was an "act" under FECA; the cause of action is, after all, based on a "failure to *act*"—not on a "failure to render an ultimate *decision*." *Id.* (emphasis in original). The D.C. Circuit cited two key reasons for this outcome— both of which apply here, too. "First, what counts as conforming action depends on what action the contrary-to-law plaintiff was entitled to compel." *Id.* "Second," like here, "when the contrary-to-law suit is based on the Commission's failure to take any action at all on a pending complaint, the plaintiff seeks to compel the Commission to take at least some cognizable enforcement step under the statute, and holding a reason-to-believe vote counts as such a step." *Id.*

The D.C. Circuit boiled it down to this. When it comes to relief in a "failure-to-act" suit, a plaintiff may only compel "the action whose nonperformance by the Commission 'aggrieved' her."

*45Committee, Inc*., 118 F.4th at 390 (citing § 30109(a)(8)(A), (C)). "That is, she can compel the action that, had it been performed, would have left her without the ability to bring (or win) her contrary-to-law suit." *Id*. Answering the question then of just what "action" it is that a failure to act plaintiff like Giffords can compel from the FEC, the D.C. Circuit held that the mere holding of a reason-to-believe vote—*without any regard for the outcome of the vote*—is such an action. *Id*.

<u>*That* is the key</u>: the mere holding of a reason-to-believe vote—even if that vote fails to garner four or more votes—is an "act" under FECA such that the FEC cannot have "failed to act." *Id*. Thus, the D.C. Circuit's recent decision in *45Committee* solidifies the fact that the FEC's February 23, 2021 failed reason-to-believe vote in the instant matters, which occurred long before the Delay Suit Court issued the orders and judgment leading to this case—leaves the first FECA suit precondition unsatisfied because the FEC did not "fail to act."

Turning this case, after considering Giffords's administrative complaints, the FEC voted on February 23, 2021 as to whether Giffords's allegations merited reason to believe that FECA violations had occurred. In a deadlocked vote, the controlling commissioners concluded there was no reason to believe that a violation occurred. *See Giffords v. FEC*, ECF No. 90-1, at 8-9. Those commissioners promptly drafted their statement of reasons, which was then placed in the administrative file. *Id*. at 27. That statement of reasons, which has since become public, clearly references the FEC's February 23, 2021, failed reason-to-believe votes as the <u>*last*</u> reason-to-believe votes taken on these matters. Those February 2021 reason-to-believe votes are, for all purposes, the basis of the FEC's disposition of Giffords's complaints. *See* Ex. G at 3 n., 9-11.

Thus, the FEC clearly acted on Giffords's administrative complaints when it held reason-to-believe votes on February 23, 2021, which means Giffords has failed to satisfy the first precondition under FECA. In fact, the three courts in this District that have considered the question

have held that a deadlocked reason-to-believe vote is a significant "action" in the context of an alleged "failure to act" under § 30109(a)(8). *See 45Committee, Inc.*, 666 F. Supp. 3d at 4; *Heritage Action*, 682 F. Supp. 3d at 77; *Iowa Values*, 691 F. Supp. 3d 94, 106 . And it is of zero significance that the failed reason-to-believe votes that constituted "acts" under FECA in those cases came during the 30-day conformation period because—just like the February 23, 2021 failed reason-to-believe votes here—the statutorily significant deadlocked reason-to-believe vote in each of those cases was *the* reason-to-believe vote that ultimately served as the FEC's decision as to each of the corresponding administrative matters. *See 45Committee, Inc.*, 666 F. Supp. 3d 1; *Heritage Action,* 682 F. Supp. 3d 62; and *Iowa Values*, 691 F. Supp. 3d 94. So too here. *Giffords v. FEC*, 19-cv-01192, ECF No. 90-1 at 33-43 (Jan. 26, 2024) (NRA's Motion for Relief from Judgment). And— more importantly—the two cases that were appealed have both been affirmed by the D.C. Circuit. *See 45Committee, Inc.*, 118 F4th at 382; *Heritage Action*, No. 23-7107 (D.C. Cir. Jan. 15, 2025).

The analysis from those cases applies equally here. The FEC's February 23, 2021 deadlocked reason-to-believe vote was an agency "action" for the purposes of § 30109(a)(8). The Delay Suit Court held that the FEC's conduct leading up to its February 23, 2021 deadlocked reason-to-believe vote was reasonable. ECF No. 88, at 30 ("In view of the above, the Commission's actions up until February 23, 2021, appear to be substantially justified."). As a result, the issue before the Court was no longer "live" as of February 23, 2021. The FEC had done what Giffords's complaint alleged it had not—"acted"— and the Court could no longer grant effectual relief at that time. And had the issue of whether those failed votes were "acts" under FECA been litigated there—as explained throughout this brief, it wasn't—then the Delay Suit Court would have had no choice but to dismiss that suit because there was simply no action left to compel under this prong of FECA. *See 45Committee, Inc.*, 118 F4th at 391-92.

24

As the D.C. Circuit held in *45Committee*, while FECA treats "a failure to act and a dismissal as distinct," *id.* at 391, a failed reason-to-believe vote is nonetheless an "act" under FECA because such a vote shows "engagement with the merits" of an administrative complaint. *Id.* at 392. Despite Giffords's claim otherwise, the FEC *did* act on Giffords's administrative complaints, which means Giffords has failed to satisfy the citizen suit preconditions under FECA because the FEC did not fail to act. Thus, Giffords's first amended complaint must be dismissed for failure to state a claim. *Id.* (citation omitted).

### C.    The Delay Suit Court's determinations lack preclusive effect here.

As further demonstrated by the D.C. Circuit's decision in *45Committee*, the NRA is <u>not</u> bound by the Delay Suit Court's determination as to whether the FECA suit pre-conditions were satisfied here. *See 45Committee*, 118 F.4th at 388-389 (citizen-suit district court was "free to revisit whether the preconditions are met" where, like here, it was now clear the FEC had "acted" through a failed reason-to-believe vote, and issue preclusion did not apply to the citizen-suit defendant).

Issue preclusion only applies where each of these three elements are shown: "(1) the same issue now being raised must have been contested by the parties and submitted for judicial determination in the prior case; (2) the issue must have been actually and necessarily determined by a court of competent jurisdiction in that prior case; and (3) preclusion in the second case must not work a basic unfairness to the party bound by the first determination." *Christian v. McHugh*, 847 F. Supp. 2d 68, 74 (D.D.C. 2012) (cleaned up). None of those elements are present here.

As a preliminary matter, the NRA was not even a party to the Delay Suit when that court issued its Opinion, Orders, and Judgment giving rise to this suit, so the NRA never had the chance to contest the issue before this suit was commenced. *See Taylor v. Sturgell*, 553 U.S. 880, 898 (2008) ("the general rule" is "that a litigant is not bound by a judgment to which she was not a party."). But even then, the parties in the Delay Suit—*i.e.*, Giffords and the FEC—never

"submitted for judicial determination" the dispositive issue of whether a deadlocked reason-to-believe vote is an act under FECA. Thus, that issue was never "actually and necessarily determined" by the Delay Suit Court. In fact, due to the absence of that argument, the NRA has moved for relief from the Delay Suit Court's orders and judgment on the grounds that the court lacked jurisdiction for want of adverseness because the parties there agreed on that very question before the court. *See Giffords v. FEC*, ECF No. 90-1 at 43-49 (Jan. 26, 2024) (NRA's Motion for Relief from Judgment). And while that motion is now fully-briefed and remains pending before the Delay Suit Court, the reality is that neither of the first two elements of issue preclusion exist here.

The third element is also absent because it would be highly prejudicial to bind the NRA by the Delay Suit Court's determination as to this issue. This citizen suit essentially delegates the enforcement function of a bipartisan agency to a private entity (Giffords) that, here especially, is ideologically averse to the respondent (NRA). So while the FEC's structure requires bipartisan agreement before investigating or prosecuting alleged violations of the law, no such check against biased or overzealous enforcement exists in the truly extraordinary context of a FECA citizen suit. To apply issue preclusion here would do more than "work basic unfairness" to the NRA; it would deprive the NRA of the "inherently bipartisan" framework through which Congress intended to prevent the abuse of FECA's enforcement provisions. *See, e.g., DSCC*, 454 U.S. at 37.

## II.    Giffords's FECA claim fails as a matter of law because the FEC's impasse at the reason-to-believe stage constituted the functional conclusion of the MURs.

While FECA treats "a failure to act and a dismissal as distinct," *45Committee, Inc.*, 118 F.4th at 391, and the deadlocked reason-to-believe votes taken by the FEC in February 23, 2021 were "acts" under FECA—which as described above preclude satisfaction of the citizen suit preconditions—Plaintiffs' claims also fail as a matter of law under the "deadlock dismissal

theory." Under that theory, some deadlocked reason-to-believe votes are functionally construed as a dismissal. *See, e.g.*, *CREW v. FEC*, 993 F.3d 880, 891 (D.C. Cir 2021). And while the D.C. Circuit held in *45Committee* that the term "deadlock dismissal" "should not be misunderstood to mean a deadlocked vote constitutes or automatically occasions a dismissal," 118 F.4th at 382, the panel did *not* hold that a failed reason-to-believe vote may *never* constitute a dismissal.

In that vein, the D.C. Circuit reasoned that "[i]f the Commission does not dismiss the complaint after a failed reason-to-believe vote, the case remains open. *In that circumstance, the Commission <u>may</u> hold further reason-to-believe votes*, and there may be no public disclosure of those votes or any other actions taken by the Commission with respect to the complaint." *Id.* at 382 (emphasis added). And that makes sense, as not all failed reason-to-believe votes are true "deadlocks"—*i.e.*, not every failed reason-to-believe vote is truly an FEC *impasse*. *See CREW*, 993 F.3d at 891 (deadlock dismissals are "dismissals resulting from the failure to get four votes to proceed with an enforcement action."); *see also Deadlock,* Oxford English Dictionary Online, https://www.oed.com/search/dictionary/?scope=Entries&q=deadlock (Last accessed March 5, 2025) ("a situation, typically one involving opposing parties, in which no progress can be made . . . stalemate, impasse, checkmate."). Without doubt, there are some instances where the FEC holds a failed reason-to-believe vote and then revisits the matter by taking *new* reason-to-believe votes *at a later time*. And that's exactly what happened in *45Committee*, where failed reason-to-believe votes were followed by another failed reason-to-believe vote, the latter of which was the ultimate, final reason-to-believe vote that just happened to occur during the 30-day conformance period. *45Committee*, *Inc.*, 118 F.4th at 381-382. So the policy concern in *45Committee*—*i.e.*, the idea that a failed reason-to-believe vote does not necessarily constitute a dismissal because the FEC <u>might</u> later take further reason-to-believe votes—had come to pass in

*45Committee. See id.*

That regulatory worry, however, is of no concern here because the FEC's February 23, 2021 deadlocked reason-to-believe votes in this case were the ultimate, final reason-to-believe votes taken by the FEC on Giffords's administrative complaints, and we know this because those failed reason-to-believe votes are directly cited in the controlling commissioners' statement of reasons as *the* basis for the FEC's decision. *See Statement of Reasons*, Ex. G, at 3. Therefore, unlike *45Commitee*, there were no subsequent reason-to-believe votes here.

Application of the deadlock dismissal theory here is consistent with FECA. In this case, the FEC considered whether Giffords's administrative complaints called for the enforcement of FECA, debated whether there was reason-to-believe FECA had been violated, and voted on that question for the final time on February 23, 2021. That vote was an impasse: it failed—not due to agency inaction—but because less than four Commissioners thought there was reason-to-believe a violation had occurred, and it takes four affirmative Commissioner votes to move past that stage of the FECA enforcement process. *See* § 30109(a)(2). This is by Congressional design. And to empower a bloc of Commissioners to "throw the game" and enable Giffords to proceed with its citizen suit despite the Commission's impasse—*i.e.*, to permit Giffords to attempt to enforce FECA not in the context of agency inaction, but where the FEC had acted by considering the issue and voting on it—and then facilitate the success of that suit by hamstringing the Commission's own counsel—would be inconsistent with FECA. Such an outcome would render FECA's bipartisan framework meaningless and open FECA's doors for private investigation and enforcement despite its plain text that enforcement is only permitted either (a) upon the vote of four Commissioners or (b) in the event of agency inaction. *See CREW*, 993 F.3d at 891. This Court should reject Giffords's atextual weaponization of FECA, and dismiss Giffords's complaint for failure to state a claim.

### III.    Giffords lacks Article III standing.

While Giffords proceeds under § 30109(a)(8)—the citizen-complainant provision of FECA—it is well-settled that § 30109(a)(8) does not confer Article III standing. Rather, § 30109(a)(8) confers a right to sue only upon those who also meet the requirements of Article III standing, separate from fulfilling the conditions precedent set forth in § 30109(a)(8). *See Common Cause*, 108 F.3d at 419 (D.C. Cir. 1997) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573 (1992)). This is consistent with the principle that federal courts may only decide "actual ongoing controversies." *21st Century Telesis Joint Venture v. FCC*, 318 F.3d 192, 198 (D.C. Cir. 2003) (cleaned up). And where a plaintiff lacks standing, there is no such controversy.

To demonstrate Article III standing, Giffords must show that: "(1) [it] suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (citing *Lujan*, 504 U.S. at 560–61). Giffords bears the burden of establishing these Article III standing requirements, and it must do so by preponderance of the evidence. *Schmidt v. U.S. Capitol Police Bd.*, 826 F. Supp. 2d 59, 69 (D.D.C. 2011) (citing *Lujan*, 504 U.S. at 561).

To survive a motion to dismiss challenging standing, Giffords "must allege in [its] pleading the facts essential to show jurisdiction," *McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189 (1936), and "the necessary factual predicate may *not* be gleaned from the briefs and arguments," *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 235 (1990) (emphasis added) (cleaned up). Further, this Court "may look beyond the allegations contained in the complaint" to "materials outside the pleadings" when determining whether Giffords met its burden to prove standing. *Flores ex rel. J.F. v. District of Columbia*, 437 F. Supp. 2d 22, 28-29 (D.D.C. 2006) (cleaned up).

As explained below, Giffords cannot show the necessary elements for Article III standing by a preponderance of the evidence, and its Complaint should be dismissed in its entirety.

**A.    Giffords fails to demonstrate the requisite injury for Article III standing.**

First and foremost, Giffords has failed to allege a concrete, imminent, and non-speculative loss arising out of the asserted FECA violations. This alone warrants dismissal for lack of standing. *See, e.g., Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 409 (2013). Indeed, Giffords claims it was "injured" by the NRA's political activities because Giffords is a "gun safety organization" that exists "to compete with the NRA and the candidates and policies it supports" and because Giffords "directly opposed" the campaigns of candidates who "benefited" from the NRA's political activities. ECF No. 81, at 3; Am. Compl. ¶ 6. Giffords also claims it was "injured by the inaccurate, incomplete, and untimely reporting of campaign-finance information" by Defendants. *Id*. These allegations do not show Article III injury by a preponderance of the evidence.

A simple assertion that Giffords suffered an injury to its ability to influence the political process "rests on gross speculation and is far too fanciful to merit treatment as an 'injury in fact.'" *Gottlieb v. FEC*, 143 F.3d 618, 621 (D.C. Cir. 1998). Likewise, Giffords's asserted injury of the NRA filing "inaccurate, incomplete, and untimely" campaign finance reports also fails, *see* ECF No. 81, at 3; Am. Compl. ¶ 6, because the D.C. Circuit has held that a desire for a legal conclusion does not create an informational injury, and whether an expenditure is coordinated, independent, or in-kind is a legal question. *See Wertheimer v. FEC*, 268 F.3d 1070, 1074-1075 (D.C. Cir. 2001).

Indeed, Giffords fails to assert any concrete "loss" or "injury." For instance, Giffords failed to allege any specific legislation or policy adverse to its own cause but that arose from the alleged violations. *See Williams v. Purdue Pharma Co.*, 297 F. Supp. 2d 171, 177 (D.D.C. 2003) ("Standing requires 'individualized proof' of both the fact and the extent of the injury") (citation omitted). Likewise, Giffords fails to identify whether the candidates referenced here *actually*

received an unfair advantage over Giffords's preferred candidates as a result of the alleged violations, although, even if they did, this is not an *individualized* injury specific to Giffords as required for Article III standing. *Id*. Rather, that injury would be specific to the candidate running against the individual benefiting from the allegedly improper expenditures. Giffords's suit "involves only a generalized grievance," and its injury, if at all substantiated, could not confer standing because it is "shared in substantially equal measure by all or a large class of citizens." *FEC v. Akins*, 524 U.S. 11, 23 (1998) (cleaned up).

Giffords insists that it "is injured by the competitive advantages the NRA has obtained by flouting campaign finance laws" and the NRA's "inaccurate, incomplete, and untimely reporting of campaign-finance information." (ECF No. 81, at 3; Am. Compl. ¶ 6). But such bare, conclusory assertions are inadequate to establish injury by a preponderance of the evidence. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (injury must be "concrete" and "particularized," not a product of conjecture or hypothetical). This, of course, is even more problematic for Giffords because, in cases like this where Giffords's "asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*, it is substantially more difficult to establish injury in fact." *Common Cause*, 108 F.3d at 417 (cleaned up).

Giffords's own success in the political arena is yet another obstacle to Article III injury here. While Giffords attempts to characterize itself as David to the NRA's Goliath, Giffords is anything but a diminutive or inconsequential organization. Rather, Giffords is a sophisticated and well-funded political machine consisting of a 501(c)(4) lobbying arm, a 501(c)(3) research arm, and even a super PAC.[3] Giffords's 501(c)(4) June 2018 Form 990 indicates receipt of nearly $9

---

[3] *See About Giffords*, Giffords, https://giffords.org/about/ (last visited Feb. 19, 2025) (referencing Giffords, Giffords Law Center to Prevent Gun Violence, and Giffords PAC).

million (through contributions or grants), and its December 2018 Form 990 indicates receipt of an additional $4 million. *See* Giffords Form 990 for June 2018 and December 2018, attached as **Exhibit I** at 2-7. Giffords's 2019, 2020, and 2021 Form 990s respectively indicate receipt of over $10 million, $7 million, and an astonishing $14 million during those years. *See id.* at 8-16. And in 2022 and 2023, Giffords's Form 990s respectively indicate receipt of just under $10 million and more than $12 million. *See id.* at 17-22.

Meanwhile, Giffords's PAC ended the 2020 election cycle with over $11 million in total contributions, the 2022 election cycle with over $13 million in total contributions, and the 2024 election cycle with over $14 million in total contributions.[4] And Giffords's 501(c)(3) drew in just under $5 million in total receipts (through contributions or grants) for 2019, more than $7 million in receipts for 2020, more than $5 million in receipts for 2021, and a huge $10.7 million for 2022. *See* Giffords Law Center to Prevent Gun Violence Form 990 for tax years 2019, 2020, 2021, and 2022, attached hereto as **Exhibit J**. As a whole, the Giffords entities received at least $26 million in contributions for the 2019-2020 election cycle, and Giffords' 501(c)(4) arm alone reported more than $50 million in receipts in the last five years. The numbers just don't reflect the "unfair playing field" that Giffords attempts to paint for standing purposes.

Giffords has elsewhere memorialized its political impact for all to see. For example, on November 8, 2018, just two days after the 2018 general election in which Giffords claims to have been competitively disadvantaged, Giffords issued a press release headlined "Giffords Took on the NRA and Won."[5] Cutting even deeper against its case for standing, Giffords's press release

---

[4] *See* Giffords PAC, Receipts (2019-2020), Federal Election Commission, *available at* https://www.fec.gov/data/committee/C00540443/?tab=raising&cycle=2020 (last visited Feb. 20, 2025); *id.* (2021-2022); *id.* (2023-2024).
[5] Press Release, *Giffords Took on the NRA and Won*, Giffords (Nov. 8, 2018), https://giffords.org/press-release/2018/11/post-election-memo/ (last visited Feb. 20, 2025). One of

claims that on Election Day in 2018, "voters from across the country took to the polls and made one thing crystal clear: *the politics of guns has shifted dramatically*." *Id.* (Emphasis in original). Giffords also claimed that "gun safety move[d] from third rail to top issue in some of the most contentious campaigns. Millions of voters—young and old, Democrat and Republican, urban and suburban—rallied for stronger gun laws and the candidates who support them." *Id.*

Giffords proclaims that it "beat the NRA in its home state in 2019, and elected gun safety champions to the White House and Senate in 2020."[6] While such claims of political victory are often hyperbolic, Giffords cannot seriously claim to have been harmed while simultaneously announcing, "WE'RE WINNING," and that voters in "red, blue, and purple states" are "rejecting the gun lobby and electing gun safety champions." *Id.*; *see also* ECF 81, at 9-10; Am. Complaint ¶28-30 (claiming electoral success). Thus, Giffords's claims of competitive harm, while touting its political success, are but a thinly veiled effort to skirt the Article III standing requirements.

Next, Giffords argues that it spent money opposing candidates the NRA had supported. *See* ECF No. 81, at 8, 12-13; Am. Compl. ¶¶ 25, 42, 46-47. It is well-settled, however, that "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 394 (2024). The Supreme Court rejects the notion that "standing exists when an organization diverts its resources in response to a defendant's actions," as "that theory would mean that all the organizations in

---

the elections in which Giffords's preferred candidate prevailed in 2018 was the Montana U.S. Senate race, in which the candidate supported by Giffords, Sen. Jon Tester, defeated Matt Rosendale. ECF No. 81, at 8, Am. Compl. ¶ 24. That victory further undercuts Giffords's claim to have been harmed by the NRA's conduct in relation to that election.

[6] Web.archive.com, Elections, Giffords,
https://web.archive.org/web/20220127084340/https://giffords.org/elections/ (last visited Mar. 7, 2025).

America would have standing to challenge [a defendant's action], provided they spend a single dollar opposing [the action]." *Id*. at 395. Here, Giffords's claim for standing based on monies given to candidates running against NRA-supported candidates, ECF 81, at 7-8; Am. Compl. ¶ 23-24, 26, fails because the Supreme Court has held that a plaintiff cannot spend its way into standing. *See Hippocratic*, 602 U.S. at 394-395; *see also*, *Clapper*, 568 U.S. 398, 415-416 (plaintiff cannot create standing through self-inflicted harms).

Giffords's informational injury claim fares no better. Attempting to recast its alleged competitive injury as an informational harm, Giffords claims the NRA coordinated expenditures with federal candidates but that Giffords was unable "to make strategic decisions as it competes with the NRA" because neither the NRA nor the campaigns disclosed the coordination of funds. *See e.g, id*. at 12-13; Am. Compl. ¶ 45-51. Setting aside the fact that there was no coordination here, Giffords would still lack standing *even if* there had been coordination. Indeed, the D.C. Circuit has already held that FECA does <u>not</u> require "disclosure" of the "fact" of coordination— the entire basis of Giffords's claims here—because "coordination" is "a legal conclusion that carries certain law enforcement consequences," and to hold otherwise "would be tantamount to recognizing a justiciable interest in the enforcement of the law." *Wertheimer*, 268 F.3d at 1074-75 (no informational standing to pursue legal determination that expenditures were "coordinated" when the relevant expenditures had been publicly disclosed). The same goes for plaintiffs seeking legal determinations that expenditures exceeded statutory limits or that otherwise reported expenditures should have been reported differently; neither are sufficient for informational standing. *See Vroom v. FEC*, 951 F. Supp. 2d 175, 178–79 (D.D.C. 2013) (no informational standing to pursue legal determination that publicly reported expenditures exceeded applicable limitations); *CREW v. FEC*, 799 F. Supp. 2d 78, 88-89 (D.D.C. 2011) (no informational standing

to pursue legal determination that publicly reported expenditures were "in-kind contributions").

Giffords's alleged informational injury fails because all it seeks is a legal determination that the NRA coordinated expenditures with federal candidates. *See* ECF No. 81, at 42-45; Am. Compl. ¶ 156-180. Giffords does not seek factual information; it's frustrated that the FEC did not find the NRA coordinated with the Senate campaigns of Matt Rosendale and Josh Hawley, and tries to frame that question as an informational injury. But FECA only creates "the right to know who is spending money to influence elections, how much they are spending, and when they are spending it." *CREW v. Am. Action Network*, 410 F. Supp. 3d 1, 12 (D.D.C. 2019) (citing *Akins*, 524 U.S. at 24-25). And Giffords does not allege that the NRA failed to disclose those details about its expenditures—their complaint is instead based on allegations that the NRA did not disclose the *nature* of the expenditures (i.e., whether they were independent, in-kind, etc.). *See, e.g.,* ECF 81, at 46; Am. Compl. at ¶ 5 (seeking an order directing defendants to "file corrective reports . . . to report in-kind contributions made in the form of coordinated communications, or misstated in-kind contributions as independent expenditures."). But coordination is not conceded here—and is in fact denied—and it is well-settled that a finding of "coordination" does not amount to a "fact" that must be disclosed under FECA. *Wertheimer*, 268 F.3d at 1074-1075 ("'coordination' appears to us to be a legal conclusion that carries certain law enforcement consequences," and to construe a legal conclusion to be a disclosable fact for informational injury purposes "would be tantamount to recognizing a justiciable interest in the enforcement of the law," which the Court would not do).

Giffords simply has not suffered a legally cognizable injury for either a competitive injury or an informational injury, and its Complaint should be dismissed for lack of standing.

**B.    Giffords fails to satisfy the causation requirement for Article III standing.**

Federal courts may act only "to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party

not before the court." *Simon v. Eastern Kentucky Welfare*, 426 U.S. 26, 41-42 (1976). Here, Giffords fails to show that their alleged injury is attributable to the NRA. For example, Giffords fails to show that the NRA influenced a candidate's position on policy issues as a result of the alleged FECA violations. And that's because Giffords cannot make such a showing; the candidates at issue here had pro-firearm policy preferences *long before* any alleged FECA violations.

The NRA rates candidates—including those implicated here—"based solely on [each] candidate's support of our Right to Keep and Bear Arms." *See* "Here's What the Ratings Mean," Compilation of NRA-PVF Candidate Endorsements, attached as **Exhibit K** (explaining that a legislator with an excellent voting record on issues critical to NRA might be rated with an "A+" while those with voting histories hostile to those issues would receive a lower rating). In other words, the candidates' position on firearm policies is a *precursor* to whether the NRA supports their candidacies, not a consequence of that support. So while Giffords's standing claim rests in part on the proposition that it "continues to engage in legislative advocacy for positions each of the NRA's beneficiaries has opposed while in office," the reality is that the firearm policy positions of those candidates existed *before* the NRA's conduct alleged in the complaint—not as a result of it—which means Giffords cannot demonstrate the requisite causation between those policy positions and its claimed injury for Article III standing.

For example, in the 2018 election cycle, NRA-PVF gave Josh Hawley an "A" rating based in part on his support of pro-gun policies, including Concealed Carry Reciprocity legislation and his *prior* work "protecting the Second Amendment rights of law abiding gun owners" as Missouri's Attorney General. *See* Ex. K-1, NRA-PVF, *Candidate Endorsements 2018, Missouri* at 1 (Sept. 15, 2018). Meanwhile, NRA-PVF gave Matt Rosendale an "A" rating based in part on his opposition to the U.N. Gun Ban Treaty and also to a proposed semi-automatic firearms ban.

*See* Ex. K-2, NRA-PVF, *Candidate Endorsements 2018, Montana* at 1 (Aug. 15, 2018); *See* Ex. K-3, NRA-PVF, *Candidate Endorsements 2018, Montana* at 1 (Sept. 15, 2018). Indeed, NRA-PVF's candidate ratings are consistently based on a candidate's *prior* positions or actions regarding firearm policies. *See, e.g.*, Ex. K-4, at 1; Ex. K-5, at 1, 2; Ex. K-6; Ex. K-7.

Nor has Giffords shown that any given candidate *actually* received an unfair advantage (*i.e.*, more votes) as a result of the alleged violations. Thus, Giffords's assertion that the "NRA's beneficiaries have opposed" Giffords's "legislative advocacy" for certain positions cannot be traced back to the alleged violations themselves. In fact, Giffords cannot show that the alleged harm bears any relation to the alleged violations because the "harm" alleged by Giffords is the result of independent decisions made by voters and elected officials.

*Gottlieb* is instructive here. 143 F.3d 618 (D.C. Cir. 1998). In *Gottlieb*, the D.C. Circuit affirmed dismissal for lack of standing where the plaintiffs could not show how allegedly improper campaign financing actually influenced public opinion. *Id.* There, the panel reasoned that while one campaign *may* have received extra funds, it did not prevent the plaintiffs from "engaging in any of the numerous activities open to all politically active citizens." *Id.* at 622. In other words, like Giffords here, the plaintiffs in *Gottlieb* were "free to raise funds to support their own candidates, volunteer their time to work on those campaigns, and vote for the candidate of their choice." *Id.*

The same dynamic forecloses Giffords's traceability argument here. Regarding claims like Giffords's where the "asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*," standing is difficult to establish because "one or more of the essential elements of standing depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." *Lujan*, 504 U.S. at 562 (citation omitted). Here, the alleged

injury is simply too attenuated. The results of any election, and the policies ultimately pursued by any elected official, are the product of "independent choices…from a range of [options]." *Garelick v. Sullivan*, 987 F.2d 913, 919-20 (2d Cir. 1993). Giffords has not pled that the alleged FECA violations caused any politicians to take policy positions adverse to Giffords, and that's because Giffords's alleged injury is not attributable to any alleged act or "competitive advantage" held by the NRA. Rather, candidates and voters make their own independent policy decisions, whether favorable or unfavorable to Giffords, despite the NRA's political activities. Those decisions, like election results, are not "traceable" to the NRA's acts, and Giffords lacks standing as a result.

### C.     Giffords fails to satisfy the redressability requirement for Article III standing.

Giffords also lacks standing because redressability cannot be based on mere speculation as to what third parties *might* do in response to a favorable ruling. *Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs.*, 489 F.3d 1267, 1274 (D.C. Cir. 2007). Even if Giffords prevails here, it will not redress its alleged grievance because their claimed harm stems from the independent actions of third parties not before the Court. *Id.* Thus, it is impossible for Giffords's alleged "injury" (*i.e.,* the election of candidates in past elections and their continued opposition to Giffords's policy preferences) to be redressed by the relief Giffords seeks (*e.g.*, declarations that Defendants violated FECA) where the "harm" is the product of voters' choices and the policy preferences of those who win elected office. Those results flow from the independent actions of voters, making redressability beyond the scope of relief available here. A ruling in Giffords's favor would not suddenly reverse the reasons for which voters in one region or another elected certain officials; nor would it reverse a legislator's pro-Second Amendment policy views.

Likewise, there is no redressability for the named and un-named candidates' continued support for firearm policy opposite to that sought through Giffords's "legislative advocacy" (ECF No. 81, at 3; Am. Compl. at ¶6). First, those candidates are already in office, and none of the

requested relief will alter their votes on public policy issues—nor should it under this country's constitutional framework. Elected officials are free to support or oppose any given legislative policy. Giffords cannot "enjoin" elected officials from supporting their own policy preferences, and any such relief is beyond the authority of this Court. There is simply no way for Giffords to illustrate redressability for the injuries alleged here. Giffords therefore lacks standing.

### D.    Giffords may not end-run Article III standing by claiming competitor-standing.

While Giffords is unable to show any specific or individualized injury, they also allege "competitor-standing" based on the respective positions of Giffords and the NRA as to firearm policies. For instance, Giffords claims it was injured by the NRA's campaign finance activities because "Giffords is a gun safety organization that exists in part to compete with the NRA and the candidates and policies it supports." (ECF No. 81, at 3; Am. Compl. ¶6).

The competitor-standing doctrine is born from a line of cases where claimants asserted the federal government erroneously allowed banks to begin competing in entirely new fields of business. *See In re U.S. Catholic Conference (USCC)*, 885 F.2d 1020, 1029 (2d Cir. 1989). This Circuit in particular, however, has emphasized that "the basic requirement common to all [such] cases" is that the allegedly unlawful competitive benefit must "almost certainly cause an injury in fact." *Sherley v. Sebelius*, 610 F.3d 69, 73 (D.C. Cir. 2010); *see also Canadian Lumber Trade All. v. United States*, 517 F.3d 1319, 1332 (Fed. Cir. 2008) ("competitor standing . . . relies on economic logic to conclude that a plaintiff will likely suffer an injury-in-fact") (cleaned up).

The Supreme Court has refused to impose "a boundless theory of standing" in which "a market participant is injured for Article III purposes whenever a competitor benefits from something allegedly unlawful." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 99 (2013). Indeed, the Supreme Court held that competitor-standing must be "based on an injury more particularized and more concrete than the *mere assertion that something unlawful benefited the plaintiff's*

*competitor.*" *Id.* (emphasis added). Courts predictably reject competitor-standing where the alleged unlawful benefit does not presumptively dictate competitive injury as a matter of economic certainty and no "concrete, economic interest…has been perceptibly damaged." *New World Radio, Inc. v. F.C.C.*, 294 F.3d 164, 172 (D.C. Cir. 2002); *State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 55 (D.C. Cir. 2015) (identifying increased difficulty in proving standing where plaintiff's claimed injury arises from government's unlawful regulation of another party).

Furthermore, it would be a mistake to apply a line of cases from the commercial world into a fundamentally ideological dispute. Giffords and the NRA are not competitors in a zero-sum game--it's not an economic "market" in which the NRA is competing for the same "customers" as Giffords, or vice-versa. Rather, they compete in a marketplace of ideas that reflects a fundamental disagreement among millions of Americans on two sides of complicated policy issues. Presumably, Giffords and the NRA share vanishingly few donors, membership, or commonality. They are not competitive with one another, they are adverse.

The doctrine of competitor-standing does not apply here. This is not a commercial dispute between two parties competing for the same customer base. Rather, this is a dispute regarding the enforcement of nuanced FECA provisions that happens to implicate *alleged* inaction by an independent agency of the government—a point disproved elsewhere in this brief. *See Raines v. Byrd*, 521 U.S. 811, 819 (1997) (insisting on strict compliance with injury-in-fact requirement in cases involving separation-of-powers concerns). Application of the competitor-standing doctrine here would grant Giffords "a special license to roam the country in search of wrongdoing" and allow federal courts to be used as "ombudsmen of the general welfare." *Valley Forge Christian College v. Americans United*, 454 U.S. 464, 487 (1982).

While this Court has applied the competitor-standing doctrine to federal election disputes,

those claims were brought by parties actually participating in the election itself. *See, e.g., Laroque v. Holder*, 650 F.3d 777, 788-89 (D.C. Cir. 2011) (would-be candidate had Article III standing where there was "substantial probability" he would be personally injured by ballot access measure); *Shays v. FEC*, 414 F.3d 76, 82, 85–87 (D.C. Cir. 2005) (incumbents had competitor-standing to challenge FEC regulation because they would suffer harm to interest in election due to regulation); *But see Gottlieb*, 143 F.3d at 621 (rejecting PAC's assertion of competitor-standing to challenge use of public matching funds by a candidate it opposed because "it was never in a position to receive matching funds itself"). In other words, those instances gave rise to competitive injury as a matter of certainty—which is not the case here because Giffords is not a candidate but, rather, a public-interest group not actually "competing" in the election.

Those decisions also reinforce the distinction that competitor-standing may only arise from a certain injury related to participation in a *future election*, not from harm allegedly suffered as a result of past infractions, for the sake of redressability. *Nader v. FEC*, 725 F.3d 226, 228-229 (D.C. Cir. 2013). For example, the plaintiff in *Nader* claimed he was "forced to compete in an illegally structured campaign environment." *Id.* at 228 (*compare with* ECF No. 81, at 3; Am. Compl. at ¶6 (Giffords claiming injury due to NRA's "competitive advantages")). There, the D.C. Circuit made abundantly clear that "the problem with [plaintiff's] argument" was that "a favorable decision . . . will not redress the injuries [claimed]." *Nader*, 725 F.3d at 228. The *Nader* court reasoned that the plaintiff "*might* have been able to establish standing as a competitor had he shown that the FEC's determination injured *his* ability to fight the next election," *Id.* (emphasis added), but no such allegations are made here, much less by a preponderance of the evidence. Here, it is not a matter of "certainty" that the alleged violations will lead to a competitive injury in the future because the extent of the parties' competition is not even made clear on the face of Giffords's

complaint, nor is Giffords's participation in any future election.

It would be untenable for an entity with a presence and political influence as wide as that claimed by Giffords to use the competitor-standing doctrine to slip past the stringent Article III standing requirements that apply to everyone else. Giffords cannot show standing by a preponderance of the evidence, and it cannot shortcut that requirement via competitor-standing.

## IV.    The five-year statute of limitations bars Giffords's pre-November-2016 claims.

Giffords's claims for violations that allegedly occurred prior to November 2, 2016 (the "Earlier Claims") should be dismissed as time-barred. A defendant may raise the defense of statute of limitations under Rule 12(b)(6) when the facts giving rise to the defense are clear from the complaint. *Smith–Haynie v. District of Columbia*, 155 F.3d 575, 578 (D.C. Cir. 1998). Dismissal of a claim is appropriate when, as here, "a complaint fails to state a claim upon which relief can be granted." *Strumsky v. Wash. Post Co.*, 842 F. Supp. 2d 215, 217 (D.D.C. 2012) (cleaned up).

Many of the counts pled against the NRA allege violations back to 2014. ECF No. 81, at 42-44 (Counts 1-4). "The statute of limitations for FECA actions," however, "is five years," *CREW v. FEC*, 236 F. Supp. 3d 378, 392 (D.D.C. 2017), *aff'd*, 892 F.3d 434 (D.C. Cir. 2018), and 28 U.S.C. § 2462 provides that "an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued[.]" Courts routinely apply Section 2462 to bar private suits like this one. *Cf., e.g.*, *Sierra Club v. Okla. Gas & Elec. Co.*, 816 F.3d 666, 675 (10th Cir. 2016) (§ 2462 barred private plaintiff's suit for civil penalties).

Here, Giffords seeks to assess a civil penalty against each Defendant under 11 C.F.R. § 111.24, "to be paid to the United States," ECF No. 81, at 47 (Am. Compl. at Requested Relief ¶ 8)—including for alleged violations occurring prior to November of 2016—so section 2462 applies here, too. And while Giffords purports to also seek declaratory and injunctive relief, in

substance, this requested relief also seeks to enforce a penalty. *See Kokesh v. S.E.C.*, 581 U.S. 455, 461 (2017) (A "penalty" to which Section 2462 applies (1) redresses a wrong to the public, rather than a wrong to an individual; and (2) is sought as punishment and to deter others from offending in like manner, rather than to compensate a victim for their loss).

Even if the equitable relief sought by Giffords were not a penalty, § 2462 would bar relief under the concurrent-remedies doctrine, which holds that "equity will withhold its relief in such cases where the applicable statute of limitations would bar the concurrent legal remedy." *Cope v. Anderson*, 331 U.S. 461, 464 (1947). In other words, "[t]his rule applies whenever an action at law or equity could be brought on the same facts," and when "the only difference between [the equitable claim] and a time-barred legal claim is the relief sought." *Id*. (cleaned up); *see also FEC v. Nat'l Right to Work Comm., Inc.*, 916 F. Supp. 10, 15 (D.D.C. 1996) ("the practical concerns alone for problems of missing documents, faded memories, and absent witnesses . . . are no less problematic in adjudicating actions for declaratory and injunctive relief than in determining liability for monetary civil penalties."). Here, the relief sought is concurrent with the legal remedies established by FECA. *See* ECF No. 81 (Am. Compl.); § 30109(d). Thus, because Giffords alleges the availability of legal remedies, § 2462 applies to their claims for purported equitable relief, too.

Not only does § 2462 apply to this case, it also necessitates dismissal of the Earlier Claims. Under § 2462, an action must be "commenced within five years from the date when the claim *first accrued*." (Emphasis added). A claim "first accrues" when the alleged violation occurs. *3M Co. (Minnesota Min. & Mfg.) v. Browner*, 17 F.3d 1453, 1462 (D.C. Cir. 1994) (holding that an action "must be commenced within five years of the date of the violation giving rise to the [civil] penalty," and rejecting the discovery-of-violation rule); *see Gabelli v. SEC*, 568 U.S. 442, 448, 454 (2013) (rejecting discovery rule because "the five-year clock begins to tick" when "a defendant's

allegedly [offending] conduct occurs").

In *FEC v. NRSC*, the district court rejected the argument that a claim should not accrue until the FEC had completed its investigation and satisfied FECA's statutory requirements, reasoning that such a result would "encourage the FEC to drag out its own investigations," and would obstruct "the general prohibition against open-ended penalties" and "FECA's goal of expeditious conflict resolution." 877 F. Supp. 15, 20 (D.D.C. 1995). It further held that "the minimal time periods statutorily imposed for review and conciliation do not transform the decision-making process of the Commission from a prosecutorial decision into a mandatory administrative adjudication." *Id*. Rather, FECA "essentially formalizes the usual steps involved in preparing a civil suit: gathering evidence, determining whether sufficient evidence exists, and attempting to work with the potential defendant to obviate the need for litigation." *Id*. There is no reason to give a private complainant additional time to commence a suit beyond the time limitation imposed upon the FEC, as that would create a bizarre result in which the FEC could cure an expired statute of limitations by setting the procedural stage for a private party to pursue the matter in a citizen suit just like the bloc of commissioners behind the non-disclosure scheme have done here.

If the date upon which a claim "first accrued" was measured by Giffords's ability to file a private suit in *this* court, then they could more than double the statute of limitations under Section 2462, receiving an additional five years *after* resolution with the FEC. This case demonstrates the concern: no administrative complaint regarding the 2014 alleged violations was filed until 2018, *four years* after the alleged violations occurred. ECF 81 at 40; Am. Compl. ¶ 142. If § 2462 was measured from the date Giffords could file its complaint, November 1, 2021, *id*. ¶ 130, Giffords could wait until November 1, *2026* to file suit regarding alleged violations from *2014*. Such a reading would directly contravene the reasons that statutes of limitations exist. Just as "nothing in

the language of Section 2462 even arguably makes the running of the limitations period turn on the degree of difficulty an agency experiences in detecting violations," *3M Co.*, 17 F.3d at 1461, nor does § 2462 concern itself with any FECA procedures that must precede a citizen complaint.

Giffords also attempts to circumvent the limitations period by invoking a continuing violation exception. *See* Am. Compl. ¶¶ 2, 138, 157, 161. But that exception plainly does not apply here. Indeed, "the text of FECA does not clearly establish that entities have a continuous obligation to report information." *CREW*, 236 F. Supp. 3d at 393; *see also Earle v. D.C.*, 707 F.3d 299, 306 n.9 (D.C. Cir. 2012 ("Courts do not lightly create exceptions to the general rule of claim accrual," such as the continuing violation exception, so "absent a clear…directive from the Congress, the general rule applies.") (cleaned up). Further, courts have rejected the notion that "where a continuing violation exists, the limitations period under Section 2462 does not begin to run until the final day of the violation." *Sierra Club*, 816 F.3d at 672. In *Sierra Club*, the Tenth Circuit held that because the statute of limitations begins to run when a claim "first" accrues, and "a continuing violation is actionable even before the last act of the violation where the conduct that has already occurred is sufficient to support a claim," Sierra Club's action was time-barred "even if the violation continued until some later date." *Id*. So too here.

## CONCLUSION

For these reasons, the NRA respectfully requests that the Court grant their motion and dismiss Giffords's First Amended Complaint in its entirety with prejudice.

Dated: March 7, 2025                              Respectfully Submitted,

                                                  /s/ *Charles R. Spies*
                                                  Charles R. Spies, Bar ID: 989020
                                                  1825 Eye Street, N.W., Suite 900
                                                  Washington, D.C. 20006
                                                  Telephone: (202) 466-5964
                                                  Facsimile: (844) 670-6009

cspies@dickinsonwright.com

Robert L. Avers, Bar ID: MI0083
350 S. Main Street, Ste 300
Ann Arbor, MI 48104
(734) 623-1672
ravers@dickinsonwright.com

*Attorneys for Defendants the National Rifle Association of America & the National Rifle Association of America Political Victory Fund*

## CERTIFICATE OF SERVICE

I hereby certify that on March 7, 2025, I caused a true and correct copy of the foregoing document to be served upon all counsel of record registered with the Court's ECF system, by electronic service via the Court's ECF transmission facilities.

/s/ *Robert L. Avers*
Robert L. Avers (Bar ID: MI0083)