# EXHIBIT G

FEDERAL ELECTION COMMISSION
1150 FIRST STREET, N.E.
WASHINGTON, D.C. 20463

### BEFORE THE FEDERAL ELECTION COMMISSION

| | |
|---|---|
| In the Matters of ) | |
| ) | MURs 7427/7497/7524/7553 |
| Nat'l Rifle Ass'n, *et al.* ) | 7560/7621/7654/7660 |
| ) | 7558 |

### STATEMENT OF REASONS OF
### VICE CHAIR ALLEN DICKERSON
### AND COMMISSIONER JAMES E. "TREY" TRAINOR, III

The First Amendment safeguards "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open"[1] and has long been understood to have "'its fullest and most urgent application' to speech uttered during a campaign for political office."[2] Yet, at the same time, significant "extra-constitutional value[s],"[3] including the need to forestall *quid pro quo* corruption or its appearance,[4] permit legislative restrictions on the giving of money for campaign purposes.[5]

The more direct a contribution is to a candidate's campaign—the more likely that the funds can be perceived as a payoff for an official act—the greater Congress's

---

[1] *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

[2] *Eu v. S.F. Democratic Campaign Comm.*, 489 U.S. 214, 223 (1989) (quoting *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971)).

[3] *Van Hollen v. Fed. Election Comm'n*, 811 F.3d 486, 501 (D.C. Cir. 2016).

[4] *Buckley v. Valeo*, 424 U.S. 1, 26-27 (1976) (*per curiam*) ("To the extent that large contributions are given to sure a political *quid pro quo* from current and potential office holders, the integrity of our system of representative democracy is undermined").

[5] *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 191 (2014) (Roberts, C.J, controlling op.) ("The right to participate in democracy through political contributions is protected by the First Amendment, but that right is not absolute").

authority to regulate the giving of funds.[6] And the reverse also holds: the more independent electoral activity is from a candidate campaign, the fewer the encumbrances that may lawfully be imposed.[7]

This is why there are no contribution limits on contributions made to independent expenditure committees and non-profit organizations. But if an organization's spending ceases to be independent of a candidate's campaign, a host of federal restrictions on spending and coordinated action snap into place. This agency has been tasked by the Congress with policing this line between independent political activity and unlawful coordination. When we get this call wrong and authorize the investigation or punishment of lawful activity at the reason-to-believe ("RTB") stage, we cause "[t]he loss of First Amendment freedoms," which even if recovered at a later stage in the proceedings, "unquestionably constitutes irreparable injury."[8]

Our Office of General Counsel ("OGC"), after the receipt of several complaints against the respondents in the instant Matters, ultimately recommended finding RTB against a handful of them. We disagreed with those recommendations and voted accordingly.[9] Our colleagues disagreed with us regarding the application of the law in these Matters,[10] and in accordance with governing law, we provide this Statement to explain our reasoning.[11]

---

[6] *Buckley*, 424 U.S. at 29 ("We find that, under the rigorous standard of review established by our prior decisions, the weighty interests served by restricting the size of financial contributions to political candidates are sufficient to justify the limited effect upon First Amendment freedoms caused by the $1,000 contribution ceiling").

[7] *SpeechNow.org v. Fed. Election Comm'n*, 599 F.3d 686, 693 (D.C. Cir. 2010) (*en banc*) ("[I]n *Citizens United*…the Court held that the government has *no* anti-corruption interest in limiting independent expenditures") (emphasis in original).

[8] *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (Brennan, J., concurring op.).

[9] Certification at 1-2, MURs 7427/7497/7560/7621/7654/7660, Feb. 9, 2021; Certification at 1-3, MURs 7427/7497/7524/7553, Feb. 23, 2021.

[10] Despite voting for enforcement, our colleagues did not support us in voting to close the file and make these Matters public. Certification at 1-2, MURs 7427/7497/7524/7553/7558/7560/7621/7654/7660:, Feb. 23, 2021. In doing so, we fear that they have frustrated proper judicial review of the Commission's decision not to find RTB, which Congress vested in the United States District Court for the District Columbia, 52 U.S.C. § 30109(a)(8), and which operates under a judicial doctrine reliant on the public availability of a statement of reasons explaining why the agency "rejected or failed to follow the General Counsel's recommendation." *Dem. Cong. Campaign Comm. v. Fed. Election Comm'n* ("*DCCC*"), 831 F.2d 1131, 1135 (D.C. Cir. 1987).

[11] *See DCCC*, 831 F.2d at 1135 (establishing requirement that "[t]he Commission or the individual Commissioners" must provide a statement of reasons why the agency "rejected or failed to follow the General Counsel's recommendation"); *Common Cause v. Fed. Election Comm'n*, 842 F.2d 436, 453 (D.C. Cir. 1988) ("A statement of reasons…is necessary to allow meaningful judicial review of the Commission's decision not to proceed"); *see also id*. at 451 (R.B. Ginsburg, J., dissenting in part and

## I. STANDARD OF REVIEW

As the caption suggests, these Matters were born from a large number of complaints filed against a similarly significant number of respondents. The complaints varied in tone and coherency, and many made allegations which OGC suggests do not rise to the level of reason-to-believe.[12]

"The Commission may find 'reason to believe' *only* if a complaint sets forth sufficient specific facts, which, if proven true, would constitute a violation of" the Federal Election Campaign Act ("FECA" or "Act"), as subsequently amended.[13] We cannot find RTB based purely on "mere speculation"[14] or conclusory statements in a complaint—"especially when accompanied by a direct refutation."[15] RTB, in other words, is no rubber stamp.

## II. BACKGROUND AND LEGAL ANALYSIS

Ultimately, OGC recommended proceeding to a formal investigation into one underlying common allegation: that various Republican campaign committees had illegally coordinated communications with certain independent speakers: the National Rifle Association's nonprofits and America First Action.[16] OGC contended

---

concurring in part) ("I concur in part III of the court's opinion holding the *DCCC* rule applicable, prospectively, to all Commission dismissal orders based on tie votes when the dismissal is contrary to the recommendation of the FEC General Counsel"); *Nat'l Republican Senatorial Comm. v. Fed. Election Comm'n*, 966 F.2d 1471, 1476 (D.C. Cir. 1992) ("We further held that, to make judicial review a meaningful exercise, the three Commissioners who voted to dismiss must provide a statement of their reasons for so voting. Since those Commissioners constitute a controlling group for purposes of the decision, their rationale necessarily states the agency's reasons for acting as it did") (citation omitted); *Campaign Legal Ctr. & Democracy 21 v. Fed. Election Comm'n*, 952 F.3d 352, 355 (D.C. Cir. 2020).

[12] For example, in two of the MURs here, 7427 and 7497, OGC urged us to take no action against *any of the respondents*, and appears to have chosen not to recommend dismissal only because it was theoretically possible that an investigation into the *other* respondents in the *other* Matters might provide relevant evidence.

[13] Statement of Reasons of Comm'rs Mason, Sandstrom, Smith, and Thomas at 1, MUR 4960 (Clinton) at 1, Dec. 21, 2000 (emphasis supplied).

[14] *Id.* at 2.

[15] Statement of Reasons of Comm'rs Hunter, McGahn, and Petersen at 5, MUR 6296 (Buck), June 14, 2011 (quotation marks and citations omitted).

[16] Once again, it bears notice that OGC determined that many of these alleged conspiracies could not survive RTB scrutiny. First Gen'l Counsel's Report ("FGCR") at 37, MURs 7427, *et al.* (Nat'l Rifle Ass'n), May 10, 2019 (sworn statements from both Mr. Rosendale and Chris Cox, the NRA official he allegedly had conspired with, made clear that "there is *no information* that Cox or Rosendale discussed

3

that the complaints demonstrated a conspiracy had been run through an entity known as National Media.[17]

In full, OGC recommended RTB findings in the following alleged conspiracies implicating National Media:

    a. The 2018 U.S. Senate campaign committee of Josh Hawley and the NRA's separate segregated fund, the National Rifle Association—Political Victory Fund ("NRA-PVF").[18]

    b. The 2018 U.S. Senate campaign committee of Matt Rosendale and the National Rifle Association-Institute for Legislative Action ("NRA-ILA").[19]

    c. The 2018 U.S. Senate campaign committee of Richard Burr and the NRA-PVF.[20]

    d. Donald Trump's 2016 Presidential campaign and both the NRA-ILA and NRA-PVF.[21]

    e. The 2018 U.S. Senate campaign committee of Josh Hawley and America First Action, Inc.[22]

---

any public communications planned by the NRA Respondents at that time, *or any other time*") (emphasis supplied); *id*. at 33 ("[G]iven…the absence of information sufficient to support [the complaint]…the record at this time *does not provide a basis on which we recommend finding reason to believe*") (emphasis supplied).

[17] National Media has other trade names, such as "Red Eagle" or American Media & Advocacy Group ("AMAG"), which are referenced in the complaints and the FGCR in these Matters. The evidence suggests that, at least initially, National Media used these different names as an organizational heuristic to comply with its firewall policies and relevant FEC regulations. *E.g.* Response of National Media, *et al*. (MUR 7654) at 5.

[18] MURs 7524 and 7560.

[19] MURs 7560 and 7561.

[20] MUR 7560.

[21] MUR 7553. MUR 7558 also alleged that the Trump campaign illegally coordinated with the NRA-PVF, but did not make any allegations regarding the NRA-ILA.

[22] MUR 7654.

4

    f.  The 2018 U.S. Senate campaign of Matt Rosendale and America First Action, Inc.[23]

    g.  The 2018 U.S. House campaign of Pete Sessions and America First Action, Inc.[24]

OGC did not recommend an RTB finding against any of the candidate committees ostensibly engaged in these cabals, presumably because of the lack of evidence to support such findings, and instead urged the Commission to find reason to believe against the NRA's § 501(c)(4) and § 527 arms and America First Action, an independent expenditure-only committee.[25]

Thus, for all the noise engendered by the multifarious complaints and MUR numbers tagged here, the question before the Commission was straightforward: was OGC correct to insinuate that National Media was a cutout entity that candidates for federal office used to illegally coordinate the creation and placement of their advertisements, or instead a *bone fide* media vendor caught in the crossfire of complaints?

Campaigns for office in the modern era require the making and placement of advertisements, a competency that even the majority of the most sophisticated campaign committees and PACs do not have themselves. Inevitably, candidates and other groups that wish to make and place ads on broadcast television or radio must hire vendors to do this work for them. And just as inevitably, in a world of limited options, some candidate committees and outside groups will seek to hire the same vendors to produce and place their advertising.

Recognizing this obvious state of affairs, the Commission has adopted common vendor rules which permit independent speakers and candidates to use the same media buyers, so long as the common vendor does not share material "[i]nformation about the campaign plans, projects, activities, or needs" or material "[i]nformation used previously by the commercial vendor in providing services to the candidate who is clearly identified in the communication, or the candidate's authorized committee, the candidate's opponent, the opponent's authorized committee, or a political party committee."[26] Put simply, PACs and candidates may use the same vendor to create

---

[23] MURs 7654, 7660.

[24] MURs 7654, 7660.

[25] The law views such cooperation (if proven), whether done directly or through a cutout entity, as an effort to circumvent the prohibition that would otherwise apply if a super PAC, § 501(c)(4), or corporate entity tried to directly give money to a federal candidate committee.

[26] 11 C.F.R. § 109.21(d)(4)(i)-(iii).

5

and place advertisements, so long as the vendor does not share information about one client with another.

Our regulations further provide that the "establishment and use of a firewall" by a common vendor serves as a defense against accusations of illegal coordination so long as "[t]he firewall…[is] designed and implemented to prohibit the flow of information between employees or consultants providing services for the person paying for the communication and those employees or consultants currently or previously providing services to the candidate who is clearly identified in the communication, or the candidate's authorized committee, the candidate's opponent, the opponent's authorized committee, or a political party committee" and "[t]he firewall [is] described in a written policy that is distributed to all relevant employees, consultants, and clients affected by the policy."[27]

National Media had such written firewall policies, which were provided to the Commission, along with sworn affidavits by National Media employees stating that they adhered to the firewall. This alone, unless something more than "mere speculation"[28] is available to cast doubt on this sworn evidence, strongly suggests that National Media was doing everything right and it, and its clients, have been inappropriately roped into allegations of conspiracy.[29]

In recommending that we overlook the written firewall policies, OGC principally relied on three batches of evidence. The first is knowledge ostensibly gained by Jon Ferrell, a certified public accountant and National Media's Chief Financial Officer, proven by his signature on NAB Form PB-18s. The second regards the alleged actions of three other National Media employees: Ben Angle, Kristy Kovatch, and Caroline Kowalski. The third asked us to make inferences based on the propinquity between ads placed by independent speakers and advertisements placed by the campaign committees.[30]

---

[27] 11 C.F.R. § 109.21(h).

[28] Statement of Reasons of Comm'rs Mason, Sandstrom, Smith, and Thomas at 1, MUR 4960 (Clinton) at 2.

[29] This presumption of non-collaboration can only be defeated by "specific information indicat[ing] that, despite the firewall, information about the candidate's or political party committee's campaign plans, projects, activities, or needs that is material to the creation, production, or distribution of the communication was used or conveyed to the person paying for the communication." *Id*.

[30] *See e.g.* FGCR (MURs 7427, *et al.*) at 19 ("…the parallel placement and distribution of many of the ads by National Media provides *additional support* for the inference that non-public information about the Trump Campaign's plans, activities, and needs influenced National Media's placement of the NRA Respondents' pro-Trump ads") (emphasis supplied).

6

In each case, we determined that OGC misread or misunderstood the evidence. Had OGC not decided to lump all of these various complaints together, that shortcoming would have been all the more evident.

1. <u>Jon Ferrell</u>

Federal law requires that holders of broadcast, cable, or satellite licenses "immediately" disclose information about political advertising in their "public file," which the Federal Communications Commission ("FCC") places in an online database accessible by any member of the public.[31] This record must "contain information regarding," *inter alia*, "the rate charged for the broadcast time," "the date and time on which the communication is aired," and "the class of time that is purchased."[32]

Jon Ferrell's signature appeared on a number of forms that OGC found in the FCC public file.[33] Thus, OGC asserted—without even a modicum of evidence that Mr. Ferrell actually provided any information to any other named respondent[34]—that because "he was in a position to know when and where the ads were being placed and the costs of the placements,"[35] he was a critical actor in the alleged coordination scheme.

The evidence is to the contrary.

First of all, Jon Ferrell provided a sworn statement explaining that his role as CFO was to keep National Media's books and records, and that he did not "make decisions regarding the development of media strategy, including the selection of advertising slots. He [did] not select advertising audiences, develop the content of advertising, produce public communications, identify voters, or otherwise provide consulting or media advice…his interaction with National Media's media buyers generally consists of receiving billing and invoicing instructions from those buyers, and his involvement in the purchasing of advertising is limited to this administrative

---

[31] 47 C.F.R. § 73.1943; *also* 47 U.S.C. § 315(e).

[32] 47 U.S.C. § 315(e)(2).

[33] As just one example, OGC noted that Mr. Ferrell's name "appear[ed] on a NRA-PVF 'Agreement Form for Non-Candidate/Issue Advertisements' dated October 19, 2016, for 'Pro Trump' 'Anti Clinton' ads scheduled to run from October 25 to October 31, 2016 on a Norfolk, Virginia[] television station. Five days later, Ferrell's name appears on an October 24, 2016[] 'Agreement Form for Political Candidate Advertisements' on behalf of the Trump Committee for 'Pro Trump' 'Anti Clinton' ads scheduled to run on the same Norfolk station during the same week." FGCR (MURs 7427, *et al.*) at 15-16.

[34] Of course, the federal requirement that the public file be made public "immediately" provides precious little advantage for a filer seeking to leverage that information for another campaign.

[35] FGCR (MURs 7247, *et al.*) at 24.

function."³⁶ Under penalty of perjury, Mr. Ferrell told us that his signatures were ministerial, not substantive.

Second, the written firewall policies back up Mr. Ferrell's affidavit. Those documents provided that "'management employees,'" such as the CFO, "'will not be provided access to information material to the creation, production[,] or distribution of the clients' communications.'"³⁷

Third, and rather damning for OGC's case, the public file forms with Mr. Ferrell's signature are NAB Form PB-18s. This form is a disclosure form that broadcasters use to place basic information about an ad buy into the public file. The form does not, for example, include the details of an ad buy schedule, that is information added *separately and later in time* by the broadcaster. The form neither contains nor reveals any information about the discrete details of an ad buy, including the so-called "flight" or airing schedule.

As the Campaign Legal Center, one of the complainants in several of these Matters, itself noted in a complaint that it filed with the FCC against Cox Media Group:

> The NAB Agreement provides the space *for stations* to meet the disclosure requirements of section 315 of the Communications Act. The form asks whether the ad communicates a 'message relating to any political matter of national importance.' If yes, then *the station* must, in the next section, disclose the name of the candidate, the office being sought, the date of the election and/or the issue to which the ad refers.³⁸

Mr. Ferrell's purely administrative act of signing Form PB-18, a form that often "was prepared by others"³⁹ and shorn of any useful information about that the ad at the time of his signature, then, is totally insufficient evidence to believe that he held within his head "information [] material to the creation, production, or distribution of the[se] communication[s]," let alone that he then conveyed that information to another actor.⁴⁰

---

³⁶ Response of National Media, *et al.* (MUR 7553) at 10 (citing to Ferrell Aff.).

³⁷ *E.g. id.* at 11 (quoting Attach. F, Nat'l Media Firewall Policy at ¶5); Response of National Media, *et al.* (MUR 7654) at 10-11.

³⁸ Cmplt. of Issue One and Campaign Legal Ctr. at 6 (emphasis supplied); *available at* https://campaignlegal.org/sites/default/files/8-21-17%20FCC-WSB-Patriot%20Majority.pdf.

³⁹ Response of National Media, *et al.* (MUR 7524) at 8.

⁴⁰ 11 C.F.R. § 109.21(d)(4)(iii).

8

In short, the complainants, and OGC, lacking any relevant expertise, simply misread these forms and, disregarding a sworn affidavit, drew unwarranted conclusions.

2. Ben Angle, Kristy Kovatch, and Caroline Kowalski

Quite a bit of OGC's recommendations were predicated on Mr. Ferrell's signature. Only three Matters,[41] all involving allegations that the National Rifle Association used National Media to illegally coordinate ads with the Trump for President and Hawley for Senate campaigns, do not rely on Mr. Ferrell's signatures.

In these Matters, OGC also singled out the actions of three National Media employees: Ben Angle, Kristy Kovatch, and Caroline Kowalski. Mr. Angle and Ms. Kovatch were media buyers and Ms. Kowalski held an entry-level administrative job.

Ms. Angle and Mr. Kovatch provided sworn statements averring that they complied with the firewall policy as a condition of their employment. These statements, made under penalty of perjury, provided both general and specific responses to insinuations that they may have served as conduits between the NRA and the Trump or Hawley committees.[42]

Robin Roberts, the president of National Media, submitted an affidavit stating that "Ms. Kowalski was hired as an entry-level employee and worked as an assistant to the firm's media buyers, providing administrative and clerical services. Her job duties included requesting advertising rates from stations, transmitting orders to stations, and transmitting traffic instructions to stations. Ms. Kowalski had no role in making decisions regarding ad placement, performed administrative tasks at the direction of others, and did not provide any strategic advice to clients."[43]

---

[41] MURs 7524, 7553, 7558.

[42] *See generally* Angle Aff., Kovatch Aff., Roberts Aff. For example, OGC makes much of Mr. Angle's name being on a purchase order for ads that ran in October 2016 for the National Rifle Association-Institute for Legislative Action, even though Mr. Angle at that time had switched from placing ads for the NRA in September 2016 to taking on the Trump committee as a client. (Our regulations permit this: they only impose restrictions on an individual moving in the opposite direction, such as moving from a candidate committee to an outside group. 11 C.F.R. § 109.21(d)(5).)

But Mr. Angle's affidavit explains this seeming discrepancy. He bought the NRA-ILA ads in advance of the switch, "on August 25, 2016," Angle Aff. at ¶ 8, and upon changing clients, he proceeded to abide by the firewall policy and never shared any information about his work for the NRA with the Trump campaign. *Id.* at ¶¶ 5-6.

[43] Roberts Aff. at ¶ 5. The substantive and attested responses we received regarding Ms. Kowalski make plain just how absurd it would be to use her employment at National Media as a hook to open an investigation into any respondent. As counsel for Respondents noted, literally "[n]one of the

9

While OGC tried to explain away these sworn statements by speculating that the affidavits might not be as comprehensive as they are, the Act does not permit us to proceed on an "RTB-of-the-gaps" approach to law enforcement. It is also worth noting, publicly, that there is a distinct lack of evidence that Ms. Kowalski, a very junior employee, served a key role in a conspiracy to evade federal election laws. Public suggestions to the contrary are the sort of casual cruelty that results when complaints, even when filed in good faith, are not subjected to adequate scrutiny by this Commission.

3. Propinquity

Finally, OGC notes that NRA ads often ran on stations around the same time as Trump or Hawley ads, and it characterizes this as "additional support" for its case.[44]

This suggestion blinks reality. The mere fact that Republican candidates and Republican-leaning independent groups would advertise, for example, during the same major college football games, is hardly evidence of illegal coordination. Rather, it shows that Republican candidates and Republican-aligned independent groups know that Republican voters watch college football. It would be odd if this were not the case, and such "coincidences" do not provide a sound basis for a federal agency finding reason to believe and initiating an invasive investigation.

III. CONCLUSION

There is signal and there is noise. These Matters involved the latter.

After a thorough review of the record, including responses from counsel for the respondents and sworn statements by individuals implicated in the complaints, we could not support OGC's RTB recommendations because "'[p]urely speculative

---

referenced documents" in the complaint, which were relied on by OGC, "establish, or *even suggest*, that Ms. Kowalski was in any way involved with the development of media strategy, including the selection or purchasing of advertising slots, the selection of audiences, the development of communication content, or the provision of media advice. The documents reflect only that Ms. Kowalski, at some point in time, performed administrative duties on behalf of National Media." National Media Resp. (MUR 7553) at 16-17, Jan. 28, 2019 (emphasis supplied).

[44] FGCR (MURs 7427 *et al.*) at 19.

10

charges…accompanied by…direct refutation[s]"[45] cannot "form an adequate basis to find a reason to believe.'"[46]

      We voted accordingly.

_____      December 23, 2021
Allen Dickerson                                                    Date
Vice Chair

_____      December 23, 2021
James E. "Trey" Trainor, III                      Date
Commissioner

---

[45] Statement of Reasons of Comm'rs Hunter, McGahn, and Petersen at 5, MUR 6296 (Buck) (quoting First General Counsel's Report in MUR 5467 (Michael Moore) at 5).

[46] *Id.*

11