# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| GIFFORDS,<br><br>                    Plaintiff,<br>     v.<br><br>NATIONAL RIFLE ASSOCIATION OF<br>AMERICA POLITICAL VICTORY FUND,<br>*et al.*,<br><br>              Defendants. | No. 21-cv-2887-LLA |

**PLAINTIFF'S COMBINED MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO ALL DEFENDANTS' MOTIONS TO DISMISS**

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

BACKGROUND .................................................................................................................4

   I.    Defendants' Violations of FECA.................................................................................4

       A.     FECA's Prohibition on "Common Vendor" Coordination Schemes.................4

       B.     Defendants' Common-Vendor Coordination Scheme.........................................5

       C.     Giffords's Injuries Caused by Defendants' FECA Violations............................6

       D.     This Case's Procedural History..........................................................................8

   II.    *Giffords v. FEC*: The "Contrary-to-Law" Court's Authorization of This Case ...........8

       A.     *Giffords v. FEC*'s Legal Background .................................................................9

           1.     The FEC and Its Enforcement Process .................................................9

           2.     The Effect of Deadlocked FEC Votes ................................................11

           3.     Confidentiality of Pending FEC Enforcement Proceedings .............12

           4.     Judicial Review of FEC Dismissals or Delay ...................................12

           5.     FECA Citizen Suits ............................................................................14

       B.     *Giffords v. FEC*'s Procedural Background ....................................................16

           1.     Giffords's FEC Complaints and Suit Against the FEC .....................16

           2.     Citizen-Suit Precondition 1: *Giffords v. FEC*'s Declaration of the
                FEC's Delay as Contrary to Law ......................................................18

           3.     Citizen-Suit Precondition 2: *Giffords v. FEC* Finds that the FEC
                Failed to Conform ............................................................................19

           4.     The NRA Intervenes to Unseal the Judicial Record .........................20

           5.     The NRA's FOIA Lawsuit Against the FEC .....................................20

           6.     The FEC's August 2022 Dismissal and Release of the Enforcement
                File ...................................................................................................21

           7.     The NRA Moves Under Rule 60(b)(4) Years After Judgment..........22

LEGAL STANDARDS .....................................................................................................22

ARGUMENT.....................................................................................................................23

   I.    Giffords's Claims Are Not Barred by Any Statute of Limitations................................23

       A.     The NRA Fails to Establish an Applicable Limitations Period........................24

       B.     This Suit Was Timely Filed Within Section 2462's Limitations Period ..........24

       C.     Section 2462 Would Not Bar Giffords's Claims for Equitable Relief.............26

II.    This Court Has Personal Jurisdiction Over Matt Rosendale for Montana...................28

    A.    The Rosendale Campaign's FEC Filings Support Jurisdiction........................29

    B.    Jurisdiction Is Proper Based on the Campaign's Fundraising in the District ..30

III.    Giffords Has Standing..............................................................................................32

    A.    Giffords Has Informational Standing................................................................33

        1.    Defendants Have Not Disclosed the Dates, Amounts,
and Purposes of the Coordinated Expenditures, Which FECA
Requires ...............................................................................................33

        2.    The Dates, Amounts, and Purposes of the
Coordinated Expenditures Are Not Mere Legal Conclusions...........35

    B.    Giffords Has Competitor Standing ...................................................................38

IV.    Defendants Cannot Relitigate *Giffords v. FEC* .......................................................45

    A.    Defendants Do Not Dispute that Giffords Has Sufficiently Pleaded
It Satisfied FECA's Preconditions to File this Citizen Suit.............................45

    B.    This Court Lacks Jurisdiction to Review and Void *Giffords v. FEC* ...............46

    C.    Issue Preclusion Prevents Defendants from Relitigating *Giffords v. FEC*.......49

V.    *Giffords v. FEC* Was Correctly Decided ..................................................................52

    A.    *Giffords v. FEC* Correctly Held the FEC's Failure to Act Was Contrary
to Law Despite Its February 2021 Deadlocked Reason-to-Believe Vote.........52

    B.    *Giffords v. FEC* Correctly Held the FEC Failed to Conform Despite Its
October 2021 Deadlocked Vote to Close the File .............................................54

    C.    *45Committee* Confirms that *Giffords v. FEC* Was Correctly Decided............ 54

        1.    *45Committee* Confirms that Deadlocked FEC Votes Do Not
Dismiss or Otherwise Terminate FEC Enforcement Actions...........55

        2.    *45Committee* Confirms that Deadlocked FEC Reason-to-Believe
Votes Do Not Preclude a Court Finding FEC Delay Contrary to Law
...............................................................................................................58

            i.    *45Committee* Hinged on that Case's Particular Order Requiring
the FEC to Conform by Taking *Any* Action ...................................59

            ii.    *45Committee* Affirms Longstanding Caselaw Holding
that FEC Delay Can Be Contrary to Law Even Where
the Agency Has *Successfully* Voted to Find Reason to Believe.....61

            iii.    *45Committee* Indicates Pre-conformance Period Reason-to-Believe
Votes Do Not Preclude a Contrary-to-Law Finding ......................63

        3.    *45Committee* Does Not Support the Hawley Committee's Claim that
the FEC Conformed by Deadlocking on a Vote to Close the File ... 64

CONCLUSION.............................................................................................................65

# TABLE OF AUTHORITIES

**Cases**                                                                                              **Pages**

*Air Excursions LLC v. Yellen*, 66 F.4th 272 (D.C. Cir. 2023) .......................................................45

*Air Line Pilots Association, International v. Chao*, 889 F.3d 785 (D.C. Cir. 2018) .....................41

*Akhmetshin v. Browder*, 275 A.3d 290 (D.C. 2022).............................................................29, 30

*American Action Network v. Cater America, LLC*, 983 F. Supp. 2d 112 (D.D.C. 2013)..............28

*Ashbourne v. Hansberry*, 302 F. Supp. 3d 338 (D.D.C. 2018)......................................................24

*Association of Data Processing Service Orgs., Inc. v. Camp*, 397 U.S. 150 (1970)....................38

*Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204 (D.C. Cir. 2022)..................................................28

*Banks v. Chesapeake & Potomac Telephone Company*, 802 F.2d 1416 (D.C. Cir. 1986)............26

*Bigelow v. Garrett*, 299 F. Supp. 3d 34 (D.D.C. 2018)................................................................32

*Brady Campaign to Prevent Gun Violence United with the Million Mom March v. Ashcroft*,
   339 F. Supp. 2d 68 (D.D.C. 2004) ...........................................................................................42

*Buchanan v. FEC*, 112 F. Supp. 2d 58 (D.D.C. 2000) ..................................................................39

*Buckley v. Valeo*, 424 U.S. 1 (1976) ...............................................................................................4

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) ................................................................29

*Campaign Legal Center v. 45Committee*,
   118 F.4th 378 (D.C. Cir. 2024)...8, 9, 10, 11, 12, 14, 16, 49, 50, 52, 53, 55, 56, 57, 59, 60, 61,
   63, 64, 65

*Campaign Legal Center v. FEC*, 2021 WL 5178968 (D.D.C. Nov. 8, 2021) ...............................62

*Campaign Legal Center v. FEC*, 31 F.4th 781 (D.C. Cir. 2022)
   (“*Correct the Record*”)........................................................................33, 36, 37, 38, 58

*Campaign Legal Center v. FEC*, 312 F. Supp. 3d 153 (D.D.C. 2018)..........................................15

*Campaign Legal Center v. FEC*, 334 F.R.D. 1 (D.D.C. 2019) ......................................................48

*Campaign Legal Center v. FEC*, 952 F.3d 352 (D.C. Cir. 2020)..................................................33

*Campaign Legal Center v. Iowa Values*, 573 F. Supp. 3d 243 (D.D.C. 2021).......14, 15, 16, 27, 52

*Canonsburg General Hospital v. Burwell*, 807 F.3d 295 (D.C. Cir. 2015)...................................51

*Celotex Corp. v. Edwards*, 514 U.S. 300 (1995)......................................................................46, 47

*Cement Kiln Recycling Coalition v. EPA*, 255 F.3d 855 (D.C. Cir. 2001) ..............................38, 43

*Chamber of Commerce of U.S. v. FEC*, 69 F.3d 600 (D.C. Cir. 1995) .........................................41

*Citizens for Percy ’84 v. FEC*, No. 84-2653, 1984 WL 6601 (D.D.C. Nov. 19, 1984) ...........61, 62

*Citizens for Resp. & Ethics in Washington v. American Action Network*,
   410 F. Supp. 3d 1 (D.D.C. 2019)..........................................................................14, 24, 25, 26

*Citizens for Responsibility & Ethics in Washington v. FEC*, 55 F.4th 918 (D.C. Cir. 2022)........12

*Citizens for Responsibility & Ethics in Washington v. FEC*,
    236 F. Supp. 3d 378 (D.D.C. 2017) ...................................................................56

*Citizens for Responsibility & Ethics in Washington v. FEC*, 799 F. Supp. 2d 78 (D.D.C. 2011) ..56

*Citizens for Responsibility & Ethics in Washington v. FEC*, 892 F.3d 434 (D.C. Cir. 2018) ........56

*Citizens for Responsibility & Ethics in Washington v. FEC*, 971 F.3d 340 (D.C. Cir. 2020) ........56

*Citizens for Responsibility & Ethics in Washington v. FEC*, 993 F.3d 880 (D.C. Cir. 2021)
    ("*New Models*") ................................................................................................56

*Citizens for Resp. & Ethics in Washington v. FEC*, No. 22-cv-3281-CRC, 2023 WL 6141887
    (D.D.C. Sept. 20, 2023) ...............................................................................10, 12

*Citizens United v. FEC*, 558 U.S. 310 (2010) ................................................................44

*Combat Veterans for Cong. Pol. Action Comm. v. FEC*, 983 F. Supp. 2d 1 (D.D.C. 2013) ...........9

*Combat Veterans for Cong. Pol. Action Comm. v. FEC*, 795 F.3d 151 (D.C. Cir. 2015) ...............9

*Common Cause v. FEC*, 489 F. Supp. 738 (D.D.C. 1980) ................................14, 53, 62

*Common Cause v. FEC*, 842 F.2d 436 (D.C. Cir. 1988) .................................................13

*Common Cause v. Bolger*, 512 F. Supp. 26 (D.D.C. 1980) ...........................................41

*Consolidated Edison Co. of N.Y. v. Bodman*, 449 F.3d 1254 (D.C. Cir. 2006) .......................51

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799 (2024)...........................24

*Doe v. Roman Cath. Diocese of Greensburg*, 581 F. Supp. 3d 176 (D.D.C. Jan. 24, 2022)...........28

*Doe, 1 v. FEC*, 920 F.3d 866 (D.C. Cir. 2019) ...............................................................56

*DSCC v. FEC*, No. CIV.A. 95-0349 (JHG), 1996 WL 34301203 (D.D.C. Apr. 17, 1996)......15, 63

*Env't Rsch. Int'l, Inc. v. Lockwood Greene Eng'rs, Inc.*, 355 A.2d 808 (D.C. 1976) .............29, 30

*FC Inv. Grp. LC v. Lichtenstein*, 441 F. Supp. 2d 3 (D.D.C. 2006) ...............................28

*FEC v. Akins*, 524 U.S. 11 (1998) ...............................................................33, 34, 35

*FEC v. Christian Coal.*, 965 F. Supp. 66 (D.D.C. 1997)..............................................27

*FEC v. Nat'l Republican Senatorial Comm.*, 877 F. Supp. 15 (D.D.C. 1995) ("*NRSC*") .............27

*FEC v. Rose*, 806 F.2d 1081 (D.C. Cir. 1986)................................................14, 53, 62

*Firestone v. Firestone*, 76 F.3d 1205 (D.C. Cir. 1996)..................................................24

*Forras v. Rauf*, 812 F.3d 1102 (D.C. Cir. 2016)..........................................................28

*Gottlieb v. FEC*, 143 F.3d 618 (D.C. Cir. 1998) ....................................................41, 42, 44

*GTE New Media Servs., Inc. v. BellSouth Corp.*, 199 F.3d 1343 (D.C. Cir. 2000).......................32

*Hardin v. Kentucky Utility Co.*, 390 U.S. 1 (1968) ......................................................38

*Heck v. Humphrey*, 512 U.S. 477 (1994) ....................................................................46

*Heritage Action for America v. FEC*, 682 F. Supp. 3d 62 (D.D.C. 2023).............................12, 56

*Herrera v. Wyoming*, 587 U.S. 329 (2019)......................................................................50

*In re National Congressional Club*, Nos. 84-5701, 84-5719,
    1984 WL 148396 (D.C. Cir. Oct. 24, 1984) ...............................................................14

*Jones v. Supreme Court of U.S.*, 405 F. App'x 508 (D.C. Cir. 2010)............................47

*Jordan v. FEC*, 68 F.3d 518 (D.C. Cir. 1995) ..............................................................56

*\*Klayman v. Rao*, 49 F.4th 550 (D.C. Cir. 2022)...........................................46, 48, 49

*Kokesh v. SEC*, 581 U.S. 455 (2017) ...........................................................................27

*La Botz v. FEC*, 889 F. Supp. 2d 51 (D.D.C. 2012).......................................................39

*Licci ex rel. Licci v. Lebanese Canadian Bank*, 732 F.3d 161 (2d Cir. 2013)...............31

*Louisiana Energy & Power Authority v. FERC*, 141 F.3d 364 (D.C. Cir. 1998)..........43

*Naartex Consulting Corp. v. Watt*, 722 F.2d 779 (D.C. Cir. 1983) ................................30

*Nader v. FEC*, 725 F.3d 226 (D.C. Cir. 2013) .......................................................39, 42

*Natural Law Party of the U.S. v. FEC*, 111 F. Supp. 2d 33 (D.D.C. 2000) ........39, 41, 43, 44

*Okolie v. Future Servs. Gen. Trading & Contracting Co., W.L.L.*,
    102 F. Supp. 3d 172 (D.D.C. 2015)............................................................................22

*Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979)....................................................51

*RELX, Inc. v. Baran*, 397 F. Supp. 3d 41 (D.D.C. 2019)..............................................22

*Riordan v. S.E.C.*, 627 F.3d 1230 (D.C. Cir. 2010).......................................................27

*Rogers v. Amalgamated Transit Union Local 689*, 98 F. Supp. 3d 1 (D.D.C. 2015)....................52

*SEC v. Carrillo*, 115 F.3d 1540 (11th Cir. 1997)...........................................................31

*SEC v. Graham*, 823 F.3d 1357 (11th Cir. 2016) ..........................................................27

*\*Shays v. FEC*, 414 F.3d 76 (D.C. Cir. 2005) ...........................................32, 38, 39, 40, 41, 42, 43

*Sherley v. Sebelius*, 610 F.3d 69 (D.C. Cir. 2010)..........................................................44

*Shoppers Food Warehouse v. Moreno*, 746 A.2d 320 (D.C. 2000) ................................30

*Smith v. United States*, 518 F. Supp. 2d 139 (D.D.C. 2007) .........................................46

*Spannaus v. FEC*, 990 F.2d 643 (D.C. Cir. 1993)..........................................................56

*Spannaus v. U.S. Dep't of Justice*, 824 F.2d 52 (D.C. Cir. 1987) ..................................25

*Telecommunications Research & Action Center v. FCC*,
    750 F.2d 70 (D.C. Cir. 1984) ("*TRAC*")....................................................................14

*Tyes-Williams v. Whitaker*, 361 F. Supp. 3d 1 (D.D.C. 2019)........................................23

*U.S. Telecommunications Association v. FCC*, 295 F.3d 1326 (D.C. Cir. 2002)............43

*United States v. Cinergy Corp.*, 397 F. Supp. 2d 1025 (S.D. Ind. 2005)........................27

*United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669 (1973)......42

*Ventura v. BEBO Foods, Inc.*, 595 F. Supp. 2d 77 (D.D.C. 2009) ..................................................31

*Wertheimer v. FEC*, 268 F.3d 1070 (D.C. Cir. 2001) .......................................................36

**Statutes, Codes, and Rules**

5 U.S.C. § 706(1) ..................................................................................................13

11 C.F.R. § 5.4(a)(4) ...........................................................................................10

11 C.F.R. § 109.21(b) .......................................................................................4, 33

28 U.S.C. § 2462 ...............................................................................................24

52 U.S.C. § 30104 .............................................................................................33

52 U.S.C. § 30104(a) .........................................................................................34

52 U.S.C. § 30104(b)(6)(B)(iv) .......................................................................33, 34

52 U.S.C. § 30106(a)(1) .......................................................................................9

52 U.S.C. § 30106(c) .........................................................................................10

52 U.S.C. § 30107(a)(6) ....................................................................................13

52 U.S.C. § 30109(a)(1) .................................................................................13, 38

52 U.S.C. § 30109(a)(2) .................................................................................10, 57

52 U.S.C. § 30109(a)(3) ....................................................................................10

52 U.S.C. § 30109(a)(4)(A)(i) ...........................................................................10

52 U.S.C. § 30109(a)(6)(A) ...............................................................................10

52 U.S.C. § 30109(a)(8) .............................................................................10, 30, 48

52 U.S.C. § 30109(a)(8)(A) ...............................................................................13

52 U.S.C. § 30109(a)(8)(C) ..............................................................13, 14, 47, 48, 61

52 U.S.C. § 30109(a)(9) ....................................................................................47

52 U.S.C. § 30109(a)(12)(B) .............................................................................12

52 U.S.C. § 30109(d)(1)(A) ...............................................................................12

52 U.S.C § 30116(a)(1) .......................................................................................4

52 U.S.C § 30116(a)(1)(C) ..................................................................................4

52 U.S.C § 30116(a)(7)(B) ...............................................................................4, 33

52 U.S.C § 30118(a) ...........................................................................................4

D.C. Code § 13-423(a)(1) ...................................................................................28

**Other Authorities**

Amended FEC Certification, MUR 7486 (Aug. 14, 2020), https://perma.cc/NW87-4UBK.........57

Appellee Brief, *Correct the Record*, No. 21-5081 (D.C. Cir. Aug. 18, 2021) ................................37

Correct the Record, Schedule B (FEC Form 3X) (filed Apr. 15, 2017),
    https://perma.cc/B2ED-58UY ........................................................................37

FEC Action Policy, 89 Fed. Reg. ..................................................................................11

FEC Certification, MUR 7486 (Dec. 7, 2021), https://perma.cc/5ZNK-ESKT...........................57

FEC Certification, MURs 7427, 7497, 7524, & 7553 (Aug. 31, 2022),
    https://perma.cc/275U-27HA .......................................................................21

FEC Certification, MURs 7427, 7497, 7524, 7553 & 7621 (Oct. 27, 2021),
    https://perma.cc/Z5MF-Z54Y. ...........................................................19, 21, 54

FEC Public Record re: MUR 7427, https://www.fec.gov
    /data/legal/matter-under-review/7427/................................................................21

FEC Public Record re: MUR 7497,
    https://www.fec.gov/data/legal/matter-under-review/7497/. .................................21

FEC Public Record re: MUR 7524,
    https://www.fec.gov/data/legal/matter-under-review/7524/...................................21

FEC Public Record re: MUR 7553,
    https://www.fec.gov/data/legal/matter-under-review/7553/. .................................21

Giffords PAC, Schedule B (FEC Form 3X) (June 20, 2018), https://perma.cc/DRM5-QZY6. ....40

Giffords PAC, Schedule B (FEC Form 3X) (Mar. 20, 2023), https://perma.cc/7DDA-JMH6......40

Hearing Transcript, *End Citizens United PAC v. FEC*,
    No. 22-5277 (D.C. Cir. Feb. 25, 2025) ........................................................64

Joint Report and Proposed Scheduling Order, *NRA v. FEC*, No. 22-cv-1017-EGS
    (D.D.C. Aug. 15, 2022), ECF No. 19 ............................................................20

Matt Rosendale for Montana, Schedule B (FEC Form 3) (Oct. 1-16, 2018),
    https://perma.cc/9ATY-Y4BB. .....................................................................32

Matt Rosendale for Montana, Statement of Organization (FEC Form 1) (Apr. 3, 2018),
    https://perma.cc/583K-L5H6. .....................................................................31

Matt Rosendale, Statement of Candidacy (FEC Form 2) (Feb. 24, 2024),
    https://perma.cc/77YV-ZAYC. ....................................................................40

*Montana Senate 2018 Race*, OpenSecrets, https://www.opensecrets.org/races/
    contributors?cycle=2018&id=MTS1&spec=N......................................................31, 32

National Rifle Association Institute for Legislative Action, Schedule 5-E (FEC Form 5) (Oct. 11,
    2018), https://perma.cc/6K7R-RD7L...............................................................40

National Rifle Association of America Political Victory Fund, Form 3X, FEC Schedule E (filed
    Oct. 25, 2018), http://docquery.fec.gov/cgi-bin/fecimg/?201810259131064941...................38

National Rifle Association of America Political Victory Fund, Schedule B (FEC Form 3X) (Aug.
    20, 2022), https://perma.cc/KAX4-FGTT. .......................................................40

National Rifle Association of America Political Victory Fund, Schedule E (FEC Form 3X), at
    1189 (Oct. 20, 2020), https://perma.cc/DG54-MPZ3..........................................40

National Rifle Association of America Political Victory Fund, Schedule E (FEC Form 3X) (Nov. 21, 2024), https://perma.cc/3GLH-GVNT................................................................40

Order, *Campaign Legal Center v Heritage Action for America*, No. 23-7107 (D.C. Cir. Jan. 15, 2025) .......................................................................................56, 57

Press Release, FEC, Dara Lindenbaum sworn in as Commissioner (Aug. 2, 2022), https://perma.cc/Q7U3-LJ85.....................................................................................21

Shane Goldmacher, *Democrats' Improbable New F.E.C. Strategy: More Deadlock Than Ever*, N.Y. Times (June 8, 2021), https://www.nytimes.com/2021/06/08/ us/politics/fec-democrats-republicans.html ..........................................................16

Statement of FEC Commissioner Ellen L. Weintraub, *On the Voting Decisions of FEC Commissioners* (Oct. 4, 2022), https://perma.cc/9LRY-3Z5E. ................................11

## INTRODUCTION

Plaintiff Giffords is a gun-safety organization that, among its other goals, works to oppose the National Rifle Association and the federal candidates it supports. In this lawsuit, Giffords seeks to remedy the injuries it suffers from an ongoing scheme by two National Rifle Association entities to illegally contribute up to tens of millions of dollars in excessive and unreported campaign contributions to several federal candidates, including Josh Hawley and Matt Rosendale. The relief sought would vindicate Giffords's statutory right to complete and accurate information about Defendants' campaign finance activity and end the competitive disadvantage Giffords is suffering due to Defendants' violations of the Federal Election Campaign Act ("FECA").

Defendants—the National Rifle Association entities (a political committee called the National Rifle Association of America Political Victory Fund ("NRA-PVF") and a 501(c)(4) corporation called the National Rifle Association of America Institute for Legislative Action ("NRA-ILA") (collectively, "NRA")), Josh Hawley for Senate ("Hawley Campaign"), and Matt Rosendale for Montana ("Rosendale Campaign")—have each moved to dismiss. No Defendant disputes that Giffords's allegations detailing the scheme successfully state claims for violations of FECA. Instead, Defendants variously claim that some of Giffords's claims are time barred, challenge this Court's jurisdiction, and attempt to collaterally attack the ruling in *Giffords v. FEC*, No. 19-cv-1192-EGS (D.D.C.), which authorized Giffords to file this FECA citizen suit. The Court should reject each of these arguments and deny the motions.

*First*, Giffords's claims are not time barred, as the NRA asserts. FECA contains no statute of limitations, and the NRA has not demonstrated that the catch-all five-year statute of limitations applicable to Federal Election Commission ("FEC") lawsuits enforcing FECA also applies to citizen suits like this one. Even assuming it does, Giffords's suit is timely because the five-year period could not have begun to run until the date Giffords's claim accrued: November 1, 2021—

1

the date FECA first allowed Giffords to sue. Giffords promptly filed suit the next day. And regardless of when the statute began to run, it cannot bar injunctive and declaratory relief.

*Second*, the Rosendale Campaign's Rule 12(b)(2) motion should be denied. The Rosendale Campaign, which exists for the purpose of winning elections for federal office in Washington, D.C., filed false campaign finance reports with the FEC in the District of Columbia. The Rosendale Campaign also raised funds that are connected to the illegal contribution scheme in the District of Columbia, while maintaining a D.C.-based bank account. Each of these contacts is sufficient to establish personal jurisdiction.

*Third*, Giffords has standing in two respects. Giffords has informational standing because Defendants failed to report the illegal coordinated contributions at issue to the FEC as required by FECA. As a result, Defendants deprived Giffords of the accurate disclosure of information that Giffords is entitled to under FECA, and which helps Giffords in deciding which candidates to support (and oppose), developing reports and messaging, advocating policies, mobilizing voters, and educating and supporting candidates. Defendants' claim that Giffords already has all the information FECA requires is baseless in light of their admissions that they have not reported the contributions Giffords alleges, including the details about such contributions that FECA requires.

Although Giffords's informational injury is sufficient for standing to pursue its claims, Giffords also has competitor standing. Defendants' illegal scheme injures Giffords as a competitor of the NRA affiliates and their preferred candidates, not only in terms of raising and spending funds, but also in electing candidates who support its policy goals. While the NRA affiliates have illegally contributed vast sums to their preferred candidates, including the Defendant candidate campaigns, Giffords has no legal way of obtaining the same financial and electoral benefits, which denies Giffords its statutory right to a FECA-regulated competitive political environment.

Defendants' assertions that political competitor standing is limited only to candidates challenging FEC regulations has no basis in the law.

*Fourth*, Defendants' Rule 12(b)(6) motions should be denied because they improperly seek to relitigate the ruling in *Giffords v. FEC* authorizing this citizen suit. At the outset, Defendants do not dispute that Giffords has sufficiently pleaded that it satisfied the citizen-suit preconditions in *Giffords v. FEC* and so the truth of those allegations must be accepted for purposes of Defendants' motions. But even if Defendants could assert a factual challenge under Rule 12(b)(6), it should be rejected. This Court lacks jurisdiction to grant Defendants' request to effectively reverse the ruling of a sister district court by dismissing this lawsuit on the ground that *Giffords v. FEC* was wrongly decided. Not only that, but issue preclusion also stands in the way of Defendants' attempt to relitigate *Giffords v. FEC*, and Defendants plainly do not qualify for the narrow exception recently recognized by the D.C. Circuit in *CLC v. 45Committee* for situations where new material facts come to light after a default judgment in the predicate lawsuit against the FEC.

*Finally*, and in any event, *Giffords v. FEC* was correctly decided. Defendants incorrectly assert that *Giffords v. FEC* erred in concluding that the FEC failed to act because, in their view, the FEC had allegedly already dismissed or sufficiently acted on Giffords's administrative complaints seven months earlier when it deadlocked in a series of votes on whether to find "reason to believe" Defendants violated FECA. But the *Giffords v. FEC* court was well aware of those votes when it correctly concluded that the FEC's failure to act was contrary to law notwithstanding the votes. *45Committee*, on which Defendants principally rely, clarified and restated long-standing principles regarding FECA's requirements for citizen suits. Far from undermining the *Giffords v. FEC* decision, however, *45Committee* confirms that *Giffords v. FEC* correctly held that Giffords satisfied FECA's citizen-suit preconditions. Defendants' motions to dismiss should be denied.

# BACKGROUND

## I.    Defendants' Violations of FECA

### A.    FECA's Prohibition on "Common Vendor" Coordination Schemes

Congress enacted FECA in response to the Watergate scandal and the "deeply disturbing" reports from the 1972 federal elections of contributors giving large amounts of money to candidates "to secure a political quid pro quo." *Buckley v. Valeo*, 424 U.S. 1, 26-27 (1976) (per curiam). To "limit the actuality and appearance of corruption resulting from large individual financial contributions," *id.* at 26, FECA limits the dollar amounts of contributions to federal candidates and prohibits corporations from contributing any amount from their treasury funds, 52 U.S.C §§ 30116(a)(1), 30118(a). Relevant here, FECA's limit on individual contributions to candidates was $2,600 per election in the 2014 cycle, and $2,700 per election in the 2016 and 2018 cycles. The limit on political committee contributions to candidates in those cycles was $5,000 per calendar year. *Id.* § 30116(a)(1)(C). FECA also generally requires disclosure of the sources and amounts of contributions to candidates to deter corruption and inform voters who is spending (and how much) to influence their vote. *See Buckley*, 424 U.S. at 66-67.

One type of contribution that is subject to FECA's source and amount restrictions and reporting requirements is a "coordinated expenditure"—an expenditure "made by any person in cooperation, consultation, or concert with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents." 52 U.S.C. § 30116(a)(7)(B). Coordinated expenditures include communications coordinated through a common vendor. *See* 11 C.F.R. § 109.21(b). Common-vendor coordination occurs when a person or entity pays a commercial vendor to create an advertisement expressly advocating for a candidate, the vendor has provided

services or advice to the candidate in the last 120 days, and the vendor uses or conveys information received from the candidate that is material to the creation of the advertisement. *See id.* § 109.21.

**B.    Defendants' Common-Vendor Coordination Scheme**

Starting as early as 2014, The NRA and candidates it supports have engaged in an ongoing scheme to evade FECA's limitations by using a series of shell corporations to surreptitiously and illegally coordinate advertising. *See* Am. Compl. ¶¶ 2, 4, 63-141, ECF No. 81 ("Am. Compl."). Through this scheme, the NRA made up to $35 million in illegal, excessive, and unreported campaign contributions across the 2014, 2016, and 2018 elections, including to the Rosendale Campaign and the Hawley Campaign (the "Candidate Defendants"). *See* Am. Compl. ¶¶ 2-4, 63-141. These coordinated contributions violate FECA's contribution limits, corporate contribution ban, and disclosure requirements. *See* Am. Compl. ¶¶ 2, 156-180.

The NRA coordinated with several candidates for federal office, including the Candidate Defendants, by contracting with a common vendor. *See, e.g.*, Am. Compl. ¶¶ 4, 86-141. Under the common-vendor scheme, the NRA and the candidates purchased advertisements through the political consulting firm OnMessage/Starboard, which operates as "OnMessage" when it acts on behalf of candidates and as "Starboard" when it acts on behalf of the NRA. *See, e.g.*, Am. Compl. ¶¶ 4, 64-74. Likewise, the NRA and the candidates placed campaign ads through a vendor named National Media, which purports to operate as "American Media and Advertising Group" ("AMAG") when it acts on behalf of candidates and "Red Eagle" when it acts on behalf of the NRA Defendants. *See, e.g.*, *id.* OnMessage/Starboard and National Media/Red Eagle/AMAG are functionally indistinguishable. *See, e.g.*, Am. Compl. ¶¶ 4-5, 76, 103. They are led by the same people, located at the same address, and have no internal separation or firewall between the staff

who work for each entity. *See, e.g.*, *id.* Indeed, the same staff performed work for both the NRA and the campaigns during the same election cycles. *See, e.g.*, Am. Compl. ¶¶ 5, 76, 126.

### C.     Giffords's Injuries Caused by Defendants' FECA Violations

Giffords is a nonpartisan, nonprofit 501(c)(4) organization headquartered in Washington, D.C., that is dedicated to saving lives from gun violence. Am. Compl. ¶ 14. Giffords exists in part to compete with the NRA and the candidates and policies the NRA supports. Am. Compl. ¶¶ 15-19, 22. Giffords has been, and continues to be, injured by the NRA Defendants' illegal campaign contributions. *See, e.g.*, Am. Compl. ¶¶ 6, 14-35, 41-44. Giffords directly opposed the campaigns of several of the candidates who participated in the NRA scheme, and who benefited from the NRA's illegal contributions, including Representative Rosendale and Senator Hawley. Am. Compl. ¶ 22-32, 38-44. Giffords's affiliated political committee ("PAC") contributed $2,500 to Representative Rosendale's 2018 Senate race opponent Jon Tester, and $5,000 to Senator Hawley's 2018 opponent Claire McCaskill. Am. Compl. ¶ 24-25. Giffords also continues to engage in legislative advocacy for positions that the NRA's beneficiaries have opposed while in office, and against positions that the NRA's beneficiaries have supported. Am. Compl. ¶¶ 15-19, 33-34. By violating FECA's contribution limits, source restrictions, and disclosure requirements, the NRA received the unlawful economic benefit of being able to make as much as $35 million in contributions to candidates, while the Rosendale and Hawley Campaigns obtained the unlawful economic benefit of accepting up to $383,196 and up to almost $1 million in contributions respectively. Am. Compl. ¶¶ 25, 130, 133. Giffords is injured by the competitive advantages the NRA and the Candidate Defendants have obtained by flouting campaign-finance laws. *See* Am. Compl. ¶¶ 6, 18-19, 23-35, 38-44, 130, 133.

Giffords continued competing with the NRA and their favored candidates, including the Candidate Defendants, in the 2022 and 2024 election cycles, and intends to do so in the future. *See* Am. Compl. ¶¶ 14-35, 41-42. For example, Giffords is competing with the NRA in 2026, and Giffords and Giffords PAC plan to support candidates who run on gun safety platforms likely opposed by the NRA, potentially including direct contributions and independent activity in federal and state races across the country. *See* Am. Compl. ¶¶ 32. The competitive fundraising advantage that the Candidate Defendants enjoy over the candidates supported by Giffords as a result of the illegal contributions from the NRA "forces Plaintiff to spend its resources countering its opponents' illegally raised funds." Am. Compl. ¶ 42; *see also id*. ¶¶ 23-37, 44.

In addition, Giffords relies on accurate information being included in FEC reports to further its mission of "saving lives from gun violence," by (1) "research[ing], writ[ing], and propos[ing] policies designed to reduce gun violence"; (2) "mobiliz[ing] voters and lawmakers in support of safer gun laws"; (3) "educat[ing] political candidates about issues and policies related to gun violence"; and (4) "support[ing] candidates for local, state, and federal office who favor strong gun-violence-prevention laws." Am. Compl. ¶¶ 14-15; *see also id.* ¶¶ 45-51. Specifically, Giffords reviews and tracks NRA spending to make strategic decisions regarding how it competes with the NRA, including where to spend its own resources; develop messaging about the NRA's activities and support for candidates; determine whether to file FEC complaints, and in its public website, reports, blog posts and social media. Am. Compl. ¶¶ 46-50. In making these decisions, Giffords relies on the accuracy and completeness of FEC filings and is thereby injured by Defendants' violations because they deny Giffords campaign finance information to which it is entitled under FECA and which would help with its activities. Am. Comp. ¶¶ 48-51.

### D.    This Case's Procedural History

On November 2, 2021, Giffords filed this civil action against Defendants under 52 U.S.C. § 30109(a)(8)(C). *See* ECF No. 1. Defendants moved to dismiss in January 2022 and Giffords opposed. *See* ECF Nos. 30-31, 35, 41. While those motions were pending, on February 13, 2024, the Court stayed this matter pending the D.C. Circuit's resolution of *Campaign Legal Ctr. v. 45Committee, Inc.*, No. 23-7040 (D.C. Cir), *see* Minute Order (Feb. 13, 2024), which was decided on October 8, 2024. On December 17, 2024, the Court lifted its stay and denied the pending motions to dismiss without prejudice to new briefing incorporating *45Committee* and other intervening legal developments. *See* Minute Order (Dec. 17, 2024). Giffords filed its amended complaint on January 15, 2025. ECF No. 81. On March 7, 2025, all three Defendants filed renewed motions to dismiss. ECF Nos. 83-85.

## II.    *Giffords v. FEC*: The "Contrary-to-Law" Court's Authorization of This Case

More than three years ago, on November 1, 2021, the district court in *Giffords v. FEC*, No. 19-cv-1192-EGS (D.D.C. Nov. 1, 2021), ECF No. 75 ("*Giffords v. FEC*" or the "contrary-to-law" action),[1] authorized this FECA citizen suit by holding that Giffords had satisfied FECA's private-right-of-action preconditions. *See* Am. Compl. ¶¶ 9, 154. Those preconditions are: "(i) a court must declare that the Commission's failure to act on a complaint . . . is contrary to law and must order the Commission to conform with that declaration; and (ii) the Commission must fail to timely conform with that declaration." *Campaign Legal Ctr. v. 45Committee*, 118 F.4th 378, 383 (D.C. Cir. Oct. 8, 2024) (citing 52 U.S.C. § 30109(a)(8)(C)); *see also* Am. Compl. ¶¶ 153-154. Giffords filed this suit the next day, ECF No. 1, and the FEC did not appeal.

---

[1]    Subsequent citations to documents in *Giffords v. FEC* omit the case number and venue, *i.e.*: Compl., *Giffords v. FEC*, ECF No. 1.

"Unlike the predicate contrary-to-law action, a citizen suit is brought against the subject of the complaint, not the Commission, and it resolves the merits of the complaint's allegations, not the lawfulness of the Commission's failure to act on . . . the complaint." *45Committee*, 118 F.4th at 383. Despite the differences in the suits, the parties, and the effect of the final judgment in the contrary-to-law suit, Defendants' Rule 12(b)(6) motions nevertheless ask "this court [to] determine[] that authorization to file the citizen suit was erroneously granted." Mem. in Supp. of Def. Josh Hawley for Senate's Mot. to Dism. at 18,[2] ECF No. 83 ("Hawley Mot."); *see also id.* at 10-18; Mem. of Points and Auth. in Supp. of the NRA's Mot. To Dism. at 17-24, ECF No. 85 ("NRA Mot."); Mem. in Supp. of Def. Matt Rosendale for Montana's Mot. to Dism. at 8-13, ECF No. 84 ("Rosendale Mot."). Defendants' request is improper, *see infra* Argument Part IV, but given that request, Giffords details the background relevant to that case below.

A.    ***Giffords v. FEC*'s Legal Background**

1.    **The FEC and Its Enforcement Process**

The FEC is "an independent agency of the United States government with exclusive jurisdiction over the administration, interpretation, and civil enforcement of [FECA]." *Combat Veterans for Cong. Pol. Action Comm. v. FEC*, 983 F. Supp. 2d 1, 5 (D.D.C. 2013) (citing 52 U.S.C. §§ 30106(b)(1), 30107(a), 30109). Congress "designed the Commission to ensure that every important action it takes is bipartisan." *Combat Veterans for Cong. Pol. Action Comm. v. FEC*, 795 F.3d 151, 153 (D.C. Cir. 2015). The FEC thus consists of six commissioners, no more than three of whom "may be affiliated with the same political party," 52 U.S.C. § 30106(a)(1), and

---

[2]    Citations to electronic documents in this brief include the internal pagination of the document, rather than the ECF page number

any "decision[] of the Commission" to "exercise . . . its duties and powers" must, at minimum, "be made by a majority vote of" Commissioners, *id.* § 30106(c).

Any person may file an administrative complaint with the Commission alleging a violation of FECA. 52 U.S.C. § 30109(a)(1). If the FEC "determines, by an affirmative vote of 4 of its members, that it has reason to believe that a person has committed, or is about to commit, a violation . . . [t]he Commission shall make an investigation of such alleged violation." *Id.* § 30109(a)(2). After an investigation, if at least four commissioners vote to find there is "probable cause to believe" FECA has been or is about to be violated, the agency must first attempt to resolve the matter through conciliation. *Id.* § 30109(a)(3), (a)(4)(A)(i). If conciliation fails, "the Commission may, upon an affirmative vote of 4 of its members," file a *de novo* civil enforcement suit in federal district court. *Id.* § 30109(a)(6)(A).

Alternatively, "the Commission at any time can dismiss a complaint." *45Committee*, 118 F.4th at 382 (citing 52 U.S.C. § 30109(a)(1), (a)(8)). The FEC can dismiss a complaint in two ways. *Id. First*, "four or more Commissioners can vote to find that there is '*no* reason to believe' a violation has occurred." *Id.* (citing 11 C.F.R. §§ 111.9(b), 111.20(a)). A successful "no reason to believe" vote "occasions dismissal of the complaint, whereas a failed 'reason to believe' vote does not." *Id. Second*, "a majority of sitting Commissioners can vote to 'dismiss' the matter . . . without rendering a four-vote decision on [the] merits." *Id.* (citing 52 U.S.C. § 30106(c); other citations omitted). The agency effects a non-merits dismissal by "vot[ing] to close [the] enforcement file." 11 C.F.R. § 5.4(a)(4). Contrary to the NRA's suggestion that the vote to close the file merely allows "the FEC's General Counsel" to "notify[] the parties that their matter concluded," NRA Mot. at 5, the "vote to close the file" is, itself, "a dismissal" under 52 U.S.C. § 30109(a)(8), *see Citizens for Resp. & Ethics in Wash. v. FEC*, No. 22-cv-3281-CRC, 2023 WL

6141887, at *6 (D.D.C. Sept. 20, 2023) ("The . . . vote to close the file was indeed a dismissal.");

FEC Action Policy, 89 Fed. Reg. at 19730 (explaining that one way "the Commission has resolved

Matters" is by "simply clos[ing] the file").

### 2.    The Effect of Deadlocked FEC Votes

When the Commission is "deadlocked—that is, when no bloc of four Commissioners votes

to find either reason to believe or *no* reason to believe," that deadlock "give[s] rise to a dismissal

only if a majority of Commissioners separately votes to dismiss the complaint." *45Committee*, 118

F.4th at 382. Although the D.C. Circuit has previously used the "convenient shorthand" phrase

"deadlock dismissal" to refer to an FEC dismissal resulting from a deadlocked reason-to-believe

vote, the Court cautioned that this phase "should not be misunderstood to mean a deadlocked vote

constitutes or automatically occasions a dismissal." *Id.[3]*

Despite a previous deadlock on whether to find reason to believe, a bipartisan Commission

majority has "often" subsequently agreed to vote to dismiss the complaint by closing the file.

*45Committee*, 118 F.4th at 382. In many cases, the commissioners who voted to find "reason to

believe" and pursue enforcement later "held their noses" and joined their anti-enforcement

colleagues in voting to dismiss "on the theory that complainants had a shot at convincing a court

that the Commission's dismissal action had been contrary to law, and the law could then be

enforced." Statement of FEC Commissioner Ellen L. Weintraub, *On the Voting Decisions of FEC

Commissioners* at 6 (Oct. 4, 2022), https://perma.cc/9LRY-3Z5E. However, if the Commission

---

[3]    The D.C. Circuit's clarification in 45Committee that reason-to-believe deadlocks do not
dismiss FEC enforcement matters absent a separate majority-supported vote to dismiss supersedes
statements to the contrary expressed in previous district court rulings heavily relied upon by the
NRA. See, e.g., NRA Mot. at 4-5, 23-24 (citing *Campaign Legal Ctr. v. 45Committee, Inc.*, 666
F. Supp. 3d 1, 2-5 (D.D.C. 2023); *Heritage Action for Am. v. FEC*, 682 F. Supp. 3d 62, 74-76
(D.D.C. 2023); *Campaign Legal Ctr. v. Iowa Values*, 691 F. Supp. 3d 94, 105-08 (D.D.C. 2023)).

cannot agree to "dismiss the complaint after a failed reason-to-believe vote, the case remains open," and the agency may conduct additional proceedings, including holding "further reason-to-believe votes" to attempt to reach a bipartisan consensus. *45Committee*, 118 F.4th at 382.

### 3.    Confidentiality of Pending FEC Enforcement Proceedings

Until the FEC closes a case by dismissing the complaint, "there may be no public disclosure of th[e] votes or any other actions taken by the Commission with respect to the complaint . . . unless the target of the complaint consents to disclosure." *45Committee*, 118 F.4th at 382 (citing 11 C.F.R. § 111.21; 52 U.S.C. § 30109(a)(12)(A)). This confidentiality requirement applies to "any . . . person," including "[a]ny member or employee of the Commission," 52 U.S.C. § 30109(a)(12)(B), and imposes criminal penalties for knowing and willful violations, *see id.* § 30109(d)(1)(A). Only once the FEC dismisses the complaint, may "the Commission make[] public, among other things, the votes taken with respect to the complaint." *45Committee*, 118 F.4th at 382.

Because a deadlocked reason-to-believe vote does not dismiss a complaint, FECA's confidentiality requirements continue to apply even after such a vote and until a Commission majority votes to dismiss or the respondent consents to disclosure. *See id.* at 382-83 (specifically casting doubt on the contrary holding in *Heritage Action for Am. v. FEC*, 682 F. Supp. 3d 62, 73-76 (D.D.C. 2023)—which the NRA heavily relies upon here, *see* NRA Mot. at 5-6, 24—but concluding that the "question is not before us in this appeal"); *see also CREW*, 2023 WL 6141887, at *10-11 ("respectfully disagree[ing]" with *Heritage Action*).

### 4.    Judicial Review of FEC Dismissals or Delay

Recognizing that the FEC's bipartisan structure "creates a risk that partisan deadlock will prevent enforcement of campaign finance laws," Congress "accounted for that possibility with a judicial review provision." *Citizens for Resp. & Ethics in Wash. v. FEC*, 55 F.4th 918, 923 (D.C.

Cir. 2022) (Millet, J., dissenting from denial of reh'g en banc). That provision allows any administrative complainant "aggrieved by an order of the Commission dismissing a complaint . . . or by a failure of the Commission to act on such complaint during the 120-day period beginning on the date the complaint is filed" to seek review in this District. 52 U.S.C. § 30109(a)(8)(A). The district court hearing the suit "may declare that the dismissal of the complaint or the failure to act is contrary to law" and "direct the Commission to conform with such declaration within 30 days." *Id.* § 30109(a)(8)(C).

Consistent with the overall structure of the FEC, when a complainant challenges a dismissal or delay, FECA does not allow the agency's nonpartisan Office of General Counsel automatically to appear in court to defend the Commission; instead, FECA requires at least four commissioners to authorize the defense of a suit under section 30109(a)(8)(A). *See id.* §§ 30106(c), 30107(a)(6). This defense-authorization requirement means that where the commissioners are deadlocked on whether to find reason to believe, the agency will not defend a resulting dismissal or delay lawsuit unless at least one commissioner who wants to pursue enforcement nevertheless chooses to authorize a defense of his or her opposing colleagues' refusal to move forward. *See id.* Where dismissal follows an FEC reason-to-believe deadlock, the non-majority of commissioners who voted against reason to believe (thereby blocking the FEC from moving forward) must issue a statement of reasons to "allow meaningful judicial review" of the dismissal, even though that statement is "not law" given its lack of majority support. *Common Cause v. FEC*, 842 F.2d 436, 449 & n.32 (D.C. Cir. 1988).

In a suit challenging an FEC failure to act, 52 U.S.C. § 30109(a)(8)(A), "the unreasonableness of the Commission's delay in completing its task [is] tested under standards generally applicable to review of agency inaction" under the Administrative Procedure Act, 5

U.S.C. § 706(1). *In re Nat'l Cong. Club*, Nos. 84-5701, 84-5719, 1984 WL 148396, at *1 (D.C. Cir. Oct. 24, 1984) (per curiam). For the last 40 years, the D.C. Circuit has therefore repeatedly instructed district courts—including most recently in *45Committee*—to "analyze the lawfulness of the Commission's challenged inaction under a set of factors laid out in *Common Cause v. FEC*, 489 F. Supp. 738, 744 (D.D.C. 1980), and *Telecommunications Research & Action Center v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984) (*TRAC*)." *45Committee*, 118 F.4th at 383. Applying the *Common Cause* and *TRAC* factors, "[w]here the issue before the Court is whether the agency's failure to act is contrary to law, the Court must determine whether the Commission has acted expeditiously." *Common Cause*, 489 F. Supp. at 744 (internal quotation marks omitted); *see also Campaign Legal Ctr. v. Iowa Values*, 573 F. Supp. 3d 243, 252 (D.D.C. 2021) (same). In such cases, Courts examine the FEC's entire "handling of [the] administrative complaint," including any votes taken and investigations conducted, for whether there was "prompt and sustained agency attention to [the] complaint and thorough consideration of the issues it raised." *FEC v. Rose*, 806 F.2d 1081, 1091 (D.C. Cir. 1986).

### 5.  FECA Citizen Suits

If a reviewing court declares that a dismissal or failure to act was contrary to law, it "may direct the Commission to conform with [that] declaration within 30 days." 52 U.S.C. § 30109(a)(8)(C). If the FEC fails to conform, the complainant may file a citizen suit, *i.e.*, "a civil action to remedy the violation involved in the original complaint." *Id.*

With FECA's citizen-suit provision, Congress's provided an escape valve for FEC inaction and deadlock. Congress "anticipated that partisan deadlocks were likely to result" from the FEC's structure and so with FECA's citizen-suit provision, "it legislated a fix." *Citizens for Resp. & Ethics in Wash. v. Am. Action Network*, 410 F. Supp. 3d 1, 6 (D.D.C. 2019), *reconsidered on other*

*grounds*, 590 F. Supp. 3d 164 (D.D.C. 2022). Where the FEC is unwilling or unable to pursue a violation, the citizen-suit provision gives a complainant the chance to "vindicat[e] its own unique and particularized . . . injury" resulting from that violation. *Iowa Values*, 573 F. Supp. 3d at 256.

Even though FECA citizen suits are not new, *see, e.g.*, *DSCC v. NRSC*, No. 1:97-cv-1493-JHG (D.D.C. filed June 30, 1997), the NRA misleadingly characterizes the filing of three such suits in the last six years as a "blitz" and "surge" arising from an alleged "strategy" and "scheme" by Democratic commissioners. NRA Mot. at 4-5. But these suits are not some nefarious scheme; instead, they are simply the logical result of the FEC's structure: "Because of its bipartisan design, the Commission will regularly deadlock as part of its *modus operandi*." *Campaign Legal Ctr. v. FEC*, 312 F. Supp. 3d 153, 164 n.6 (D.D.C. 2018) (internal quotation marks omitted). As noted above, when the Commission deadlocks on whether to find "reason to believe" a FECA violation occurred, the commissioners who supported pursuing enforcement *may*—but are not required to—subsequently join their anti-enforcement colleagues in voting to dismiss the administrative complaint and to authorize the General Counsel to defend that dismissal in federal court. *See supra* pp. 11-13.

The NRA, however, treats deadlocks arising out of these three votes with a blatant double standard: When commissioners vote against finding reason-to-believe, the NRA admits a resulting deadlock is "evidence of the Congressional scheme working." NRA Mot. at 3 (internal quotation marks omitted). But just two pages later, the NRA asserts that when other commissioners vote not to dismiss or defend their colleagues' refusal to pursue enforcement, the resulting deadlocks are suddenly an underhanded "scheme." *Id.* at 5. The Court should reject this slanted framing—the fact that some commissioners unsurprisingly oppose dismissing or defending cases they would prefer to pursue is no more a "scheme" than their colleagues voting not to pursue those matters the

first place. *See, e.g.*, Shane Goldmacher, *Democrats' Improbable New F.E.C. Strategy: More Deadlock Than Ever*, N.Y. Times (June 8, 2021), https://www.nytimes.com/2021/06/08/us/politics/fec-democrats-republicans.html (quoting one commissioner as stating: "If I don't believe the case ought to be dismissed, why would I vote to dismiss?").

Despite the obvious incentives to deadlock, throughout the FEC's history, commissioners believing a complaint should be investigated have often chosen to vote to dismiss the complaint in an act of bipartisan compromise. But contrary to the NRA's suggestions, *see, e.g.*, NRA Mot. at 5-6, those choices did not calcify into a legal requirement that commissioners *must* dismiss enforcement matters that they would prefer to pursue, *see 45Committee*, 118 F.4th at 382 ("[A] reason-to-believe vote resulting in a deadlock will give rise to a dismissal only if a majority of Commissioners separately votes to dismiss the complaint.").[4]

### B. *Giffords v. FEC*'s Procedural Background

#### 1. Giffords's FEC Complaints and Suit Against the FEC

Giffords filed four administrative complaints with the FEC, from August 16 to December 7, 2018. Am. Compl. ¶¶ 7, 142-50. After the FEC failed to act on Giffords's complaints for more than 120 days, Giffords filed suit against the Commission on April 24, 2019. *See id.*, ¶¶ 8, 151-152; *see also* Compl., *Giffords v. FEC*, ECF No. 1. Despite not being required to do so, *see supra*

---

[4]      The NRA's "scheme" narrative also relies on pre-*45Committee* district court rulings that, to some degree, adopted the now corrected deadlock-dismissal theory and interpreted it to *require* commissioners to vote to close the file and disclose the record after a reason-to-believe deadlock had supposedly already dismissed the matter. *See* NRA Mot. at 4-5 (citing *Heritage Action*, 682 F. Supp. 3d at 75-76 ("Because a deadlocked reason-to-believe vote is equivalent to a dismissal (or termination), such a vote requires prompt disclosure."); *Iowa Values*, 691 F. Supp. 3d at 99 (noting partisan-aligned commissioners' criticism of their colleague for "deliberately voting against administratively closing files")); *but see supra* n.3.

p. 13, a Commission majority authorized a defense of the agency.[5] Career attorneys in the FEC's

nonpartisan Office of General Counsel appeared in the case and defended the agency. *See, e.g.*,

*Giffords v. FEC*, ECF Nos. 12-14, 19, 23, 26, 41, 42.

After Giffords conducted discovery, the parties cross-moved for summary judgment in

December 2019. *See Giffords v. FEC*, ECF Nos. 41, 44-45. The FEC's motion for summary

judgment argued the "specific actions the agency has taken in these matters plainly shows that it

has acted reasonably," and that "[t]here is no basis to find unlawful delay here." FEC's Mot. to

Dism. or, in the Alt., for Summ. J., *Giffords v. FEC* (Dec. 6, 2019), ECF No. 41-1 at 2. To support

those contentions, the agency disclosed to the Court—under seal to maintain the confidentiality of

pending proceedings—the alleged actions it had taken on Giffords's complaints, including those

taken since the suit was filed. *See id.* at 10-12, 24-26; *see also* FEC Resp. to Non-Party Mot. for

Relief from J. at 2-3, *Giffords v. FEC* (Feb. 9, 2024), ECF No. 94.

Giffords cross-moved for summary judgment on the grounds that the FEC had failed "to

determine whether there is reason to believe [the respondents] violated FECA and should therefore

be investigated." Pl. Mem. of Pts. and Auth. in Supp. of Cross-Mot. for Summ. J. and Opp. to Def.

Mot. to Dism. or, in the Alt., for Summ. J. at 7, *Giffords v. FEC* (Dec. 20, 2019), ECF No. 48.

While the cross motions were pending, the FEC filed two notices of subsequent developments

informing the Court of new facts regarding the FEC's ongoing handling of Giffords's

administrative complaints. *Giffords v. FEC*, ECF Nos. 84-85. The first stated that, on February 9,

---

[5]    The NRA speculates that the FEC's defense authorization in *Giffords v. FEC* must have
authorized "something less than a full defense of this suit" because of the presence of redactions
under FOIA Exemption 5 on an FEC vote certification. NRA Mot. at 9-10. The NRA appears to
have obtained this record during a FOIA suit it filed against the FEC and which it agreed to dismiss
without challenging the FEC's redactions. *See* Stipulation of Settlement and Dismissal, *NRA, et
al. v. FEC*, No. 22-cv-1017 (D.D.C. Aug. 8, 2023), ECF No. 34. This Court should reject the
NRA's supposition about what the agency's privileged materials do or do not say.

2021, the Commission held a vote on a motion to find "no reason to believe" the violations alleged in two of the four complaints occurred. ECF No. 84 at 2-3. That vote failed in deadlock, 2-3, with one recusal. *Id.* The FEC's second notice informed the Court that on February 23, 2021, the Commission held a vote to find "reason to believe," a vote to find "no reason to believe," and a vote to close the file, all of which also failed to receive the necessary four votes to pass and thus deadlocked. ECF No. 85 at 1-2.

### 2.    Citizen-Suit Precondition 1: *Giffords v. FEC*'s Declaration of the FEC's Delay as Contrary to Law

On September 30, 2021, the contrary-to-law Court issued a memorandum opinion and order granting Giffords's motion for summary judgment. Unredacted Mem. Op., *Giffords v. FEC*, ECF No. 88. The Court's 31-page analysis painstakingly applies the *Common Cause* and *TRAC* factors and concludes that "the FEC has unreasonably delayed its consideration of Plaintiff's administrative complaints." *Id.* at 13. The Court properly considered the entire factual record of the FEC's handling of the administrative complaints when applying the *Common Cause* and *TRAC* factors. *See id.* at 13-22.

The Court's analysis also fully considered the significance of the FEC's February 2021 deadlocked votes. See *id.* at 21, 26-27. The Court explained that these votes helped demonstrate that the FEC's delay was contrary to law because they showed that there was no valid excuse for "the Commissioners' failure to reach a decision during executive sessions in the approximately seven months since the February vote." *Id.* at 21; *see also id.* at 26-27 (noting the lack of "any action" since the February deadlock and that "the FEC cannot ignore its statutory obligations by allowing a matter to languish for months following an inconclusive vote"); 30-31 (holding the FEC's seven month delay unreasonable in part because the February deadlock showed the FEC had already "carefully considered and underst[oo]d the facts, legal issues, and interests at stake").

The Court's opinion concludes by declaring the FEC's delay contrary to law and directing the FEC "to conform to the Court's Order within 30 days . . . by making the reason-to-believe determination set forth in 52 U.S.C. § 30109(a)(2)." *Id.*; *see also* Order at 1, *Giffords v. FEC* (Sep. 30, 2021), ECF No. 71 (same).

### 3.    Citizen-Suit Precondition 2: *Giffords v. FEC* Finds that the FEC Failed to Conform

More than 30 days later, on November 1, 2021, the Court held a status conference during which the FEC confirmed that it had failed to even vote whether to find reason to believe, let alone make the reason-to-believe determination the Court's September 30 Order required. FEC counsel reported that Giffords's administrative complaints "remain open," and that, "last week," the FEC attempted, but failed, to dismiss the matter by taking "an additional vote on whether to close the file. That vote did not pass." Hr. Tr. at 6, *Giffords v. FEC¸* ECF No. 89. FEC counsel's report during the conference was confirmed when, in September 2022, the FEC released its enforcement files for Giffords's complaints. Those files show that the agency held only a failed vote to close the file and no votes to find reason to believe during the 30-day conformance period. *See* FEC Certification MURs 7427, 7497, 7524, 7553 & 7621 (Oct. 27, 2021), https://perma.cc/Z5MF-Z54Y.

FEC counsel also informed the Court at the November 1 conference that the commissioners who had previously voted in February 2021 not to find reason to believe had submitted their statement of reasons to the administrative record. Hr. Tr. at 6, *Giffords v. FEC*, ECF No. 89. Counsel stressed, however, that the statement of reasons was still non-public and "will be released publicly when the files in the matters are closed" upon a successful, majority supported vote to dismiss. *Id.* Only then would FECA's confidentiality provision no longer prohibit disclosure of the administrative file. *See supra* p. 12.

After the November 1, 2021 conference, the Court entered an order stating that "Defendant FEC has failed to conform to this Court's Order entered September 30, 2021," and thus "[p]ursuant to 52 U.S.C. § 30109(a)(8)(C), Plaintiff Giffords may bring a civil action" under FECA's citizen suit provision. Order at 1, *Giffords v. FEC*, ECF No. 75.[6] On November 2, 2021, Giffords filed this suit. Compl., ECF No. 1. The FEC did not appeal the decision in *Giffords v. FEC*.

### 4.    The NRA Intervenes to Unseal the Judicial Record

Eleven days after the contrary-to-law court found that the FEC failed to conform, on November 12, 2021, the NRA moved to intervene in that case for the limited purpose of moving to unseal the judicial record after agreeing to waive FECA's confidentiality protections. Mot. to Int., *Giffords v. FEC*, ECF No. 77. The court entered final judgment six days later, on November 18, 2021. *Giffords v. FEC*, ECF No. 81. On December 13, 2021, the Court granted the NRA's motion and unsealed the record. *See* Minute Order, *Giffords v. FEC* (Dec. 13, 2021). Once the record was unsealed, the NRA obtained access to the documents the FEC filed in the case evidencing its alleged actions on Giffords's complaints, including the FEC's February 23, 2021 reason-to-believe deadlocks. *See id.*; *see also* FEC's Second Not. of Subs. Dev., *Giffords v. FEC*, ECF No. 85.

### 5.    The NRA's FOIA Lawsuit Against the FEC

Four months later, on April 12, 2022, the NRA filed a Freedom of Information Act ("FOIA") suit against the FEC, seeking pre-dismissal access to the FEC's administrative file. *See NRA, et al. v. FEC*, No. 22-cv-1017-EGS (D.D.C. Apr. 12, 2022), ECF No. 1. In August 2022, the

---

[6]    Undeterred by the clear language of the district court's order, the NRA incorrectly asserts that the *Giffords v. FEC* court "thought the notion that Giffords had satisfied the citizen suit preconditions was at least questionable," citing an ambiguous exchange that took place at the conference hours before the court's order issued. NRA Mot. at 13-14.

FEC voluntarily produced more than 1,000 pages of material to the NRA and withheld other materials subject to FOIA exemptions. *See* Joint Report and Proposed Scheduling Order at 2, *NRA v. FEC*, No. 22-cv-1017-EGS (D.D.C. Aug. 15, 2022), ECF No. 19. The NRA agreed to dismiss the action in August 2023 without moving the Court to require the FEC to produce withheld material. *See* Stip. of Settlement and Dism., *NRA, et al. v. FEC*, No. 22-cv-1017 (D.D.C. Aug. 8, 2023), ECF No. 34.

### 6.    The FEC's August 2022 Dismissal and Release of the Enforcement File

More than eight months after final judgment in the contrary-to-law action, a new Democratic commissioner arrived at the FEC[7] and subsequently joined the three Republican commissioners opposed to enforcement in this case in a vote to close the file, thereby dismissing Giffords's administrative complaints. FEC Certification MURs 7427, 7497, 7524, & 7553 (Aug. 31, 2022), https://perma.cc/275U-27HA. That dismissal triggered the FEC's September 30, 2022 disclosure of the matter's administrative file,[8] although much of the information contained therein had already been disclosed to the Court under seal. Among the documents the FEC released was the October 26, 2021 vote certification confirming that the agency in fact had failed to conform to this Court's contrary to law order. *See* FEC Certification MURs 7427, 7497, 7524, 7553 & 7621 (Oct. 27, 2021), https://perma.cc/Z5MF-Z54Y.

---

[7]    *See* Press Release, FEC, Dara Lindenbaum sworn in as Commissioner (Aug. 2, 2022), https://perma.cc/Q7U3-LJ85.

[8]    *See generally* FEC Public Record re: MUR 7427, https://www.fec.gov /data/legal/matter-under-review/7427/; FEC Public Record re: MUR 7497, https://www.fec.gov/data/legal/matter-under-review/7497/; FEC Public Record re: MUR 7524, https://www.fec.gov/data/legal/matter-under-review/7524/; FEC Public Record re: MUR 7553, https://www.fec.gov/data/legal/matter-under-review/7553/.

### 7.    The NRA Moves Under Rule 60(b)(4) Years After Judgment

On January 26, 2024—more than 26 months after *Giffords v. FEC*'s final judgment, 25 months after the NRA's intervention in that case, 24 months after the NRA filed its first motion to dismiss in this citizen suit, 17 months after the FEC produced more than 1,000 pages to the NRA under FOIA, and 16 months after the FEC released the administrative file—NRA filed a Rule 60(b)(4) motion, even though it is not a party. *See* Non-parties NRA Mot. for Relief from Orders and J., *Giffords v. FEC* (Jan. 26, 2024), ECF No. 90. That motion is fully briefed and currently pending. *Giffords v. FEC*, ECF Nos. 90-90-13, 94, 102-104, 107, 110.

### LEGAL STANDARDS

A motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(1) may assert either a facial or factual challenge to the Court's subject-matter jurisdiction. *RELX, Inc. v. Baran*, 397 F. Supp. 3d 41, 47 (D.D.C. 2019). In response to a facial challenge, a court must accept the complaint's allegations as true, view them in a light most favorable to the non-moving party, and deny the motion if those allegations plausibly establish jurisdiction. *Id.* at 48 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In response to a factual challenge, the court "may consider materials outside of the pleadings to determine whether it has subject matter jurisdiction over the claims." *Id.* at 47-48.

Under Rule 12(b)(2), although a plaintiff bears the burden of demonstrating personal jurisdiction, to satisfy that burden, the plaintiff need only "allege specific acts connecting [the] defendant with the forum." *Okolie v. Future Servs. Gen. Trading & Contracting Co., W.L.L.*, 102 F. Supp. 3d 172, 175 (D.D.C. 2015). And in assessing whether it has personal jurisdiction over a defendant, the court may go beyond the pleadings and evaluate any "relevant matter to assist it in determining the jurisdictional facts." *Id.*

22

Finally, under Rule 12(b)(6), a motion to dismiss "tests the legal sufficiency of a plaintiff's complaint; it does not require a court to assess the truth of what is asserted or determine whether a plaintiff has any evidence to back up what is in the complaint." *Tyes-Williams v. Whitaker*, 361 F. Supp. 3d 1, 6 (D.D.C. 2019) (citation omitted). Instead, the court must accept the allegations of the complaint as true, "construe[] all factual inferences in favor of the plaintiff," and deny the motion if the complaint "contain[s] sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Id.* (citations omitted).

## ARGUMENT

The Court should deny Defendants' motions to dismiss. *First*, the NRA cannot carry its burden of proving that Giffords claims are time-barred, as the NRA asserts. *Second*, this Court has personal jurisdiction over the Rosendale Committee, which exists for the purpose of winning elections for federal office and filed false campaign-finance reports in this District. *Third*, Giffords has standing based on informational injury—given Defendants' failure to report their illegal contributions as FECA requires—and competitive injury—given the advantages Defendants obtained by violating FECA's rules for the competitive political environment in which the parties operate. *Fourth*, Defendants' Rule 12(b)(6) motions should be denied because they improperly seek to relitigate *Giffords v. FEC*'s ruling that Giffords satisfied FECA's preconditions for filing this citizen suit. *Finally*, and in any event, *Giffords v. FEC* was correctly decided, and so even if his Court could review that ruling, it should be upheld.

## I.    Giffords's Claims Are Not Barred by Any Statute of Limitations

Giffords's Amended Complaint alleges that the NRA made illegal campaign contributions during the 2014, 2016, and 2018 election cycles. *See* Am. Compl. at 1. The NRA's arguments that Giffords's claims are time-barred to the extent those claims allege violations occurring before

November 2, 2016 lack merit. *See* NRA Mot. at 42.[9] "The statute of limitations is an affirmative defense that defendant must prove." *Firestone v. Firestone*, 76 F.3d 1205, 1210 (D.C. Cir. 1996). The NRA cannot satisfy its "'heavy burden' to show that the complaint is time-barred." *Ashbourne v. Hansberry*, 302 F. Supp. 3d 338, 348 (D.D.C. 2018).

### A.    The NRA Fails to Establish an Applicable Limitations Period

At the outset, the NRA has not established what, if any, statute of limitations applies to Giffords's claims. FECA itself contains no statute of limitations. *CREW v. Am. Action Network*, 410 F. Supp. 3d at 23. The NRA relies instead on "the catch-all five-year limitations period set forth in 28 U.S.C. § 2462" that courts apply "to FECA enforcement actions *brought by the Commission*." *Id.* (emphasis added). But the NRA cites no authority holding that section 2462 applies to a FECA citizen suit and Giffords is aware of no such case. This, alone, is sufficient to reject the NRA's argument.

### B.    This Suit Was Timely Filed Within Section 2462's Limitations Period

Even if section 2462 applies here, it would not bar any of Giffords's claims. Contrary to the NRA's assertions, *see* NRA Mot. at 43, the statute's five-year clock did not start to run in 2014—when the alleged violations started—but on November 1, 2021, when Giffords obtained the right to sue. Giffords timely filed this suit one day later.

Section 2462's limitations period starts "when the claim first accrued." 28 U.S.C. § 2462. As the Supreme Court explained just last year, the term "'accrue' ha[s] a well settled meaning: A 'right accrues when it comes into existence,' *i.e.*, 'when the plaintiff has a complete and present cause of action.'" *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 810

---

[9]    The NRA does not dispute that the Amended Complaint's claims are not time barred to the extent they allege violations occurring on or after November 2, 2016.

(2024) (quoting *United States v. Lindsay*, 346 U.S. 568, 569 (1954); *Gabelli v. SEC*, 568 U.S. 442, 448 (2013)). "[A] cause of action 'does not become complete and present for limitations purposes'—it does not accrue—'until the plaintiff can file suit and obtain relief.'" *Id.* (quoting *Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 201 (1997)) (emphasis omitted). Where a cause of action depends on certain preconditions—as is true of FECA citizen suits—the cause of action "does not 'first accrue' . . . until a party has exhausted all administrative remedies whose exhaustion is a prerequisite to suit." *Spannaus v. U.S. Dep't of Justice*, 824 F.2d 52, 56-57 (D.C. Cir. 1987). Giffords's claims thus accrued on November 1, 2021, the first day those claims could have been brought. *See supra* pp. 14-15, 20. Because Giffords timely filed suit the next day, none of its claims could be barred by section 2462—even if it applies.

Although it does not dispute that Giffords could not have filed this suit before November 1, 2021, the NRA nonetheless asserts that some of Giffords's claims started to accrue seven years *earlier*—in 2014—when the NRA began violating FECA, *see* NRA Mot. at 43. But the D.C. Circuit has stated is "virtually axiomatic" that "a statute of limitations cannot begin to run against a plaintiff *before* the plaintiff can maintain suit in court." *Spannaus*, 824 F.2d at 56 n.3. Relying on *Spannaus*, at least one court in this District has rejected the NRA's precise argument. *CREW*, 410 F. Supp. 3d at 24 (holding that a FECA citizen suit accrues for purposes of section 2462 "not when the alleged violation occurred, but when the claim first could have been brought"). The cases upon which the NRA relies are inapposite because they analyze when *an agency's* enforcement claims accrue under section 2462, not when a private right of action conditional on the exhaustion of administrative remedies accrues, as here. *See* NRA Mot. at 43 (citing *3M Co. (Minn. Mining & Mfg.) v. Browner*, 17 F.3d 1453, 1462 (D.C. Cir. 1994); *FEC v. NRSC*, 877 F. Supp. 15 (D.D.C. 1995)).

Even though its argument runs headlong into well-established law, the NRA nonetheless claims it would be bad policy not to bar Giffords's claims. *See* NRA Mot. at 44. But it is the NRA's proposed rule that would lead to absurd results: "Running the statute of limitations before [a plaintiff] was able to initiate the suit would render [a plaintiff] unable to bring its claims—through no fault of its own—even though it otherwise had a right to do so." *CREW*, 410 F. Supp. 3d at 25. Not only that, but it would empower an FEC (or a bloc of commissioners) guilty of illegal delay to intentionally time-bar any citizen suit resulting from that delay by simply extending the delay long enough to run out the limitations period. The NRA's concern that "Giffords could wait until November 1, *2026* to file suit," NRA Mot. at 44, ignores that Giffords waited just *one day* to file suit. Any prospective citizen-suit plaintiff has incentive to move with urgency, given that it already had to litigate a case against the FEC to final judgment and given the risk that evidence may become stale or unavailable. Finally, following the rule that accrual occurs when suit can be filed would not "contravene" the purposes of limitations periods, as the NRA claims, *see id.*, but instead, respects that the "balancing of various factors" represented by any statute of limitations must include the "interest in ensuring that statutory rights are vindicated," *Banks v. Chesapeake & Potomac Tel. Co.*, 802 F.2d 1416, 1420 n.10 (D.C. Cir. 1986).

## C.    Section 2462 Would Not Bar Giffords's Claims for Equitable Relief

Even assuming that section 2462 applies to Giffords's claims for violations occurring before November 2, 2016 (it does not), the statute would not bar Giffords's claims for equitable relief. *See, e.g.*, Am. Compl. at 45-46. "[I]t is well settled that '[t]raditionally and for good reasons, statutes of limitation are not controlling measures of equitable relief,'" and, indeed, "the explicit language of § 2462" in particular "only refers to 'enforcement of any civil fine, penalty or

forfeiture.'" *FEC v. Nat'l Republican Senatorial Comm.*, 877 F. Supp. 15, 20-21 (D.D.C. 1995) ("*NRSC*") (quoting *Holmberg v. Armbrecht*, 327 U.S. 392, 396 (1946)).

The NRA nevertheless asserts that section 2462 should apply to the equitable relief sought by Giffords, which they claim is, "in substance," a "penalty" because it allegedly "redresses a wrong to the public" and "is sought as punishment." NRA Mot. at 43 (citing *Kokesh v. SEC*, 581 U.S. 455, 461 (2017)). The NRA is wrong on both counts. *First*, a FECA citizen suit plaintiff "is not vindicating a public right in the courts," but instead "its own unique and particularized informational injury." *Iowa Values*, 573 F. Supp. 3d at 256. *See also supra* pp. 6-7, *infra* pp. 32-45. (describing Giffords's informational and competitive injuries). *Second*, Giffords seeks declaratory and injunctive relief, *see* Am. Compl. at 45-47, which are nonpunitive remedies that aim to prevent future violations, *Riordan v. S.E.C.*, 627 F.3d 1230, 1234-35 (D.C. Cir. 2010). They are therefore unlike "SEC disgorgement," a punitive remedy, *Kokesh*, 581 U.S. at 461, that Giffords does not seek. *See also SEC v. Graham*, 823 F.3d 1357, 1361 (11th Cir. 2016) ("[T]he purpose and effect of the SEC's claim for injunctive relief are nonpunitive, and § 2462's time bar is inapplicable.").

The concurrent remedies doctrine also does not bar any of Giffords's claims for equitable relief, as the NRA claims, NRA Mot. at 43. The NRA overlooks that the concurrent remedies doctrine does not apply to "a suit brought under the FECA." *FEC v. Christian Coal.*, 965 F. Supp. 66, 71-72 (D.D.C. 1997) (distinguishing *Cope v. Anderson*, 331 U.S. 461 (1947)). As the *Christian Coalition* court details, FECA grants "the authority to seek injunctive relief wholly separate and apart from its authority to seek a legal remedy." *Id.* at 73. Therefore, "declaratory and injunctive relief" sought under FECA "are not subject to the rule of *Cope*." *Id.*; *see also United States v. Cinergy Corp.*, 397 F. Supp. 2d 1025, 1032 (S.D. Ind. 2005) (explaining that courts have refused

to apply the concurrent-remedies doctrine to civil enforcement lawsuits seeking equitable relief brought by the federal government and other parties "acting as enforcers to protect the public interest, just like [the] federal government"). In any event, even under the NRA's theory, the concurrent remedies doctrine could not apply to any equitable relief Giffords seeks for violations occurring on or after November 2, 2016. Those violations alone justify the forward-looking equitable relief Giffords seeks. *See* Am. Compl. at 45-46.

## II.    This Court Has Personal Jurisdiction Over Matt Rosendale for Montana

Despite fundraising in Washington, D.C. and filing false campaign finance reports with the FEC, the Rosendale Campaign contends this Court lacks personal jurisdiction. *See* Rosendale Mot. at 22-28. That is incorrect. To establish specific personal jurisdiction, Giffords need only show that jurisdiction is proper under the District's long-arm statute and the Due Process Clause. *See Forras v. Rauf*, 812 F.3d 1102, 1105-06 (D.C. Cir. 2016). The District's long-arm statute, D.C. Code § 13-423(a)(1), is coextensive with due process, meaning the only question is whether the Rosendale Campaign had "minimum contacts" with the District such that jurisdiction comports with "fair play and substantial justice." *Am. Action Network v. Cater Am., LLC*, 983 F. Supp. 2d 112, 119 (D.D.C. 2013) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

Minimum contacts exist where a defendant "purposefully avails itself of the privilege of conducting activities within the forum." *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 233 (D.C. Cir. 2022). In making this determination, courts focus on the quality, not the quantity, of the contacts. *FC Inv. Grp. LC v. Lichtenstein*, 441 F. Supp. 2d 3, 9 (D.D.C. 2006) (citing *Neal v. Janssen*, 270 F.3d 329, 332 (6th Cir. 2001)). At the pleading stage, Giffords must only make a prima facie showing of jurisdiction, with all factual inferences drawn in its favor. *Doe v. Roman*

*Cath. Diocese of Greensburg*, 581 F. Supp. 3d 176, 191 (D.D.C. Jan. 24, 2022). Even a single, meaningful contact can suffice. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 n.18 (1985).

Here, two independent sets of contacts provide a sufficient basis for personal jurisdiction: (A) the Rosendale Campaign's filing of false FEC reports in the District, and (B) the Rosendale Campaign's fundraising and banking activity in the District.

### A.    The Rosendale Campaign's FEC Filings Support Jurisdiction

The Rosendale Campaign, like every federal campaign, filed its campaign finance reports with the FEC in Washington, D.C. Am. Compl. ¶¶ 7, 11, 180. These reports are central to this lawsuit because they failed to disclose illegal in-kind contributions from the NRA, violating FECA.

The Rosendale Campaign does not dispute it submitted these filings. Instead, it invokes the so-called "government contacts" exception, a doctrine some courts have used to exclude interactions with federal agencies from jurisdictional analysis. *See Env't Rsch. Int'l, Inc. v. Lockwood Greene Eng'rs, Inc.*, 355 A.2d 808, 813 (D.C. 1976). The D.C. Court of Appeals, however, recently cast doubt on the continued vitality of that doctrine. In *Akhmetshin v. Browder*, 275 A.3d 290 (D.C. 2022), the court criticized the doctrine's lack of a textual basis and questioned its conceptual coherence. *Id.* at 293-96. It noted that concerns about federal defendants being hauled into court unnecessarily could be addressed through other doctrines like *forum non conveniens* or constitutional limits on jurisdiction. *Id.* at 295.

Even if the government-contacts exception remains viable, it should not apply here. The Rosendale Campaign's false FEC reports are not protected "petitions" within the meaning of the First Amendment, and courts have held that filers of *fraudulent* government submissions are not

shielded from jurisdiction. *Akhmetshin*, 275 A.3d at 296 (quoting *Companhia Brasileira Carbureto De Calcio v. Applied Indus. Materials Corp.*, 35 A.3d 1127, 1132 (D.C. 2012)).

Nor is there any risk of transforming the District into a "national judicial forum." *See Env't Rsch.*, 355 A.2d at 813. FECA citizen suits are rare and, even when they do arise, litigation in the District is unavoidable, since the predicate contrary-to-law action must be brought in this Court. *See* 52 U.S.C. § 30109(a)(8). This particular citizen suit, involving the narrow issue of the accuracy of campaign finance reports filed in the District, does not risk opening the door broadly to suits relating to any "attempt to influence government action." *Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 787 (D.C. Cir. 1983). To the extent any such risk might exist, it could be addressed in considering a motion to dismiss on the ground of *forum non conveniens*, *Akhmetshin*, 275 A.3d at 296, which Defendant has not sought.

### B.    Jurisdiction Is Proper Based on the Campaign's Fundraising in the District

The Rosendale Campaign's fundraising and banking activities in the District provide independent bases for personal jurisdiction over this suit.

*First*, the Rosendale Campaign held a fundraising event in July 2018 in D.C, *see* Am. Compl. ¶ 129 & n.34, at which it subjected itself to jurisdiction by engaging in "purposeful" advertising in the District, *Shoppers Food Warehouse v. Moreno*, 746 A.2d 320, 331 (D.C. 2000) (en banc). During this event, Rosendale personally touted the NRA's support and referenced ongoing coordination, seeking to inspire donor confidence. See *id.*; Rosendale. Admin. Compl. ¶¶ 10, 11 (Sep. 17, 2018), https://perma.cc/9BMG-V29K. The Daily Beast later published audio from the event, where Rosendale described how the NRA was preparing to enter the race due to concerns about Supreme Court nominees. *See* Am. Compl. ¶ 129 & n.34; Rosendale Admin. Compl. ¶¶ 10, 11.

Less than two months later, the NRA spent hundreds of thousands of dollars on ads opposing Rosendale's opponent, Senator Jon Tester. Rosendale Admin. Compl. ¶ 12; Am. Compl. ¶ 130. The ads aired during Supreme Court nomination hearings and attacked Senator Tester for his votes on prior nominees. Rosendale Admin. Compl. ¶ 13. The NRA ran the campaign through Starboard, spending nearly $400,000 on the ads. Am. Compl. ¶ 130. Meanwhile, the Rosendale Campaign spent over $400,000 on similar ads, purchased through Starboard alter ego OnMessage. *Id.* These ads were coordinated parts of a broader illegal scheme, and the D.C. fundraiser was directly tied to that effort—both by soliciting funds for it and by promoting the underlying coordination.

*Second*, the Rosendale Campaign maintained a bank account with EagleBank, located in downtown D.C., during the 2018 election.[10] Courts have consistently held that maintaining a forum-based bank account related to the underlying dispute supports jurisdiction. *See SEC v. Carrillo*, 115 F.3d 1540, 1546 (11th Cir. 1997); *Licci ex rel. Licci v. Lebanese Canadian Bank*, 732 F.3d 161, 168 (2d Cir. 2013); *Ventura v. BEBO Foods, Inc.*, 595 F. Supp. 2d 77, 79 (D.D.C. 2009).

The Rosendale Campaign used this account to receive contributions, including from D.C.-based donors such as Club for Growth PAC, which contributed more than $375,000.[11] It also made disbursements in the District, including paying for a D.C. facility rental around the time of the

---

[10]    *See, e.g.*, Matt Rosendale for Montana, Statement of Organization (FEC Form 1) (Apr. 3, 2018), https://perma.cc/583K-L5H6.

[11]    *Montana Senate 2018 Race*, OpenSecrets, https://www.opensecrets.org/races/contributors?cycle=2018&id=MTS1&spec=N.

fundraiser.[12] It even paid payroll tax to the District's treasury,[13] indicating it had employees or contractors located here.

Defendant argues that its D.C. activities are unrelated to Giffords's claims. *See* Rosendale Mot. at 22-28. But *Bigelow v. Garrett*, 299 F. Supp. 3d 34 (D.D.C. 2018), on which the Rosendale Campaign relies, undermines that argument. In *Bigelow*, the court found no jurisdiction because the plaintiff failed to connect the alleged copyright infringement to D.C. fundraising. *See id.* at 39-40, 45. Here, by contrast, the Campaign's fundraising and banking activities are directly tied to the alleged FECA violations.[14,15]

## III.    Giffords Has Standing

The Court should deny Defendants' Rule 12(b)(1) motions to dismiss for lack of standing. To establish standing, a plaintiff must show that it has suffered an "injury in fact caused by the challenged conduct and redressable through relief sought from the court." *Shays v. FEC*, 414 F.3d 76, 83 (D.C. Cir. 2005) (citation omitted). Giffords has suffered at least two distinct types of injury that the Supreme Court and D.C. Circuit have held are sufficient to confer standing. *First*, Defendants' FECA violations deny Giffords information about the amounts the NRA contributed

---

[12]    *Montana Senate 2018 Race*, OpenSecrets, https://www.opensecrets.org/races/contributors?cycle=2018&id=MTS1&spec=N.

[13]    Matt Rosendale for Montana, Schedule B (FEC Form 3) (Oct. 1-16, 2018), https://perma.cc/9ATY-Y4BB.

[14]    Giffords has made a sufficient *prima facie* showing that personal jurisdiction exists over the Rosendale Campaign. But if the Court requires additional evidence, the appropriate step is jurisdictional discovery—not dismissal. *See GTE New Media Servs., Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1351-52 (D.C. Cir. 2000).

[15]    For much the same reason, the Rosendale Campaign's argument about service fails. *See*, Rosendale Mot. at 24. As the campaign acknowledges, the service requirements of D.C. Code § 13-334(a) applies only to claims of general jurisdiction. *Id.* at 22-23 (citing *Okolie*, 102 F. Supp. 3d at 175). Here, Giffords has established specific jurisdiction under D.C. Code § 13-423, to which the requirement that the defendant be served in the district do not apply.

to the Candidate Defendants in the form of coordinated communications. *Second*, Giffords has alleged a competitive injury caused by the NRA making—and the Rosendale and Hawley Campaigns accepting—illegal, excessive, and unreported contributions in violation of FECA, which is redressable through a court order prohibiting Defendants from continuing their violations.

### A.    Giffords Has Informational Standing

### 1.    Defendants Have Not Disclosed the Dates, Amounts, and Purposes of the Coordinated Expenditures, Which FECA Requires

The Supreme Court has long held that the "inability to obtain information . . . that, on [plaintiff's] view of the law, [FECA] requires that [the defendant] make public" is an "injury in fact" sufficient to establish standing. *FEC v. Akins*, 524 U.S. 11, 21 (1998); *see also Campaign Legal Ctr. v. FEC*, 952 F.3d 352, 356 (D.C. Cir. 2020) ("'The law is settled that a denial of access to information qualifies as an injury in fact where a statute (on the claimants' reading) requires that the information be publicly disclosed and there is no reason to doubt their claim that the information would help them.'" (quoting *Env't Def. Fund v. EPA*, 922 F.3d 446, 452 (D.C. Cir. 2019)).

Among FECA's disclosure requirements is that entities making or receiving coordinated contributions must disclose the "date, amount, and purpose" of those in-kind contributions, just as they would for direct contributions. 52 U.S.C. § 30104(b)(6)(B)(iv); *see also* 52 U.S.C. §§ 30104, 30116(a)(7)(B); 11 C.F.R. § 109.21(b). The D.C. Circuit has applied the general rule from *Akins* in the specific context of coordinated spending disclosures, holding that plaintiffs have standing to pursue information regarding those expenditures. *See Campaign Legal Ctr. v. FEC*, 31 F.4th 781, 790 (D.C. Cir. 2022) ("*Correct the Record*") ("FECA clearly gives Appellants a statutory right to information about the amounts, dates, recipients, and purposes of any coordinated

expenditures and contributions made by a political committee and received by a candidate's authorized committee.").

Defendants—entities that have made or received coordinated expenditures—have not made the disclosures FECA requires. By categorizing what Giffords alleges were coordinated contributions as independent expenditures, the NRA failed to report the "date, amount, and purpose" of those in-kind contributions. 52 U.S.C. § 30104(b)(6)(B)(iv); *see* Am. Compl. ¶ 165. Similarly, the Candidate Defendants failed to disclose these contributions in their FECA-required quarterly disclosure reports, which detail the campaign's receipts and disbursements. 52 U.S.C. § 30104(a); Am. Compl. ¶¶ 168-173. For example, the Amended Complaint alleges the NRA-ILA ran advertisements during the 2018 election cycle opposing Rosendale's opponent and in coordination with the Rosendale Campaign, which therefore constituted in-kind contributions which FECA requires to be disclosed by both participants. *See* Am. Compl. ¶¶ 128-31. But neither the NRA nor the Rosendale Campaign reported any such contributions, *id.* ¶ 140, depriving Giffords—and the public—of information about that spending.

There is "no reason to doubt" that this information would be useful to Giffords. *Akins*, 524 U.S. at 21. *First*, it "would help [Giffords] . . . evaluate candidates for public office." *Id.*; *see* Am. Compl. ¶ 48 (Giffords uses this information to decide "which candidates to support and oppose," as well as "the quantity, amount, and placement of independent expenditures"). *Second*, it "would help [Giffords] . . . evaluate the role that [the NRA's] financial assistance might play in a specific election." *Akins*, 524 U.S. at 21; *see* Am. Compl. ¶ 46 (Giffords uses these disclosures to "gain information about how the NRA is spending in federal races"); *see generally* Am. Compl. ¶¶ 46-48. *Third*, Giffords "uses this information to develop messaging, engage with the press, and educate the public and the electorate about the NRA's activities and support for candidates." *Id.*

"Information about NRA support and spending, and candidates' acceptance of support and contributions," including coordinated contributions, "is particularly important to Giffords's messaging about candidates." *Id.* ¶ 47. In short, the information that Giffords seeks—and which Defendants have not disclosed—is exactly the type of information that Giffords uses for the purposes that *Akins* and FECA envisioned. *See* 524 U.S. at 21. The Court could redress Giffords's informational injury by ordering Defendants to file corrective reports with the FEC that accurately report each contribution made in the form of coordinated communications, and by enjoining Defendants from committing any additional violations in the future. *See* Am. Compl. at 46 ¶¶ 5-7.

### 2.    The Dates, Amounts, and Purposes of the Coordinated Expenditures Are Not Mere Legal Conclusions

Defendants do not seriously dispute that Giffords has a concrete interest in obtaining information about these expenditures but, rather, argue the NRA has already made the disclosures Giffords seeks, albeit reporting these items as independent expenditures. Defendants contend that disclosure of the coordinated (rather than independent) nature of those expenditures is simply a legal conclusion, not factual information. *See* NRA Mot. at 34-35; Rosendale Mot. at 19-20; Hawley Mot. at 10.

But Defendants have failed to report more than just the coordinated nature the NRA's already reported expenditures. Rather, by lumping its coordinated contributions to the Candidate Defendants into its other independent expenditures, the NRA has masked the "date, amount, and purpose" of the subset of its expenditures that were coordinated. No party disputes that some of NRA's expenditures in support of Hawley and Rosendale could indeed have been genuinely independent. In fact, the Amended Complaint makes clear that Giffords can discern only the upper bound of the value of the coordinated contributions, not the actual amounts. *See, e.g.*, Am. Compl. ¶ 170 (alleging Hawley accepted "*up to* $973,411" in coordinated contributions (emphasis added));

*id.* ¶ 176 (alleging Rosendale accepted "*up to* $383,196" in coordinated contributions (emphasis added)); *id.* ¶ 165 (alleging that NRA-PVF failed to properly disclose "millions of dollars in in-kind contributions" but not specifying any value). Because their reporting fails to disaggregate Defendants' coordinated contributions from the NRA's other expenditures (including independent expenditures and operating expenses), Defendants avoid disclosing the "date, amount, and purpose" of those former (coordinated) contributions. That is factual information, not a legal conclusion, and its nondisclosure is an informational injury to Giffords.

The D.C. Circuit recently confirmed that this type of incomplete disclosure establishes standing in a case with a nearly identical fact pattern. *See Correct the Record*, 31 F.4th at 781. In *Correct the Record*, the Correct the Record PAC allegedly made unreported coordinated contributions to the 2016 Clinton campaign while only reporting the PAC's disbursements in the aggregate, *id.* at 790, just as the NRA did here. The court observed that although "[the PAC] has disclosed its aggregated expenditures publicly, [] it has not broken down its expenditures to show which were coordinated contributions to the Clinton campaign." *Id.* at 783. It concluded that "[t]here is no doubt that those numerical amounts constitute factual information and that FECA requires them to be disclosed." *Id.* at 791.

In its standing analysis, the *Correct the Record* court rejected the same appeal to *Wertheimer v. FEC*, 268 F.3d 1070 (D.C. Cir. 2001), that Defendants make here. *Compare Correct the Record*, 31 F.4th at 791-92, *with* NRA Mot. at 34-35; Rosendale Mot. at 19-21; Hawley Mot. at 10. In *Wertheimer*, the D.C. Circuit held there was no informational injury when *all* the underlying factual details of a delineated set of coordinated expenditures were publicly available, and plaintiffs sought merely an FEC declaration that those expenditures were, in fact, coordinated. *See* 268 F.3d at 1074-75. As *Correct the Record* notes, while the candidates in *Wertheimer* had

not reported the coordinated contributions, "the precise transactions that the plaintiffs sought in *Wertheimer* had already been reported by political parties *as coordinated expenditures*." 31 F.4th at 791 (citing *Wertheimer*, 268 F.3d at 1075 (Garland, J., concurring)) (emphasis in original). By contrast, in this case—as in *Correct the Record*—neither the candidates (Hawley and Rosendale) nor the spender (NRA) reported the NRA's coordinated expenditures as contributions as required by FECA. So it is impossible for Giffords to determine which of Defendants' numerous financial transactions were made in furtherance of their coordinated advertising scheme. Giffords has suffered, and will suffer, the precise injury recognized in *Correct the Record*.

Despite these clear parallels, the Rosendale Campaign asserts that in *Correct the Record*, "unlike here, there were no individualized disclosures." Rosendale Mot. at 21. That is simply wrong. The Correct the Record PAC had made the same itemized disclosures as the NRA. *See, e.g.*, Correct the Record, Schedule B (FEC Form 3X), at 8-83 (filed Apr. 15, 2017), https://perma.cc/B2ED-58UY; *see also* Appellee Br. at 32, *Correct the Record*, No. 21-5081 (D.C. Cir. Aug. 18, 2021) ("Correct the Record's disbursements are already itemized"). What Correct the Record had not done, as the NRA has not done here, is identify which of those itemized expenditures, or which portions of individual line items, were coordinated contributions and which were independent expenditures. It is therefore impossible for Giffords to tell the "date, amount, and purpose" of the coordinated contributions. What the D.C. Circuit in *Correct the Record* rightly understood was that when a PAC's disbursements are all labeled "independent expenditures," despite some of them in fact being coordinated contributions, those disclosures have still been aggregated in the relevant sense even if they are otherwise itemized because the blanket labeling masks information that FECA requires: the "date, amount, and purpose" of in-kind contributions. 31 F.4th at 792. That is fundamentally unlike the facts in *Wertheimer* where the political parties

had delineated which transactions, and which amounts, were coordinated contributions to the candidates and which were not.

For example, one of the line items at issue here, a single $398,157 disbursement by NRA-PVF to Starboard Strategic, Inc., is listed as an independent expenditure in support of Hawley.[16] There is no indication whether or what portion of this expenditure was in fact coordinated with Hawley or what the purpose of the coordinated portion of that spending was—despite the fact that, as Giffords alleges, at least some of this expenditure was unlawfully coordinated; Giffords's Amended Complaint contains more examples of the same. *See generally* Am. Compl. ¶¶ 126-41. That information remains unavailable to Giffords, which constitutes a textbook informational injury. *See Correct the Record*, 31 F.4th at 792.

### B.    Giffords Has Competitor Standing

Government action that "illegally structure[s] a competitive environment" injures "parties defending concrete interests" in that environment. *Shays v. FEC*, 414 F.3d 76, 87 (D.C. Cir. 2005). A plaintiff's pecuniary interest in successfully competing economically with its competitors is a well-established concrete interest supporting standing. *See, e.g.*, *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 152 (1970); *Shays*, 414 F.3d at 85-87; *Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 870 (D.C. Cir. 2001). But the principle about injury to a competitor's interest in a fair playing field applies more broadly: "[W]hen [a] particular statutory provision . . . reflect[s] a legislative purpose to protect a competitive interest, the injured competitor has standing to require compliance with that provision." *Hardin v. Ky. Utility Co.*, 390 U.S. 1, 6 (1968). And the D.C. Circuit has specifically held that "competitor standing [applies] to politics as well as

---

16      National Rifle Association of America Political Victory Fund, Form 3X, FEC Schedule E, at 1156 (filed Oct. 25, 2018), http://docquery.fec.gov/cgi-bin/fecimg/?201810259131064941.

business." *Shays*, 414 F.3d at 87. Accordingly, courts in this district and the D.C. Circuit have routinely found that competitive injuries are sufficient to confer standing under FECA. *See Shays*, 414 F.3d at 90; *La Botz v. FEC*, 889 F. Supp. 2d 51, 56 (D.D.C. 2012); *Buchanan v. FEC*, 112 F. Supp. 2d 58, 63-66 (D.D.C. 2000); *Nat. L. Party of the U.S. v. FEC*, 111 F. Supp. 2d 33, 45-47 (D.D.C. 2000); *see also, e.g.*, *Nader v. FEC*, 725 F.3d 226, 229 (D.C. Cir. 2013) (acknowledging that a failure to enforce FECA could produce competitive injury when plaintiffs will compete against the entities violating FECA in the future).

In *Shays*, the D.C. Circuit held that "by banning certain campaign practices, Congress has created" a legally cognizable right to a fair competitive environment. 414 F.3d at 89. There, two members of Congress challenged several FEC regulations, contending that those regulations would erode FECA's reforms and allow the plaintiffs' political competitors to engage in conduct that Congress had prohibited. *See* 414 F.3d at 82-84. The court of appeals found that the plaintiffs had alleged a sufficient injury in fact, holding that if the FEC failed to enforce FECA in the way the statute required, the two Congressmembers, who regularly participated in re-election campaigns, would suffer injury to their right to a legally structured competitive political environment in those campaigns, as their competitors would be able to operate outside FECA's limits. *Id.* at 84-87.

Here, as in *Shays*, FECA's contribution limits, corporate contribution ban, and disclosure requirements define and regulate the competitive environment under which Giffords, the NRA, and the Candidate Defendants operate. Giffords, a 501(c)(4) organization with an affiliated PAC, competes with the NRA, Candidate Defendants, and other NRA-supported candidates to raise and spend funds and to elect candidates, Am. Compl. ¶¶ 15-18, 20-27, and will continue to do so in the future, Am. Compl. ¶¶ 31-32. Giffords opposed, and will continue to oppose, the NRA and the election to federal office of NRA-supported candidates, like Rosendale and Hawley, who oppose

Giffords's gun safety platform. *Id.* ¶ 41; *see also id.* ¶¶ 24-25, 33, 38-39. And Giffords has supported and will continue to support the election of rival candidates. *Id.* ¶¶ 39, 41.[17] Under FECA, Giffords and the candidates it supports are subject to the same restrictions on contributions that they allege Defendants have violated. Thus, Giffords competes politically in the same FECA-regulated arena as Defendants.

Defendants claim that competitor standing applies only to candidates. *See* NRA Mot. at 41; Rosendale Mot. at 15-16; Hawley Mot. at 6-7. But *Shays* defined competitive injury more broadly, rooting injury not just in "genuine rivalry from candidates" but also from "parties in a position to exploit FEC-created loopholes." 414 F.3d at 87 (internal citation and quotation marks omitted). *Shays* made clear that in understanding who has been injured by FECA regulations (or violations thereof), courts should look to whom FECA regulates. *Id.* at 85 ("[R]egulated litigants suffer legal injury when agencies set the rules of the game in violation of statutory directives"). In the FECA context, regulated parties include—but are not limited to—candidates, and the D.C. Circuit has repeatedly declined to draw the sharp candidate-noncandidate distinction Defendants insist exists. *See id.* at 86 (citing, as examples of potential competitors who could exploit FEC-created

---

[17]    Rosendale has been a candidate for federal office in every election since the 2017-18 cycle, including in the most recent election cycle prior to dropping out. *See* Matt Rosendale, Statement of Candidacy, FEC Form 2 (filed Feb. 24, 2024), https://perma.cc/77YV-ZAYC. The NRA has spent in each of those four races, and Giffords has spent in two of them (the 2018 and 2024 contests for U.S. Senate in Montana). *See* NRA-PVF, Schedule E (FEC Form 3X), at 557 (Nov. 21, 2024), https://perma.cc/3GLH-GVNT; NRA-PVF, Schedule B (FEC Form 3X), at 360 (Aug. 20, 2022), https://perma.cc/KAX4-FGTT; NRA-PVF, Schedule E (FEC Form 3X), at 1189 (Oct. 20, 2020), https://perma.cc/DG54-MPZ3; NRA-ILA, Schedule 5-E (FEC Form 5), at 3 (Oct. 11, 2018), https://perma.cc/6K7R-RD7L; Giffords PAC, Schedule B (FEC Form 3X), at 159 (Mar. 20, 2023), https://perma.cc/7DDA-JMH6; Giffords PAC, Schedule B (FEC Form 3X), at 787 (June 20, 2018), https://perma.cc/DRM5-QZY6. Given that record—and in light of Rosendale declining to represent that he will not seek federal office in the future, *see* Rosendale Mot. at 19—Giffords competitive injuries with respect to the Rosendale Campaign remain redressable. *Contra* Rosendale Mot. at 18-19.

loopholes, a rival candidate's "supporters," and "rival state parties"); *Chamber of Com. of U.S. v. FEC*, 69 F.3d 600, 603 (D.C. Cir. 1995) (appellant, a nonprofit, could have "political competitor[s]" injured by violations of FEC regulations who may be able to sue); *see also Common Cause v. Bolger*, 512 F. Supp. 26, 31 (D.D.C. 1980) (competitive injury to nonprofit advocacy group from "subsidized political mailings" by incumbent elected officials, whom the court repeatedly described as political "competitors" to the group and its members); *Nat. L. Party of U.S.*, 111 F. Supp. 2d at 45 (finding competitive injury to a political "[p]arty itself"); *Gottlieb v. FEC*, 143 F.3d 618, 622 (D.C. Cir. 1998) (recognizing "that, in some circumstances, the interests of candidates and voters are so intertwined that an injury to the candidate causes correlative harm to voters").

In the business context, competitor standing has never been limited to just direct market participants, but rather encompasses any "'parties defending concrete interests'" in a "'competitive environment.'" *Air Line Pilots Ass'n, Int'l v. Chao*, 889 F.3d 785, 788 (D.C. Cir. 2018) (quoting *Shays*, 414 U.S. at 87). In *Chao*, for example, the D.C. Circuit recognized that a pilots' union had competitor standing to challenge the granting of an air carrier permit to a foreign airline because, while the union's members were not themselves competitors in the air carrier arena, the entry of a new airline could "exposing them to . . . competitive pressures." *Id.* at 789. Similarly, while Giffords is not itself a direct participant in the candidate arena, it nonetheless has "concrete interests" linked inextricably to candidate competition. *Shays*, 414 U.S. at 87.

*Gottlieb v. FEC*, 143 F.3d 618 (D.C. Cir. 1998), is inapposite. *Contra* Rosendale Mot. at 16 & n.5. *Gottlieb* stands for the uncontroversial proposition that only parties that receive matching funds—namely, candidates—can assert an injury premised solely on the allocation of matching funds. *See id.* at 621. Unlike the PAC in *Gottlieb*, which "was never in a position to receive

matching funds itself" and thus did not compete for those funds, 143 F.3d at 621, Giffords competes with the NRA and Candidate Defendants in fundraising, spending, and electoral success—and Giffords is subject to the same coordination limits and disclosure requirements that Defendants have allegedly violated. *See* Am. Compl. ¶¶ 15-18, 20-25.

Nor does *Nader v. FEC*, 725 F.3d 226 (D.C. Cir. 2013) support Defendants' view. The Hawley Campaign argues that, under *Nader*, plaintiffs categorically cannot be injured by being "'forced to compete' in an 'illegally structured campaign environment' because opponents are flouting election laws without suffering any consequences from the FEC." Hawley Mot. at 6-7 (quoting *Nader*, 725 F.3d at 228). But that sweeping proposition is nowhere to be found in *Nader*. The passage Defendant cites discusses the *redressability* of plaintiff's competitive injury, not whether an injury occurred. *See Nader*, 725 F.3d at 228 ("[A] favorable decision here will not redress the injuries he claims.").

The NRA also contends that Giffords has not been injured by Defendants' alleged FECA violations for purposes of competitor standing.[18] NRA Mot. at 30-31. But Giffords' injury is the same as the injury recognized in *Shays*: It must raise money, make expenditures, and support or oppose candidates in "contests tainted by [FECA]-banned practices." *Shays*, 414 F.3d at 85. As a

---

[18]    The NRA also claims that Giffords is too successful to be injured, citing Giffords's fundraising totals, NRA Mot. at 31-32, its public statements claiming it has made headway in influencing public opinion on guns, NRA Mot. at 32-33, and former Senator Jon Tester's victory against Rosendale in 2018, NRA Mot. at 32 n.5. But the touchstone of the competitor standing inquiry is whether the playing field is even, not whether the plaintiff has been driven out of the competitive arena entirely. *See Shays*, 414 F.3d at 87. That Giffords has achieved some success despite an uneven playing field is irrelevant to whether it at a competitive disadvantage. "[A]n inquiry into the size or magnitude of the plaintiff's alleged injury has no place in the standing analysis." *Brady Campaign to Prevent Gun Violence United with the Million Mom March v. Ashcroft*, 339 F. Supp. 2d 68, 76 n.5 (D.D.C. 2004) (internal quotation and citation omitted)); *see also United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 689 n.14 (1973).

result, Giffords suffers a political competitive injury from the "*intensified* competition" resulting from its rivals' illegal spending. *Id.* at 86 (emphasis in original). "Basic economics indicates that a competitor whose costs are lower will be able to provide services at lower cost—and one can reasonably expect this to result in lost business to [plaintiff's] members." *Cement Kiln Recycling Coal.*, 255 F.3d at 870. Spending made in coordination with a campaign is inherently more cost-effective and efficient method of support than arms-length independent expenditures, which, due to the lack of coordination, may even be at odds with, or duplicative of, the campaign's own spending. Because the NRA and Candidate Defendants have illegally coordinated spending, the NRA is able to spend more dollars (by circumventing FECA's contributions limits)—and spend them more cost effectively (by illegally coordinating its spending with candidates)—than Giffords, and in ways that are contrary to Giffords's goal of electing candidates who support gun safety laws, causing Giffords competitive injury.[19]

That injury can be directly "analogiz[ed] . . . to business rivalry." *Shays*, 414 F.3d at 87; *see Nat. L. Party of U.S.*, 111 F. Supp. 2d at 46 ("[T]he D.C. Circuit has observed that political competitor cases are treated consistently with the line of cases deciding economic competitor standing." (citing *Gottlieb*, 143 F.3d at 621)); *La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998) (finding competitive injury when competitor's prices were exempted from price controls); *U.S. Telecomm. Ass'n v. FCC*, 295 F.3d 1326, 1331 (D.C. Cir. 2002) (finding

---

[19]    The NRA misunderstands Giffords's injury as candidates taking certain policy positions, and, as a result, it contests the causal linkage between Defendants' FECA violations and the adoption of those stances, NRA Mot. at 36, as well as the redressability of Giffords's injuries, NRA Mot. at 38. But Giffords's competitive injury is rooted in the existence of disadvantage in fundraising, spending, and supporting its preferred candidates' electoral success—not any one candidate's positions on particular policies or the occurrence of policy outcomes. And that disadvantage is clearly traceable to Defendants' actions, *contra* NRA Mot. at 37, and redressable without reliance on the independent action of third parties like voters, *contra* NRA Mot. at 31, 38.

competitive injury when competitor was permitted to receive subsidies); *Cement Kiln Recycling Coal.*, 255 F.3d at 870 (finding competitive injury when plaintiff's members' products—but not their competitors' products—were subject to costly regulations); *Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010) (finding competitive injury when "a seller facing increased competition may lose sales to rivals, or be forced to . . . expend more resources to achieve the same sales"). Giffords exists, in substantial part, to compete with the NRA in the political arena. Am. Compl. ¶ 17. If the NRA, and its aligned candidates, are able to shirk FECA's requirements in that competition, it puts Giffords at a profound disadvantage.[20]

Finally, the NRA argues that Giffords's injuries are not redressable, again appealing to *Gottlieb*. *See* NRA Mot. at 37. But the portion of the *Gottlieb* on which the NRA relies relates not to competitor standing, which is at issue here, but rather to alternative standing theories asserted by individual voters, which are not. *See* 143 F.3d at 622. What's more, Giffords's Amended Complaint meticulously documents millions of dollars in illegal, excessive, and unreported contributions between the NRA and its preferred candidates, including the Candidate Defendants. *See* Am. Compl. ¶¶ 126-41. Thus, unlike the voters in *Gottlieb*, Giffords has shown that it is "personally disadvantaged" by as much as $35 million in unlawful spending due to the NRA accrual of unlawful benefits. 143 F.3d at 621 (internal citation and quotation marks omitted); Am. Compl. ¶ 88. As such, Giffords has shown that Defendants' illegal contribution scheme has

---

[20]    In addition to the injuries to Giffords itself, Defendants' actions also injure Giffords through its constituent political action committee, Giffords PAC. *Contra* Rosendale Mot. at 16 n.6. As *Citizens United v. FEC* made clear, a corporation's PAC, though a separate association, is simply a vehicle "to make [the corporation's own] views known regarding candidates and issues in a current campaign." 558 U.S. 310, 339 (2010). Any injury to Giffords PAC, then, is an injury to Giffords. *See Nat. L. Party of U.S.*, 111 F. Supp. 2d at 46 ("[T]he D.C. Circuit held that a 'relative diminution in [plaintiffs'] political voices—their influence in federal elections' was legally cognizable for purposes of establishing standing.'" (quoting *Int'l Ass'n of Machinists v. FEC*, 678 F.2d 1092, 1098 (D.C. Cir. 1982) (en banc))).

unfairly increased competition and has caused their injury. And given the nature of coordination, the Candidate Defendants, just as much as the NRA, participate in that scheme and accept the resulting coordinated contributions. Thus, redressability does not "require[] the further action of . . . the NRA Defendants," as the Rosendale Campaign contends, because the Candidate Defendants themselves could be enjoined from coordinating, ending the scheme. Rosendale Mot. at 19.

## IV.    Defendants Cannot Relitigate *Giffords v. FEC*

Defendants' Rule 12(b)(6) motions should be denied. No Defendant disputes that Giffords's Amended Complaint pleads that Defendants violated FECA's prohibition on common-vendor coordination schemes, or that it pleads that Giffords has met the preconditions for a citizen suit under FECA. Instead, Defendants' Rule 12(b)(6) motions are premised on their disagreement with the *Giffords v. FEC* court's rulings in the contrary-to-law action and their desire for "this court [to] determine[] that authorization to file the citizen suit was erroneously granted," Hawley Mot. at 18, even as the NRA's Rule 60(b)(4) motion is pending before that court. For three independent reasons, this Court should reject Defendants' improper request to transform this citizen suit into a quasi-appellate proceeding exercising *de novo* review over an ongoing lawsuit.

### A.    Defendants Do Not Dispute that Giffords Has Sufficiently Pleaded It Satisfied FECA's Preconditions to File this Citizen Suit

Defendants do not dispute that Giffords has sufficiently pleaded that it met FECA's requirements to file this citizen suit. *See* Am. Compl. ¶¶ 142-55. The Court must "accept the[se] well-pleaded factual allegations as true" for purposes of Defendants' Rule 12(b)(6) motions. *Air Excursions LLC v. Yellen*, 66 F.4th 272, 277 (D.C. Cir. 2023) (internal quotation marks omitted). Defendants' attempt to use Rule 12(b)(6) to litigate whether "Giffords has failed to satisfy the FECA citizen suit preconditions," NRA Mot. at 21-25, *accord* Rosendale Mot. at 8-13; Hawley Mot. at 16, should be rejected, because "[u]nlike motions to dismiss under Rule 12(b)(1), factual

challenges are not permitted under Rule 12(b)(6)," *Smith v. United States*, 518 F. Supp. 2d 139, 145 (D.D.C. 2007). Defendants' Rule 12(b)(6) motions fail for this reason alone.

**B.    This Court Lacks Jurisdiction to Review and Void *Giffords v. FEC***

Even if Defendants could assert a factual challenge under Rule 12(b)(6), this Court would lack jurisdiction to grant Defendants request that it review and void the *Giffords v. FEC*'s order and judgment authorizing this suit.

"'A federal district court lacks jurisdiction to review decisions of other federal courts.'" *Klayman v. Rao*, 49 F.4th 550, 552 (D.C. Cir. 2022) (quoting *Smalls v. United States*, 471 F.3d 186, 192 (D.C. Cir. 2006)). Once a "court of first instance" has answered a legal question, "its orders based on its decision are to be respected" unless that "decision is reversed for error by orderly review, either by itself or by a higher court." *Celotex Corp. v. Edwards*, 514 U.S. 300, 313 (1995) (internal quotations omitted). Accordingly, "'collateral attacks on the . . . decisions of federal courts are improper'" since they "'permit, in effect, a horizontal appeal from one district court to another or even a reverse review of a ruling of the court of appeals by a district court.'" *Klayman*, 49 F.4th at 552-53 (quoting *Mullis v. U.S. Bankr. Ct. for the Dist. of Nev.*, 828 F.2d 1385, 1392-93 (9th Cir. 1987)). Because such collateral attacks "seriously undercut[] the orderly process of the law," *Celotex*, 514 U.S. at 313, "the principle barring collateral attacks" is "a longstanding and deeply rooted feature of both the common law and our own jurisprudence," *Heck v. Humphrey*, 512 U.S. 477, 490 n.10 (1994).

Here, Defendants' Rule 12(b)(6) motions "necessarily involve review of the decisions of other federal courts" because "granting . . . the relief [t]he[y] request[] would void a decision" of another district court. *Klayman*, 49 F.4th at 553 (internal quotation marks omitted). Defendants ask "this court [to] determine[] that authorization to file the citizen suit was erroneously granted"

by *Giffords v. FEC*, rendering "this citizen suit void ab initio." Hawley Mot. at 10, 18; *see also* Rosendale Mot. at 9 (claiming "this citizen suit was erroneously authorized"), 11 ("[T]he contrary-to-law court's determination was erroneous."); NRA Mot. at 9 (contending the "Delay Suit Court unwittingly authorized this suit"). The contrary-to-law court's decision, however, can be "reversed for error" only "by orderly review, either by itself or by a higher court." *Celotex*, 514 U.S. at 313. And the NRA *has* asked the contrary-to-law court to reverse itself in a pending Rule 60(b)(4) motion for relief from the same orders and judgment, which asserts many of the same flawed arguments that Defendants assert here. *See* NRA Mot. at 16-17, 24; *Giffords v. FEC* (Jan. 26, 2024), ECF No. 90-1; Supp. Mem., *Giffords v. FEC* (Dec. 9, 2024), ECF No. 102. Defendants cannot also collaterally attack that judgment here in an effort to obtain insurance in the likely event the NRA's Rule 60 motion fails.

FECA's process for citizen suits (and the authority of contrary-to-law courts) would be seriously undercut if every citizen-suit court had jurisdiction to review the contrary-to-law court's authorization. FECA states that "the [contrary-to-law] court may declare" the FEC's failure to act was contrary to law and direct the FEC to conform, but describes the citizen suit as an "action to remedy the violation involved in the original complaint." 52 U.S.C. § 30109(a)(8)(C). These are discrete questions that the statute entrusts to two separate courts in two separate proceedings. FECA also provides that the contrary-to-law court's judgment "may be appealed to the court of appeals, and the judgment of the court of appeals . . . *shall be final*, subject to review by the Supreme Court." 52 U.S.C. § 30109(a)(9) (emphasis added). But there would be no finality if a citizen-suit court could effectively void the result of those proceedings by granting a motion to dismiss based on a finding that the contrary-to-law court's authorization was erroneous. *See Jones v. Supreme Ct. of U.S.*, 405 F. App'x 508 (D.C. Cir. 2010) ("The district court properly held that

it lacked jurisdiction to review decisions of the United States Supreme Court, federal appellate courts, or other district courts.").

Allowing citizen-suit courts to review contrary-to-law judgments would also prejudice plaintiffs while incentivizing gamesmanship, inefficiency, and forum shopping. Contrary-to-law actions must be filed against the FEC in this District, *see* 52 U.S.C. § 30109(a)(8)(C), and courts hearing those actions routinely allow respondents to intervene, *see, e.g.*, *Campaign Legal Ctr. v. FEC*, 334 F.R.D. 1 (D.D.C. 2019).[21] If courts hearing citizen suits (which can be filed in other federal judicial districts) could review the contrary-to-law court's judgment, it would incentivize respondents to skip or delay intervention (as occurred here) to forum shop, create delay, and force the plaintiff to convince *two* district courts (both subject to appellate review) that it satisfied the citizen-suit preconditions. FECA plainly does not sanction such absurd results.

Defendants' assertions that issue preclusion does not apply to their arguments does not cure the jurisdictional problem with this Court effectively reversing the contrary-to-law court's judgment. *See* NRA Mot. at 25–26; Hawley Mot. at 18; Rosendale Mot. at 12–13. Issue preclusion is a distinct and nonjurisdictional doctrine that prevents parties from relitigating "an issue of fact or law necessary" to the first decision's judgment. *Klayman*, 49 F.4th at 553 (internal quotation omitted). Defendants claim that issue preclusion does not prevent them from arguing here that the FEC's deadlocked votes were "acts" under FECA because the issue allegedly was not decided in the contrary-to-law suit. *See* NRA Mot. at 25–26; Hawley Mot. at 18; Rosendale Mot. at 12–13. But the contrary-to-law court accepted that the votes were acts under FECA and properly ruled

---

[21]    FECA ensures that respondents are on notice of any allegations against them long before a complainant can file a contrary-to-law action against the FEC. 52 U.S.C. §§ 30109(a)(1) (providing FEC respondents with notice and opportunity to respond within 20 days of an administrative complaint being filed), 30109(a)(8) (requiring FEC complainants to wait at least 120 days after filing a complaint before challenging the FEC's failure to act).

against the FEC anyway. *See infra* Argument Part V. In any event, even if Defendants were right that this legal issue was not decided, this Court nevertheless "*lacks jurisdiction* to review" and "void a decision" of one its sister district courts. *Klayman*, 49 F.4th at 552-53 (emphasis added; internal quotation marks omitted).

Finally, *45Committee* does not permit Defendants' collateral attack on *Giffords v. FEC*. *45Committee* allowed a citizen-suit district court not to *review* a contrary-to-law court's judgment, but to "consider afresh" whether the citizen-suit preconditions were satisfied "in the specific circumstances of th[a]t case," where the citizen-suit district court "learned about [a] previously undisclosed December 2021 reason-to-believe vote." 118 F.4th at 381, 388; *see also id.* at 381 (highlighting "the previously unknown vote held by the Commission"), 389 (emphasizing that because "new facts materially bearing on the issue became known after the decision," the "citizen-suit court thus could take into account pertinent information that had been unknown to the contrary-to-law court"). In contrast here, the contrary-to-law court was aware of *every vote* the FEC held on Giffords's administrative complaint at the time of its decisions and Defendants do not claim otherwise. *See supra* pp. 16-20. The NRA Defendants instead claim (incorrectly) that the alleged "absence of [a legal] argument" before the contrary-to-law court justifies the appellate review they seek. NRA Mot. at 26. That request is squarely foreclosed by *Klayman*, which held that a litigant cannot obtain collateral review of another district court ruling simply by repackaging its legal arguments. 49 F.4th at 552-53.

C.    **Issue Preclusion Prevents Defendants from Relitigating *Giffords v. FEC***

The doctrine of issue preclusion also defeats Defendants' attempt to challenge the contrary-to-law court's decision. Under that doctrine, "a prior judgment . . . foreclos[es] successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination

essential to the prior judgment." *Herrera v. Wyoming*, 587 U.S. 329, 342-43 (2019) (internal quotations omitted). In *45Committee*, the D.C. Circuit recognized that, normally, "a citizen suit . . . resolves the merits of the complaint's allegations, *not the lawfulness of the Commission's failure to act on . . . the complaint*." 118 F.4th at 383 (emphasis added). However, *45Committee* also recognized that "issue preclusion would not preclude revisiting whether the citizen-suit preconditions were satisfied" where "[a]ll three" of the following "factors are . . . present":

- "(i) [the defendant] was not a party to the proceedings in which the contrary-to-law court decided that the Commission had failed to conform with its contrary-to-law order;

- (ii) that decision was a default judgment; and

- (iii) new facts materially bearing on the issue became known after the decision."

118 F.4th at 389 (cleaned up). All three factors were satisfied in *45Committee* because (1) the citizen-suit defendant was not a party to the contrary-to-law case; (2) the "Commission did not appear in court to defend" the contrary-to-law action and so the court "entered a default judgment"; and (3) after the judgment, the citizen suit court "learned about [a] previously undisclosed December 2021 reason-to-believe vote." *Id.* at 383-84, 388.

None of these factors are present here, let alone all three. *First*, the *Giffords v. FEC* court's decision was not a default judgment. *See supra* p. 16-17. *Second*, no new material facts came to light after that court's decision: unlike in *45Committee*, the FEC appeared in and defended the contrary-to-law action and informed the court (under seal) of each vote the FEC held on Giffords's administrative complaint. *Id.* at 17-19. The *Giffords v. FEC* court took those votes into account in its ruling against the FEC. *Id.* at 18-20. Defendants' assertion that the contrary-to-law court incorrectly analyzed the legal effect of those votes, NRA Mot. at 11-15; Rosendale Mot. at 6, 10; Hawley Mot. at 3-4, is wrong, *see infra* Argument Part V, but in any event, it is irrelevant for

purposes of issue preclusion, whose "analysis does not review the merits of the determinations in the earlier litigation," *Consol. Edison Co. of N.Y. v. Bodman*, 449 F.3d 1254, 1257 (D.C. Cir. 2006), since "even a patently erroneous first judgment is insufficient to bar issue preclusion," *Canonsburg Gen. Hosp. v. Burwell*, 807 F.3d 295, 306 (D.C. Cir. 2015) (cleaned up).

Independently and in combination, the absence of each of these factors means the exception articulated in *45Committee* plainly does not apply, but Defendants assertions that they were not parties to the contrary-to-law case also fall flat. *See, e.g.*, NRA Mot. at 25. The NRA moved to intervene in that case six days before final judgment; the motion was granted a few weeks later. *See supra* p. 20. More than two *years* later, the NRA filed its Rule 60(b)(4) motion—a motion available only to "a party or its legal representative"—in which the NRA is asking the contrary-to-law court to address many of the same arguments they assert here. Moreover, the parties litigated the contrary-to-law suit for two years before judgment, during which time the Defendants could have sought to intervene to raise these issues. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979) (holding that "petitioners are collaterally estopped from relitigating the question of whether the proxy statement was materially false and misleading" in a private action, where "the petitioners received a 'full and fair' opportunity to litigate their claims in the [previous] SEC action" but did not). Having not done so, but having now raised these issues (improperly) before the contrary-to-law court, the NRA's (and its co-defendants') complaints that they "never had the chance to contest the issue," NRA Mot. at 25, ring hollow. They had the same chance afforded all other respondents but chose to only pursue some. In any event, they also fail to establish that the *45Committee* exception to issue preclusion applies here.

Finally, it would neither be "highly prejudicial" nor "unfair[]" to require the NRA to defend against this citizen suit. *See* NRA Mot. at 26. As a general matter, the prejudice of having to defend

oneself in a civil suit is "minimal." *Rogers v. Amalgamated Transit Union Loc. 689*, 98 F. Supp. 3d 1, 8 (D.D.C. 2015). More specifically, the NRA's assertion that citizen suits are unfair because they are not brought by the bipartisan FEC proves too much, since FECA citizen suits, by definition, are not filed by the FEC. In upholding the validity of FECA citizen suits, courts have rejected the NRA's claim that a citizen suit "essentially delegates the enforcement function" of the FEC to a private entity, *see* NRA Mot. at 26, since a citizen suit "plaintiff is not vindicating a public right in the courts," but "[i]nstead, . . . is vindicating its own unique and particularized informational injury." *Iowa Values*, 573 F. Supp. 3d at 256.

## V.    *Giffords v. FEC* Was Correctly Decided

For the reasons stated above, the judgment in *Giffords v. FEC* is dispositive as to whether Giffords has met the preconditions for a citizen suit under FECA, and this Court is without jurisdiction to relitigate those questions. But even if this Court had jurisdiction to revisit *Giffords v. FEC*, the Amended Complaint establishes that Giffords has met the relevant conditions.

As noted above, to trigger FECA's private cause of action, a complainant must exhaust its administrative remedies by satisfying two preconditions: (1) a court must declare that the FEC's delay was contrary to law, and (2) on remand, the FEC must fail to conform with the court's declaration within 30 days. *45Committee*, 118 F.4th at 386-88. As the contrary-to-law court correctly held, Giffords satisfied both preconditions. The D.C. Circuit's subsequent ruling in *45Committee* confirms the contrary-to-law court's decision was correct.

### A.    *Giffords v. FEC* Correctly Held the FEC's Failure to Act Was Contrary to Law Despite Its February 2021 Deadlocked Reason-to-Believe Vote

Under 52 U.S.C. § 30109(a)(8), "[w]here the issue before the Court is whether the agency's failure to act is contrary to law," the Court must determine not whether the FEC has taken any conceivable action, but instead, "whether the Commission has acted expeditiously." *Common*

*Cause*, 489 F. Supp. at 744 (quotation marks omitted); *see also 45Committee*, 118 F.4th at 383 (reaffirming *Common Cause*). The *Common Cause* and *TRAC* factors probe the FEC's entire "handling of [the] administrative complaint" for whether the agency unreasonable delayed or conversely if there was "prompt and sustained agency attention to [the] complaint and thorough consideration of the issues it raised." *Rose*, 806 F.2d at 1091.

Accordingly, the contrary-to-law court correctly observed that the issue in that case was whether the FEC had made an expeditious "decision *whether or not* to investigate." Unredacted Mem. Op. at 13, *Giffords v. FEC*, ECF No. 88 (emphasis added). This determination turned on the *Common Cause* and *TRAC* factors, each of which was addressed in the court's ruling in *Giffords v. FEC*. *See, e.g.*, *id.* In applying these factors, the district court was well aware of the FEC's February 2021 deadlocked reason-to-believe votes and appropriately held that those failed votes helped demonstrate that the agency's subsequent seven-month delay was unreasonable and thus contrary to law. *See* Unredacted Mem. Op. at 9-10, 21, 26, 30, *Giffords v. FEC*, ECF No. 88.

Defendants do not challenge the contrary-to-law court's application of the *Common Cause* and *TRAC* factors or dispute that court's finding that the Commission's failure to act in the *seven months after* the votes were taken was unreasonable. *See id*. at 30. Instead, Defendants argue simply that the FEC did *something* when it deadlocked in February 2021 and thus it cannot be found to have failed to act. See NRA Mot. at 21-25; Rosendale Mot. at 8-13; Hawley Mot. at 16-18. But this is not the standard for determining whether the FEC acted reasonably or expeditiously on Giffords's complaints for purposes of FECA. *See generally* Unredacted Mem. Op. at 12-13, 27-31, *Giffords v. FEC*, ECF No. 88; *see also supra* p. 14. As such, it not a sufficient basis for this Court to set aside the contrary-to-law court's ruling that the FEC's "failure to take any action on the matters" in the seven months after it voted on the matters in February 2021 was contrary to

law or the subsequent conformance order directing the FEC "to conform to [the Court's] Order within 30 days . . . by making the reason-to-believe determination set forth in 52 U.S.C. § 30109(a)(2)." Order at 1, *Giffords v. FEC* (Sep. 30, 2021), ECF No. 71.

**B.**    ***Giffords v. FEC* Correctly Held the FEC Failed to Conform Despite Its October 2021 Deadlocked Vote to Close the File**

On November 1, 2021, the contrary-to-law court correctly held that the FEC failed to conform with the court's September 30 contrary-to-law order. During the status conference on that date, the FEC confirmed that in the preceding 30 days, the agency did not even vote on whether to find reason to believe, let alone make the reason-to-believe determination the court had ordered it to make within 30 days. As with the previous deadlocked reason-to-believe vote, the court was well aware of the FEC's October 2021 deadlocked vote to close the file when it authorized the citizen suit in this case—FEC counsel informed the court of that failed vote during the status conference. Hr. Tr. at 6, *Giffords v. FEC*¸ ECF No. 89; *see also* FEC Certification MURs 7427, 7497, 7524, 7553 & 7621 (Oct. 27, 2021), https://perma.cc/Z5MF-Z54Y. The court appropriately found that the FEC had failed to conform notwithstanding that failed vote, given that the Court's September 30 Order required the FEC to make a reason-to-believe determination.

**C.**    ***45Committee* Confirms that *Giffords v. FEC* Was Correctly Decided**

Defendants each claim that, notwithstanding the reasoned decision and ultimate judgment in *Giffords v. FEC*, the FEC's February 2021 reason-to-believe votes mean Giffords cannot meet FECA's claim-processing rules. In addition, the Hawley Campaign (but not the other Defendants) claims that the FEC's October 2021 deadlocked vote to close the file conformed with the contrary-to-law court's order requiring the FEC to make a reason-to-believe determination.

Defendants rely on *45Committee*, but that case did not purport to overrule any aspect of the analysis courts, including in *Giffords v. FEC*, have long employed to address whether the FEC

delay is contrary to law. Instead, *45Committee* dealt with a separate question relating only to the second of the two citizen-suit preconditions—whether, in that case, a deadlocked reason-to-believe vote was sufficient to conform with the *45Committee* contrary-to-law court's order requiring conformance. 118 F.4th at 381. Far from undermining *Giffords v. FEC*, *45Committee* shows that the contrary-to-law decision and subsequent order authorizing this suit was correct.

             **1.**     ***45Committee* Confirms that Deadlocked FEC Votes Do Not Dismiss or Otherwise Terminate FEC Enforcement Actions**

The NRA, alone among Defendants, attempts to resurrect the deadlock dismissal theory, NRA Mot. at 26-28, but runs directly into *45Committee*, as well as the text and structure of FECA. The NRA admits that *45Committee* made clear that FECA treats a "failure to act and a dismissal as distinct," *id.*, but nonetheless press the claim that *some* deadlocks may nonetheless be treated as dismissals. This argument is wrong for at least three reasons.

*First*, to the extent there was a doubt, *45Committee* clarified that deadlocked reason-to-believe votes are *not* equivalent to dismissals. As the D.C. Circuit explained, the FEC can,

> properly dismiss a complain—or 'terminate the proceedings'—in two relevant ways. First, four or more Commissioners can vote to find that there is 'no reason to believe' a violation has occurred. Such a vote occasions dismissal of the complaint, whereas a failed 'reason to believe' vote does not. Second, a majority of sitting Commissioners can vote to "dismiss" the matter. In doing so, the Commission dismisses a complain without rendering a four-vote decision on its merits.

118 F.4th at 382 (internal citations omitted). The NRA's claim that the D.C. Circuit "did *not* hold that a failed reason-to-believe vote may *never* constitute a dismissal," NRA Mot. at 27, is plainly without merit. The court, in its discussion of the "deadlock dismissal" theory, held that there are two—and only two—ways the Commission may dismiss a case, neither of which follows automatically from a deadlocked reason-to-believe vote. The court went further and explained that its former use of the term "deadlocked dismissal" "should not be misunderstood to mean a

deadlocked vote constitutes or automatically occasions a dismissal." 118 F.4th at 382. In its explanation, the D.C. Circuit specifically cited *Citizens for Responsibility & Ethics in Washington v. FEC*, 993 F.3d 880 (D.C. Cir. 2021) ("*New Models*") as a case in which it had used this "convenient shorthand." *Id.* The NRA nonetheless relies almost entirely on *New Models* in arguing that this theory survives. *See* NRA Mot. at 27-28. *45Committee*, however, is categorical and consistent with other cases distinguishing deadlocked reason-to-believe votes from actual dismissals. *See Citizens for Resp. & Ethics in Wash. v. FEC*, 971 F.3d 340, 346 (D.C. Cir. 2020); *Doe, 1 v. FEC*, 920 F.3d 866, 871 n.9 (D.C. Cir. 2019); *Citizens for Resp. & Ethics in Wash. v. FEC*, 892 F.3d 434, 442 n.13 (D.C. Cir. 2018); *Citizens for Resp. & Ethics in Wash. v. FEC*, 236 F. Supp. 3d 378, 388 (D.D.C. 2017). The D.C. Circuit has also recognized that the date the FEC closed the file (and not the date of any previous reason-to-believe votes) is "the date of the dismissal" that triggers section 30109(a)(8)(B)'s 60-day deadline for a complainant to sue the FEC to challenge the dismissal. *See CREW*, 892 F.3d at 436; *Jordan v. FEC*, 68 F.3d 518, 519 (D.C. Cir. 1995); *Spannaus v. FEC*, 990 F.2d 643, 644 (D.C. Cir. 1993); *see also Citizens for Resp. & Ethics in Wash. v. FEC*, 799 F. Supp. 2d 78, 83 (D.D.C. 2011).

The D.C. Circuit resolved any remaining doubt when it issued its per curiam order in *Campaign Legal Center v. Heritage Action for America v. FEC*, No. 23-7107 (D.C. Cir. Jan. 15, 2025). In that case, the district court had granted Heritage Action's motion to dismiss the plaintiff's citizen suit, holding that the preconditions to FECA citizen suits are jurisdictional, and that the FEC's "deadlock dismissal" constituted final agency action that amounted to conformance, depriving the court of jurisdiction. *Heritage Action for Am. v. FEC*, 682 F. Supp. 3d 62, 68 (D.D.C. 2023). After *45Committee*, the D.C. Circuit summarily affirmed on alternative grounds—that the FEC's votes constituted conformance with the order in the preceding contrary-to-law suit. Order,

*Heritage Action for Am.*, No. 23-7107 (D.C. Cir. Jan. 15, 2025). By affirming on alternative grounds, the court affirmed that the district court's central holding—and the same deadlock dismissal theory the NRA again urges this Court to adopt—was incorrect.

*Second*, the text of FECA requires the same conclusion. The provision describing the four-vote requirement for finding reason to believe does not state or imply that a matter is automatically dismissed when a reason-to-believe vote fails. *See* 52 U.S.C. § 30109(a)(2). FECA specifically references a distinct "vote to dismiss" a complaint in the prior section of the statute. *See id.* § 30109(a)(1).

*Third and finally*, the NRA's attempt to distinguish between cases in which the FEC might take a later vote—and therefore is not at a "true" impasse—and all others is nonsensical. *See* NRA Mot. at 27. At the time of any deadlocked reason-to-believe vote, neither the FEC nor any individual commissioner can know for certain whether an impasse will break. The facts known to the commissioners, or the commissioners themselves, may change. That is precisely what occurred in *45Committee*: In June 2020, the first reason-to-believe vote failed 2-2. 118 F.4th at 383-84; Amended FEC Certification at 1-2, MUR 7486 (Aug. 14, 2020) (June 2020 Certification), https://perma.cc/NW87-4UBK. Eighteen months later, when the FEC took its second vote, the numbers changed and the motion received three votes in favor, two against, and one abstention. *45Committee*, 118 F.4th at 385. This was in part due to a change in personnel. FEC Certification at 1, MUR 7486 (Dec. 7, 2021), https://perma.cc/5ZNK-ESKT. In other cases, the Commission has held one failed reason-to-believe or probable-cause-to-believe vote, only to later vote that there was in fact reason to believe or probable cause to believe on the same claim. *See, e.g.*, MURs 7350, 7351, 7357, and 7382; MUR 6623; MUR 5754; MUR 4012.

The NRA offers no principled basis on which a reviewing court could determine whether a deadlocked vote should be treated as a dismissal even under their theory, stating instead that "we know" the February 2021 votes "were the ultimate, final reason-to-believe votes" because they were "cited in the controlling commissioners' statement of reasons." NRA Mot. at 27-28. But that is not what the statement of reasons says, nor could it. The statement of reasons explains the substantive reasons why the controlling commissioners disagreed with OGC's recommendations and voted against finding reason to believe. *See* Ex. G, Stmt. of Reasons at 2, ECF No. 85-9 ("Our colleagues disagreed with us regarding the application of the law in these Matters, and in accordance with governing law, we provide this Statement to explain our reasoning."); *Correct the Record*, 31 F.4th at 787 (citing *Common Cause v. FEC*, 842 F.2d 436, 449 (D.C. Cir. 1988)). The previous votes are not "*the* reason" the controlling commissioners voted as they did. Ex. G, Stmt. of Reasons at 10 ("After a thorough review of the record . . . we could not support OGC's RTB recommendations."). And the statement of reasons is dated December 23, 2021. *Id.* at 11. If the NRA was correct, however, the deadlock resulted in dismissal eight months earlier, in February. But the NRA cannot explain how the FEC, or anyone else, would know *at the time of the vote* that there would be no future action.

### 2.    *45Committee* Confirms that Deadlocked FEC Reason-to-Believe Votes Do Not Preclude a Court Finding FEC Delay Contrary to Law

*45Committee* confirms that the FEC's February 2021 deadlocked reason-to-believe votes did not preclude *Giffords v. FEC* from concluding that the FEC's subsequent seven-month delay in acting was contrary to law.

i.    *45Committee* **Hinged on that Case's Particular Order Requiring the FEC to Conform by Taking** *Any* **Action**

As *45Committee* makes clear, what qualifies as conforming FEC action in an FEC delay case hinges on the particular action the suit and the court's contrary-to-law order demands: "What constitutes conformance, in other words, necessarily turns on the kind of Commission action the contrary-to-law plaintiff was entitled to compel by bringing her contrary-to-law suit." *45Committee*, 118 F.4th at 390. The D.C. Circuit then found that (1) when a contrary-to-law order is based on the FEC's failure to act in *any way* then (2) the Commission may conform to that order by holding a reason-to-believe vote, even if it results in deadlock. *Id.* As the court explained, holding a deadlocked reason-to-believe vote is conforming action "[i]n the case of a contrary-to-law suit alleging that the Commission has failed to take *any action at all* on a pending complaint." *Id.* (emphasis added); *see also id.* at 392 ("[W]hen a complainant brings a contrary-to-law suit based on a failure by the Commission to act at all on a pending complaint, the Commission's conduct of a reason-to-believe vote would conform with a decision finding that its failure to act was contrary to law."). The allegation that the FEC had failed to act "at all" in *45Committee* reflected the particular circumstance in that case where the FEC had failed to appear and put forth evidence of any action whatsoever. *Id.* at 384. Consistent with the basis for the plaintiff's suit, the district court's contrary-to-law order directed the Commission "'*to act* on the complaint within thirty days.'" *Id.* (emphasis added) (internal quotation omitted).

This case and the contrary-to-law order at issue are different from *45Committee* for at least three reasons. *First*, unlike in *45Committee*, the FEC here did not take a reason-to-believe vote (deadlocked or otherwise) during the conformance period. *Cf.* 118 F.4th at 392. *45Committee* held that "[t]o conform with a decision that declares the Commission's failure to act at all on a complaint contrary to law, the Commission can hold a reason to believe vote." *Id.* That plainly did

not occur here. The deadlocked reason-to-believe vote took place in February 2021, eight months *before* the conformance order in *Giffords v. FEC* and therefore cannot constitute sufficient action because the court had yet to issue a conformance order against which those votes could be compared. *45Committee*, 118 F.4th at 390. Nor did the FEC take any other action during the relevant 30-day period that would even come close to conforming with that order.

    *Second*, whereas *45Committee* dealt with a contrary-to-law court's decision finding that the "Commission's failure to act at all on the complaint was contrary to law" and an order to the Commission "to act on the complaint within thirty days," *id.* at 384 (internal quotation omitted), the order in *Giffords v. FEC* required more—directing the FEC to conform not merely by taking any act, but specifically "by making the reason-to-believe determination set forth in 52 U.S.C. § 30109(a)(2)." Unredacted Mem. Op. at 31, *Giffords v. FEC*, ECF No. 88; see also Order at 1, ECF No. 71 (same). Even if the FEC had taken another deadlocked reason-to-believe vote, it would not have conformed with the order.

    *Third*, the differences between the conformance order in this case and in *45Committee* are not formalistic but based on the arguments of the parties and the relief requested. The FEC appeared in the case and disclosed in its own motion, supporting declarations, and discovery regarding what actions it had allegedly taken on Giffords's administrative complaints. See *supra* p. 16-19. And Giffords sought summary judgment on the ground that the FEC had failed not just to act at all, but "to determine whether there is reason to believe [the respondents] violated FECA and should therefore be investigated." Pl.'s Mem. Supp. Cross-Mot. Sum. J. & Opp'n at 14, *Giffords v. FEC* (Dec. 23, 2019), ECF No. 48; *see also id.* at 7 (alleging that the FEC "has failed to act expeditiously to determine whether there is reason to believe"); *id.* (objecting that "the Commission has not yet completed the initial stage of enforcement by making a determination of

reason to believe"). Indeed, after the FEC disclosed that it had taken a deadlocked reason-to-believe vote on February 23, 2021, Giffords objected in response that a mere deadlocked vote meant that "an investigation of Plaintiff's administrative complaints cannot begin," since that would require a successful reason-to-believe determination. Pl.'s Resp. to Def.'s Not. of Subsequent Dev. at 2, *Giffords v. FEC* (Apr. 2, 2021), ECF No. 86. The court specifically addressed the failed February 2021 votes, Unredacted Mem. Op. at 9-10, *Giffords v. FEC*, ECF No. 88,[22] and how those votes impacted the court's decision, *id.* at 21, 26, 30. The court ultimately held that the FEC's actions "until February 23, 2021 were substantially justified" but that its subsequent failure to act was not. Accordingly, the court ordered that the FEC not merely to act, but make the decision that it had failed make. In short, the contrary to law court held that the FEC's failure to act was contrary to law and directed the FEC to act, and the Commission did not conform with that order. Both citizen suit conditions were therefore met. *45Committee*, 118 F.4th 389; 52 U.S.C. § 30109(a)(8)(C).

ii. ***45Committee* Affirms Longstanding Caselaw Holding that FEC Delay Can Be Contrary to Law Even Where the Agency Has *Successfully* Voted to Find Reason to Believe**

In addition to the language in the opinion, *45Committee* makes clear that its holding is limited to deadlocked reason-to-believe votes taken during the conformance period by reiterating the importance of, and relying on, various cases in which courts have found the FEC had acted contrary to law notwithstanding one or more pre-conformance period reason-to-believe votes. *See* 118 F.4th at 383 ("[C]ourts analyze the lawfulness of the Commission's challenged inaction under a set of factors laid out in [*Common Cause*] and [*TRAC*]."); *id.* at 391 ("[W]e review a failure to

---

[22]    In reaching this conclusion, the court cited *Citizens for Percy*, in which that court found the FEC acted contrary to law despite a *successful* reason-to-believe vote. 1984 WL 6601 at *4.

act by considering the factors laid out in *Common Cause* and *TRAC*."). Under the totality-of-the-circumstances analysis described in these cases, merely taking "some action" on an administrative complaint does not per se mean the FEC has acted expeditiously, *Campaign Legal Ctr.*, 2021 WL 5178968, at *7. Just as in this case, courts have repeatedly found that FEC delays were contrary to law notwithstanding significant FEC action—including *successful* votes to find reason to believe—where the agency otherwise failed to act expeditiously. Both *Common Cause* and *Rose*, on which *45Committee* relied, involved not just deadlocks but successful reason-to-believe determinations, and yet in neither case did the court conclude that the district court erred in finding the FEC had acted contrary to law.

In *Common Cause*, during the FEC's more than three-year consideration of the complaint, the agency found reason to believe and probable cause to believe that "10 state medical PACs" had violated the Act and conducted a full investigation. *See* 489 F. Supp. at 740-41, 745. The court said it was nonetheless "disturbed about the inordinate length of time consumed by this investigation," and concluded that the FEC's delay would be contrary to law unless the FEC either "executed conciliation agreements with those PACs or institute[d] a civil action for relief" within 30 days of the court's decision. *Id.* at 744-45; *see also Citizens for Percy '84 v. FEC*, No. 84-2653, 1984 WL 6601, at *4 (D.D.C. Nov. 19, 1984).

Similarly, in *Rose*, the FEC found reason to believe there had been a FECA violation and initiated an investigation. *Rose*, 806 F.2d at 1082. The FEC then found probable cause and successfully engaged in conciliation efforts. *Id.* at 1083. While this was occurring, the complainant filed a delay suit and, following substantial litigation, the district court applied the *Common Cause* and *TRAC* standard and granted summary judgment in his favor. *Id.* at 1083-85.

62

Although *45Committee* does not rely on this case, in *DSCC v. FEC*, the court similarly found the FEC's two-year failure to act was contrary to law even though the agency took "significant action" during that time and *successfully* voted to find reason to believe six months after the suit was filed. No. CIV.A. 95-0349 (JHG), 1996 WL 34301203, at *4, *9 (D.D.C. Apr. 17, 1996). The court rejected the FEC's argument "that the complaint is moot based upon the fact[] that . . . the Commissioners have since made their [reason-to-believe] determination," because "accepting this argument would provide the FEC with *carte blanche* to avoid judicial review by implementing a start-stop administrative process based on whether a complaint was pending in district court." *Id.* at *9. *45Committee* is consistent with, not in opposition to, this line of cases.

### iii.    *45Committee* Indicates Pre-conformance Period Reason-to-Believe Votes Do Not Preclude a Contrary-to-Law Finding

Under *45Committee*, while a failed reason-to-believe vote may constitute *conformance* under certain circumstances, a failed vote prior to the 30-day conformance period (like the February 2021 votes in this case) must be analyzed as part of the overall contrary-to-law assessment, and is not a per se bar to proceeding with a citizen suit.

During the district court's consideration of the contrary-to-law suit in *45Committee*, the FEC deadlocked on reason-to-believe twice: In June 2020, before the district court declared the FEC's delay contrary to law (just like the February 23, 2021 deadlocks in this case), 118 F.4th at 383, and again in "December 2021—within the thirty-day period after the contrary-to-law order issued" *id.* at 385. The D.C. Circuit held that the plaintiff's delay suit failed on the merits because the FEC's *second* deadlock conformed with the instructions of the "contrary to law" declaration. *See id.* at 392. But the court gave no indication that the *first* deadlock affected the plaintiff's ability to pursue a citizen suit. This distinction conforms to both the logic of *45Committee* and FECA. In determining whether the second deadlock constituted an act, the D.C. Circuit looked to "the type

of contrary-to-law determination with which the Commission must conform." *Id.* at 390. In the absence of that determination, there is nothing to which a reviewing court can compare.

Defendants' argument puts the cart before the horse—they would have the Court rule that a deadlock that *preceded* a contrary-to-law determination by almost eight months should be treated the exact same way. But if intermittent deadlocked reason-to-believe votes always constitute action for purposes of a contrary-to-law suit, then a non-majority of Commissioners could continuously avoid judicial review, even though the FEC has taken no action, foreclosing any complainant's ability to pursue a citizen suit and obtain relief. *But see 45Committee*, 118 F.4th at 383. Even if the Commission takes one reason-to-believe vote expeditiously, it is entirely fitting with FECA that the Commission may nonetheless act contrary to law by subsequently failing to act on a complaint. That is akin to what occurred in the contrary-to-law action in this case, in which the Court found that the FEC's actions up to February 23, 2021 were substantially justified, but the FEC's subsequent inaction was not. Unredacted Mem. Op. at 30-31, *Giffords v. FEC*, ECF No. 88. Chief Judge Srinivasan, the author of *45Committee*, recently expressed his understanding that *45Committee* did not preclude such a finding. *See* Hr. Tr. at 86:3-5, 8-10, *End Citizens United PAC v. FEC*, No. 22-5277 (D.C. Cir. Feb. 25, 2025) ("*45Committee* doesn't talk about whether there can be a subsequent failure to act [after one deadlocked reason-to-believe vote]. . . I don't think it treats with whether there can never ever be another—a subsequent failure to act challenge if the Commission just doesn't do anything."). The Commission agreed such a finding was possible. *Id.* at 86:11-12 ("There potentially could be, Your Honor.").

### 3. *45Committee* Does Not Support the Hawley Committee's Claim that the FEC Conformed by Deadlocking on a Vote to Close the File

Finally, the Hawley Campaign alone claims that the Commission's October 2021 deadlocked vote to close the file on Giffords's complaints conformed with the *Giffords v. FEC*

court's September 30, 2021 conformance order. *See* Hawley Mot. at 17. First, as described above, *supra* Argument Part V.C.2, the contrary-to-law court did not merely require the FEC to do "anything." Rather, that court required the Commission to "mak[e] the reason-to-believe determination set forth in 52 U.S.C. § 30109(a)(2)." Unredacted Mem. Op. at 31, *Giffords v. FEC*, ECF No. 88. And while the Commission can dismiss a by voting "to find that there is '*no* reason to believe' a violation has occurred," *Id.* (citing 11 C.F.R. §§ 111.9(b), 111.20(a)), that is not what occurred here. As such, the Commission's vote did not represent even an attempt to conform with the Court's order.

*45Committee* supports this conclusion. In finding that a deadlocked reason-to-believe vote could constitute conformance in the circumstances presented in that case, the D.C. Circuit relied on the fact that even a failed reason-to-believe vote required "engagement with the merits of [the] administrative complaint," and therefore constituted conformance. *45Committee*, 118 F.4th at 392. A vote to close the file is not a vote on the merits of the complaint. *Id.* (citing 52 U.S.C. § 30106(c); other citations omitted). Even in a case—unlike this one—in which the conformance order is based on the FEC's failure to act at all, a deadlocked vote to close the file would not constitute substantial action, as the Commission would still not have engaged with the merits of the complaint. The Hawley Campaign's alternative argument is misplaced, and the Court should deny the motion on this basis as well.

## CONCLUSION

For these reasons, Giffords respectfully requests that the Court deny Defendants' motions to dismiss.

Dated: April 11, 2025

DAVID PUCINO*
Giffords Law Center to
Prevent Gun Violence
244 Madison Ave., Ste. 147
New York, NY 100168
(917) 680-3473
dpucino@giffords.org

* *Admitted* Pro Hac Vice

Respectfully submitted,

/s/ *Daniel S. Lenz*
Adav Noti (DC Bar No. 490714)
Kevin P. Hancock (DC Bar No. 90000011)
Daniel S. Lenz (WI Bar No. 1082058)*
CAMPAIGN LEGAL CENTER ACTION
1101 14th Street NW, Ste. 400
Washington, DC 20005
(202) 736-2200
anoti@campaignlegalcenter.org
khancock@campaignlegalcenter.org
dlenz@campaignlegalcenter.org

*Counsel for Plaintiff Giffords*